1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   ZUNUM AERO, INC.,                          CASE NO. C21-0896JLR

11                          Plaintiff,          ORDER

12          v.

13   THE BOEING COMPANY, et al.,

14                          Defendants.

15                   **I.    INTRODUCTION**

16          Before the court is Defendants The Boeing Company ("Boeing") and Boeing

17   HorizonX Ventures, LLC's ("HorizonX") (collectively, "Boeing") motion for partial

18   judgment on the pleadings.  (Mot. (Dkt. # 50); Reply (Dkt. # 53).[1])  Plaintiff Zunum

19   Aero, Inc. ("Zunum") opposes the motion.  (Resp. (Dkt. # 52).)  The parties also filed

20   supplemental briefing in response to the court's May 24, 2022 order.  (*See* 5/24/22 Order

21

22          [1] When citing to the parties' pleadings, the court uses the pleadings' internal pagination
     unless otherwise stated.

1    (Dkt. # 54); Defs. Supp. (Dkt. # 56); Pl. Supp. (Dkt. # 55).)  The court has considered the

2    parties' submissions, the balance of the record, and the applicable law.  Being fully

3    advised,[2] the court GRANTS Boeing's motion.

## II.    BACKGROUND

5    This suit centers on hybrid-electric and electric aircraft technology that Boeing,

6    Safran S.A. ("Safran"), and certain of Safran's affiliates[3] allegedly misappropriated from

7    Zunum while falsely assuring Zunum that they would invest in its technology.  (*See* FAC

8    (Dkt. # 1-1) ¶¶ 111-21.)  The court details the relevant factual background, as alleged by

9    Zunum, before reviewing the procedural background.

## A.    Factual Background

11   Zunum, which was founded in 2013, strived "to develop the word's [sic] first

12   hybrid-electric and all-electric . . . regional aircraft for commercial service and to develop

13   this new market as the first-mover." (*Id.* ¶¶ 31-32.)  To protect its first-mover advantage,

14   Zunum operated in "stealth mode" from 2013 to 2017 as it executed the initial phases of

15   its business plan.  (*Id.* ¶ 79.)  Afterwards, Zunum sought outside funding from a strategic

16   partner.  (*Id.* ¶ 91.)  It "approached a few of the major aerospace companies to explore

17   investments" and identified Boeing, a leader in the aircraft industry, as a "prospective

---

[2] Boeing requests oral argument (*see* Mot.), but the court finds that oral argument would not be helpful to its disposition of Boeing's motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] These affiliates include Safran Corporate Ventures, S.A.S. ("SCV"), Safran Electrical & Power, S.A.S. ("SEP"), and Safran Helicopter Engines, SASU ("SHE") (collectively with Safran, the "Safran Defendants").  Zunum dismissed its claims against the Safran Defendants in October 2021.  (*See* Not. (Dkt. # 43).)

1    investor and strategic partner."  (*Id.* ¶¶ 48, 93-94; *see also id.* ¶¶ 91–92 (alleging that it

2    "faced limited options for financing" and approached Boeing to obtain "outside

3    funding").)

4          Boeing "quickly became interested" (*id.* ¶ 95) and, as it explored the potential

5    investment, "undertook extensive due diligence to evaluate Zunum's concepts,

6    technologies, and business plans" (*id.* ¶ 105).  The parties entered into a proprietary

7    information agreement in August 2016 (the "2016 PIA") (Nordlund Decl. (Dkt. # 51) ¶ 2,

8    Ex. A ("2016 PIA")), and Boeing was accordingly "granted access to extensive details of

9    Zunum's business plans; go-to-market strategy; patent pending aircraft and propulsion

10   technologies; and development, production, and certification plans," including propriety

11   information such as "confidential whitepapers, technical reports, business plans, and

12   provisional patent applications."  (FAC ¶¶ 104-06, 116-17.)  Boeing eventually invested

13   $5 million, accompanied by the right to appoint a non-voting "Observer" onto Zunum's

14   Board of Directors.[4]  (*See id.* ¶¶ 125-26.)  Pursuant to this appointment, Boeing continued

15   to have "access to information . . . about 'significant business issues' and 'annual

16   operating plans.'"  (*Id.* ¶ 130.)  Thereafter, the Safran Defendants, a French aerospace

17   conglomerate that supplied electrical systems equipment to Boeing and other aircraft

18   manufacturers, allegedly began to show interest in partnering with Zunum as well.  (*See*

19   *id.* ¶¶ 8, 144, 265, 268.)

20

21          _____

             [4] Boeing made its 2017 investment through a convertible promissory note and note
     purchase agreement (collectively, the "2017 Notes"), which were accompanied by an investor
22   rights letter (the "2017 IRL").  (*See* FAC ¶¶ 125-26; Nordlund Decl. ¶¶ 3-4, Exs. B-C ("2017
     Notes"); *id.* ¶ 5, Ex. D ("2017 IRL").)

The partnerships began unraveling in 2017 when Boeing allegedly showed signs of its intent to take Zunum's technology for itself.  (*Id.* ¶¶ 98, 152-64.)  In November 2017, Zunum learned that Boeing was developing its own hybrid-electric aircraft that mimicked Zunum's aircraft; Boeing was allegedly engaging its partners, including the Safran Defendants, on developing propulsion for its own aircraft.[5]  (*Id.* ¶¶ 170-71, 174-93.)  Zunum's partnership with the Safran Defendants similarly unraveled.  Initially, Safran Defendants' officials expressed interest in Zunum and accessed Zunum's proprietary information when performing their due diligence.  (*Id.* ¶¶ 271, 273-75, 282-83, 292.)  However, the Safran Defendants ultimately pulled out of the investment, allegedly because of Boeing's influence.  (*Id.* ¶¶ 296, 299, 348-49.)  Boeing, "in turn, used the reversal by [the Safran Defendants] as a basis to withdraw its own support for co-leading the . . . financing."  (*Id.* ¶ 297; *see also id.* ¶ 166 (alleging that, after completing due diligence, Boeing was "expressing concerns" that Zunum was "overpromising").)

Instead of further investing in Zunum, the Safran Defendants and Boeing "deepened their close partnership" by "collu[ding] . . . to usurp Zunum's first-mover advantage in hybrid-electric and all-electric propulsion aircraft market."  (*Id.* ¶¶ 305-06.) The Safran Defendants and Boeing further filed patents for hybrid-electric propulsion technology that is "directly inspired by confidential information that Zunum supplied."

---

[5] Boeing did, however, make another $4 million investment in Zunum in 2018 through a convertible promissory note and note purchase agreement (collectively, the "2018 Notes"), which were accompanied by a new investor rights letter (the "2018 IRL").  (*See* FAC ¶¶ 246-47; Nordlund Decl. ¶¶ 6-7, Exs. E-F ("2018 Notes"); *id.* ¶ 8, Ex. G ("2018 IRL").)

1  (*Id.* ¶¶ 380-83.)  For example, Zunum alleges that Boeing's Thin Haul Hybrid Electric

2  Propulsion System patent "borrows heavily from Zunum's ZA10 architecture" and

3  Boeing's Active Voltage Control for Hybrid Electric Aircraft ("Active Voltage") patent

4  "relates closely to issues addressed by the control system in an international patent filed

5  by Zunum," raising issues around "inventorship."  (*Id.* ¶¶ 381-82.)

6        Ultimately, Zunum failed to obtain any other significant investment, "r[a]n out of

7  operating funds," and "close[d] all of its centers" and laid off all employees in April

8  2019.  (*See id.* ¶¶ 296, 323-356).

9  **B.     Procedural History**

10       Zunum filed this lawsuit against Boeing, Safran, and certain affiliates of Safran on

11  November 23, 2020 in King County Superior Court.  (State Records (Dkt. # 2) at 7.[6]

12  Shortly thereafter, Zunum filed its first amended complaint ("FAC"), which includes

13  claims for:  (1) breach of the 2016 PIA (FAC ¶¶ 405-25); (2) breach of the 2017 IRL (*id.*

14  ¶¶ 426-41); (3) breach of the 2018 investor rights letter (the "2018 IRL") (*id.* ¶¶ 442-50);

15  (4) breach of the implied covenant of good faith and fair dealing (*id.* ¶¶ 451-60);

16  (5) breach of fiduciary duty (*id.* ¶¶ 461-77); (6) declaratory judgment (*id.* ¶¶ 478-82);

17  (7) tortious interference with business expectancy (*id.* ¶¶ 483-92); (8) violation of

18  Washington Trade Secrets Act ("WTSA") (*id.* ¶¶ 493-512); (9) violation of Washington

19  Consumer Protection Act ("WCPA")—antitrust conspiracy (*id.* ¶¶ 513-29); (10) violation

20  of WCPA—attempted monopolization (*id.* ¶¶ 530-42); (11) violation of Securities Act of

21

22       _____

     [6] The court uses the CM/ECF page numbers when citing to the state court records.

Washington ("WSSA") (*id.* ¶¶ 543-69); and (12) violation of WCPA—unfair competition

(*id.* ¶¶ 570-76).[7]  Boeing filed a motion to dismiss seven of the counts in the FAC[8] for

failure to state a claim, which the King County Superior Court Judge summarily denied.

(*See* State Records at 313-51; 1165-66.)

In July 2021, Boeing answered the complaint and filed multiple counterclaims.

(*See* Answer (Dkt. # 1-2).)  Boeing and the Safran Defendants then removed the case to

this court.  (NOR (Dkt. # 1).)  Zunum sought to remand the case back to King County

Superior Court, but this court denied its motion.  (*See* Remand Mot. (Dkt. # 26); 8/17/21

Order (Dkt. # 36).)  Zunum dismissed its claims against the Safran Defendants, who had

not yet answered the FAC, in October 2021.  (*See* Not.; *see also* Dkt.)  Two months later,

Boeing amended its counterclaims to add an additional claim for declaratory relief based

on a recently issued patent.  (Mot to Amend (Dkt. # 46); Boeing FAA (Dkt. # 48).)

Zunum answered Boeing's counterclaims in January 2022.  (Zunum Answer (Dkt. # 49).)

Boeing now asks the court to enter partial judgment on the pleadings in its favor on

Zunum's WCPA antitrust conspiracy (FAC ¶¶ 513-29), WCPA attempted

monopolization (*id.* ¶¶ 530-42), WCPA unfair competition (*id.* ¶¶ 570-76), WSSA (*id.*

¶¶ 543-69), and breach of fiduciary duty (*id.* ¶¶ 461-77) claims.  (Mot. at 1.)

---

[7] Zunum asserts some claims against Boeing and HorizonX jointly and some claims against them individually.

[8] Specifically, Boeing moved to dismiss Zunum's implied covenant of good faith and fair dealing claim (Count IV), breach of fiduciary duty claim (Count V), tortious interference claim (Count VII), WCPA antitrust conspiracy claim (Count IX), WCPA attempted monopolization claim (Count X), WSSA claim (Count XI), and WCPA unfair competition claim (Count XII). (*See* State Records at 313-51.)

1

### III.   ANALYSIS

2      The court begins by setting forth the standard of review before turning to Boeing's

3  motion.

4  **A.    Standard of Review**

5      Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—

6  but early enough not to delay trial—a party may move for judgment on the pleadings."

7  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is proper when the moving party

8  clearly establishes on the face of the pleadings that no material issue of fact remains to be

9  resolved and that [they are] entitled to judgment as a matter of law."  *Hal Roach Studios,*

10  *Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990).  Because a

11  motion for judgment on the pleadings is "functionally identical" to a motion to dismiss,

12  the standard for a Rule 12(c) motion is the same as for a Rule 12(b)(6) motion.  *Dworkin*

13  *v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *Cafasso, U.S. ex rel. v. Gen.*

14  *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).

15      When considering a Rule 12(b)(6) or 12(c) motion, the court may consider the

16  pleadings, documents attached to the pleadings, documents incorporated therein, or

17  matters of judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003);

18  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The court must accept the

19  non-moving party's well-pleaded factual allegations as true and draw all reasonable

20  inferences in favor of the non-moving party.  *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th

21  Cir. 2019); *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.

22  1998).  However, the court is not required to accept as true legal conclusions or

1  "formulaic recitation[s] of the elements of a cause of action."  *Chavez v. United States*,

2  683 F.3d 1102, 1008 (9th Cir. 2012) (first citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

3  544, 570 (2007); and then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The

4  complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

5  relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

6  570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

7  the court to draw the reasonable inference that the defendant is liable for the misconduct

8  alleged."  *Id.*

9  **B.    Whether Boeing's Motion is Procedurally Proper**

10         As a threshold point, the parties dispute whether Boeing's motion is procedurally

11  proper.  (*Compare* Mot. at 5; Reply at 1-3, *with* Resp. at 5-7.)  Zunum argues that

12  Boeing's Rule 12(c) partial motion to dismiss is duplicative of the partial motion to

13  dismiss that Boeing filed in state court pursuant to Washington Civil Rule 12(b)(6)

14  because "there is no material difference in the standards applied in reviewing the prior

15  motion to dismiss" and the instant motion to dismiss in light of the fact that, "under both

16  Washington and federal law, dismissal is presumptively with leave to amend."  (*See*

17  Resp. at 5, 7.)  Thus, it contends that Boeing's "renewed dispositive motion" is barred by

18  the law-of-the-case doctrine and Federal Rule of Civil Procedure 12(g)(2).  (*See id.* at

19  5-7.)  In response, Boeing argues that:  (1) the instant motion is not "the same" as its prior

20  motion to dismiss because the federal pleading standard differs from the one applied in

21  state court (Reply at 3 (stating that "Washington courts have "declin[ed]" to adopt the

22  federal "plausibility" standard")); and (2), even if it was duplicative of the prior motion to

1   dismiss, the law-of-the-case doctrine and Rules 12(g)(2) and 12(h)(2) do not prevent the

2   court from reconsidering a pretrial order nor do they prevent a party from bringing a

3   successive motion to dismiss for failure to state a claim under Rule 12(c) (*id.* at 2).

4          A motion for judgment on the pleadings is timely when made after the

5   "pleadings . . . close[]" and "early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The

6   court concludes that Boeing's motion for partial judgment on the pleadings pursuant to

7   Rule 12(c) is procedurally proper because it was timely raised and is not duplicative of

8   the Washington Civil Rule 12(b)(6) motion to dismiss that it filed in state court.  First,

9   Boeing timely filed the instant motion because it was filed after the pleadings closed, in

10  accordance with Rule 12(c).  (*See generally* Dkt.)  Second, the instant motion is not

11  duplicative of the Washington Civil Rule 12(b)(6) motion to dismiss that Boeing filed in

12  state court because the instant motion is subject to a different standard of review.[9]

13         Washington courts have "declin[ed]" to adopt the federal "plausibility" standard in

14  reviewing motions to dismiss for failure to state a claim.  *McCurry v. Chevy Chase Bank,*

15  *FSB*, 233 P.3d 861, 863 (Wash. 2010).  Instead, they consider "hypothetical facts"

16  beyond the pleadings, and dismiss claims only where "it appears beyond a reasonable

17  doubt" that the plaintiff cannot state a claim.  *FutureSelect Portfolio Mgmt., Inc. v.*

18  *Tremont Grp. Holdings, Inc.*, 331 P.3d 29, 34 (Wash. 2014); *Bravo v. Dolsen Cos.*, 888

19  P.2d 147, 150 (Wash. 1995) (stating that Washington Civil Rule 12(b)(6) motions should

20

21         [9] Zunum provides no support for its proposition that the dismissal standard in state and
    federal court is the same simply because both systems presumptively allow leave to amend.  (*See*
    Resp. at 7.)  Adopting such a rule would, as Boeing argues, "run roughshod over federal and
22  Washington law."  (Reply at 3.)

1  be granted only "sparingly and with care").  Thus, although courts apply the same

2  standard when ruling on Rule 12(b)(6) and Rule 12(c) motions, the pleading standard for

3  complaints is higher in federal court than it is in Washington State court.[10]  For that same

4  reason, Boeing's Rule 12(c) motion presents no law-of-the-case doctrine issue because

5  the court is not revisiting the state court's order but is rather ruling on a separate motion

6  subject to an entirely different standard of review.  Nor does Rule 12(g)(2)'s limitation on

7  successive motions apply because Rule 12(h)(2)(B) explicitly permits Rule 12(c)

8  motions, like Boeing's.  *See* Fed. R. Civ. P. 12(g)(2), 12(h)(2)(B).

9       Having determined that Boeing's motion is procedurally proper, the court now

10  turns to consider whether, as Boeing argues, Zunum's WCPA antitrust conspiracy (FAC

11  at 109-11), WCPA attempted monopolization (*id.* at 111-13), WCPA unfair competition

12  (*id.* at 117-18), WSSA (*id.* at 114-17), and breach of fiduciary duty (*id.* at 101-04) claims

13  "should be dismissed on the pleadings because they are facially and incurably defective."

14  (Mot. at 1.)  The court evaluates each claim in turn.

15  **C.   WCPA Antitrust Conspiracy Claim**

16       RCW 19.86.030 prohibits any "contract, combination, . . . or conspiracy in

17  restraint of trade or commerce."  This provision "is essentially identical to section 1 of

18  the Sherman Act," and "courts are to be guided by federal decisions interpreting

19  comparable federal provisions" when construing RCW 19.86.030 claims.  *See Murray*

20

21       [10] As Boeing notes in its motion, Zunum successfully argued in state court that the
"federal plausibility standard" was "inapplicable" to Boeing's Washington Civil Rule 12(b)(6)

22  motion to dismiss in light of Washington's lower standard of review.  (*See* Mot. at 5 (quoting
State Records at 484-85).)

1   *Pub. Co. v. Malmquist*, 832 P.2d 493, 497 (Wash. Ct. App. 1992).  To establish an

2   antitrust conspiracy claim, Zunum must plead sufficient facts to establish:  "(1) the

3   existence of an agreement, and (2) that the agreement was [a]n unreasonable restraint of

4   trade" under either a per se rule of illegality or a rule of reason analysis.[11]  *FTC v.*

5   *Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (emphasis omitted) (quoting *Aerotec*

6   *Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016)); *see also*

7   *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021).

8          For the purposes of the instant motion, the court assumes, without deciding, that

9   Boeing and the Safran Defendants agreed to "exclude[e] Zunum from the national and

10  international markets for hybrid-electric and all-electric aircraft, short-haul flights under

11  1,500 miles, and integrated door-to-door travel" (the "Alleged Markets").  (FAC ¶ 515;

12  *see also id.* ¶ 516 (alleging that Boeing and the Safran Defendants "did this through a

13  systematic and coordinated campaign to deny Zunum access to additional funding and to

14  key inputs, like funding, aerostructures support, and support for a turboshaft agreeing").)

15  Thus, the court focuses on whether such an agreement was an unreasonable restraint of

16  trade.  A plaintiff must sufficiently plead that the restraint of trade is unreasonable under

17  //

18

19  _____

20  [11] In addition to proving injury to competition, a private antitrust plaintiff must also plead "antitrust injury," meaning they must allege that "they are the proper parties to bring the antitrust action because they were harmed by the defendants' contract, combination, or conspiracy, and the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct." *In*

21  *re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (citing *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (noting that this is also referred to as

22  "antitrust standing")).

1    either a per se approach or the rule of reason analysis.[12]  *PLS.Com, LLC v. Nat'l Ass'n of*

2    *Realtors*, 32 F.4th 824, 833 (9th Cir. 2022).

3          A small group of restraints "have such predictable and pernicious anticompetitive

4    effect, and such limited potential for procompetitive benefit, that they are deemed

5    unlawful per se." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th

6    Cir. 2011) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *Ohio v. Am. Express*

7    *Co.*, — U.S. —, 138 S. Ct. 2274, 2283 (2018) (stating that these types of restraints

8    "always or almost always tend to restrict competition and decrease output").

9    Accordingly, such restraints "are conclusively presumed to be unreasonable and therefore

10   illegal without elaborate inquiry as to the precise harm they have caused or the business

11   excuse for their use." *Harris*, 651 F.3d at 1133 (quoting *Nw. Wholesale Stationers, Inc.*

12   *v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)).  Because per se treatment

13   is reserved for conduct that is "manifestly anticompetitive" and without "any redeeming

14   virtue," the Supreme Court has "expressed reluctance to adopt per se rules where the

15   economic impact of certain practices is not immediately obvious." *Harris*, 651 F.3d at

16   1133 (first quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886

17   (2007); and then quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).

18

19          [12] A third test, the "quick look" analysis, falls somewhere between the rule of reason

20   analysis and per se approach.  The "quick look" analysis is an abbreviated form of the rule of
     reason that may be used when "an observer with even a rudimentary understanding of economics
     could conclude that the arrangements in question could have an anticompetitive effect on

21   customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (rule of reason is a
     continuum and must be applied in a case-specific manner).  Because neither party advocates for

22   nor applies the quick look analysis, the court also declines to do so.

1    "Restraints that are not unreasonable per se are judged under the 'rule of reason.'"

2    *Qualcomm*, 969 F.3d at 989 (quoting *Am. Express*, 138 S. Ct. at 2283).  This is the

3    default standard under which most antitrust claims are analyzed.  *See State Oil*, 522 U.S.

4    at 10; *see also Harris*, 651 F.3d at 1133.  This test "requires courts to conduct a

5    fact-specific assessment of 'market power and market structure . . . to assess the

6    [restraint]'s actual effect' on competition."  *State Oil*, 522 U.S. at 10 (quoting *Am.*

7    *Express*, 138 S. Ct. at 2283); *Harris*, 651 F.3d at 1133 ("[A] plaintiff [must] 'demonstrate

8    that a particular contract or combination is in fact unreasonable and anticompetitive.'"

9    (quoting *Dagher*, 547 U.S. at 5)).  Courts "examine 'the facts peculiar to the business, the

10   history of the restraint, and the reasons why it was imposed,' to determine the effect on

11   competition in the relevant product market."  *See In re NFL's Sunday Ticket*, 933 F.3d at

12   1150 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).

13       Boeing argues that Zunum has failed to properly plead a per se violation and that

14   the alleged restraint is, in any event, properly characterized as a vertical restraint—

15   because the Safran Defendants are Boeing's supplier (*see* FAC ¶¶ 8, 521)—which should

16   be analyzed under a full rule of reasons analysis.  (*See* Mot. at 8-13; Reply at 5-8.)

17   Zunum characterizes the restraint at issue as a "boycott," and argues it is thus unlawful

18   per se.  (Resp. at 9-10; FAC ¶ 518.)  Alternatively, Zunum asserts that it has adequately

19   alleged a restraint of trade that is unreasonable under the rule of reason analysis.  (Resp.

20   at 10-15; FAC ¶ 519.)  Below, the court discusses whether the alleged restraint is per se

21   unlawful or whether it is unreasonable under the rule of reason analysis.

22   //

1          1.  <u>Per Se Violation</u>

2          While the FAC is silent as to the specific type of established per se violation, the

3 court accepts Zunum's characterization of its alleged per se violation as a "boycott"

4 between Boeing and the Safran Defendants, which denied Zunum "access to additional

5 funding and to key inputs."  (*See* Resp. at 9-10; FAC ¶¶ 516, 518.)  However, "precedent

6 limits the per se rule in the boycott context to cases involving horizontal agreements

7 among direct competitors."  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998);

8 *see also Am. Express*, 138 S. Ct. at 2283-84 ("Typically only 'horizontal' restraints—

9 restraints 'imposed by agreement between competitors'—qualify as unreasonable per se."

10 (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988))).  Here,

11 the alleged agreement between Boeing and the Safran Defendants to exclude Zunum

12 from the Alleged Markets was not an "agreement between competitors," *Am. Express*,

13 138 S. Ct. at 2283-84, as the Safran Defendants are suppliers to Boeing, not competitors.

14 (*See* FAC ¶¶ 8, 521); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798

15 F.3d 1186, 1191-92 (9th Cir. 2015) (stating that vertical agreements—i.e., agreements

16 made up and down a supply chain, such as between a manufacturer and a supplier or

17 retailer—"are analyzed under the rule of reason").

18          Thus, the agreement alleged by Zunum in the FAC is simply not susceptible to per

19 se treatment under the controlling law.  (*See* FAC ¶ 518); *see also Calculators Haw., Inc.*

20 *v. Brandt, Inc.*, 724 F.2d 1332, 1337 n.2 (9th Cir. 1983) ("The district court properly

21 found per se analysis inappropriate because Brandt and Hallett were not competitors.

22 Any 'group boycott' therefore consisted of a vertical agreement, to which the rule of

1   reason applies."); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F.

2   Supp. 2d 1347, 1357 (N.D. Cal. 2013) (rejecting plaintiff's argument that a conspiracy

3   involving "manufacturers, distributors, and a retailer" was per se unlawful because a

4   manufacturer's agreements with its distributors are vertical agreements, to which per se

5   analysis does not apply).  Accordingly, the court must analyze whether the alleged

6   restraint of trade is unreasonable under the rule of reason.

7         2.  Rule of Reason

8         Under the rule of reason's "three-step, burden-shifting framework, courts must

9   determine if a practice unreasonably restrains trade by "analyz[ing] the degree of harm to

10  competition along with any justifications or procompetitive effects to determine whether

11  the practice is unreasonable on balance." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

12  1410 (9th Cir. 1991).  As "[a] threshold step," the court must "accurately define the

13  relevant market, which refers to 'the area of effective competition.'" *See Qualcomm*, 969

14  F.3d at 992 (quoting *Am. Express*, 138 S. Ct. at 2285 ("[C]ourts usually cannot properly

15  apply the rule of reason without an accurate definition of the relevant market.")).

16         *a.  Establishing a Relevant Market*

17         The relevant market must include "both a geographic market and a product

18  market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  The geographic

19  market extends to the "'area of effective competition' . . . where buyers can turn for

20  alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir.

21  2001); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984)

22  (defining geographic market as the "'economically significant' area of effective

1   competition in which the relevant products are traded").[13]  A product market "must

2   encompass the product at issue as well as all economic substitutes for the product."

3   *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Economic

4   substitutes are those that have a "reasonable interchangeability of use" or sufficient

5   "cross-elasticity of demand" with the relevant product.  *Id.* (quoting *Brown Shoe v.*

6   *United States*, 370 U.S. 294, 325 (1962)).[14]  Finally, the relevant market must include

7   "the group or groups of sellers or producers who have actual or potential ability to

8   deprive each other of significant levels of business."  *Thurman Indus., Inc. v. Pay 'N Pak*

9   *Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

10          Without an "accurate definition of the relevant market" "there is no way to

11   measure [the defendant's] ability to lessen or destroy competition."  *Am. Express*, 138 S.

12   Ct. at 2285 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382

13   U.S. 172, 177 (1965)).  Thus, while plaintiffs need not plead a relevant market with

14   specificity, "a complaint may be dismissed under Rule 12(b)(6) if the complaint's

15

16          [13] "The commercial realities considered when defining the relevant geographic market
     include:  where the parties market their products; the size, cumbersomeness, and perishability of
     the products; regulatory requirements impeding the free flow of competing goods into or out of
17   the area; shipping costs and limitations; the area within which the defendant and its competitors
     view themselves as competing; and other factors bearing upon where customers might
18   realistically look to buy the product."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637
     F.3d 435, 442-43 (4th Cir. 2011); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th
19   Cir. 1979).

20          [14] Cross-elasticity of demand refers to "the extent to which consumers will change their
     consumption of one product in response to a price change in another."  *Eastman Kodak Co. v.*
21   *Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992).  Reasonable interchangeability of use refers
     to whether consumers could use the products for the same purposes and depends on the products'
22   "price, use[,] and qualities."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395
     (1956).

'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045; *Tanaka*, 252 F.3d at 1063 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999)). For example, a relevant market definition may be "facially unsustainable" where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1224-25 (C.D. Cal. 2012) (quoting *Colonial Med. Group, Inc. v. Catholic Healthcare W.*, No. 09-2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010)); *see also Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-cv-03587-BLF, 2019 WL 1560460, at *5 (N.D. Cal. Apr. 10, 2019) (rejecting a geographic market based on county lines where there was no plausible explanation for excluding other neighboring counties).

### b. *Zunum's Proposed Geographic and Product Markets*

Zunum identifies the relevant geographic markets as "national and international" and the relevant product markets as the "hybrid-electric and all-electric aircraft" market; the market for "short-haul flights under 1,500 miles"; and market for "integrated door-to-door travel." (*See, e.g.*, FAC ¶¶ 19, 515; *see also id.* ¶ 1 (describing its plan to be "the first-mover in the market for hybrid-electric and electric aircraft, initially tailored to short-haul flights under 1,500 miles, and with the potential to establish a new paradigm for door-to-door travel).) Boeing argues that Zunum does not sufficiently define the

1   relevant market with respect to the alleged geographic and product markets and,

2   accordingly, its FAC fails to establish an unreasonable restraint of trade.  (Mot. at 8-11.)

3         To begin, the court agrees that Zunum fails to sufficiently define a geographic

4   market because it fails to identify the scope of the "national and international" markets in

5   more than vague and conclusory terms.  *See Orchard Supply*, 939 F. Supp. 2d at 1010

6   (rejecting "various regional markets in California and Oregon" as "vague and

7   conclusory" and requiring "greater specificity").[15]  Likewise, Zunum fails to allege facts

8   explaining why the national and international markets, in the context of the alleged

9   product markets, are two distinct markets, rather than one global market.  *See, e.g.*,

10   *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (concluding

11   that "plaintiffs have provided no basis on which to justify their proposed geographic

12   market definition" where they alleged that a casino/gaming market in New York state

13   excluded, by 25 miles, admittedly comparable "gambling markets in Connecticut,

14   Pennsylvania, and New Jersey"); *see also Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160,

15   1175 (N.D. Cal. 2013) (holding complaint insufficiently alleged relevant geographic

16   market in part because the plaintiffs "provide[d] no factual allegations to support drawing

17   lines at . . . county borders").  Without such allegations, Zunum has not sufficiently pled,

18   with respect to each of the alleged product markets, a relevant geographic market that

19

20

21       [15] For example, does Zunum's proposed national market encompass only the United
States?  Or all of North America?  Similarly, does Zunum's proposed international market
encompass the global market for each of the alleged product markets?  Or does it encompass

22   every foreign country except for the United States?

1    extends to the "'area of effective competition' . . . where buyers can turn for alternative

2    sources of supply." *Tanaka*, 252 F.3d at 1063.

3        In its response, Zunum seems to suggest that it defined the geographic scope of the

4    markets based on where "Boeing does business." (*See* Resp. at 10-11.)  To the extent

5    that Zunum is "suggesting that the location of market participants defines the geographic

6    market, this suggestion is supported neither by the law of economics nor the law of the

7    Ninth Circuit." *Flaa v. Hollywood Foreign Press Ass'n*, No. 220CV06974SBEX, 2021

8    WL 1399297, at *7 (C.D. Cal. Mar. 23, 2021).  "[A] company may compete in many

9    markets or in only part of a market.  Where it competes does not define the market."

10   *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.

11   1991).

12       Turning to Zunum's alleged product markets, Boeing first argues that Zunum's

13   "hybrid-electric and all-electric aircraft" market fails because, among other things, "it

14   does not exist" (Mot. at 9)[16] and is, at best, a "goods market that has yet to be

15   established" because it currently "has no products, purchasers, or prices" (Reply at 6

16   (quoting *Siegler v. Sorrento Therapeutics, Inc.*, No. 318CV01681GPCNLS, 2019 WL

17   581719, at *11-12 (S.D. Cal. Feb. 13, 2019))).  Zunum does not necessarily dispute that

18   the alleged product market does not exist, though it thinks it is premature to resolve that

19

20   _____

     [16] (*See, e.g.*, FAC ¶ 32 (alleging that Zunum was formed to "develop the word's [sic] first
     hybrid-electric and all-electric . . . regional aircraft for commercial service and to develop this
21   new market as the first-mover"); *id.* ¶ 39 (admitting that it never produced such an aircraft and
     only had a "ground prototype"); *id.* ¶ 399 (calling the market for hybrid-electric or all-electric
     aircraft a "nascent market"); *id.* ¶¶ 369-95 (failing to allege that any entities currently selling
22   completed, commercial hybrid-electric or all-electric aircraft).)

issue, but instead argues that, if the market does not exist, it is because "Boeing has colluded to squelch that market for fear that it will undercut its mainstay business model." (Resp. at 11 (asserting that Boeing seeks to "claim the benefit of the supposed absence of a market that it has destroyed to protect its existing business").) Zunum, however, cites no case law to support its assertion that a defendant's alleged anticompetitive behavior excuses the fact that the alleged product market does not currently exist. (*See generally id.*) Accordingly, the court agrees that Zunum's alleged product market for "hybrid-electric and all-electric aircraft" is facially unsustainable because such a market has yet to be established. *See, e.g.*, *Siegler*, 2019 WL 581719, at *11-12 ("If there is no extant product market, then it necessarily follows that there is no viable anti-trust claim."); *Newcal Indus.*, 513 F.3d at 1044 ("Plaintiff must allege . . . that a 'relevant market' exists . . . .").

With respect to Zunum's second product market, the market for "short-haul flights under 1,500 miles," Boeing first argues that such a market is deficient because it is unclear what exactly the alleged market encompasses, as Zunum contradictorily refers to it as both a services market comprised of those who operate flights up to 1,500 miles and a product market comprised of those who make aircraft that can travel that distance. (Mot. at 10-11.) In response, Zunum first purports to confirm that the market is for the service of "flights under 1,500 miles" rather than aircraft, but then discusses the "Boeing 737" and its use for flights in this range. (Resp. at 12.) Thus, it is still unclear whether this alleged market encompasses products or services. In any event, Zunum cannot

//

1  supplement its FAC with unpled allegations clarifying the scope of this alleged market.[17]

2  *See, e.g.*, *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 617 (N.D. Cal. 2020)

3  (dismissing antitrust claim where scope of the product market was not clearly set forth in

4  complaint); *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020)

5  (noting that plaintiff could not amend complaint through opposition to a motion to

6  dismiss).  Accordingly, Zunum fails to plausibly establish a market for short-haul flights

7  under 1,500 miles.

8         Finally, Boeing argues that Zunum's third product market, the market for

9  "integrated door-to-door travel," is deficient because Zunum does not plead any facts

10  showing what exactly such a market encompasses, and thus, it "has no meaningful

11  boundaries."  (Mot. at 11.)  In response, Zunum contends that the market for integrated

12  door-to-door travel includes "all-electric air taxies."  (Resp. at 13.)  However, Zunum's

13  FAC is devoid of any such allegations (*see generally* FAC), and the court agrees with

14  Boeing's contention that "Zunum's attempt to buttress this alleged market with new,

15  unpled allegations is . . . improper" (*see* Reply at 7 (citing *Apple*, 445 F. Supp. 3d at 59)).

16  Moreover, even if the FAC did define the integrated door-to-door travel market in such a

17  way, the court is unconvinced that such a market would be sufficient because Zunum has

18  not established that such a product—i.e., all-electric air taxies—currently exists.  (*See*

19  *generally* FAC; *see also* Resp. at 11 (alleging that companies are investing in and/or

20  developing this service, not that a market for it currently exists).)  Additionally, Zunum

21

22         [17] Because the FAC fails to define the scope of this alleged market, the court does not
address Boeing's other arguments in favor of dismissal of this market.  (*See, e.g.*, Mot. at 10-11.)

1  fails to explain why the integrated door-to-door travel market would "not also include

2  myriad other forms of transportation that are not reasonably interchangeable, including

3  the bus service Zunum mentions" in its response.  (*See* Reply at 7 (citing Resp. at 12).)

4  Accordingly, Zunum fails to plausibly establish an integrated door-to-door travel market.

5      In sum, Zunum's alleged geographic and product markets are facially

6  unsustainable.  *Newcal Indus.*, 513 F.3d at 1045; *Tanaka*, 252 F.3d at 1063.  Therefore,

7  the court DISMISSES Zunum's WCPA antitrust conspiracy claim (Count IX).  As noted

8  *infra*, Zunum will have an opportunity to amend this claim.  In addition to the

9  aforementioned deficiencies, if Zunum chooses to amend this claim, it must take care to

10 define the proposed market(s) "with reference to the rule of reasonable interchangeability

11 and cross-elasticity of demand."  *RealPage*, 852 F. Supp. 2d at 1224.

**D.  WCPA Attempted Monopolization Claim[18]**

13     RCW 19.86.040 makes it "unlawful for any person to monopolize, or attempt to

14 monopolize or combine or conspire with any other person or persons to monopolize any

15 part of trade or commerce."  This provision is "equivalent" to Section 2 of the Sherman

16 Act.  *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1350 (9th Cir. 1986); *Ceiling &*

17 *Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1393 n.2 (W.D.

18 Wash. 1993) (Section 19.86.040 "essentially follows [S]ection 2 of the Sherman Act.").

19 To state a claim for attempted monopolization, Zunum must allege facts that, if true, will

20 prove:  (1) specific intent to control process or destroy competition; (2) predatory or

22     [18] Zunum brings this claim against Boeing individually.  (*See* FAC at 111.)

anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power";[19] and (4) a causal antitrust injury.  *Khalid v. Microsoft Corp.*, 409 F. Supp. 3d 1023, 1032 (W.D. Wash. 2019) (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995)).

"A threshold step in any antitrust case is to accurately define the relevant market . . . ."  *Qualcomm*, 969 F.3d at 992; *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (noting that, in assessing injury to competition, courts must focus on anticompetitive effects "in the market where competition is [allegedly] being restrained").  As such, an attempted monopolization claim, like an antitrust conspiracy claim, requires a plaintiff to sufficiently define the relevant market.  *See Newcal Indus.*, 513 F.3d at 1044 & n.3 (stating that a plaintiff is required to define the relevant market under Sections 1 Sherman Act, which governs restraints of trade, and Section 2 of the Sherman Act, which governs monopolization and attempted monopolization); *see also Murray*, 832 P.2d at 500 ("A successful claimant under RCW 19.86.040 must also show an unreasonable restraint on competition. Because Malmquist failed to establish an actual injury to competition under RCW 19.86.030, his claim under RCW 19.86.040 fails for the same reason.").

Zunum asserts that Boeing is attempting to monopolize the Alleged Markets and "has undertaken anti-competitive conduct with the specific intent to foreclose or exclude

---

[19] While the parties briefly debate whether Washington courts require a plaintiff to specifically plead a dangerous probability of achieving monopoly power (*see, e.g.*, Resp. at 15; Reply at 8-9), the court need not address their arguments to resolve the instant motion.

1  Zunum and other would-be competitors from these markets."  (FAC ¶¶ 532-33.)  As

2  discussed above, Zunum's alleged relevant geographic and product markets are facially

3  unsustainable, and thus, the court is unable to determine whether Boeing's alleged

4  conduct actually injured competition.  Zunum's failure to state an antitrust conspiracy

5  claim under RCW 19.86.030 is dispositive of this claim as well.  *See, e.g.*, *PBTM LLC v.*

6  *Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178-82 (W.D. Wash. 2021) (dismissing the

7  plaintiff's RCW 19.86.040 and 19.856.030 claims, as well as its claims under Sections 1

8  and 2 of the Sherman Act, for failure to adequately plead a relevant product market);

9  *CaptiveAire Sys., Inc. v. ITW Food Equip. Grp., LLC*, No. C09-0244JLR, 2009 WL

10  10676075, at *5 (W.D. Wash. Sept. 28, 2009) (dismissing the plaintiff's RCW 19.86.040

11  claim because a plaintiff "must establish an unreasonable restraint on competition to

12  prevail on a monopolization or attempted monopolization claim under RCW 19.86.040,"

13  and the plaintiff failed to do so "because it does not define the relevant geographic

14  market").

15       Accordingly, the court DISMISSES Zunum's WCPA attempted monopolization

16  claim (Count X) because Zunum's Alleged Markets are facially deficient.  *Newcal Indus.*,

17  513 F.3d at 1045; *Tanaka*, 252 F.3d at 1063.

18  **E.   WCPA Unfair Competition Claim**

19       The WCPA makes unlawful "[u]nfair methods of competition and unfair or

20  deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.

21  To establish an unfair competition claim under the WCPA, a plaintiff must show that

22  (1) an unfair or deceptive act or practice, (2) occurred in the course of trade or commerce,

1    (3) impacted the public interest, (4) injured the plaintiff's business or property, and

2    (5) was caused by the defendant. *See Hangman Ridge Training Stables, Inc. v. Safeco*

3    *Title Ins. Co.*, 719 P.2d 531, 533-34, 539 (Wash. 1986) ("[P]rivate [W]CPA plaintiffs

4    must establish all five elements.").  Here, Boeing challenges the sufficiency of Zunum's

5    allegations with respect to the public interest prong.  (*See* Mot. at 20-21.)

6        A plaintiff can establish the public interest impact element by proving that the

7    defendant's conduct:  "(1) violates a statute that incorporates [RCW 19.86]; (2) violates a

8    statute that contains a specific legislative declaration of public interest impact; or

9    (3)(a) injured other persons; (b) had the capacity to injure other persons; or (c) has the

10   capacity to injure other persons."  RCW 19.86.093.  "The first two subsections of this

11   statute reflect . . . that the public interest element can be satisfied per se."[20]  *Rush v.*

12   *Blackburn*, 361 P.3d 217, 227 (Wash. Ct. App. 2015) (quoting *Klem v. Wash. Mut. Bank*,

13   295 P.3d 1179, 1196 (Wash. 2013) (Madsen, C.J., concurring)).  "Subsection (3), by

14   contrast, 'bases public interest impact on actual injury and capacity to injure.'"  *Id.*

15   (quoting *Klem*, 295 P.3d at 1196 (Madsen, C.J., concurring)).  "For violations falling

16   under subsection (3), 'whether the public has an interest in any given action is to be

17

18   _____

     [20] Zunum does not argue that Boeing has violated a statute that contains a specific
19   legislative declaration of public interest impact or a statute that incorporates the WCPA.  (*See*
     *generally* FAC ¶¶ 571; Resp. 21-22); *see also CaptiveAire*, 2009 WL 10676075, at *3
20   ("Washington courts have not found that anticompetitive conduct *per se* impacts the public but
     rather require a deeper analysis to determine if the public interest has been impacted." (citing
     *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 635 (Wash. Ct. App.
21   1997))); *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1197 (W.D.
     Wash. 2015) (stating that misappropriation of trade secrets is not an act with a per se public
22   interest impact).  The court therefore does not address either of these alternative methods of
     establishing public interest impact.

1  determined by the trier of fact from several factors, depending upon the context in which

2  the alleged acts were committed.'" *Id.* (quoting *Hangman Ridge*, 719 P.2d at 537).

3       Where, as here,[21] "the transaction was essentially a private dispute, it may be more

4  difficult to show that the public has an interest in the subject matter." *Hangman*, 719

5  P.2d at 538 (citations omitted); *see also Lightfoot v. MacDonald*, 544 P.2d 88, 90 (Wash.

6  1976) ("A breach of a private contract affecting no one but the parties to the

7  contract . . . is not an act or practice affecting the public interest.").  There must be a

8  "likelihood that additional plaintiffs have been or will be injured in exactly the same

9  fashion" to transform a "factual pattern from a private dispute to one that affects the

10  public interest." *Hangman*, 719 P.2d at 538.  Factors indicating that a private dispute

11  affects the public interest include:  (1) whether the "alleged acts" were "committed in the

12  course of the defendant's business"; (2) whether the defendant "advertise[d] to the public

13  in general"; (3) whether the defendant "actively solicit[ed] th[e] particular plaintiff"; and

14  (4) whether the parties "occupy unequal bargaining positions."[22]  *Id.* (stating that "not

15  one of these factors is dispositive, nor is it necessary that all be present").

16

17  [21] Boeing argues that this dispute is essentially private.  (Mot. at 20-21.)  Zunum
implicitly agrees by arguing that a private dispute can affect the public interest if it is likely "that
additional plaintiffs have been or will be injured in exactly the same fashion."  (*See* Resp. at 21

18  (citing *Birkholm v. Wash. Mut. Bank, F.A.*, 447 F. Supp. 2d 1158, 1165 (W.D. Wash. 2006)).)
The court accordingly analyzes the parties' dispute as private.  *See, e.g.*, *A.H. Lundberg Assocs.,*

19  *Inc. v. TSI, Inc.*, No. C14-1160JLR, 2016 WL 9226998, at *7 (W.D. Wash. Feb. 18, 2016).

20  [22] Although the WCPA was amended in 2009 to codify the public interest element, *see*
RCW 19.86.093(1)-(3), "[c]ourts have not interpreted this amendment as abandoning prior

21  tests," *Stiegler v. Saldat*, No. C14-1309TSZ, 2015 WL 13686087, at *3 (W.D. Wash. Oct. 23,
2015), *aff'd*, 707 F. App'x 478 (9th Cir. 2017) (citing *Jet Parts Eng'g, Inc. v. Quest Aviation*

22  *Supply, Inc.*, No. C15-0530RSM, 2015 WL 4523497, at *3-4 (W.D. Wash. July 27, 2015)
(considering both the 2009 amendments and the *Hangman Ridge* factors)).  Thus, these "factors

1    Here, Zunum's FAC fails to establish that Boeing's alleged "misappropriation of

2  Zunum's trade secrets and attempt[s] to restrain trade and delay development in the

3  market for hybrid-electric and all-electric aircraft" "impacts the public interest."  (*See*

4  FAC ¶ 571.)  To begin, the court is unable to plausibly infer from Zunum's allegations

5  any likelihood that "additional plaintiffs have been or will be injured in exactly the same

6  fashion" as Zunum alleges it has been.  *Hangman*, 719 P.2d at 538.  Zunum alleges that

7  Boeing's misconduct harmed Zunum by causing it:  (1) "to have to seek capital from

8  alternative sources at higher costs of capital and on less favorable terms"; (2) to have to

9  "replac[e] Boeing, SEP, and SHE as suppliers for components of Zunum's aircraft";

10  (3) "substantial loss of goodwill"; and (4) "loss of first-mover advantages in the emerging

11  market for hybrid-electric and all-electric aircraft."  (FAC ¶ 575.)  It also alleges that

12  Boeing's misconduct harms the public by:  (1) "reducing competition, which will have

13  the effect of increasing the cost of air travel or avoiding or delaying reductions in the cost

14  of air travel while limiting consumer choice and convenience in air travel"; and

15  (2) "delaying or eliminating the deployment of technology and market systems that

16  reduce emissions associated with air travel, noise, and other externalities."  (*Id.*

17  ¶¶ 571-73.)  As these allegations exemplify, the fashion in which Boeing has allegedly

18  harmed Zunum is far from "exactly the same" as the fashion in which Zunum alleges

19  Boeing's misconduct has or could harm the general public.  *See Michael v. Mosquera-*

20  *Lacy*, 200 P.3d 695, 700 (2009); *see also A.H. Lundberg*, 2016 WL 9226998, at *7-8.

21

---

22  are still relevant in analyzing public interest impact and are useful in interpreting the 2009
amendments."  *Id.*

1     Moreover, Zunum's allegations do not give rise to any plausible inference that

2  Boeing has or is likely to injury others by, among other things, misappropriating trade

3  secrets or committing acts to block entry to an innovative, but nonexistent product

4  market.  In its response, Zunum points to the portion of its FAC that discusses a 2018

5  deal between Boeing and Embraer—wherein Boeing was to purchase 80% of Embraer's

6  commercial aircraft division, allegedly in an effort to monopolize the "short-haul

7  market"—and argues that deal shows a "pattern" of Boeing "attempt[ing] to establish a

8  monopoly in [a] nascent relevant market."  (Resp. at 21 (citing FAC ¶¶ 48, 51-59).)  As

9  Zunum alleges, however, Boeing terminated the deal with Embraer after coming "[u]nder

10  pressure from the 2019 Boeing 737 MAX crisis," "as well as the subsequent COVID-19

11  pandemic" (FAC ¶¶ 57-58), which are significant, even *sui generis*, factors not present

12  here and not suggestive of a pattern.  The terminated Embraer deal also involved the

13  consolidation of market share in a mature market segment with multiple participants,

14  whereas the present dispute involved a research and development investment in

15  innovative, but unproven technology.  Further, Zunum's allegations regarding the

16  terminated Embraer deal do not enable the court to draw an inference that Boeing

17  misappropriated trade secrets from Embraer or took steps to block Embraer's entry from

18  an innovative, but nonexistent product market, as it allegedly did to Zunum.

19  Accordingly, the court concludes that the allegations in the FAC do not plausibly

20  establish that Boeing has done or is likely to do to another company what it allegedly did

21  to Zunum.  *See Mosquera–Lacy*, 200 P.3d at 700 (stating that to establish public interest,

22  "there must be shown a real and substantial potential for repetition, as opposed to a

1   hypothetical possibility of an isolated unfair or deceptive act's being repeated" (quoting

2   *Eastlake Constr. Co. v. Hess*, 686 P.2d 465 (Wash. 1984))); *see also T-Mobile*, 115 F.

3   Supp. 3d at 1196; *Buffets, Inc. v. Klinke*, 73 F.3d 965, 970 (9th Cir. 1996).

4          A review of the factors that indicate public interest in the context of a private

5   dispute further support the court's conclusion.[23]  Boeing concedes that the first factor is

6   met because the alleged misconduct took place in the course of Boeing's business.  (*See,*

7   *e.g.*, Mot. at 20.)  However, Boeing argues that Zunum's FAC does not include sufficient

8   factual allegations to establish any of the remaining factors and, thus, that Zunum's FAC

9   fails to establish public interest in the parties' otherwise private dispute.[24]  The court

10  agrees.  First, nothing in the pleadings shows that Boeing either was advertising to the

11  general public or soliciting Zunum.  *See Evergreen Moneysource Mortg. Co. v. Shannon*,

12  274 P.3d 375, 385 (Wash. Ct. App. 2012) ("Significantly, conduct that is not directed at

13  the public, but, rather, at a competitor, lacks the capacity to impact the public in general."

14  (citing *Goodyear*, 935 P.2d at 635)); *Mosquera–Lacy*, 200 P.3d at 700.  In fact, Zunum

15  alleges that it "cautiously approached a few of the major aerospace companies" and

16  "identified Boeing as a prospective investor."  (FAC ¶¶ 93-94.)  Second, the FAC does

17

18          [23] As a threshold matter, the court rejects Boeing's binary characterization of the four
    public interest factors articulated in *Hangman Ridge*.  (*See, e.g.*, Mot. at 20 ("Here, the last three
19  of the four factors—the most important three—have not been alleged.").)  The *Hangman Ridge*
    public interest factors are neither dispositive nor necessary, and the court treats them as
20  touchstones that can be supported to different degrees rather than yes-or-no questions whose
    answers are to be assessed without context.  *See Hangman Ridge*, 719 P.2d at 538; *see also A.H.*
21  *Lundberg*, 2016 WL 9226998, at *7-9 & n.12.

22          [24] Zunum makes no arguments with respect to whether the allegations in its FAC
    establish the four public interest factors.  (*See generally* Resp. at 22.)

not establish that Zunum and Boeing held the type of unequal bargaining positions that are contemplated by the WCPA. *See Hangman Ridge*, 719 P.2d at 540; *Goodyear*, 935 P.2d at 635 (finding no public interest where the plaintiff-dealer was an experienced businessman who was better able than the average consumer to judge the risks associated with the defendant's proposal and was not vulnerable to exploitation). The allegations show that Zunum has a "history of business experience" (FAC ¶ 40) and, therefore, the court concludes it is "not representative of [the type] of bargainer[] subject to exploitation and unable to protect [itself]," *Hangman Ridge*, 719 P.2d at 540.

In sum, Boeing allegedly harmed Zunum in ways separate and distinct from the ways it allegedly harmed or plausibly might harm the general public. Zunum has also failed to allege a "real and substantial potential for repetition" of Boeing's alleged misconduct. *See Mosquera–Lacy*, 200 P.3d at 700. Additionally, while one of the public interest factors is present here, the second, third, and fourth factors are absent. *See Shugart v. GYPSY Off. No. 251715*, No. C14-1923RSM, 2015 WL 1965375, at *3 (W.D. Wash. May 1, 2015) (declining to find public interest impact with only the first factor present). On balance, the court concludes that Zunum's allegations fail to support a public interest impact resulting from the private dispute that Zunum has pleaded. Accordingly, the court DISMISSES WCPA unfair competition claim (Count XII).

## F.   WSSA Claim

It is a violation of the WSSA to, "in connection with the offer, sale or purchase of any security, directly or indirectly," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light

1    of the circumstances under which they are made, not misleading."  RCW 21.20.010(2);

2    *see also Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC*, 449 P.3d

3    1019, 1022-23 (Wash. 2019).  Washington courts define "material fact" as "a fact to

4    which a reasonable [person] would attach importance in determining [their] choice of

5    action in the transaction in question."  *Clausing v. DeHart*, 515 P.2d 982, 984 (Wash.

6    1973) (quoting *Shermer v. Baker*, 472 P.2d 589, 595 (Wash. 1970)).  For an omission to

7    be material, "there must be a substantial likelihood that the disclosure of the omitted fact

8    would have been viewed by the reasonable investor as having significantly altered the

9    'total mix' of information made available."  *Guarino v. Interactive Objects, Inc.*, 86 P.3d

10   1175, 1185 (Wash. Ct. App. 2004) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

11   (1988)); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018)

12   (regarding an omission, "[d]isclosure is required . . . only when necessary 'to

13   make . . . statements made, in the light of the circumstances under which they were made,

14   not misleading.'"  (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

15   (2011))).

16          Zunum bases its WSSA claim on the securities agreements that it entered into with

17   Boeing, which include the 2017 Notes and the 2018 Notes (collectively, the "securities"

18   or the "securities agreements").  (*See* FAC ¶ 544.)  It alleges that Boeing violated the

19   WSSA because, prior to investment, it told Zunum that it would not compete with Zunum

20   but, in reality, planned to "develop a hybrid-electric aircraft."  (*Id.* ¶¶ 548, 555; *see also*

21   *id.* ¶ 556 (alleging that, to the extent Boeing claims that it "informed Zunum of an

22   intention to compete," Boeing "failed to provide material facts sufficient to make any

1    such statement not misleading").)  Zunum claims that it "would not have entered into"

2    the securities agreements with Boeing "had [it] known that Boeing intended to compete

3    directly with Zunum."  (*Id.* ¶ 548.)

4            Boeing argues that Zunum fails to state a securities fraud claim under the WSSA

5    for six reasons.[25]  (*See* Mot. at 18-19.)  To begin, Boeing contends that Zunum signed

6    contracts, including the 2016 PIA and the 2017 and 2018 IRLs,[26] "that foreclose its

7    claim."  (*See* Mot. at 18.)  Before Boeing made its initial investment, Zunum signed the

8    2016 PIA, in which it acknowledged that Boeing "may already possess or have developed

9    products or services similar to or competitive with those of [Zunum]," and was not

10   "preclude[d] . . . from developing information or products that may be similar to and/or

11   compete with the products or services of [Zunum]."  (2016 PIA § 3; Mot. at 18.)

12   Likewise, with each subsequent investment, Zunum signed documents that

13   "acknowledge[d] that [Boeing] has . . . operations . . . which may be deemed competitive

14   with [Zunum's] business."  (2017 IRL § 5; 2018 IRL § 5; Mot. at 18.)  Zunum does not

15   address or attempt to rebut the language in these contracts in its response.  (*See* Resp. at

16   19.)

17   //

18

19           [25] Boeing's first argument in favor of dismissal is that Zunum cannot bring a claim under
     the WSSA because "Delaware law governs the securities."  (*See* Mot. at 18 (citing FAC ¶¶ 428,

20   444, 480).)  Because, as discussed below, Zunum fails to state a claim under the WSSA for
     numerous other reasons, the court need not resolve the choice-of-law issue.

21           [26] Because these contracts "form[] the basis of [Zunum's] claim[s]" in Counts I, II, and
     III of the FAC (FAC ¶¶ 405-450), the court may consider them in reviewing the instant motion.

22   *Khoja*, 899 F.3d at 1002.

1    The court agrees with Boeing's contention that "Zunum cannot for purposes of

2    this claim disavow these contractual acknowledgments and contend that it was misled

3    about whether Boeing 'intended to compete.'" (Mot. at 18 (first citing FAC ¶ 548; then

4    citing *Stewart v. Est. of Steiner*, 93 P.3d 919, 924 (Wash. Ct. App. 2004) (stating, in the

5    context of "non-reliance" clauses, that "[s]ecurities law does not permit a party

6    to . . . disavow such representations"); and then citing *Hammond v. Everett Clinic, PLLC*,

7    16 Wash. App. 2d 1072 (Table), 2021 WL 961130, at *5-6 (Wash. Ct. App. Mar. 15,

8    2021) (affirming denial of leave to add securities fraud claim to complaint where such a

9    claim would fail because the defendant's alleged omissions did not mislead the plaintiff;

10   the defendant's letter accurately put the plaintiff on notice of the transaction's form and

11   "revealing the allegedly omitted facts would not have materially changed the facts

12   disclosed")).)  The language in the 2016 PIA and 2017 and 2018 IRLs clearly put Zunum

13   on notice that Boeing was not precluded from developing products that may directly

14   compete with Zunum and that Boeing had "operations . . . which may be deemed

15   competitive with [Zunum's] business." (*See, e.g.*, 2017 IRL § 5; 2018 IRL § 5; 2016 PIA

16   § 3.)  In the face of such contractual representations,[27] Zunum cannot plausibly allege

17   that Boeing misrepresented its intention to compete with Zunum by failing to inform

18   Zunum that it intended to "develop a hybrid-electric aircraft." (*See* FAC ¶¶ 548, 555);

19   *Stewart*, 93 P.3d at 924; *Hammond*, 2021 WL 961130, at *5.

20

21   _____

22   [27] Zunum does not point the court to any other statements that Boeing made after the parties entered into the 2016 PIA or 2017 and 2018 IRLs that would expressly contradict the relevant representations in those contracts. (*See generally* Resp. at 19-20; FAC.)

ORDER - 33

1    In an attempt to establish that Zunum was misled by Boeing's alleged omission,

2    Zunum directs the court to Boeing's April 2016 statement that its "interest in

3    electrification technology was focused on drones and other military areas, and the parallel

4    hybrid 'SUGAR' program . . . funded by NASA for single-aisle aircraft." (FAC ¶¶ 101,

5    546; Resp. at 19.) However, that statement was made prior to Zunum and Boeing

6    entering into the 2016 PIA and 2017 and 2018 IRLs,[28] and those contracts clarify that

7    Boeing's interest in electrification technology may, in fact, extend to products that

8    directly compete with Zunum. (*See* 2017 IRL § 5; 2018 IRL § 5; 2016 PIA § 3.)

9    Revealing the allegedly omitted facts—i.e., that Boeing intended to "develop a

10   hybrid-electric aircraft"—would not have significantly altered the "total mix" of facts

11   already disclosed. *Guarino*, 86 P.3d at 1185; (*see also* 2017 IRL § 5; 2018 IRL § 5; 2016

12   PIA § 3). Because no further information was required to prevent Zunum from being

13   misled about whether Boeing intended to compete, Boeing's alleged omission was not

14   material. *See, e.g.*, *Freeman v. Seneca Ventures, LLC*, 16 Wash. App. 2d 1035 (Table),

15   2021 WL 423135, at *3 (2021) (discussing cases regarding untrue statements of material

16   fact by omission).

17   Even if the contracts did not foreclose Zunum's WSSA claim, the court agrees

18   with Boeing's contention that Zunum's WSSA claim also fails because promises or

19   statements about future conduct cannot support a misrepresentation or omission claim,

20

21   [28] (*See, e.g.*, FAC ¶ 101 (describing Boeing representative's April 22, 2016 e-mail to
     Zunum representative regarding Boeing's interest); *id.* ¶ 104 (stating that the 2016 PIA was
     signed on August 16, 2016); *id.* ¶¶ 125 26 (stating that the 2017 IRL was executed in March

22   2017); *id.* ¶¶ 246-47 (stating that the 2018 IRL was executed in May 2018).)

1   because they do not go "to a presently existing fact."[29]  (Mot. at 18-19 (quoting *Havens v.*

2   *C&D Plastics, Inc.*, 876 P.2d 435, 448 (Wash. 1994)); *Seattle Pac. Indus., Inc. v.*

3   *Melmarc Prods., Inc.*, No. C06-0834RSM, 2007 WL 397450 at *3 (W.D. Wash. Jan. 31,

4   2007) (stating that a representation that something will be done in the future cannot be

5   either true or false at the time it is made"); *see also In re VeriFone Secs. Litig.*, 11 F.3d

6   865, 869 (9th Cir. 1993) (dismissing securities fraud claim based on alleged omissions of

7   material facts because the alleged omissions—namely, the "failures to make forecasts of

8   future events"—"are not of material, actual facts"); *King Cnty., Wash. v. Merrill Lynch &*

9   *Co.*, No. C10-1156RSM, 2012 WL 2389991, at *8 (W.D. Wash. June 25, 2012)

10  (dismissing WSSA claim "based on a promissory statement").  Zunum's WSSA claim

11  concerns what Boeing allegedly said or failed to say regarding what it might do in the

12  future with respect to competing against Zunum.  (*See, e.g.*, FAC ¶¶ 548, 552-56.)  Thus,

13  Zunum has not alleged the misrepresentation or omission of an existing fact, as is

14  required to state its securities fraud claim.

15      Having concluded that Zunum fails to state a plausible securities fraud claim

16  because the 2016 PIA and 2017 and 2018 IRLs foreclose its claim and because it has not

17  alleged the misrepresentation or omission of an existing fact, the court declines to address

18  Boeing's remaining arguments in favor of dismissal.  (*See, e.g.*, Mot. at 18-19.)

19  Accordingly, the court DISMISSES Zunum's WSSA claim (Count XI).

20

21      [29] Zunum fails to provide any meaningful response to this argument, and instead states
    that it "has alleged an omission" and that nonverbal conduct can constitute a "statement" for the
22  purpose of a securities fraud claim.  (*See* Resp. at 19-20.)

1    **G.      Breach of Fiduciary Duty Claim**

2           Zunum's "internal affairs are governed by Delaware law" (FAC ¶ 462), and

3    accordingly, so is its breach of fiduciary duty claim.[30]  *See McDermott Inc. v. Lewis*, 531

4    A.2d 206, 215 (Del. 1987).  Under Delaware law, to establish liability for breach of

5    fiduciary duty, whether it be through aiding and abetting or a direct breach, Zunum must

6    plausibly plead that Boeing or its employee, Logan Jones, owed it a fiduciary duty.  *Est.*

7    *of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  For example, to state an aiding and

8    abetting a breach of fiduciary duty claim, a plaintiff must prove:  "(1) the existence of a

9    fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation

10   in that breach by the non-fiduciary."  *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910

11   A.2d 1020, 1039 (Del. Ch. 2006) (citing *In re Santa Fe Pacific Corp. Shareholder Litig.*,

12   669 A.2d 59, 72 (Del. 1995)).  Similarly, to state a direct breach of fiduciary duty claim,

13   a plaintiff must prove:  "(1) that a fiduciary duty existed and (2) that the defendant

14   breached that duty."  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub*

15   *nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (citing *ZRii, LLC v.*

16   *Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del.Ch. Sept. 21, 2009)).

17          In its FAC, Zunum alleges that Boeing owed Zunum fiduciary duties because its

18   employee, Mr. Jones, "became a *de facto* officer and fiduciary of Zunum" by virtue of his

19   position as Boeing's Observer on Zunum's Board of Directors.  (FAC ¶¶ 463-67.)  It then

20   claims that Boeing breached its fiduciary duties by:  (1) "usurping Zunum's corporate

21

22   _____

     [30] The parties do not dispute that Delaware law governs this claim.  (*See generally* Mot.
     at 21; Resp. at 22.)

1    opportunities" in the Alleged Markets and "then exploiting them for Boeing's benefit and

2    to the detriment of Zunum"; (2) "using Zunum's proprietary information and trade secrets

3    for their own account, which was harmful and unfair to Zunum, and a violation of the

4    duty of loyalty"; (3) "impeding Zunum and delaying its pursuit of its valuable

5    opportunities," "causing waste to Zunum," and "usurping Zunum's first-mover advantage

6    in hybrid-electric propulsion aircraft"; and (4) "acting contrary to Zunum's best interests

7    including by seeking to depress its enterprise valuation." (*Id.* ¶¶ 470-73.)  Alternatively,

8    Zunum alleges that if Mr. Jones's fiduciary duties as a *de facto* Director of Zunum are not

9    attributable to Boeing, then Boeing "aided and abetted Mr. Jones's breaches of fiduciary

10   duties in his role as an individual." (*Id.* ¶ 475.)  It alleges that Boeing "had knowledge of

11   Mr. Jones's conduct and breaches of fiduciary duties" because Mr. Jones served as a

12   representative of Boeing and reported to it "in a manner such that his conduct was

13   imputable to [Boeing] as [its] knowing participation." (*Id.* ¶ 476.)

14          Boeing argues that Zunum fails to state a breach of fiduciary claim under either

15   theory of liability for a number of reasons. (*See* Mot. at 21-24.)  It contends that Zunum

16   fails to plausibly establish that Boeing and/or Mr. Jones owed a fiduciary duty to Zunum.

17   (*Id.* at 21.)  First, with respect to whether Boeing owed a fiduciary duty to Zunum,

18   Boeing states that it "was a creditor who invested in Zunum through convertible loans,

19   and as such, had no fiduciary duty to Zunum." (Mot. at 21 (first citing FAC ¶¶ 125-26,

20   246-47; then citing *Diehl Guerrero v. Hardy Boys Constr., LLC*, No. N16C–08–041 CLS,

21   2017 WL 1162947, at *2 (Del. Super. Ct. Mar. 27, 2017) ("[A] fiduciary relationship

22   //

1   does not exist between a debtor and a creditor."); and then citing *Simons v. Cogan*, 542

2   A.2d 785, 790 (Del. Ch. 1987)).  The court agrees.

3       Second, with respect to Mr. Jones, Boeing argues that "Mr. Jones was not a *de*

4   *facto* director or officer of Zunum," and thus, he did not owe a fiduciary duty to Zunum.

5   (*Id.* at 21-23.)  "A [d]e facto director is one who is in possession of and exercising the

6   powers of that office under claim and color of an election, although he is not a director

7   [d]e jure and may be removed by proper proceedings." *Hockessin Cmty. Ctr., Inc. v.*

8   *Swift*, 59 A.3d 437, 459 (Del. Ch. 2012) (quoting *Prickett v. Am. Steel & Pump Corp.*,

9   253 A.2d 86, 88 (Del. Ch. 1969)) (alterations in original).  Here, Mr. Jones was appointed

10  to Zunum's board as a non-voting board Observer.  (FAC ¶¶ 463-64; 2017 IRL § 3; 2018

11  IRL § 3.)  Zunum has not identified, nor is the court able to identify, any allegations in

12  the FAC that would suggest that Mr. Jones acted as a director "under claim and color of

13  an election." *Hockessin*, 59 A.3d at 459 (finding that the defendants served as *de facto*

14  directors because, among other things, they joined the board "under color of right

15  according to what everyone involved believed was a legitimate appointment process");

16  (*see generally* FAC).

17      Even if Zunum had established that Mr. Jones acted "under claim and color of an

18  election," it has not adequately pled that Mr. Jones "exercise[ed] the powers" reserved to

19  Zunum's Board of Directors. *Hockessin*, 59 A.3d at 459.  "[T]he function of a board of

20  directors is to direct and manage the corporation's affairs" by:  "(1) selecting senior

21  officers; (2) controlling executive compensation; (3) delegating administrative authority

22  to officers; (4) making high level corporate policy; (5) deciding financing and capital

1    allocation; and (6) supervising the 'welfare of the whole enterprise.'" *Obasi Inv. LTD v.*

2    *Tibet Pharm., Inc.*, 931 F.3d 179, 184-85, 189 (3d Cir. 2019) (quoting 2 Fletcher Cyc.

3    Corp. § 505 (Sept. 2018 Update)).  Individual directors exercise their power to manage

4    the corporation's affairs "by formal voting." *Id.* at 189.  Zunum contends that "Mr. Jones

5    engaged in precisely these types of activities."  (Resp. at 24 (citing FAC ¶¶ 146, 156,

6    169, 195, 205, 235, 465).)  However, the sections of the FAC Zunum cites to largely

7    involve allegations that Mr. Jones acted as a liaison for Boeing and had "considerable

8    influence" over Zunum.  (*See, e.g.*, FAC ¶¶ 156, 169, 195.)  Those sections do not, for

9    example, contain allegations that Mr. Jones had or exercised the authority to vote on

10   matters related to Zunum's financing and capital allocation.  *See Obasi*, 931 F.3d at

11   189-91 (concluding observers were not directors because, among other things, they could

12   not "vote for board action" and, "[w]ithout the ability to manage the company's affairs,

13   [the observers] lack directors' most basic power").  As such, the court agrees with

14   Boeing's contention that the "influence" alleged "falls far short of a 'legal responsibility

15   to manage the business' and 'legal control' over its operations."  (Mot. at 22 (quoting

16   *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) (defining a director's function)) (citing

17   *Obasi*, 931 F.3d at 189-91 (discussing how observers in the case did not perform "similar

18   functions" to directors)).)

19        Because Zunum has not plausibly established that Mr. Jones was a *de facto*

20   director, the court turns to address whether Zunum's allegations sufficiently establish that

21   Mr. Jones was a *de facto* officer.  That status of a *de facto* officer is reserved for one

22   "who actually assumes possession of an office under the claim and color of an election or

1   appointment and who is actually discharging the duties of that office." *In re Walt Disney*

2   *Co. Derivative Litig.*, 906 A.2d 27, 48 (Del. 2006).  Mr. Jones's "appointment" was to the

3   position of Observer—which is not an office of Zunum, but rather a role arising from the

4   Boeing-Zunum investment contracts.  (*See* FAC ¶ 463-64; 2017 IRL § 3; 2018 IRL § 3.)

5   The FAC is similarly devoid of allegations showing that Mr. Jones acted as an officer

6   "under claim and color of an election." *In re Walt Disney*, 906 A.2d at 48; (*see generally*

7   FAC).

8          Even if Zunum had shown that Mr. Jones acted "under the claim and color of an

9   election or appointment," it has not established that Mr. Jones "actually discharge[ed] the

10  duties" of an officer.  *In re Walt Disney*, 906 A.2d at 48.  Delaware courts have treated

11  individuals as *de facto* officers where the facts demonstrate that the individuals are

12  "sufficiently involved in," and have "sufficient control over, the management" of the

13  corporation.  *See, e.g.*, *Triple H Fam. Ltd. P'ship v. Neal*, No. CV 12294-VCMR, 2018

14  WL 3650242, at *14 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) (finding

15  *de facto* officer where individual owned 50% of LLC with family; staffed the LLC;

16  managed the relationship between the CEO and employees; approved hiring decisions

17  and payment of employees; and terminated employees); *WaveDivision Holdings, LLC v.*

18  *Millennium Digital Media Sys., L.L.C.*, No. 2993–VCS, 2010 WL 3706624, at *3 (Del.

19  Ch. Sept. 17, 2010) (finding *de facto* officer where individual enjoyed "unfettered access

20  to confidential information"; was "empowered" by the management to exert control and

21  influence over the LLC; and engaged in acts on behalf of the LLC).  Zunum attempts to

22  demonstrate that Mr. Jones "wielded significant control" over Zunum by alleging, among

1    other things, that he spoke with potential investors; tried to direct Zunum on who it

2    should partner with; had access to confidential information; and acted as a gatekeeper to

3    support from Boeing.  (Resp. at 23 (citing FAC ¶¶ 146, 156, 164, 168, 169, 195, 200,

4    203, 205, 208, 319, 346, 359, 364, 381, 439, 457, 466, 486, 495-496).)  While these

5    allegations again demonstrate that Mr. Jones had influence over Zunum and acted as a

6    liaison to Boeing, they do not establish that he was "empowered" to control Zunum or

7    exerted actual control over Zunum.[31]  (*See, e.g.*, FAC ¶¶ 156, 169, 195, 319); *see also*

8    *Kahn v. Lynch Comm. Sys., Inc.*, 638 A.2d 1110, 1114-15 (Del. 1994) (stating that a third

9    party exerts actual control over an entity through the existence of a relationship where the

10   third party dominates the company's business affairs).

11        Having concluded that Zunum fails to state a plausible breach of fiduciary duty

12   claim because it has not established that Boeing or Mr. Jones owed it a fiduciary duty, the

13   court declines to address Boeing's remaining arguments in favor of dismissal.  (*See, e.g.*,

14   Mot. at 23-24.)  Accordingly, the court DISMISSES Zunum's breach of fiduciary duty

15   claim (Count V).

16   //

17   //

18

---

19   [31] The 2017 and 2018 IRLs further support the conclusion that Mr. Jones was not
     empowered to control Zunum, as he had a nonvoting role and Zunum was permitted to exclude
20   him from meetings when exclusion was "reasonably necessary to preserve the attorney-client
     privilege or reasonably necessary to protect highly confidential proprietary technical and
     competitive (as to Investor) information."  (*See* 2017 IRL § 3; 2018 IRL § 3.)  Zunum does not
21   allege that it was unable to exercise these legal protections.  (*See generally* Resp.)  The IRLs also
     "contrast starkly with Zunum's request that any investment from Safran include a representative
     to 'join[] Zunum's Board of Directors'— precisely so that Safran's representative would 'then
22   have fiduciary obligations to Zunum.'"  (Mot. at 22 (citing FAC ¶ 280).)

1    **H.**    **Leave to Amend**

2          The standard for granting leave to amend under Rule 12(c) is also identical to Rule

3 12(b)(6).  *Pac. W. Grp., Inc. v. Real Time Sols., Inc.*, 321 F. App'x 566, 569 (9th Cir.

4 2008).  Thus, when dismissing a complaint for failure to adequately state a claim,

5 "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is

6 clear . . . that the complaint could not be saved by amendment."  *Harris v. Cnty. of*

7 *Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Eminence Capital LLC v. Aspeon,*

8 *Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)); *see also DeSoto v. Yellow Freight Sys., Inc.*,

9 957 F.2d 655, 658 (9th Cir. 1992) ("A district court does not err in denying leave to

10 amend where the amendment would be futile."  (citing *Reddy v. Litton Indus., Inc.*, 912

11 F.2d 291, 296 (9th Cir. 1990))).

12          The court concludes that any amendments as to Zunum's WCPA unfair

13 competition, breach of fiduciary duty, and WSSA claims would be futile, *see supra*

14 Sections III.E-G, and thus dismisses these claims without leave to amend.  *See Platt Elec.*

15 *Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1060 (9th Cir. 2008).  Although Zunum

16 has failed to plausibly plead its WCPA antitrust conspiracy and attempted

17 monopolization claims, *see supra* Sections III.C-D, at present, the court cannot conclude

18 that "it is absolutely clear that the deficiencies of the complaint could not be cured by

19 amendment."  *Platt*, 522 F.3d at 1060.  Thus, Zunum may amend its WCPA antitrust

20 conspiracy and attempted monopolization claims.  Zunum shall file an amended

21 complaint as to these claims, if at all, by June 27, 2022.  The court warns Zunum that

22 failure to timely file an amended complaint that remedies the aforementioned deficiencies

will result in the dismissal of its WCPA antitrust conspiracy and attempted monopolization claims with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Boeing's motion for partial judgment on the pleadings (Dkt. # 50). Specifically, the court DISMISSES Zunum's WCPA unfair competition (Count XII), breach of fiduciary duty (Count V), and WSSA (Count XI) claims with prejudice and without leave to amend. The court further DISMISSES Zunum's WCPA antitrust conspiracy (Count IX) and attempted monopolization (Count X) claims without prejudice and with leave to amend. Zunum shall file an amended complaint as to these claims, if at all, by June 27, 2022. The court warns Zunum that failure to timely file an amended complaint that remedies the aforementioned deficiencies will result in the dismissal of its WCPA antitrust conspiracy and attempted monopolization claims with prejudice.

Dated this 13th day of June, 2022.

JAMES L. ROBART
United States District Judge