1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

9

ZUNUM AERO, INC.,

NO. 2:21-cv-00896

10

               Plaintiff,

PLAINTIFF ZUNUM AERO, INC.'S
SECOND AMENDED COMPLAINT

11

      v.

12
13
14
15
16

THE BOEING COMPANY; BOEING
HORIZONX VENTURES, LLC; SAFRAN,
S.A.; SAFRAN CORPORATE VENTURES,
S.A.S.; SAFRAN ELECTRICAL & POWER,
S.A.S.; SAFRAN HELICOPTER ENGINES,
SASU,

**JURY TRIAL DEMANDED**

17

               Defendants.

18

       Plaintiff Zunum Aero, Inc. ("Zunum"), by and through its attorneys of record, Williams

19

Kastner & Gibbs, PLLC, and Shlansky Law Group, LLP (*pro hac vice*), hereby states and alleges

20

as follows:

21

**I.    INTRODUCTION**

22

      1.    Aircraft giant The Boeing Company ("Boeing"), along with its affiliates, major

23

suppliers, and their affiliates, employed a targeted and coordinated campaign to gain access to

24

proprietary information, intellectual property, and trade secrets reflecting Zunum's plans as the

25

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1   first-mover in the markets for commercial hybrid and all-electric aircraft, and commercial hybrid

2   and all-electric propulsion systems, serving commercial air travel up to 1,500 miles.

3       2.    Zunum's innovation reconceptualized air travel in a way that would enable

4   hybrid-electric or all-electric aircraft technologically to be economically viable decades sooner

5   than the aerospace industry otherwise thought possible.  This fundamental advancement in

6   aviation technology has the same potential to disrupt the air travel as Tesla has recently achieved

7   in the automotive market.

8       3.    The paradigm shift that Zunum has innovated will provide cheaper, faster,

9   cleaner, and quieter alternatives to 80% of current domestic commercial flights, opening

10   extensive unserved and underserved markets for short-haul air travel.  Zunum's innovations

11   include novel aircraft designs, series hybrid or all-electric propulsion systems, integrated

12   electronic systems, and systems that will create new opportunities for integrated door-to-door

13   travel options for consumers.  Zunum's innovative and unique design for hybrid-electric and

14   electric propulsion aircraft outperforms conventional air travel on cost, travel time, noise,

15   emissions, and other key metrics.

16       4.    Boeing took advantage of preferred access through a position of trust as an

17   Observer on Zunum's Board of Directors, which entailed fiduciary duties to Zunum, as well as

18   through extensive due diligence under the pretext of a strategic investment in Zunum, to gain

19   access to the business plan, market and technological analysis, and other trade secrets and

20   proprietary information that Zunum had developed over many years and that were otherwise

21   unknown to Boeing.  Boeing exploited this access for its own benefit and to Zunum's detriment.

22       5.    Prior to obtaining access to Zunum's proprietary and confidential information,

23   Boeing believed that hybrid-electric propulsion aircraft was a distantly futuristic technology that

24   was decades away from realization.  A senior Boeing executive also told Zunum's Chief

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 2

1    Executive Officer that Boeing's interest in electric aircraft pertained to small drones or parallel-

2    configured hybrid single-aisle aircraft decades in the future.

3        6.        But, upon gaining access to Zunum's proprietary and confidential information,

4    Boeing realized its value and recognized the potential for Zunum to revolutionize air travel,

5    initially in the short-haul market for commercial flights under 1,500 miles, which would pose a

6    direct threat to Boeing's mainstay single-aisle aircraft market, and which presented an

7    opportunity that Boeing could eventually leverage to extend its dominant position in its other

8    aircraft markets.

9        7.        Boeing also gained this insight through extensive due diligence on the market

10   viability of Zunum's proprietary technology, which it undertook in connection with an initial

11   investment in Zunum.  The same engineers and other personnel that Boeing had deployed to

12   conduct investment due diligence on Zunum also, without Zunum's permission, were also

13   assigned to staff competing programs at Boeing that directly benefitted from exposure to the

14   voluminous body of information and trade secrets that Zunum had provided to Boeing.

15       8.        In order to gain and then maintain control over the competitive threat posed by

16   Zunum's innovative technology, Boeing strung Zunum along with assurances that Boeing would

17   invest in Zunum.  It also offered to lead efforts to secure commitments from additional investors

18   in Zunum, while Boeing actually undermined and sabotaged Zunum's efforts to attract additional

19   investors, and made (ultimately hollow) offers to collaborate with Zunum to build the airframe

20   and provide other expertise to aid in the commercialization of Zunum's novel design and

21   technology.

22       9.        Within months of Boeing's initial investment, the main suppliers of Boeing's

23   electrical systems, the Safran, S.A., also known as the Safran Group ("Safran"), a French

24   aerospace conglomerate, and United Technologies Aerospace Systems ("UTAS," which was a

25   part of United Technologies Corporation and is now part of Raytheon Technologies

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 3

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    Corporation), approached Zunum with proposed investments to support the development of

2    Zunum's technology.  Zunum also held discussions regarding collaborating with one of the

3    Safran Group's business units to supply a turboshaft for Zunum's hybrid-to-electric propulsion

4    system.

5        10.    However, unbeknownst to Zunum, Boeing was copying the plans, designs and

6    technologies that Zunum had disclosed to Boeing as an investor in Zunum and as an Observer

7    on Zunum's Board of Directors (and subject to non-disclosure and non-use obligations), and was

8    misappropriating Zunum's proprietary information as its own in order to exploit the vast market

9    opportunity that Zunum was in the process of capitalizing on as the first entrant.

10       11.    After obtaining this proprietary information from Zunum, Boeing approached

11   Safran and other original equipment manufacturers ("OEMs") of electrical components, such as

12   UTAS, to provide a hybrid-electric propulsion system for a different aircraft design that Boeing

13   was trying to develop based upon this proprietary information misappropriated from Zunum.

14   This aircraft design is now called the BHE-11, which, upon information and belief, refers to the

15   Boeing Hybrid Electric 11.

16       12.    Safran also believed that hybrid-electric aircraft were not viable until decades in

17   the future.  By approaching Safran to develop the BHE-11 on timeframes identified in Zunum's

18   business plan, Boeing disclosed Zunum trade secrets to Safran that enabled Safran, in less than

19   two years, to accelerate its development of hybrid-electric aircraft by nearly two decades, and

20   colluded with Safran to displace Zunum from the very market that Zunum had innovated and

21   disclosed to Boeing.

22       13.    Zunum was unaware that Boeing was using its proprietary information in concert

23   with Safran in this manner.  Meanwhile, other Safran business units also misused their ongoing

24   investment due diligence on Zunum's plans and technologies to gain, under false pretenses, the

25   information that they needed in order to: partner effectively with Boeing on the development of

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 4

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1   the BHE-11; exclude Zunum from Zunum's own technologies and exclusive opportunity; and

2   enter the market as a supplier of hybrid or electric aircraft.  At approximately the same time,

3   UTAS was attempting to do the same thing, also without Zunum's knowledge.

4          14.     Zunum discovered that Boeing was secretly developing a replica prototype of

5   Zunum's market entry aircraft design, staffed by the very same Boeing engineers and other

6   professionals whom Boeing had assigned to conduct extensive due diligence on Zunum, under

7   non-disclosure and non-use obligations.

8          15.     Boeing had previously provided false assurances that it merely wanted to

9   determine whether it could supply aerostructures for Zunum, not compete with Zunum, and that

10   Zunum continued to have the support of Boeing's top executives.  Boeing's Observer on

11   Zunum's Board of Directors, Logan Jones, told Zunum that the replica was being developed by

12   a team drawn from the Boeing Commercial Airplanes unit ("BCA"), and that Zunum should

13   provide further proprietary information in order to avoid damaging Boeing's supposed support

14   of Zunum.

15          16.     Boeing also kept Zunum beholden to it for much-needed capital and market

16   validation, stringing Zunum along with the prospects of an anchor investment and providing

17   leadership for further rounds of financing.  Although Zunum also sought investments elsewhere,

18   Boeing actively interfered with, undermined, and effectively sabotaged those business

19   relationships while inducing Zunum to continue its reliance on Boeing by holding out the

20   prospect of a strategic partnership or merger.

21          17.     Boeing induced Zunum to accept debt financing, convertible into equity in

22   Zunum, without disclosing that Boeing had decided to compete against Zunum and that Boeing

23   would be using Zunum's trade secrets against it to do so.

24

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 5

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

18.     By the time that Zunum discovered that Boeing was in the process of competing against it and had misappropriated Zunum's business plan, aircraft design, and technologies for supporting electrical, propulsion, and related systems, Zunum was starved of capital.

19.     Through a series of breaches of contract and fiduciary duties, misappropriations of trade secrets, and other tortious and fraudulent conduct, Boeing has sought to leverage its dominant position in the aircraft industry and its powerful influence over downstream suppliers to execute on a concerted and systematic strategy to delay and then foreclose the entry of an innovative competitor into the aircraft industry.

20.     Boeing has also colluded with other key aerospace manufacturers and funders to refuse to deal with Zunum and attempted to foreclose Zunum's entry into the worldwide markets for: (a) aircraft serving commercial air travel up to 1,500 miles; (c) commercial hybrid and all-electric aircraft; and (d) commercial hybrid and all-electric propulsion systems.

21.     Put simply, in contrast to the widely-accepted industry outlook that hybrid-electric or all-electric aircraft were decades away from commercial viability and Boeing's own lacking technology capabilities, Boeing saw Zunum as an innovative venture, with a dramatically accelerated path to the future enabled by its proprietary technologies and plans, and Boeing presented itself as interested in investing and partnering with Zunum.  But instead, Boeing stole Zunum's technology and disclosed it to Boeing's partners to accelerate Boeing's own roadmaps by two decades, while intentionally hobbling Zunum, as the upstart entrant, thus stifling competition in order to maintain Boeing's dominant position in commercial aviation. Meanwhile, Boeing combined with its partners to pursue the very same markets innovated by Zunum by misusing Zunum's trade secrets and preventing Zunum's recovery.

22.     By these actions, Boeing also aided and abetted the misappropriation of critical technologies in a strategic sector of Washington's and the United States' economies by Safran, a French "national champion" partially owned and supported by the national government of

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 6

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

France.  Boeing then proceeded with Safran as it claimed leadership of the market usurped from the entrant headquartered in Washington, while disrupting successive efforts by that entrant, Zunum, to recover.

## II.   JURISDICTION AND VENUE

23.     The Court has personal jurisdiction over the Defendants pursuant to RCW 4.28, *et seq.*, and 19.86.160 because the acts alleged concern the transaction of business, commission of tortious acts, and the ownership of property within the State of Washington.

24.     Venue is proper in King County pursuant to RCW 4.12, *et seq.*, because Defendants engaged in the conduct set forth in this Complaint in King County and elsewhere in the State of Washington and because one or more of the Defendants reside in King County.

## III.   PARTIES

25.     Zunum, formerly known as Tzunum, Inc., is a Delaware corporation headquartered in Redmond, Washington.

26.     The Boeing Company ("Boeing") is a Delaware corporation that conducts business within the State of Washington.

27.     Boeing HorizonX Ventures, LLC ("HorizonX"), is a Delaware limited liability company that also conducts business within the State of Washington.

28.     Safran, S.A., is a French company with a principal place of business in Paris, France.  Upon information and belief, Safran also describes itself, with its subsidiaries, as the Safran Group.

29.     Safran Corporate Ventures, S.A.S. ("SCV"), is a French company with a principal place of business in Paris, France.

30.     Safran Electrical & Power, S.A.S. ("SEP"), is a French company with a principal place of business in Cedex, France.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 7

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

31.     Safran Helicopter Engines, SASU ("SHE"), is a French company with a principal place of business in Cedex, France.

## IV.    FACTUAL ALLEGATIONS

32.     Zunum was founded in 2013 by Ashish Kumar, Ph.D., and Matt Knapp, who conceived of proprietary, innovative technologies to disrupt the air transportation industry by developing a $3 trillion market over 20 years for hybrid-electric and all-electric aircraft and hybrid-electric and all-electric propulsion systems that will dramatically improve mobility and greatly reduce or eliminate aviation emissions while reducing noise pollution on commercial flights up to 1,500 miles.  Dr. Kumar and Mr. Knapp formed Zunum to develop the world's first hybrid-electric and all-electric (alternately "hybrid-to-electric," as a converging process) regional aircraft for commercial service and to develop this new market as the first-mover.

33.     Zunum's aircraft and business plan offer to increase efficiency in door-to-door mobility, reduce emissions, reduce noise, and drive down the cost of short-haul air travel substantially lower than commercial air travel today.  By enabling more efficient, smaller, and quieter aircraft, the market and consumers would experience faster and more customized routing, creating time, fuel, emissions, and convenience efficiencies, which in turn would lower consumer costs and substantially expand the commercial aviation market.

34.      The first aircraft that Zunum designed was the ZA10, a 9 - 12 passenger plane with a 700-mile range, which Zunum planned to be commercially available by 2022.  Zunum's plan was to follow the ZA10 with increasingly capable aircraft, creating a low-risk pathway to a suite of single-aisle aircraft that was far less capital-intensive than conventional aircraft design and manufacture.

35.     Zunum planned to scale to the ZA50, a 48-seat aircraft with a 1,000-mile range, by 2027, followed by a 100 or greater seat airliner with a 1,500-mile range, by 2030.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 8

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

36.    The aircraft that Zunum had developed offered breakthrough performance, including operating costs at 30% to 80% below that of its best-in-class rivals, regional travel at two to five times faster than existing alternatives, enabling 40% to 80% lower airfares, and with emissions between 60% to 100% lower than conventional aircraft. In short, Zunum's innovative technologies offered a more convenient, faster, cleaner, and cheaper air transportation alternative for consumers.

37.    These technological features threatened to upend the single-aisle market for short-haul flights. Approximately 80% of flights of the Boeing 737 platforms are under 1,500 miles, which Zunum's aircraft were positioned to displace with advantages in travel time, cost, emissions, and noise.

38.    To this end, Zunum built a unique, agile cross-functional development capability across aircraft, electric power, and propulsion, scaling to nearly 100 engineers in three centers located in the states of Washington, Illinois, and Indiana. Zunum's technologies include hybrid-to-electric aircraft, megawatt-class series hybrid powertrain, and quiet all-electric propulsion, along with algorithms to orchestrate seamless multi-modal journeys door-to-door.

39.    In early 2019, when it was forced to halt its development program due to Boeing-caused capital starvation resulting in financial distress, Zunum had a ground prototype of the megawatt class hybrid-to-electric propulsion system for the ZA10 aircraft in final fabrication and testing on track for flight tests on a converted Rockwell Commander later that year. This included proprietary 500 kW lightweight electric machines, along with power electronics, controls, and thermal management, developed at its Electric Power Center in Illinois. Meanwhile, its proprietary electric fan designs were achieving 95% efficiency, with sub-scale prototypes ready for testing at Purdue University. The configuration of Zunum's 500 kW quiet electric propulsion units, with fully integrated electric motors, had been finalized, which along with the aircraft and systems, was on track for a Preliminary Design Review later that year, a

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    key milestone for delivery in 2023. Zunum had also been granted an FAA Special Project
2    Number for both aircraft and engine certification programs.

3        40.    Dr. Kumar and Mr. Knapp undertook significant economic risk and left successful
4    professional careers to embark on the Zunum venture and, over several years, developed an
5    extensive body of proprietary inventions, analysis, business and technological plans, and designs,
6    resulting in a roadmap to redesign air travel to improve service for consumers, while reducing
7    the environmental impact from emissions and noise. The aerospace industry and governmental
8    constituents had largely dismissed the possibilities that Dr. Kumar and Mr. Knapp were bringing
9    to the fore, which meant that there was not much financial or research support for these ideas.

10        41.    The world-class aircraft, propulsion, electrical, mechanical, thermal, and control
11    engineers, whom Zunum hired from leading OEMs in aerospace, automotive, and heavy
12    electrical systems, also gave up stable careers and risked their futures to join Zunum's effort at
13    the forefront of global aviation.

14        42.    The market that Zunum envisioned was hailed in the industry as "a new dawn"
15    for short-haul air travel and was being recognized for its disruptive and transformational value
16    proposition. In addition, in August 2017, shortly after Zunum emerged from operating in a
17    stealth mode, the Zunum ZA10 aircraft was featured on the cover of *Aerospace America*, a
18    publication of the American Institute of Aeronautics and Astronautics, the world's largest
19    aerospace technical society, with the headline: "Can this plane reshape air travel? Zunum Aero
20    leads in betting on the power of hybrid-electric technology." Further, in a survey by UBS Group
21    AG ("UBS"), an investment bank, published in late 2020, passengers listed "hybrid-electric
22    planes" as the most preferred alternative to conventional aircraft due to environmental concerns,
23    ahead of high-speed rail, automobiles, trains, and buses.

24        43.    Fast Company shortlisted Zunum as one of the World's Breakthrough Ideas in
25    2018, and, in 2019, selected it as one of the World's Most Innovative Companies. Also,

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 10

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  Bloomberg New Energy Finance selected Zunum as a New Energy Pioneer for 2019, one of a

2  few innovative companies from around the world recognized for leadership in clean energy

3  technologies and business transformation.

4       44.    Zunum's ZA10 aircraft also won the Gold Award for Product Design at the 2018

5  New York Design Awards.

6       45.    In July 2019, the investment bank UBS identified Zunum as one of two leading

7  aircraft programs in its report, "Green Power: Will Climate Change Propel the Sector Towards

8  Hybrid Electric Aviation by 2028?"

9       46.    In February 2020, Zunum's hybrid and all-electric aircraft and propulsion

10  technologies were included in the "Aircraft Technology Roadmap to 2050" by the International

11  Air Transport Association, the leading trade association for global airlines.

12       47.    Zunum has launch orders for up to 155 ZA10 aircraft from customers in the

13  United States and Europe, valued at up to $800 million.

14  **A.**    **Industry Background**

15       48.    Boeing enjoys a super duopoly with Airbus that dominates the market for single-

16  aisle aircraft with over 90% share of this market. In the past, single-aisle aircraft accounted for

17  about 50% of commercial aircraft sales, and wide-body aircraft made up the other half. Now the

18  percentage of single-aisle aircraft sales is increasing, reaching 60% to 70% of all commercial

19  aircraft sales.

20       49.    In the 1990s, much of civil aviation was focused on long-haul flights served by

21  enormous aircraft, such as the Boeing 747 and the Airbus A380. The Boeing 747 was successful

22  for decades with seating for up to 366 passengers, which was eclipsed by the Airbus A380, with

23  seating for up to 853. Not all airport runways could accommodate widebody aircraft, nor could

24  flights to smaller destinations fully utilize the passenger capacity of widebody aircraft, so this

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 11

1    necessitated a "hub and spokes" networks of airports requiring passengers to take connecting

2    flight to smaller destinations not serviced by widebody aircraft.

3        50.    Over time, however, the airline market has seen a retreat from superjumbo jets to

4    smaller, more efficient long-haulers, coupled with widespread use of variants on the smaller

5    Boeing 737 platform and Airbus competitors.  This gives consumers more direct or non-stop

6    flights, which has provided travelers with the benefits of avoiding layovers while minimizing the

7    risk of lost checked luggage when transferring between planes.  Simply put, traveling from

8    Bellingham to Provo may now require over a day, a lot of money, and a lot of driving and waiting

9    (if even possible without a private charter), but a direct flight in a smaller craft, using closer,

10   smaller airports, can result in speedier, cheaper, and a more comfortable air transportation

11   experience.

12       51.    Boeing's 737 class of aircraft and Airbus's A320 class of aircraft dominate the

13   vast single-aisle market.  These platforms were designed for ranges up to 4,400 miles but are

14   often operated on much shorter legs.  For example, currently, approximately 80% of the flights

15   of the Boeing 737 in the United States are under 1,500 miles, approximately one-third of the

16   range for which the Boeing 737 platform was designed, making them ill-suited to such

17   operations.

18       52.    Boeing has historically not been active in the market for smaller aircraft tailored

19   for short-haul flights, which was served by other manufacturers, such as Embraer and

20   Bombardier.  In recent decades, given increasing interest by the airlines in aircraft with seat

21   capacities of 100 to 150, "Embraer and Bombardier saw an opportunity to extend their product

22   lines in ways that, for the first time, would put them in a position to steal business away from

23   Boeing and Airbus, which had not fundamentally redesigned their single-aisle planes in

24   decades."  Steven Pearlstein, "Boeing and Airbus, the new 'super duopoly,'" *Washington Post*,

25   April 25, 2018.  They did so by launching the Embraer E-Jet E2 family and the Bombardier C

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 12

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1   Series into the low end of the single-aisle market, creating a competitive threat to Boeing's and

2   Airbus's super duopoly.

3       53.    After a mutually unsuccessful competitive confrontation for larger, super jumbo

4   jets, Boeing and Airbus enjoyed many years of profitable full production of the Being 737 and

5   Airbus A320, with years of backlogged orders.  In 2015 - 2019, as they looked to the future, they

6   began concentrating on the smaller capacity aircraft, where the demand from airlines was rapidly

7   growing.  Efficient routes offered by the likes of Southwest Airlines in the United States, Ryanair

8   in Europe, and scores of new entrants and emulators in Asia and throughout the world became

9   the new standard, resulting in an explosion in air travel options that were both cost and time

10  efficient.

11      54.    In October 2017, precipitated by Boeing's action to block the Bombardier C

12  Series from the United States, including unsuccessful fair-trade complaints, discounted pricing

13  on the smallest 737s to undercut the Bombardier C Series and other obstructions, Airbus acquired

14  control of that program for $1, which set Bombardier on path to exit commercial aviation entirely

15  in February 2020.  "Boeing was quick to criticize the Airbus-Bombardier alliance as 'a

16  questionable deal between two heavily state-subsidized competitors.'  But to many in the

17  industry, it looked as if Boeing's strategy had backfired.  Not only could Bombardier now enter

18  the U.S. market with a sleek new fuel-efficient plane against which Boeing could offer no

19  alternative – at least not without undermining its pricing for its smallest 737s – but it also had

20  unwittingly strengthened the market position of its archrival, Airbus."  Pearlstein, "Boeing and

21  Airbus, the new 'super duopoly.'"

22      55.    "So Boeing decided it had no choice but to respond in kind and began serious

23  negotiations to buy the commercial aircraft division of Embraer," confirming these discussions

24  in December 2017, and announcing its plan in July 2018 to purchase 80% of Embraer's

25  commercial aircraft business for $4.2 billion.  *Id.*  Having failed in the attempt to use legal

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  maneuvering and political influence to preserve their highly profitable duopoly, Boeing and

2  Airbus sought to acquire competitive threats.

3      56.    Boeing's planned purchase of Embraer triggered an investigation by the European

4  Union's antitrust regulators, given that it would have removed Embraer as the third-largest

5  competitor in the highly concentrated single-aisle market.  Meanwhile, Embraer prepared for the

6  purchase by separating its commercial aircraft unit and aligning its product plans with Boeing.

7      57.    Under pressure from the 2019 Boeing 737 MAX crisis, in which faulty product

8  design is widely believed to have resulted in numerous fatalities, which shut down all flights of

9  that aircraft, as well as the subsequent COVID-19 pandemic in 2020, Boeing abruptly withdrew

10  from the purchase of Embraer in April 2020, triggering Embraer to initiate arbitration, alleging

11  that Boeing had "manufactured false claims as a pretext to seek to avoid its commitments to

12  close the transaction."  Embraer's future remains uncertain, and it is reported to be exploring

13  partnerships with potential partners from India, China, and Russia.

14      58.    Thus, despite the failed Embraer purchase, actions by Boeing over the past few

15  years have reflected the momentum for the continued consolidation of the already highly

16  concentrated short-haul market, eliminating Bombardier as a competitor, and leaving Embraer

17  hobbled, without a strategic partner and urgently in need of new investors, mid-pandemic.

18      59.    Meanwhile, competition from new entrants is stifled by the Boeing-Airbus super

19  duopoly's vast technological and infrastructural critical-mass advantage, and financial scale

20  advantages, including modeling and engineering complexities that multiply when scaling up to

21  larger airframes.  There is also a substantial advantage conferred by aggressive subsidies and

22  protectionist trade policies that both Boeing and Airbus have enjoyed from their respective

23  governments, in exchange for providing jobs.  This support for "national champions" has, for

24  Boeing and Airbus, led to limited pricing pressure, years of profitably-priced backlogs, and

25  stable pricing and profitability.  For instance, in recent years, Boeing has "benefited from billions

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 14

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    of dollars in subsidies from the States of Washington, South Carolina and Missouri," "federal

2    subsidies it received by way of loan guarantees from the Export-Import Bank," and "research

3    and development subsidies embedded in the tens of billions of dollars of Pentagon contracts on

4    Boeing's order books." Pearlstein, "Boeing and Airbus, the new 'super duopoly.'"

5        60.    Additionally, Boeing and Airbus reap the benefit of captive profits from their

6    defense aviation businesses, which are perceived as strategic national security assets for the

7    United States and Europe, respectively.

8        61.    Many aircraft OEMs around the world have been subsidized by their home

9    nations to move up the technology and industrial hierarchy as "national champions" within the

10   aviation industry, including Bombardier (Canada); Embraer (Brazil); Dassault (France); Fokker

11   (Netherlands); COMAC (China); Yakovlev and Ilyushin (Russia); among others. In fact, when

12   lobbying for support of its acquisition of Embraer, Boeing asserted "that government-subsidized

13   competitors from China, Japan, and Russia are the real competitive threat looming on the horizon

14   and that allowing Boeing to take over Embraer will put the American champion in a strong

15   position to withstand that 'unfair' competition." *Id.*

16       62.    This form of support has been provided as well to "national champion" engine

17   OEMs such as Safran, which has long been a beneficiary of the EU and the French Republic in

18   ways that may violate EU competition laws, United States antitrust laws, and treaties that the EU

19   has entered into with other nations. In fact, the French Republic is by far the largest shareholder

20   of Safran, with 11.2% of the shares of the conglomerate, and a disproportionate 17.2% of the

21   voting rights. Recent examples of support to Safran that distort competition in the markets

22   identified and developed by Zunum include: a € 300M loan from the European Investment Bank

23   to Safran in 2009 under the European Clean Transport Facility; a sharp increase in funding in

24   June 2020 for the Civil Aviation Research Council (Safran is a leading member and current

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 15

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    Chair), equaling € 1,500M (approximately $1.8 billion), to accelerate research on a green jetliner;

2    and even greater support under France's "big green recovery plan" of September 2020.

3         63.    Meanwhile, commercial airlines have also undergone tremendous consolidation

4    over the past decade such that over 80% of domestic aviation in the United States is controlled

5    by just four carriers – United, Delta, American, and Southwest – leading to higher fares, poorer

6    service, and fewer routes.  The United States has just 10 mainline carriers, down from 18 just

7    over a decade ago.

8         64.    The consolidation has been even more severe among regional carriers that serve

9    short-haul routes.  While approximately 100 carriers accounted for 90% of the market for short-

10   haul flights in the 1980s, only five carriers accounted for this same market share in 2012, and

11   this trend has continued.  The consolidation has come with a scale-up of the regional fleet driven

12   by the economics of large jet engines.  Aircraft in the regional fleet expanded from 20 seats on

13   average in 1980, to 60 seats in 2010, and are now standardizing to 80 seats or greater with aircraft

14   OEMs such as Embraer following suit.

15        65.    The scale-up has left vast unserved and underserved communities in its wake as

16   commercial air service has become concentrated in just a few large hubs.  For example, the State

17   of Washington has roughly 140 airfields, 63 of which are included in the national airport system

18   under the National Plan of Integrated Airport Systems ("NPIAS"), and yet commercial service

19   has consolidated to such a degree that 96% of all traffic is limited to just two airfields.  This

20   pattern has been replicated throughout the United States and around the world as smaller aircraft

21   in the global commercial fleet have been swept aside by larger single-aisle aircraft, with dire

22   impact to consumers, who are often left with no little or no alternative other than slow journeys

23   on highways.  The impact is illustrated by the fact that nearly 95% of long-distance travel (over

24   100 miles) in the United States is to destinations within 1,500 miles, and over 90% of this travel

25   is by highway.

1    66.    This long-running consolidation of commercial aviation is "leading to a less than

2    fully competitive aerospace sector in which there are only two giant parts makers and two or

3    three engine makers supplying two giant aircraft manufacturers, which in turn supply only three

4    or four giant airlines." Pearlstein, "Boeing and Airbus, the new 'super duopoly.'" The level of

5    consolidation "has already reached the point where it is producing outsize profits, higher prices

6    for consumers and declining rates of investment and innovation." *Id*. In sectors such as aviation

7    where there are already only a few competitors and high barriers for any new players to enter,

8    there is a critical need to protect entrants from the anticompetitive actions of the incumbents, and

9    of their supporting nations.

10    67.    Meanwhile, fuel is roughly 20% of the operating expense of a commercial airline,

11    and it is the largest variable element. In addition, airlines face increasing pressure from

12    consumers and regulators to reduce fuel emissions to help combat climate change and improve

13    air quality, particularly in the vicinity of the airport hubs, which are generally located near major

14    metropolitan areas. Increasing numbers of carriers are charting paths to net zero emissions. In

15    September 2020, for instance, the 13 airlines in the Oneworld Alliance committed to net zero

16    emissions by 2050.

17    68.    This vast sector of the economy, the aerospace OEMs and the short-haul

18    operations of the commercial airlines, is on the cusp of the greatest transformation since the

19    advent of the jet age 70 years ago. Novel propulsion systems tailored to short-haul flights,

20    benefiting from the fast pace of electrification of ground transportation, will initially complement

21    and then supplant jet engines over the coming decades, thus increasing consumer choice while

22    simultaneously reducing the environmental impacts of air emissions and noise pollution.

23    69.    Zunum's business model and value proposition was focused on releasing this

24    monopolistic stranglehold by serving the vast unmet need for economical, fast, and efficient

25    short-haul travel. Zunum planned to do this by developing novel propulsion systems and aircraft

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 17

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1 tailored specifically to the needs of consumers and airlines in this market, which are necessarily

2 unlike current aircraft and jet engines designed for medium-haul distances and beyond.

3 Accordingly, in July 2020, Roland Berger, a leading European consultancy, published a roadmap

4 to net zero emissions for aviation, advising the industry to "invest in new propulsion technologies

5 and deploy them for range-appropriate missions." The technologies listed for missions to 3,700

6 miles, fully electric, hybrid-electric, and hydrogen fuel cells, are optimally addressed by

7 Zunum's power source-agnostic, hybrid-to-electric propulsion systems.

8   70.  The explosive worldwide growth of companies such as Tesla, Inc., has been

9 driven by such transformational adaptation and disruptive technology. By becoming the first-

10 mover for innovative electric ground vehicles, even with limited market penetration, Tesla has

11 achieved a market valuation of $578 billion as of December 11, 2020. That value is greater than

12 four times that of the combined legacy "Big Three" United States automakers, which have lagged

13 Tesla's agility and innovation: General Motors, $60 billion; Ford, $36 billion; and Chrysler

14 (including Fiat), $37 billion (totaling $133 billion). In fact, Tesla is the most valued automaker

15 worldwide by far, such that its value far exceeds that of the combined market valuation of the

16 next three largest auto makers: Toyota, Volkswagen, and Daimler.

17   71.  In November 2018, 13D Global Strategy & Research, an independent institutional

18 research firm, published an installment of its weekly publication, "What I Learned This Week,"

19 explaining that, "[t]he trillion-dollar global aviation sector is on the brink of massive disruption.

20 Electric propulsion will completely reinvent the industry." This article highlighted that the type

21 of disruption that occurred in the automobile industry would inevitably occur in the aviation

22 industry such that "the transformation of the global aviation sector may be one of the major

23 investment opportunities of the century."

24   72.  The potential of Zunum to do to Boeing what Tesla did to entrenched automakers

25 represented an existential competitive threat to Boeing's dominance of the single-aisle market,

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 18

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    triggering an aggressive response similar to its actions against Bombardier and Embraer. This

2    competitive pressure on Boeing has since been compounded by the operational pressure due to

3    the Boeing 737 MAX safety issues, which grounded this fleet, and the financial pressure due to

4    the COVID-19 pandemic.

5         73.     Innovative, market-leading technology, coupled with effective and nimble

6    execution, are the hallmarks of the first-mover advantage. If another party slows down or

7    otherwise impedes the first-mover's progress, it can foreclose the first-mover's advantage in the

8    market, which potentially sets this blocking company up to exploit the first-mover advantage

9    itself and leverage its way into a dominant position in the market, or to protect its existing

10   position if it is already a dominant player in the same or a related market.

11        74.     While Tesla came to market with intellectual property that included significant

12   trade secrets, it did not invent the automobile, the battery, or even smooth integration of both.

13   But its numerous innovations in integrating the two – software, algorithms, novel assemblies,

14   and devices – were the competitive boost that led it to the front of the pack.

15        75.     Prior to Zunum's emergence from operating in stealth mode in early 2017, the

16   prevailing view among airlines and aircraft manufacturers, including Boeing, as well as industry

17   analysts and economists, had long been that hybrid-electric or all-electric propulsion systems

18   were not technologically or economically viable, especially not before 2040 or beyond.

19        76.     For example, in 2016, the National Academies of Sciences, Engineering, and

20   Medicine published a report funded by NASA, entitled, "Commercial Aircraft Propulsion and

21   Energy Systems Research: Reducing Global Carbon Emissions." This report reflected the

22   collective perspective of the major aerospace OEMs at the time, and it recommended a 30-year

23   national research agenda that the United States de-emphasize hybrid-electric propulsion systems,

24   high-power batteries, hydrogen fuel cells, superconducting motors, and generators, especially

25   because the near-to-middle term opportunity was projected to be futile. As reflected in this

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 19

1  report, the conventional wisdom among the OEMs of the primary components of the propulsion,

2  electrical systems, and aircraft frame was that the batteries and other technologies necessary to

3  achieve commercial series hybrid and all-electric propulsion systems would continue to not be

4  cost-competitive and weigh too much, resulting in greater energy requirements, and therefore,

5  would continue to be infeasible for decades to come.

6      77.    Meanwhile, in October 2016, Safran published a paper describing "the

7  perspective of Safran Group" on electrified propulsion at the Greener Aviation 2016 Conference,

8  entitled, "Long-Term Hybrid-Electric Propulsion Architecture Options for Transport Aircraft."

9  This paper set forth Safran's expected timelines for the introduction of a range of electrified

10  aircraft, by class:

| Class of Aircraft | Takeoff Power | Entry to Service | | Zunum Lead Years |
|---|---|---|---|---|
| | | Safran | Zunum | |
| Commuters | 1 MW | 2041 | 2021 | 20 |
| Regionals (50-100 seats) | 2-5 MW | 2049 | 2025 | 24 |
| Single-aisles (100-150 seats) | 5-10 MW | 2054 | 2030 | 24 |

16      78.    Safran's timelines for "series hybrid" aircraft are shown in the table above, along

17  with timelines that Zunum disclosed to Boeing for its family of series hybrid-to-electric aircraft

18  while under due diligence in that period.  Safran's anticipated timeline was two decades or more

19  behind Zunum, consistent with the perspectives expressed in the report by the National

20  Academies of Sciences, Engineering, and Medicine.

21      79.    Zunum operated in stealth mode from 2013 to 2017 to protect this substantial

22  first-mover advantage based on the uniqueness of its technology while executing on the initial

23  phases of its business plan.  While operating in a stealth mode, Zunum engaged a wide array of

24  industry stakeholders, such as carriers, communities, regulators, and funding agencies, to

25  validate and refine the disruptive technologies that it had identified and developed.  Starting in

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 20

1    2015, Zunum also applied to a range of federal agencies that are critical sources of early

2    financing for engineering ventures. This included the National Science Foundation ("NSF"), the

3    Department of Energy (DOE), the Advanced Research Projects Agency-Energy ("ARPA-E"),

4    NASA, the Department of Defense, and the FAA. However, Zunum's proposals were repeatedly

5    impeded by the assertions of the entrenched major manufacturers that hybrid and all-electric

6    propulsion was not viable ahead of the 2040s, and that the focus of electrification must be on the

7    existing Boeing and Airbus fleet, *e.g.*, the Boeing SUGAR project, with minimum ranges of over

8    3,500 miles and minimum capacity of 150 seats. Meanwhile, venture investors viewed Zunum

9    as potentially viable, but ill-suited to venture funding. A successful hardware investor noted

10   about Zunum in 2015, "This is probably going to work out for someone eventually but this is a

11   DOE investment, not a venture investment." A founder that successfully sold a company to

12   Boeing noted in 2015 that "I think one alternative is that they need to stake out a strategy that

13   includes teaming with one of the airframers (Boeing, Cessna, Embraer, etc.) once they have some

14   proprietary technology locked down to keep from being over-run."

15   **B.    Zunum's Intellectual Property, Trade Secrets, and Proprietary Information**

16       80.    Zunum's breakthrough "range optimized" aircraft are built on hybrid-to-electric

17   propulsion systems, where the aircraft is powered entirely by electric motors that receive

18   electricity from one or two sources of power, such as batteries, turbogenerators, or hydrogen fuel

19   cells. They may have a hydrocarbon-fueled engine, but it is smaller than typical, uses less fuel,

20   and is designed for replacement with less polluting sources, including fuel cells or batteries, as

21   these technologies achieve anticipated performance improvements during an aircraft's life.

22       81.    Zunum's proprietary information includes a large body of designs, analyses,

23   modeling, development tools and platforms, algorithms, prototypes, test data, and forecasting

24   concerning the market opportunity and the technical elements that would allow Zunum to

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 21

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    develop the aircraft and propulsion systems, enter the market, and execute on the opportunity in

2    order to seize the first-mover advantage.

3        82.    In recent decades, oversized flying tubes have pushed customers through rigid

4    hub-and-spoke routes, with 100+ passenger units racing to high altitudes and high speeds,

5    burning inefficient amounts of fuel, time, and money.  To get a family of seven in Olympia,

6    Washington to a wedding in Nampa, Idaho means an 8-hour drive, or a drive-park-wait-fly-rent-

7    drive combination of 6 to 11 hours, using Sea-Tac and Boise airports.

8        83.    Direct point-to-point routing enabled by Zunum flights, using local airports, cuts

9    that time to two-and-a half hours door-to-door at a commercial price point, with less fuel, less

10   impact on the environment while providing an experience akin to private jet owners.  There are

11   two or more Zunum-suitable airports in each of Olympia and Nampa proper, just as there are

12   tens of thousands of local and municipal facilities around the United States that can

13   accommodate smaller craft to provide a closer point-to-point fit for more customized travel.  The

14   paradigm shift impacts over 95% of long-distance travel in the United States to destinations of

15   less than 1,500 miles, where no good alternatives exist.  Commercial air has consolidated to a

16   few large hubs.  High-speed rail, or even the hyperloop, if realized, is fast along its spine, but not

17   for off-spine trips.  High-speed rail is also notoriously capital-intensive, such that any

18   deployment in the United States would be limited to a few trunk routes, already served by

19   commercial air.  As a result, door-to-door times have not declined over the last 50 years, and

20   large numbers of smaller communities are increasingly disconnected from the global air system,

21   impacting investment and employment.  Reversing this trend could increase domestic air travel

22   by 50% to 75%, improve productivity, enable living and working less tethered to large cities,

23   and rejuvenate rural and other less densely populated communities, all while taking short-haul

24   air to net zero emissions.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 22

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

84.     The tangible innovations that Zunum shared with Boeing included, without limitation: (i) fundamental reconfigurations of the aircraft and propulsion system; (ii) selection and configuration of power sources onboard; and (iii) propulsion electrical systems and components thereof; and (iv) propulsors and components thereof.   These tangible innovations are the product of many additional trade secrets, including Zunum's design process, which were also shared with Boeing.  Zunum has patented numerous items (some of which, on information and belief, Boeing has claimed as if it invented them, to be addressed elsewhere, as sufficient facts develop), but has also relied on trade secret protection for dozens of separate tangible and intangible devices and tools.

      i.     For example, at the time of discussions with Boeing, the prevailing industry thought was that commercial hybrid-electric aircraft were at least 20 years in the future, and even then, likely only mild parallel-configured hybrids.  Zunum undertook to change hybrid aircraft powering to strong series-configured hybrid-to-electrics, tailored to and optimized for missions to 1,500 miles where these technologies would have immediate impact.  The series-configured hybrid supplements batteries or other energy storage technology with an optional combustion engine or hydrogen fuel cell, which, with the matching aircraft design, results in large efficiency gains, which continue to increase over the life of the aircraft.  These efficiencies are due in part because any engine is actually in use for only a fraction of the flight duration, so the optional combustion engine or hydrogen fuel cell only needs to supplement the battery as needed for limited durations of flight time.  That, in turn, means that the engine is smaller, the fuel use is lesser, the overall emissions are lesser, and the operating costs are lesser.  In contrast, a parallel configuration uses the battery and motors to supplement the fueled engine, which remains the prime mover, staying on for the full flight.  The

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    correspondingly small reductions in fuel burn delivered by the typical parallel

2    battery and engine configurations led to a conventional wisdom that hybrid and

3    battery flight are realistic only in the distant future and uncompetitive

4    economically in the near to mid-term. The hardware and software needed to

5    make this series configuration viable are a large number of interdependent

6    specifications, and include items ii, iii, and iv below, as well as numerous bespoke

7    design considerations, including unique generator and battery placements,

8    propulsor rotor designs, and propulsion system weight distributions.

9    ii.    By way of another example, Zunum's aircraft are power source-agnostic,

10    designed to adapt to the continuous development of technologies such as turbines,

11    batteries, and fuel cells driven by ongoing investments in decarbonization across

12    sectors. For instance, ground-transport batteries have experienced radical

13    improvements in energy density, cost, and safety. Electrical output from different

14    batteries is fungible. Using a flexible battery integration mechanism with a

15    battery-agnostic powering apparatus allows the Zunum aircraft and powertrain to

16    adapt to use different presently available batteries, and use varied future

17    batteries. Ground-transport batteries will continue the same inexorable evolution

18    to greater energy densities, lower costs, and improved safety as has happened

19    every year for the last decades, not unlike the continuous improvement that has

20    occurred in integrated chips in computers. A Zunum aircraft that can fly at

21    competitive door-to-door speeds presently with a fixed fuel load will fly that same

22    route faster and with less fuel and emissions with a battery that is, for example,

23    twice as dense in several years and at even lower costs. At some convergence

24    point, no internal combustion engine will be necessary. The continuous evolution

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 24

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

of improvements in battery technology is accommodated by Zunum's present technologies, including the eventual removal of the internal combustion engine.

iii.    As a further example, Zunum's aircraft's propulsion electrical systems are customized and designed to yield extraordinary efficiency and adaptation to the varying power requirements during different phases of taxi, climb, cruise, and descent, across a wide range of operating altitudes and speeds.  They use algorithms and control systems drawing power from the most efficient combination of power sources for each phase.  Those algorithms, source code programs, and hardware and software controls, are trade secrets that Zunum has developed and protected.  Ordinary aircraft have vast power consumption during each phase, including because the primary engines (kerosene-fueled) are always fully operating, even if throttled back.  Numerous design innovations and novel mechanical systems have been implemented by Zunum to achieve their novel hybrid-to-electric propulsion electrical systems such that they perform this function within the unique weight, safety, and cost requirements of commercial aviation, at least two decades or more ahead of when others asserted this could be done.

iv.    As another example, Zunum's electric propulsors achieve very high efficiencies and low noise by extending bypass fan technology to low and ultra-low pressures for short-haul flights, while allowing for optimal coupling with simple, lightweight electric machines rather than extremely complex jet engines.  Unlike a conventional bypass fan, the design of which is constrained by the need to ensure proper functioning of the jet engine, the Zunum electrically-driven fan is freely optimized across the fan and electric motor.  This novel fan and motor assembly is uniquely integrated into a quiet propulsion unit for far lower noise

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

and far greater simplicity, comprising additional design innovation and novel mechanical, electrical, and thermal systems to maximize efficiency, while minimizing cost and noise. To fully realize the potential of the electric propulsor, Zunum also developed proprietary algorithms and platforms for the integrated design of such electric propulsors, and the synchronization of this design with aircraft design cycles.

85.    Zunum's calculational innovations that were shared with Boeing included fundamental re-modeling of aircraft design assumptions and equations, manifesting in numerous insights that drive novel designs and which enable novel solutions to what were until recently fundamental constraints on aircraft performance parameters. For example, because conventional kerosene-fueled jet engines have been a mainstay of modern air travel, certain baseline assumptions have been held steady in aircraft design and use models for decades. The jet engine is most efficient at high altitude and high speeds; however this combination requires very high power. This is evident in definition of power required as velocity times drag force; at a constant altitude drag scales as the square of velocity such that power required is a cubic mathematical function so that a doubling of the rate of airspeed at the same altitude results in increasing the power required – and hence the rate of fuel consumption by 8 times (2 x 2 x 2). That is one of the drivers for aircraft to fly at higher altitudes, typically 36,000 feet, where there is less atmospheric pressure (which reduces air resistance once the aircraft has attained 36,000 feet, but increases fuel consumption to reach 36,000 feet). By flying at lower altitudes at lower flight speeds, but on more direct courses, net, actual travel times (and real speed to reach the destination) are reduced. Those high altitude and high velocity inputs are also assumed to be the normal operating constraints on aircraft performance because that is the optimal condition for the family of kerosene-fueled jet engines that have been the mainstay of all air travel. A prime example is the Boeing 737, which is designed for speeds up to Mach 0.8 and ranges of at least

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 26

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

3,500 miles. Previous approaches to electrifying aircraft retained these assumptions, leading to very high energy and power requirements, which require electrical components and batteries that are not likely to be available for the next decade or more. Moreover, the resulting aircraft, like the 737, are not designed to be maximally efficient for flights less than 1,500 miles even though 80% of all commercial flights are less than 1,500 miles, and flights of less than 400 miles generally yield extreme inefficiencies resulting in fuel waste.

86.    By focusing on the design parameters for commercial air travel less than 1,500 miles, thus reducing payload and speed requirements, Zunum's optimized aircraft and propulsion specifications yield much higher net door-to-door speeds based on more-direct routing that leverages a much larger fraction of the existing airfields than receive commercial air service today. Lower payload and speed, coupled with a novel hybrid-to-electric propulsion system, enables Zunum to optimize performance over a vast range of design parameters, based on different and innovative calculational approaches. Boeing engineers have confirmed by their own words that these approaches are novel, surprising, and had been unrealized and unknown to Boeing until revealed by Zunum. While Zunum has developed tangible, mechanical, and design manifestations that are themselves trade secrets, the underlying trade secret generator is the calculational and conceptual paradigm that itself is a complex and proprietary trade secret, but which yields watershed changes, including scores of consequent innovations.

87.    This paradigm shift upends well-known calculational tradeoffs in the commercial aviation industry of range, speed, and payload. Range drives speed, requiring a heavier aircraft, and larger engines. Range also drives weight of fuel, which results in a still-heavier aircraft and even larger engines. Zunum solved the universal range-speed-payload trade-off in a previously unknown way, building on the capabilities of rapidly improving power sources and electrical components, by developing novel propulsion that scales to smaller aircraft in ways that kerosene-fueled jet engines do not and also aircraft powered by this novel propulsion uniquely tailored for

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 27

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    commercial flights under 1,500 miles.  Zunum has undertaken those tangible solutions, many of

2    which are novel, including some patented and some protected as confidential information and

3    trade secrets.  But the underlying paradigm, the calculations and modeling that enabled the new

4    market space, and then the studies and plans that derive from it, themselves were all unknown to

5    Boeing, and acknowledged as such by disbelief, skepticism, and even jealousy.

6         i.    The actual design responses to the new market space enabled by the calculational

7               outcomes are many.  Electrically powered propulsors optimized for lower speeds

8               are far simpler than extremely complex jet engines.  All propulsive power being

9               electrical means that an innovative series architecture enables aircraft that are

10              uniquely power source-agnostic, adopting future power sources as these evolve,

11              while drawing power from these sources on every flight to minimize energy used.

12              This also enables uniquely safe aircraft using components and power sources

13              provided by third parties at modest cost and weight.

14       ii.    Instead of misapplying to short-haul flights single-aisle aircraft that were

15              designed for traveling thousands of miles, Zunum's aircraft are purpose-built

16              from the ground-up to fly short-haul routes in a wholly different way and at lower

17              operating costs.  Both the conceptual realization, and the vast number of design

18              solutions resulting therefrom, were previously unknown.  Boeing's prior lack of

19              awareness of, then its expressed interest in, and then its competitive attempt to

20              emulate Zunum's aircraft, all showed the valuable and innovative nature of these

21              new approaches, which Zunum duly protected as trade secrets.

22      iii.    The opportunities that Zunum's design innovations have yielded to date have

23              resulted in other engineering and technical developments.  Resulting trade secrets

24              included, without limitation, (a) quiet propulsion via novel electric ducted fans

25              optimized for ranges and speeds of the hybrid-to-electric aircraft; (b) optimal

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    scaling that enables an earlier market entry and lower certification risk via Federal
2    Aviation Administration Part 23; (c) novel aircraft and propulsion systems that
3    scale to single-aisle airliners; and (d) component simplification, reducing
4    purchase price, maintenance required, and operating costs, across a range of
5    commercial aircraft.

6    iv.    Zunum's economic studies, leveraging data re-analysis and mining, developed
7    heretofore undiscovered correlations between operating cost and size and range,
8    led to detailed business cases, and plans relating to markets for which kerosene
9    jet engines are inherently inefficient. The secret work on a new paradigm, new
10    calculational tools, and trade studies and business plans, fleshed out a whole new
11    business model. Zunum developed these all and shared much of them with
12    Boeing, including the information that these new aircraft would exceed the
13    performance of Boeing's 737 product line on short-haul flights.

14    88.    These trade secrets, which included Zunum's hybrid-to-electric aircraft and
15    propulsion technologies, were unknown in the marketplace, and provide the foundation for
16    Zunum's competitive advantage across several key metrics, such as cost, noise, and emissions.
17    In fact, Boeing had previously rejected these concepts before Zunum's innovative and disruptive
18    technology demonstrated that these concepts were economically and technologically feasible and
19    marketable in the very near term.

20    89.    These trade secrets were also costly to develop, and Zunum spent approximately
21    $3.5 million to develop its trade secrets before its Series A investment round.

22    90.    In order to protect its unique and superior technological advancements in this
23    area, Zunum guards its trade secrets vigorously. It operated in a stealth mode from 2013 through
24    early 2017. When engaging potential investors, partners, and employees, it did so only when
25    non-disclosure agreements were in place, and by strictly limiting what information was shared

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 29

otherwise.   All Zunum employees, contractors, and advisors signed strict confidentiality agreements to protect Zunum's confidential information.   Zunum's computers and networks have always been protected by state-of-the-art security, and public access to Zunum's facilities have always been restricted.

C.    **Zunum Develops a Relationship with Boeing**

91.    As Zunum began to emerge from its stealth development phase, it sought outside funding and a strategic partner to provide complementary industry expertise and infrastructure in order to advance its technological concepts toward market production.

92.    With high entry barriers for new entrants into this market, most investors perceive that a new entrant would require billions of dollars in capital to develop a new commercial aircraft.  Although Zunum's technology and business plan offered a much less capital-intensive path, the company still faced limited options for financing.  Venture capital typically eschews hardware ventures, and government funding was limited by the prevailing view at Boeing and others that the electrification of commercial aircraft was decades away.

93.    Given this dynamic, Zunum cautiously approached a few of the major aerospace companies to explore investment to develop their technological concepts toward market production, limiting outreach to companies where the risk of competitive conflict was lower.

94.    Zunum identified Boeing as a prospective investor and strategic partner because, at the time, Boeing did not compete in aircraft propulsion and was not developing smaller aircraft tailored to short-haul flights.

95.    On hearing that Zunum had developed low-emissions aircraft and propulsion that delivered economics competitive with single-aisle airliners in commercial aircraft as small as 10 seats, Boeing quickly became interested in Zunum as an investor and strategic partner.

96.    Furthermore, 2016 being the Centennial of Boeing's founding in 1916, leaders at Boeing had been directed to pursue large-scale disruptive opportunities that could lay the

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 30

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    foundation for the next 100 years of growth for the company.  The $3 trillion transformation of

2    short-haul aviation proposed to Boeing by Zunum was perceived as enabling just such an

3    opportunity.

4        97.    Zunum's initial introduction to key decisionmakers at Boeing was through

5    Pradeep Fernandes, then Managing Director of Integrated Product Strategy for the BCA business

6    unit, with whom Dr. Kumar was acquainted socially.

7        98.    In May 2016, Mr. Fernandes invited Dr. Kumar and Mr. Knapp to an introductory

8    discussion with Michael Sinnett and Sheila Remes.  Mr. Sinnett was the Vice President of

9    Product Development for BCA.  Ms. Remes was the Vice President of Strategy for BCA.

10       99.    BCA is the mainstay business unit at Boeing, delivering 68% of Boeing's $95

11   billion in revenue in 2016, and is responsible for Boeing's well-known lines of commercial

12   aircraft, including the 737, 737 MAX, 777, and 787, among other platforms.  In 2016, BCA

13   forecast a $1.4 trillion opportunity for single-aisle aircraft from 2016 to 2025, and an equivalent

14   opportunity for twin-aisle aircraft.

15       100.   Mr. Fernandes informed Dr. Kumar that Boeing's legal department had

16   suggested that they have the introductory meeting first to determine whether further discussion

17   was warranted, and that a formal non-disclosure agreement would not be necessary at that time.

18   Nevertheless, Mr. Fernandes understood that the meeting would be treated as confidential, and

19   he specifically told Dr. Kumar that he would not invite anyone from Boeing's Advanced

20   Concepts team, which was working on electric aircraft concepts for Boeing's much larger

21   aircrafts, "to protect both sides."

22       101.   Prior to engagement with Zunum, Boeing was not focused on series hybrid-

23   electric aircraft.  Mr. Fernandes also told Dr. Kumar in an e-mail on April 22, 2016, that Boeing's

24   interest in electrification technology was focused on drones and other military areas, and the

25

1  parallel hybrid "SUGAR" program, the acronym for Subsonic Ultra Green Aircraft Research,

2  funded by NASA for single-aisle aircraft.

3      102.    In advance of the meeting, Dr. Kumar sent Boeing a short presentation "for very

4  limited distribution" to provide context on Zunum.  This presentation did not contain any

5  proprietary or confidential trade secrets or technological details, only broad summaries of

6  Zunum's general business model.

7      103.    In July 2016, Mr. Fernandes suggested that Boeing and Zunum follow up with

8  much more extensive discussions, this time with senior personnel drawn from other Boeing units

9  such as Boeing Defense and Space.

10     104.    In advance of this more extensive meeting, the parties entered into a Proprietary

11 Information Agreement, dated August 16, 2016 (the "PIA").

12     105.    Between August 16, 2016, and approximately February 2017, Boeing undertook

13 extensive due diligence to evaluate Zunum's concepts, technologies, and business plans for

14 potential investment and strategic partnership whereby Boeing would provide Zunum with the

15 technical resources, with a focus on aerostructures, needed to bring its aircraft to market.

16     106.    During this period of due diligence, and pursuant to the PIA, Boeing was granted

17 access to extensive details of Zunum's business plans; go-to-market strategy; patent-pending

18 aircraft and propulsion technologies; and development, production, and certification plans.  This

19 included an extensive library of Zunum's confidential whitepapers, technical reports, business

20 plans, and provisional patent applications, which were provided to Boeing personnel via an

21 online data room.

22     107.    This information reflected Zunum's proprietary, contrarian, and disruptive

23 blueprint to an extensive and previously unidentified $3 trillion market for commercial hybrid

24 and all-electric aircraft designed specifically for flights up to 1,500 miles, with a clear path to

25 zero emissions.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 32

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

108.    Boeing had previously asserted that series hybrid-electric propulsion was not competitive with conventional aircraft and was unrealistic in the timeframe targeted by Zunum. Published research by Boeing underlined that parallel-configured hybrid-electric propulsion would not be viable until the 2030s and would then only deliver modest improvements in emissions. Boeing also insisted that series-configured hybrid-electric propulsion, which was the focus of Zunum's technology, would not be viable until the 2040s.

109.    However, Boeing quickly realized that Zunum had a technology portfolio and business plan to execute on its market strategy that was on track to commercialize Zunum's hybrid-to-electric propelled ZA10 by early the 2020s, with achievement of cost-competitiveness and drastic improvements in door-to-door travel time, emissions, and noise.

110.    As part of its due diligence in determining whether to invest in Zunum, Boeing held a two-day design workshop at the Zunum offices in Washington on January 23 - 24, 2017, to understand the performance and operating cost estimates for the Zunum ZA10 and ZA100 aircraft, relative to conventional equivalents, and to validate the results using Boeing's own design tools.

111.    Attendees at this workshop included several senior executives and engineers from BCA, BCA Advanced Concepts, and Boeing Defense and Space.    This included: (a) Steven Shumate, who was a Product Strategy Analyst for BCA; (b) Martin Bradley, Ph.D., a Technical Fellow in BCA Advanced Concepts; (c) Hubert Wong, a design engineer for BCA Advanced Concepts; (d) Logan Jones and two others from Boeing Defense and Space; and (e) a senior representative of JetBlue Technology Ventures.

112.    The attendees from BCA Advanced Concepts were precisely the category of Boeing personnel whom Mr. Fernandes had previously excluded from meetings with Zunum until an appropriate non-disclosure agreement was in place.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 33

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

113.    The agenda for the design workshop included: (a) an overview of Zunum's hybrid-to-electric aircraft and propulsion technologies; (b) detail about the key specifications, metrics, and assumptions of the ZA10 aircraft; (c) an explanation of Zunum's key drivers for reductions in operating costs over existing aircraft propulsion systems; and (d) a comparative analysis by Boeing of the design and performance of the ZA10 aircraft, including its expected sizing and operating costs.

114.    In order to conduct this comparative analysis as part of its due diligence, Boeing requested access to configuration parameters for the efficiency assumptions for Zunum's propulsion system, including: (a) turbine/internal combustion engine thermal efficiency and specific fuel consumption; (b) ducted fan efficiency; (c) power transmission efficiency; and (d) electric motor and inverter efficiency.

115.    It also requested access to operational parameters for: (a) energy consumption for flight mission segments such as taxiing, takeoff, cruising, and descent; (b) mission reserve requirements for fuel and electricity; (c) direct operating costs and assumptions for fuel and electricity prices, airframe, and engine maintenance and reserves; and (d) battery performance.

116.    All the data that Boeing requested and that Zunum supplied during Boeing's due diligence were proprietary, reflecting Zunum's roadmap to a breakthrough class of aircraft and propulsion, to achieve advantages over competitors and open new markets, and trade secrets reflecting precise specifications for how to achieve performance advantages across a range of metrics. Zunum produced all such information pursuant to the PIA.

117.    Through the design workshop and Boeing's ongoing due diligence, Zunum provided Boeing with voluminous documentation of its proprietary technologies, design specifications, economic analyses, computational tools, and business plans. Most of these technologies, models and specifications were previously unknown in the industry and largely ran counter to Boeing's initial assumptions with respect to the acquisition and operating costs of

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 34

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    commercial hybrid and all-electric aircraft, and Zunum's analysis for reducing the operating

2    costs for smaller, short-haul aircraft to be competitive with the economics of the larger aircraft

3    in light of their economies of scale.

4        118.    The inconsistency between Boeing's assumptions and Zunum's models made

5    Boeing skeptical, and Zunum had to substantiate many of its analyses with respect to cost and

6    performance.

7        119.    The BCA Advanced Concepts personnel became confident in Zunum's methods,

8    assumptions, and expertise.  They agreed that Zunum's technology and design had achieved

9    previously unforeseen advantages in energy efficiency and maintenance costs but wanted to

10   conduct additional investigation and validation.  They believed that it was very likely that the

11   ZA10 would deliver breakthrough economics, but that the economics of the ZA100 were far

12   more sensitive to future oil prices and electricity rates.

13   **D.    Boeing's 2017 Series A Investment in Zunum**

14       120.    In addition to financial resources, venture investors typically provide strategic

15   guidance or other support for the companies in which they invest, to help ensure the success of

16   their investment and also often in light of fiduciary obligations to act in the company's best

17   interest and avoid waste.

18       121.    This includes leading fundraising activities to cultivate and close additional

19   investors to build upon their earlier investments.  They help the companies in which they invest

20   build value by ensuring that valuations are high enough to reward earlier investors while still

21   attracting new investors.  Venture investors often engage their business partners to form

22   syndicates that come together to value and close subsequent financings, which are primarily

23   motivated by financial return.

24       122.    Strategic early-stage investors, which are businesses with investment arms that

25   fund nascent companies, share the goal similar to venture capitalists of having a positive financial

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 35

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    return on their investment, but unlike venture capitalists they focus their investment in areas of

2    strategic interest to the corporation's current or future core businesses as a means of augmenting

3    their new product development efforts, often by forming a joint venture with the start-up

4    company or ultimately acquiring the start-up company.

5          123.    For both traditional venture investors and strategic investors, their role as anchor

6    or lead investor often includes leading subsequent financing rounds by helping to attract

7    additional financial support to build upon an initial investment.

8          124.    Boeing also understood that if it abandoned support for Zunum after previously

9    investing, it would signal a lack of confidence in Zunum, undermining Zunum's reputation and

10   damaging its ability to attract further investment, a reality that Boeing used to help keep Zunum

11   beholden to it.   Boeing's dominant position in aviation and areas of expertise led most

12   prospective aviation investors to use Boeing's interest as a barometer of the value and wisdom

13   of an investment in Zunum.

14         125.    Boeing invested $5 million in Zunum through a Convertible Promissory Note and

15   Note Purchase Agreement dated March 17, 2017 (together the "2017 Note").

16         126.    The 2017 Note was accompanied by an Investor Rights Letter effective the same

17   date (the "2017 IRL").   In the 2017 IRL, Boeing obtained the right to appoint a non-voting

18   Observer on Zunum's Board of Directors, subject to confidentiality provisions in the PIA and

19   2017 IRL, and the fiduciary duties attendant to corporate governance.

20         127.    The 2017 IRL also gave Boeing the right to appoint a representative to Zunum's

21   Advisory Board, which was intended as a mechanism for Boeing to provide technical expertise

22   to Zunum.  2017 IRL §§ 1, 3.

23         128.    JetBlue Technology Ventures also invested $1 million, and Zunum was also

24   awarded an $800,000 grant from the State of Washington Clean Energy Fund.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 36

129.    Boeing installed Mr. Jones as its Observer on Zunum's Board of Directors and Mr. Fernandes as its representative on Zunum's Advisory Board.

130.    Pursuant to the 2017 IRL, Boeing had access to information from Zunum about "significant business issues" and "annual operating plans." The 2017 IRL obligated Zunum's management to "meet with Investor [Boeing] regularly during each year at the Company's facilities . . . for such consultation to discuss such issues and to review progress in achieving said plans." 2017 IRL § 1.

131.    Boeing had the option to increase its stake in Zunum by investing up to the lesser of two times the amount of its investment in the 2017 Note or half of the additional capital sought in a subsequent equity financing. 2017 IRL § 8.

132.    In addition, the 2017 IRL gave Boeing a right to notice of any intent by Zunum to sell or offer any other securities, and a right of first negotiation for any contract to: "(A) design, develop, or manufacture any aircraft or substantial component (for example, a wing or fuselage) of an aircraft, excluding the hybrid-electric propulsion system, fuel system, energy storage and terms thereof (hereinafter the 'Propulsion System'), (B) perform any assembly of, or otherwise integrate into an aircraft any substantial components . . . of, an aircraft, excluding the Propulsion System, or (C) maintain or otherwise support an aircraft (other than the Propulsion System) . . . ." 2017 IRL § 10.

133.    The right of first negotiation required Zunum to give Boeing notice of its intent to enter into any contract for any such work, after which Boeing would have 20 business days to provide notice of its intent to negotiate "exclusively and in good faith for the next 90 days" to perform the scope of work. *Id.*

134.    The right of first negotiation reflected Boeing's proposed relationship with Zunum, whereby Boeing had an initial exclusive opportunity to bid to become a supplier to Zunum for elements of its aircraft, excluding the propulsion system.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 37

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    135.    This right of first negotiation is also something for which only a strategic

2    corporate investor, as opposed to a venture investor, would negotiate.  It reflects that Boeing saw

3    the potentially greater opportunity for Boeing to earn revenue and reap profits directly from

4    Zunum's business, not just through its return on its limited investment in Zunum.

5    136.    Further to the clause, Mr. Jones told Dr. Kumar that Boeing was interested in

6    being Boeing's aerostructures partner.  Zunum had already determined that it would contract out

7    a significant portion of the aerostructures, and Boeing had considerable expertise in the area.

8    Accordingly, to avoid Zunum having to hire any aerostructures engineers, Mr. Jones told Dr.

9    Kumar that Boeing was prepared to supply an aerostructures team to support Zunum promptly

10   after closing of the March 2017 investment.  This was consistent with what Boeing told Zunum

11   in the prior weeks and months.

12   137.    Approximately one month after Boeing's investment in Zunum, Boeing

13   announced the formation of HorizonX, Boeing's venture capital and business incubation arm,

14   that would manage Boeing's investments, including its investment in Zunum.  Boeing and

15   Zunum aligned their public launches to occur on April 5, 2017, such that Boeing announced

16   HorizonX on that day, disclosing that Zunum, which was emerging from its stealth development

17   mode on that day, was its first investment.

18   138.    HorizonX managed Boeing's investment in Zunum through an investment

19   committee that included Boeing's Chief Executive Officer, Chief Financial Officer, and Chief

20   Technology Officer.

21   139.    HorizonX was formed to coincide approximately with the Boeing Centennial to

22   lay the groundwork for the next century by investing in innovative ventures as a corporate

23   venture arm, while also launching disruptive businesses within Boeing.

24   140.    Although HorizonX was not officially incorporated until August 23, 2017, the

25   group at Boeing that would eventually staff HorizonX began holding themselves out earlier as

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 38

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    representatives of HorizonX.  At all times, HorizonX personnel had the same e-mail address

2    suffix as Boeing employees.  HorizonX's offices were also co-located in Boeing facilities.  Mr.

3    Jones and Mr. Fernandes both took on Managing Director roles at HorizonX.  Mr. Jones moved

4    from Boeing Defense and Space, and Mr. Fernandes moved from BCA, to lead HorizonX's

5    Disruptive Innovation, responsible for developing disruptive businesses within Boeing.

6        141.    Boeing, under the auspices of the yet-to-be-formed HorizonX, also appeared to

7    take steps to fulfill its commitment to lead Zunum's Series B investment round and to provide

8    technical expertise to support the development of Zunum's flagship aircraft.

9        142.    For example, in July 2017, Justin O'Brien, who was involved in HorizonX's

10   strategic development, developed a plan to engage external targets to promote the relationship

11   between Boeing and Zunum.  Mr. O'Brien developed a set of talking points for external

12   engagement that held Boeing out, under the auspices of HorizonX, as a "formal technical

13   advisor" to Zunum and represented that Boeing was "looking for opportunities to provide

14   technical advice to enable Zunum's success."

15       143.    Boeing's investment and these indicia made it initially appear to Zunum as though

16   Boeing was following through on its commitments by undertaking what it said that it would do:

17   invest in Zunum; lead fundraising; and collaborate with Zunum on the development and

18   commercialization of its aircraft.

19       144.    Following Boeing's investment, Zunum also received investment interest from

20   Safran and UTAS.  Zunum also began engaging with SHE to supply a turboshaft range-extender

21   for Zunum's hybrid-to-electric propulsion system.

22   **E.    Boeing Seeks Additional Information, Ostensibly to Support ZA10 Aerostructures**

23       145.    Following its investment, Boeing personnel, holding themselves out as HorizonX,

24   also began asking Zunum for additional information for the stated purpose of supporting Zunum

25   with the aerostructures component of the production of the ZA10.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 39

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1      146.     Mr. Jones expressed frustration at Boeing's pace in providing an aerostructures

2 team to Zunum, suggesting that the delay was the result of Boeing's process to reach a decision

3 to provide Zunum with that support. Mr. Jones purported to act on behalf of Zunum in

4 shepherding the process to help ensure that Boeing would provide the aerostructures resources

5 that it had committed.

6      147.     Boeing's supposed internal process to decide whether to provide Zunum with the

7 support, that its Observer on Zunum's Board of Directors had already committed, was opaque to

8 Zunum, except for occasional requests by Boeing for Zunum's proprietary information on the

9 size of the market and key customers. Mr. Fernandes appeared to be engaged, as was Mr.

10 O'Brien, who had prepared messaging for Boeing to use when engaging with customers that

11 Zunum had identified.

12      148.     However, there was one request that appeared inappropriate. In June 2017, Mr.

13 Fernandes asked Dr. Kumar to help one of his strategists better understand Zunum's proprietary

14 concepts for seamless multi-modal transportation and enabling technology platforms as

15 described in a provisional Zunum patent that Boeing had been provided during prior diligence.

16      149.     These proprietary claims were a key element to Zunum's hybrid-to-electric

17 aircraft offering door-to-door travel two to five times faster than conventional aviation by

18 integrating emerging electrified and autonomous ground transport modes with short-haul aircraft

19 serving community airfields to enable fast, seamless, door-to-door journeys, unlike the time-

20 intensive airport hub-to-hub travel that exists today.

21      150.     There was no justification for a strategist on Mr. Fernandes' team, tasked with

22 developing disruptive businesses within Boeing, to be using Zunum proprietary materials on

23 future multi-modal travel for any such purpose. Dr. Kumar met with the strategist but declined

24 to provide any detail other than to note the proprietary nature of that provisional patent.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 40

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

151.    Other than this, Boeing's investigation into Zunum's innovations and technologies was, by all outward appearances, consistent with its stated purpose to support Zunum to achieve early 2020s deployment of the ZA10.  Zunum targeted an October 2017 announcement of its design and plans.

**F.    Boeing's Clandestine Program to Pursue and Preempt Zunum's Plan Comes into View**

152.    In August 2017, Mr. Sinnett participated in an interview with *Aviation Week*, a well-known trade publication, where he confirmed that "a small experimental 'X-plane' hybrid-electric demonstrator planned for the early 2020s could signal an unprecedented push into the commuter market" and "could open the door to a new generation of small Boeing airliners seating 12-50+.  The initiative, if sanctioned, may lead to a new product line from the mid-2020s, effectively taking the manufacturer full circle to its commercial transport roots."

153.    In fact, Zunum had just received approval from its Board of Directors to proceed with a 12-seat variant of the ZA10 aircraft, and was preparing to announce this publicly in October, targeting entry to service in 2022, ahead of a planned 50-seat regional aircraft in the mid-2020s.  As someone heavily involved in Boeing's prior due diligence of Zunum, Mr. Sinnett was aware of Zunum's product plan, market timing, and funding needs, and may have intended to preempt the upcoming Zunum publicity.

154.    Mr. Sinnett explained that Boeing had been attracted to Zunum's expertise in powertrain and power conversion and that Boeing provided complementary strengths for integrating the other aircraft components.  He acknowledged that this opportunity was outside of Boeing's typical mainstream business and a market segment in which Boeing was not previously active.  However, his published interview communicated that Boeing, not Zunum, was assessing market entry.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 41

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

155.    In an exchange with Dr. Kumar following publication of this article, Mr. Jones admitted that Mr. Sinnett's announcement was highly inappropriate and contrary to Boeing's intent to support Zunum with commercializing the ZA10 and ZA50 aircraft. He asserted that the interview was a mistaken action by a "loose cannon," that it was nothing other than internal politics, and was not supported by Boeing or reflective of a change in Boeing's continuing strategic support for Zunum.

156.    Mr. Jones held considerable influence over Zunum, both as Boeing's Observer on Zunum's Board of Directors and as gatekeeper to support from the HorizonX Investment Committee for future financing of Zunum and partnership with Boeing.

157.    Nevertheless, the two competing announcements on 12-50 seat hybrid aircraft, by BCA in August, and by Zunum in October, sent conflicting messages to investors and the aerospace industry.

158.    Earlier in 2017, Zunum had recruited Waleed Said, Ph.D., as Chief Technology Officer for Electric Power to lead work on the hybrid-to-electric powertrain and establish a world-class center in Illinois for this purpose. Dr. Said joined Zunum after a long career at UTAS (the worldwide leader in electrical systems for airlines), where he led work on the electrification of the secondary systems of conventional aircraft such as the Boeing 787 (which "secondary systems" include all essential control and operating systems). On hearing of Dr. Said's role at Zunum, the President of Electric Systems at UTAS contacted him in June 2017 to express interest in collaborating on the development of Zunum's hybrid-to-electric powertrain, leading to progressive exchanges between Zunum and UTAS.

159.    In late October 2017, Dr. Said was invited to a black-tie event hosted by UTAS in New York City, where he was strategically seated at a table by the President of UTAS, who informed him that he would like for UTAS to invest in Zunum.

160.    Mr. Sinnett was also at the event and knew Dr. Said from their past work on the Boeing 787 program: Mr. Sinnett had led the 787 program at Boeing, and Dr. Said had led work on power electronics for the Boeing 787 at UTAS.  Later that evening, Mr. Sinnett loudly and physically accosted Dr. Said in an accusatory manner in front of senior executives at UTAS and called him a "rogue player" who was selling out Boeing 787 technologies to a competitor, Zunum.

161.    Dr. Said gently pointed out that Zunum's aircraft had nothing in common with the Boeing 787 other than a common power quality standard: the ZA10 had all-electric propulsion; while electrification of the Boeing 787 was limited to the secondary systems.  The exchange prompted a senior executive at UTAS to intervene in case Mr. Sinnett's aggression escalated.

162.    Given the importance of Boeing's support as an early investor and strategic partner, the public display of overt hostility and false accusation by Mr. Sinnett, whom leaders at UTAS viewed as a key customer, was damaging to the relationship of trust that Zunum had been developing with UTAS, which was building toward a collaboration and investment.

163.    The public display of overt hostility and false accusation had the potential to disrupt Zunum's business relationship with UTAS.  That this was likely no coincidence came into focus in light of what Zunum later learned about Boeing's use of Zunum's technology to further the activities that Mr. Sinnett had announced to the media in August, and what Zunum later experienced from Boeing with respect to other prospective investors and partners.

164.    Dr. Kumar reported the incident to Mr. Jones who confirmed that Mr. Sinnett's behavior was inappropriate.  Dr. Kumar also reported the incident to Zunum's investors at JetBlue Technology Ventures, who questioned Mr. Jones and the Vice President of HorizonX, Steven Nordlund, on Boeing's support for Zunum and asked that Boeing either commit to Zunum

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 43

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    or indicate otherwise.  Mr. Nordlund emphasized that Boeing was supportive of Zunum, and that

2    he and Mr. Jones would take steps to defuse the internal politics within Boeing.

3        165.    In the weeks that followed, Mr. Jones continued to assure Zunum that it continued

4    to have the full support of Boeing's "C-Suite" executives who sat on HorizonX's investment

5    committee, while acknowledging tensions with a separate group that included unspecified

6    elements from BCA and HorizonX, including Mr. Fernandes (such corporate group collectively

7    the "BHE team"), that was purportedly supporting the very slow decision within Boeing on

8    aerostructures.

9        166.    Mr. Jones noted that the BHE team was unable to achieve the operating costs that

10   Zunum had announced to the media in October, and that it believed commercialization would

11   take through 2024, while Zunum had targeted 2022.  The BHE team was expressing concerns

12   within BCA that Zunum was "overpromising."

13       167.    The difference in calculations was not surprising for several reasons.  First, the

14   conventional consensus among the aerospace OEMs was that hybrid-electric or all-electric

15   commercial aircraft was not economically or technologically feasible in the near-to-mid-term.

16   Second, Boeing had undertaken to analyze Zunum's design in secret rather than in consultation

17   with Zunum, which created a risk of miscommunications and misinterpretations.  Third, Boeing

18   lacked familiarity with commuter aircraft certified under FAA Part 23 because the aircraft that

19   Boeing manufactures are certified under the more stringent FAA Part 25.

20       168.    Mr. Jones stated that he was concerned that the discrepancies between Zunum's

21   results and Boeing's results, if left unchecked, could undermine support for Zunum among senior

22   executives at Boeing, affecting Boeing's decisions to invest in the Zunum Series B, or engage

23   on aerostructures.

24       169.    To mitigate this risk, and purporting to look out for Zunum's interests, Mr. Jones

25   used his influence over Zunum's Board of Directors to pressure Zunum to host a workshop to

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 44

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    reconcile the findings of the BHE team and the actual technical specifications, feasibility, and

2    progress to date of the Zunum ZA10 aircraft.  This necessarily involved disclosing additional

3    insight to Boeing's engineers and executives from BCA and HorizonX to remedy their mistaken

4    assumptions and quell their alleged concerns.

5         170.    Boeing's clandestine activities began to be further exposed in late November

6    2017, when Dr. Kumar learned from Mr. Fernandes that the BHE team at Boeing was in fact

7    pursing its own hybrid-electric aircraft.  Mr. Fernandes also informed Dr. Kumar that the aircraft

8    would be commercialized with a partner for the hybrid propulsion, and that Boeing would solicit

9    bids from its existing suppliers and that Zunum was welcome to submit a bid along with the other

10   companies to provide the hybrid-electric propulsion.

11        171.    Mr. Fernandes also told Dr. Kumar that Boeing had already engaged its existing

12   partners such as Safran on propulsion for the aircraft, and that there had been exchanges with

13   individuals at UTAS as well.  Boeing was already the Safran Group's largest customer, and

14   UTAS was already the primary supplier of electrical systems for Boeing's larger aircraft models.

15        172.    This revelation left Dr. Kumar extremely concerned, and in a subsequent debrief

16   the Zunum leaders decided that it was imperative to use the upcoming workshop with the BHE

17   team to derive clarity on what Boeing was really doing with its own internal competing hybrid-

18   electric aircraft program and what its strategic intent was regarding Zunum.

19   **G.    Zunum Discovers Boeing's Misappropriation**

20        173.    Further to Mr. Jones's insistence, Zunum held a workshop on December 12, 2017,

21   with the BHE team to address their supposed technical skepticism and disparagement of the

22   Zunum ZA10 aircraft and Zunum's design and technology.

23        174.    Instead, at this workshop, the BHE team demonstrated that Boeing had actually

24   created a new aircraft design that was not the Zunum ZA10, but that took the Zunum aircraft's

25   specifications, insights, innovations, technology, and trade secrets and applied them to create a

1 | whole new aircraft – now called the BHE-11. Boeing personnel casually asserted that the design
2 | was "their" aircraft.

3 |       175.    Concerningly, several individuals on the BHE team that copied from the Zunum
4 | ZA10 to develop the BHE-11 had been heavily involved in Boeing's prior due diligence of
5 | Zunum and were provided access to a large body of Zunum's trade secrets through that process.
6 | For example, Dr. Bradley and Mr. Shumate had also attended the January 2017 design workshop.
7 | Meanwhile, Mr. Fernandes served on Zunum's Advisory Board until November 2017, when he
8 | was replaced by Peter Kunz, Ph.D., the Chief Technologist of HorizonX.

9 |       176.    This revelation showed an aircraft that Boeing's team purported to be its own
10 | design of a new market entrant, the BHE-11, to target the same market opportunity that the
11 | Zunum/Boeing team was ostensibly working together to address with the ZA10. The context of
12 | the discussions revealed that this was not a friendly, skeptical exercise, but a new competing
13 | design that Boeing seemed to think was its own market entrant.

14 |       177.    Zunum's meeting participants were baffled and troubled by this surreal situation
15 | in which Boeing, under the guise of seeking to support Zunum on aerostructures, had launched
16 | an effort that the participants acknowledged was intended to compete with Zunum's ZA10.

17 |       178.    The Boeing participants overtly showed that they had used Zunum's trade secrets
18 | and confidential materials. The new plane bore hallmarks of Zunum's approach, including
19 | targeting the same commuter market with the same novel propulsion system, with differentiation
20 | limited to the use of a different quiet duct than the ZA10. The slides used showed extensive use
21 | of Zunum's own calculations, design drawings, terminology, forecasts, economics, and aircraft
22 | design. These slides even included cut-and-pasted verbatim text, tables, and graphics from the
23 | Zunum material previously shared with Boeing.

24 |

25 |

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 46

179.    Specifically, the Boeing attendees showed slides that included data and graphs copied directly from the proprietary information-containing slides that Zunum had provided to Boeing during the January 2017 design workshop and via the due diligence data room.

180.    In particular, the BHE-11 design matched many of the ZA10 specifications that Zunum had shared with Boeing, including specifications for maximum weight, usable load, cabin pressurization, takeoff and landing distance, and other features.

181.    The BHE team also copied Zunum's design and layout for integration of the aircraft's turbogenerator unit in the aft section of the fuselage, and also copied a substantial fraction of the high-voltage electricals.

182.    Highly unusual for any propeller aircraft, the BHE-11 team chose to place its propellers close by, almost flush with, the fuselage, exactly where the Zunum ZA10 positioned its ducted fans.

183.    The BHE-11 design also incorporated a series hybrid-electric propulsion system, whereas Boeing's prior focus was on a parallel hybrid-electric architecture, and the industry had been highly skeptical that a series hybrid design would be feasible or cost-effective for at least several decades.

184.    The BHE team also appeared to copy Zunum's proprietary process for modeling and designing necessary components of the aircraft, such as how to optimize the aircraft's range and generator size, as well as other features.

185.    Boeing's description of its design also reflected Zunum's analysis in how to reduce direct operating costs per passenger while extending the aircraft's range. The engineers from BCA had been surprised that this was possible, and Zunum had to substantiate its analysis to demonstrate to them that it was possible. Now, they were showing these same innovations on Boeing's "own" aircraft.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 47

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    186.    The presentation that the BHE engineers made in the meeting on December 12,

2    2017, also included a direct copy of a Zunum graphic illustrating reduction in fuel burn and the

3    effect on direct operating costs, as well as another graphic analyzing operating costs.

4    187.    The BHE-11 design that the BHE engineers presented also reflected Zunum's

5    unique approach to reducing space in the flight deck to accommodate another passenger seat.

6    This is a counterintuitive design because it is not permitted under the regulations that apply to

7    the types of aircraft Boeing typically designed, and even with a careful reading of the rules, this

8    configuration was highly innovative.

9    188.    These are designs that were unique to the ZA10, otherwise unknown in the

10    industry, and that drove the economic metrics and other differentiating features that were the

11    foundation for the economic value proposition of the ZA10.

12    189.    It became evident that the purpose of the meeting was to mine Zunum for even

13    more insights into how Boeing would have to improve upon its BHE-11 design to achieve the

14    results that Zunum had already achieved under the false pretense of helping Zunum by

15    addressing an alleged "overpromise" by Zunum on the economics and time to market.

16    190.    At the workshop, it also became apparent that the undermining of Zunum within

17    Boeing, and potentially even Mr. Sinnett's public display of overt hostility, were the result of the

18    inability of this team to achieve the performance of the ZA10 with the BHE-11, and thus the

19    need to drag out the supposed due diligence and manipulate Zunum into providing additional

20    access to its remaining undisclosed technology breakthroughs.

21    191.    Boeing's participants proceeded to explain that they were happy with their results

22    in that they showed successful general results, but they could not replicate the Zunum design's

23    actual results.  This showed that Boeing found unexpected and unprecedented outcomes from

24    Zunum's approach, confirming that the design worked in ways that Boeing's senior engineers

25    had not believed possible.  And it also demonstrated how Boeing, even with enormous resources,

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 48

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  had previously not been able to replicate the same extraordinary outcomes – only because there

2  were still many insights and trade secrets that Boeing had not yet extracted from Zunum on the

3  promise of aerostructures support, future financing, or a strategic relationship.

4         192.    Zunum at this meeting realized that it was dealing with a company with an

5  internal team looking to drain Zunum of value, steal its technology, eliminate it as a competitor,

6  and usurp its first-mover advantage.  The BHE engineers seemed to have no awareness of – or

7  if they had an awareness,  no regard for – any contractual obligation, any duty to Zunum, or any

8  moral compunction about what became evident as an ongoing widespread dispersion of Zunum's

9  trade secrets within Boeing and its affiliates.

10        193.    Moreover, now that it was clear that this team at Boeing was actually replicating

11 the Zunum business plan as announced by Mr. Sinnett to *Aviation Week* in August, it became

12 apparent that outreach by the BHE-11 team to engage Safran and others on the propulsion system

13 would have inevitably required Boeing's disclosure of Zunum's trade secrets to Safran and

14 others, because Boeing had no other independent design.  An engine OEM would have needed

15 substantial detail about the design and specification in order to assess the feasibility and cost of

16 producing the propulsion system, all of which information would have been based on Zunum's

17 design.  In light of this replica program, several prior requests by Boeing after closing of the

18 2017 investment became concerning in retrospect.  These requests were ostensibly to assess

19 Zunum's aerostructures requirements but in hindsight appeared to have been to further Boeing's

20 internal program copied from and competing directly with Zunum's.

21        194.    When Zunum learned that Boeing had replicated Zunum's proprietary aircraft

22 technologies, and instead of assessing the opportunity for aerostructures, was looking to

23 commercialize the aircraft with partners for the propulsion, it asked Mr. Jones about what Boeing

24 was doing.  Mr. Jones confirmed that Boeing was indeed developing a separate hybrid-electric

25 aircraft and was seeking a partner to provide the propulsion system from the engine OEMs.  An

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 49

1  associate at HorizonX also confirmed to Dr. Kumar that Safran had expressed confusion about

2  the Zunum and Boeing aircrafts, following similar confusion at UTAS.

3          195.    However, Mr. Jones used his influence as a representative of Boeing to dissuade

4  Dr. Kumar from raising the issue further on the basis that this would disrupt Zunum's standing

5  at Boeing, just as personnel changes were being made to accelerate Boeing's engagement with

6  Zunum.  The message from Mr. Jones was essentially that Boeing had acted inappropriately but

7  was remedying the situation, and Zunum should play along without objecting, lest it destroy its

8  chances of otherwise on-track funding and partnering.

9          196.    Mr. Jones also spoke of the paranoid, entitled culture at BCA, drawn from its

10 "super duopoly" with Airbus, spilling over into actions against Zunum, which was viewed as

11 competing for "Boeing's markets."  Mr. Jones also stated that Boeing also believed that Zunum

12 could not do aerostructures without Boeing.   Mr. Jones's statements appeared to reflect a

13 personal compunction and concern regarding a dysfunctional and conflicted Boeing approach to

14 Zunum.  Zunum relied on Mr. Jones's abiding claim that Boeing's senior executives continued

15 to support Zunum.

16         197.    Confirming Boeing's false pretenses, Zunum never receive any aerostructures

17 support, despite the specialized workshop with the BHE team.  Mr. Knapp reached out to Dr.

18 Kunz in February 2018 to restart dialogue on aerostructures, while also launching outreach to

19 suppliers worldwide.  A month later, he sent a formal Request for Information ("RFI") to Dr.

20 Kunz who routed the request to Boeing Research & Technology, which responded in May 2018

21 to say that it will not respond to the RFI but looked forward to the subsequent, more formal

22 Request for Proposals.

23         198.    Shortly thereafter, in early 2018, Mr. Jones informed Zunum that Aurora Flight

24 Sciences Corporation ("Aurora") had circulated a whitepaper within Boeing attacking the ZA10

25 as infeasible based on patently inaccurate specifications, a "straw-man" false model, although

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 50

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

Zunum lacked further detail regarding the contents of the report. The supposed concerns about Zunum's technology's performance were belied by Boeing's active and overt efforts to take the technology itself, and falsely claim it as its own, including in the BHE-11 program which directly competed with the ZA10.

**H.     Boeing Further Reveals Its Misuse of Zunum's Trade Secrets and Continues to String Zunum Along**

199.    HorizonX and Boeing used their repeated commitments to assist Zunum with in-kind support and expertise and promises of investments and strategic partnership to repeatedly string Zunum along with stop-and-start negotiations, keeping it captive and beholden to Boeing and delaying and stifling its progress.

200.    Despite the ongoing criticism of Zunum from within BCA and its apparent attempt to copy Zunum's design, Mr. Jones continued telling Zunum that it had the continuing support of Boeing's C-Suite executives, who sat directly on the HorizonX investment committee.

201.    In early 2018, Zunum was preparing for a Series B fundraising round, targeting a capital raise of $80 to 90 million to resource its development plan for the next 18 months.

202.    In January 2018, Zunum informed Mr. Jones that it planned to engage an investment advisor to help with its fundraising for the Series B round.

203.    Mr. Jones questioned the need for an investment advisor when Zunum had support from Boeing to provide access to investors and increase Zunum's valuation, on the basis that Boeing would lead and anchor the financing round with a commitment of least 20% of the funding raise, or $16 million.

204.    By February 2018, Zunum had made significant headway, obtaining expressions of interest in investments from outside investors of up to $61 million of the $80 - $90 million that it was targeting to raise in the Series B round.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    205.    These expressions of interest included $30 million from investors in Hong Kong,

2  who were proposing to enter into a China-focused joint venture with Zunum based in Zhejiang

3  province, where Boeing had a finishing center.  The investors had approached Zunum over the

4  prior summer, and Mr. Jones had traveled with Dr. Kumar to Zhejiang Province for several days

5  earlier that month for meetings with investors and provincial officials.  The President of Boeing

6  China also participated in the meetings and confirmed that the leaders negotiating with Zunum

7  had previously engaged with Boeing to lay the ground work for its finishing center.  Mr. Jones

8  was eager for Boeing to partner with Zunum such that the joint venture was tripartite.

9    206.    These expressions of interest also included $15 million from SCV and UTAS.

10    207.    Upon information and belief, HorizonX and Boeing did not want Zunum to obtain

11  such extensive funding from any third party or parties, which would make it less reliant on

12  Boeing, reduce Boeing's influence over Zunum, limit Boeing's ability to gain control of

13  Zunum's trade secrets, and delay or foreclose Zunum as a market entrant.

14    208.    In January 2018, Mr. Jones and Mr. Nordlund approached Zunum and induced it

15  to pause its pursuit of investors in order to launch a strategic process with Boeing code-named

16  "Project Catalyst," later referred to as a "More Strategic Relationship" ("MSR"), which would

17  lead to Boeing becoming the sole investor in Zunum, while unlocking Boeing's aerostructures,

18  materials, and manufacturing expertise for Zunum.  This was correlated with reassurances that

19  the BHE team was going to be controlled and overridden by the Boeing C-Suite's continuing

20  support for Zunum.

21    209.    On February 13 and 14, 2018, Dr. Kumar, Mr. Knapp, and others from Zunum

22  met at HorizonX's facility in St. Louis, Missouri, with Mr. Nordlund, Mr. Jones, and others from

23  HorizonX to discuss Project Catalyst and the MSR, which HorizonX described as a joint venture.

24    210.    HorizonX's proposed investments until this time had been capped at 20% because

25  an investment above that amount would require formal corporate approval from Boeing and

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 52

1    trigger regulatory reporting requirements. With Project Catalyst and the MSR, Horizon was

2    proposing a far more substantial investment that would go well beyond the 20% threshold.

3    211.    At the meeting on February 13 and 14, 2018, Mr. Nordlund and Mr. Jones stated

4    that they were confident that Project Catalyst or the MSR would go forward, but they indicated

5    that it would likely take until June 2018 to close in light of the corporate approvals required.

6    212.    By this time, Zunum had a runway of approximately 10 weeks of operating

7    expenses if it froze all new expenditures. In the meeting, Mr. Jones asked that Zunum continue

8    scaling to the targeted 2022 delivery of the ZA10, such that there was no loss of momentum

9    ahead of the MSR with Boeing, and such that Zunum would keep spending down its funds

10   rapidly. Dr. Kumar responded that this would not be possible without an immediate investment,

11   especially as HorizonX's proposal also required that Zunum cease its fundraising and decline the

12   interest in investments that it had cultivated and received.

13   213.    Boeing gave Zunum confidence in this approach and induced its reliance on

14   Boeing by explaining that Boeing had followed a similar path with its acquisition in 2008 of a

15   drone manufacturer called Insitu. Several of the leaders at HorizonX, such as Mr. Nordlund and

16   Dr. Kunz, had joined Boeing through that acquisition, reflecting that it was a successful model

17   for working with Boeing.

18   214.    Boeing also induced Zunum's reliance through ongoing reassurance by Mr. Jones

19   and a fast-paced schedule for additional due diligence and closing.

20   215.    HorizonX targeted March 1, 2018, as a date to close funding on the additional

21   bridge financing, with additional due diligence for the MSR to be completed by April, and the

22   MSR with Boeing closing in May or June 2018.

23   216.    Given that the proposal would expose Zunum financially, freezing its discussions

24   with other investors just at the point when Zunum was on the verge of running out of funds, Mr.

25   Nordlund and Mr. Jones offered Zunum a bridge loan to carry Zunum to June 2018. Dr. Kumar

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 53

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1   made it clear that Zunum would need a cushion of a few months so as not to be out of funds in
2   the event of a delay in closing.  Accordingly, Dr. Kumar told Mr. Nordlund and Mr. Jones that
3   Zunum would need at least $10 million in the near term, and Mr. Nordlund responded that
4   "money was no object."  Mr. Nordlund and Mr. Jones indicated that a $10 million bridge would
5   not be a problem and would be available within a few weeks.

6       217.    On March 29, 2018, Mr. Jones confirmed that it was HorizonX's "objective of
7   getting Zunum Aero the needed funding today ($10M of capital within weeks) to relieve a near
8   term need . . . but doing it with an eye toward future investibility [sic] and in a way that's
9   defendable within Boeing."

10      218.    During this period, in early 2018, Zunum had been developing relationships with
11  other well established aviation industry partners, such as Safran and UTAS, to create other
12  strategic options besides Boeing, given its prior experience with the BHE team.  However, the
13  HorizonX proposal for Boeing to become a sole investor reset the scales, given that Boeing
14  would effectively be acquiring the trade secrets that it had misappropriated by foreseeably
15  acquiring Zunum, and given that the partnership would cement Boeing's full support for Zunum.

16      219.    As part of the due diligence for Boeing's proposed MSR with Zunum, Mr. Jones
17  asked Zunum to host a review of its aircraft and propulsion program with 16 engineering leaders
18  from across Boeing units.

19      220.    Specifically, Boeing sought to undertake an "enterprise technology assessment"
20  of Zunum in a meeting at Zunum's facility in Kirkland, Washington, with engineers from BCA,
21  Aurora, and other Boeing programs.  Dr. Kunz, who was organizing the meeting, acknowledged
22  that Zunum had previously briefed Boeing on much of the information sought.

23      221.    On March 30, 2018, Christopher Kettering, a Chief Engineer for Aeromechanics
24  Technology in Boeing's Research & Technology division, sent a proposed agenda for the
25  meeting.  The express goal of the meeting was to "develop an enterprise agreed technology

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 54

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    assessment of the Zunum Aero Thin Haul concept assumptions and performance," which was a

2    reference to Zunum's initial focus on shorter, regional flights (short-haul).

3           222.    The agenda also included a discussion of the "Zunum ideal vs. minimum variable

4    aircraft spectrum for the first/smaller aircraft," as well as descriptions of several specifications

5    for gross sizing; requirements for range, speed, takeoff, time to climb, noise, and other criteria;

6    and assumptions upon which Zunum based its performance expectations for several components

7    of the mechanical and electrical systems, including batteries, turbines, generators, inverters,

8    motors, propulsors, powertrain, and propulsion.

9           223.    In light of the scope of the information requested, and prior events, Dr. Kumar

10   specifically asked Dr. Kunz and Mr. Kettering to confirm how Zunum's intellectual property

11   would be protected, and Mr. Kettering responded that it would be, but Dr. Kumar continued to

12   express his reservations about sharing data with this team in light of the apparent competitive

13   efforts by the supposedly-rogue BHE team, drawn from across BCA and HorizonX (which was

14   supposedly an error, being phased out).

15          224.    The list of proposed attendees included Brian Yutko, who was Senior Vice

16   President of Programs at Aurora.  Dr. Yutko and his team at Aurora had published the whitepaper

17   circulated within Boeing to undermine the ZA10 (using false attributes) and were themselves

18   developing urban electric air-taxis.  Mr. Shumate, who had attended the January 2017 design

19   workshop and was subsequently involved in Boeing's BHE-11 program, was also scheduled to

20   attend.  Dr. Kumar was concerned about the participation in the assessment by individuals who

21   were involved in Boeing's electric aircraft, given further risk created to Zunum's proprietary

22   information, and asked that they be excluded from the assessment.

23          225.    On the investment, HorizonX proposed to include a valuation cap of $40 million.

24   A valuation cap, especially in a bridge loan, generally impedes securing additional investments

25   because it sets a valuation benchmark and would require Zunum to justify an increase in the

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 55

1    valuation as part of a subsequent Series B investment round, if Project Catalyst and the MSR fell

2    through. For this reason, Zunum was unwilling to agree to a valuation cap.

3    226.    On April 2, 2018, HorizonX's Investing Director, Michael Lohnert,

4    communicated that Boeing's investment would be reduced from the previously indicated

5    commitment of $10 million to $3 million and confirmed that the note would not include a

6    valuation cap, which he said was the most that it would invest without a valuation cap, although

7    HorizonX ultimately agreed to invest $4 million. This unilateral imposition by Boeing

8    constrained Zunum's fundraising flexibility greatly and significantly reduced Zunum's runway

9    and any cushion of time to close on the MSR, and provided Boeing and HorizonX with

10    significantly greater negotiating leverage in the event that they had a genuine intent to follow

11    through on the MSR, or push Zunum to the brink of financial distress if they were not to follow

12    through with the MSR. It turns out that the latter was Boeing's actual strategic intent.

13    227.    On April 4, 2018, in preparation for the ostensible due diligence meeting, Dr.

14    Kunz circulated a "common data worksheet" to enable the systematic resolution of technical

15    issues that were raised. The spreadsheet included a tab in which the Boeing team developing the

16    BHE-11 documented insights gained from the December 12, 2017, workshop with Zunum.

17    228.    In particular, this tab documented how Boeing could advance the BHE-11 to

18    achieve the superior performance of the ZA10. This was derived from the information that Mr.

19    Jones had insisted that Zunum provide the team developing the BHE-11, supposedly to quell

20    their undermining of Zunum to Boeing's leadership and prevent erosion of Boeing's continuing

21    support for Zunum.

22    229.    The comments and notes by the BHE team in the spreadsheet reflected active

23    competition with Zunum's aircraft and an ongoing attempt to use Zunum's design and analysis

24    to further Boeing's directly competitive BHE-11 program. The comments also confirmed the

25    strategic value of Zunum's ZA10.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 56

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

230.    For example, Dr. Bradley commented that BCA would do a side-by-side comparison of the two systems' power loads and thermals.  He noted that the BHE-11 had "a lot more load" than the ZA10, which translated into the BHE-11 system having less efficiency than the ZA10.  Dr. Bradley was apparently seeking a way to achieve Zunum's results with the BHE-11.  Dr. Bradley and others were also very intrigued by Zunum's superior engine and aircraft maintenance factors, including novel operations of the range extender to achieve these superior features, and sought to achieve these results with the BHE-11.

231.    Dr. Bradley's comments also reflected his intent to obtain further data from Zunum about the ZA10's propulsion and maintenance achievements to further Boeing's attempt to achieve similar results with the BHE-11.  Others demonstrated a similar intent to extract further proprietary information from Zunum immediately after misusing the workshop to do so.  Notably, the workshop came about purely as a result of their misuse of information derived from the prior funding due diligence, repurposed to launch the BHE-11 program.

232.    Dr. Kumar immediately brought the spreadsheet to Mr. Jones's attention and asked that two of the scheduled attendees be disinvited from the due diligence review as a reasonable means to ensure against any misuse of Zunum's intellectual property, proprietary information, or trade secrets in Boeing's attempt to compete with Zunum.

233.    Dr. Kumar specifically requested that Mr. Shumate be excluded from the meeting, given his involvement with the BHE-11 program, and that Dr. Yutko from Aurora be excluded, given Aurora's work on an electric urban air taxi.

234.    Dr. Bradley had not been listed as a proposed attendee in the e-mails to Zunum. Dr. Kumar also sought input from Mr. Jones as to other Boeing personnel who should be excluded from the meeting in light of any involvement in Boeing's competing programs, given Zunum's lack of visibility into competitive efforts by other units at Boeing.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 57

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1     235.    Mr. Jones reaffirmed the need for Zunum to disclose additional information,

2    allegedly to satisfy HorizonX's and Boeing's ongoing due diligence, but acknowledged Zunum's

3    desire and need to protect its intellectual property, trade secrets, and other proprietary

4    information. Mr. Jones reassured Zunum that the information was really part of investment due

5    diligence, was not for Boeing's competitive effort, and that Zunum should trust Boeing and focus

6    on the broader value of steady funding and an ultimate acquisition, which would be enhanced

7    once the skeptics were assured that the Zunum ZA10 really could deliver the performance that

8    Zunum said it could. He characterized the BHE-11 efforts as a program that would show the

9    innovation and value of Zunum's proprietary technology, which was fully protected. This was

10   Boeing's ongoing cover story for its ongoing espionage of Zunum's trade secrets and intellectual

11   property.

12    236.    On April 5, 2018, Mr. Jones told Dr. Kumar that the internal discussions about

13   the MSR at HorizonX "revolve[d] around [their] understanding of the technical plan," and he

14   proposed a meeting within two weeks to discuss the MSR. Boeing and HorizonX were

15   considering how best to structure the relationship contemplated by the MSR.

16    237.    However, after Dr. Kumar raised his concern that certain BCA and Aurora

17   personnel, which were participating in Boeing's due diligence, were also actively involved in

18   developing the BHE-11 that was competing directly against Zunum with the benefit of Zunum's

19   trade secrets learned through the due diligence process, HorizonX and Boeing abruptly reversed

20   course.

21    238.    Upon information and belief, HorizonX and Boeing used Zunum's umbrage at

22   their misuse of Zunum's intellectual property, trade secrets, and other proprietary information as

23   a pretext to delay the bridge financing and postpone the MSR. Mr. Jones elevated the concerns

24   that Dr. Kumar had raised to Boeing's legal department and postponed the due diligence meeting.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED              **Shlansky Law Group, LLP**
COMPLAINT - 58                                           1 Winnisimmet Street
                                                         Chelsea, MA 02150
                                                         (617) 492-7200

239.    On April 10, 2018, Mr. Jones expressed that there were some unspecified "concerns" about the bridge financing. He nevertheless reiterated that "our position is to complete the bridge asap," but indicated that Zunum would need to "raise money on the market" and reflected an understanding that abandonment by Boeing would send a negative signal to the market that would be "detrimental to Zunum."

240.    Boeing did not ultimately conduct this additional due diligence, in hindsight reflecting that it had no sincere interest, and that the exercise was part of an ongoing, systematic effort to misappropriate additional trade secrets.

241.    Thus, despite initially taking steps to follow through on HorizonX's and Boeing's leadership of an investment round, such as with Justin O'Brien's outline of a plan and messaging in mid-2017, and after inducing Zunum to abandon the external fundraising as a precondition to pursuing a joint venture with Boeing, Mr. Jones told Dr. Kumar on April 10, 2018, that the MSR with Boeing was no longer feasible within the timing that Boeing and HorizonX had proposed and that Zunum therefore expected. He strongly encouraged Dr. Kumar to renew Zunum's external fundraising efforts without near-term reliance on a more formal partnership with Boeing.

## I.    Boeing's 2018 Bridge Investment

242.    Zunum's operating funds had nearly been depleted by February 2018, and Mr. Nordlund and Mr. Jones had induced Zunum to continue ramping up its development in anticipation of a $10 million bridge loan and eventual MSR or acquisition. As a result, Zunum was in desperate need of funding when Boeing reduced the proposed bridge financing from $10 million to $4 million in April 2018.

243.    After Boeing reneged on its offer of a $10 million bridge financing, Boeing and HorizonX closed on a bridge investment of only $4 million in Zunum in May 2018, and JetBlue Technology Ventures joined the bridge with an additional $2 million.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 59

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

244.    Zunum was in desperate need for continued investment after being induced by Boeing to abandon the $61 million in expression of interest from outside investors that it had secured on its own.  Boeing's $4 million bridge financing was not enough, and Zunum would also need continued support from Boeing as its lead investor and strategic investor to obtain additional outside investments.  If Boeing and Zunum suddenly parted ways, it would signal a lack of confidence in Zunum's designs and technology to suppliers, customers, and most importantly at this time, investors.  In fact, interested investors frequently asked about Boeing's support including its commitment to continued financial support of Zunum, which was material to investors considering investments in Zunum.

245.    During this time, Zunum was also heavily engaged in due diligence with SCV and other business units of Safran, which were also looking to Boeing – the main customer of several Safran business units – to signal Boeing's support for an investment in Zunum.  Zunum was also engaging UTAS with respect to working with Zunum to allow testing in UTAS's megawatt-scale testing facility for electrical systems, which was the only such system known to Zunum.  Zunum was unable to find an alternative even through NASA or the National Renewable Energy Laboratories.

246.    Zunum gave HorizonX a Convertible Promissory Note for $4 million, and Zunum and HorizonX executed a Note Purchase Agreement, effective as of May 1, 2018.

247.    They also executed a new Investor Rights Letter (the "2018 IRL").

248.    In addition, Boeing transferred all of its rights and interests in the 2017 Convertible Promissory Note, Note Purchase Agreement, and 2017 IRL to HorizonX, pursuant to a Transfer Agreement.

249.    The Transfer Agreement expressly confirmed that Boeing "agree[d] to continue to be bound by Section 5 of the [2017 IRL] with respect to all Confidential Information (as

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 60

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  defined in the [2017 IRL]) disclosed to [Boeing] through the date of this Agreement . . . ."
2  Transfer Agreement § 1.

3       250.    Following execution of the 2018 investment, HorizonX and Boeing, through Mr.
4  Jones and others, continued to string Zunum along with the prospect of establishing a joint
5  venture and providing in-kind support.

6       251.    For example, on May 1, 2018, after closing on the smaller $4 million investment,
7  Mr. Lohnert congratulated Dr. Kumar on the current financing and wrote in an e-mail, "Next
8  step is the MSR."

9       252.    In a meeting at HorizonX's office on June 5, 2018, Mr. Jones confirmed to Dr.
10 Kumar that HorizonX "had funds to work with Zunum."

11      253.    In June and July 2018, Mr. Jones continued to discuss the path forward to an MSR
12 with Zunum. He also indicated that he would help to facilitate support and expertise from Boeing
13 on materials, manufacturing, and Zunum's efforts to seek partnerships in China and India, but
14 he did not follow through.

15      254.    For example, on July 26, 2018, Mr. Jones told Dr. Kumar that HorizonX had
16 received approval for a materials and manufacturing team from Boeing to help work on Zunum's
17 aircraft. Mr. Jones had supposedly operated on Zunum's behalf to obtain this approval.

18      255.    Meanwhile, however, in July 2018, Boeing created the Boeing NeXt division
19 focusing on integrated door-to-door and electric vertical lift-off aircraft using proprietary
20 information obtained from Zunum through Boeing's and HorizonX's prior due diligence.

21      256.    Boeing NeXt was led by Mr. Nordlund, as well as Per Beith, who became Chief
22 Executive Officer of Aurora in July 2019. Aurora's outgoing founder and Chief Executive
23 Officer left to found Electra.aero, another competitor to Zunum, in March 2020.

24
25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 61

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

257.    Boeing NeXt was formed to launch next-generation Boeing businesses, and numerous personnel involved with Boeing NeXt had been involved in reviewing Zunum's platform.

258.    Now, Electra.aero advertises its aircraft with "distributed electric propulsion" to reduce cost, emissions, and noise, as well as "on-demand service" to allow "seamless integration into ground mobility services," which describes the multi-modal transportation system that Zunum disclosed to Dr. Bradley, Mr. Langford, Edward Lovelace, Ph.D., as well as Dr. Yutko and others who worked for Mr. Langford at Aurora.  Drs. Yutko and Lovelace also traveled to the Zunum center in Washington for the "Zunum IP assessment," extracting information on a wide range of aircraft and propulsion technologies from Zunum engineering leadership, and Dr. Lovelace, who was a Senior Technical Fellow at Aurora, subsequently visited the Zunum Electric Power Center in Illinois, ostensibly as a precursor to Boeing contracting work to Zunum, thus inspecting Zunum's world-leading 500 kW hybrid-to-electric propulsion system in its final fabrication and test phase of development.

259.    The Electra.aero aircraft under development is probably not coincidentally targeting the markets that the ZA10 was designed to serve and, therefore, likely builds on extensive market and economic studies that Zunum provided to Boeing during the financing due diligence prior to the 2017 investment, and as part of due diligence in support of the MSR.  These were also provided to Dr. Yutko, along with 15 other Boeing Vice Presidents, in a confidential whitepaper by Zunum on the future of short-haul air travel, as background reading ahead of a review to support "Project Catalyst."

260.    Moreover, several of these individuals had broad exposure to Zunum's hybrid-to-electric aircraft and propulsion technologies and their application to aircraft from air-taxis to large aircraft while (supposedly) performing financing due diligence on Zunum prior to the 2017

1   investment, while engaged in the Boeing BHE-11 program, while reviewing Zunum for an MSR,

2   and while assessing Zunum.

3          261.    Given the nature of Zunum's hybrid-to-electric architecture, these technologies

4   expressly enabled hybrid-electric aircraft and all-electric aircraft and carried over to

5   Electra.aero's electric designs.  Aurora circulated a whitepaper within Boeing that undermined

6   confidence in Zunum, and Zunum was recently informed that Aurora leaders have openly

7   discussed their subsequent success in capturing funds that Boeing had committed to invest in the

8   Zunum ZA10 program.

9          262.    During this time, Zunum also sought to renew its discussions with its Hong Kong

10   investor, SCV, and UTAS, who had all previously expressed interest in investing, but these

11   discussions had been tabled due to HorizonX's proposal of the MSR.  Mr. Jones proposed that

12   Boeing help by including a Zunum-Boeing joint venture focused on China in Boeing's 2020

13   strategic plan for that critical Boeing market.  Accordingly, he engaged Mr. Fernandes, who had

14   transferred from HorizonX to a role at Boeing International, on this initiative, but it did not come

15   to fruition.

16          263.    On August 9, 2018, Mr. Jones reported to Dr. Kumar that HorizonX and Boeing

17   may be able to leverage Boeing's relationship with Safran to obtain an investment.

18   **J.**      **Zunum's Engagement with Safran and UTAS**

19          264.    After stringing Zunum along between February 2018 and August 2018 with the

20   prospect of an MSR which never materialized, an interim bridge financing of $10 million which

21   was reduced to $4 million as well as promises of in-kind support that never materialized, Boeing

22   and HorizonX interfered with and ultimately undermined Zunum's ability to obtain investments

23   from two of Boeing's main suppliers – Safran and UTAS – at a time when the funds from the

24   May 2018 bridge from HorizonX were almost exhausted.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 63

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

265.    It is no coincidence that Safran, a major supplier of electrical systems equipment to Boeing and a competitor of Zunum, which had engaged with Boeing – again without Zunum's knowledge or consent – to develop its own hybrid-electric propulsion system for its replica aircraft program, began proposing an investment in Zunum.  UTAS, a primary supplier of electrical systems for Boeing's larger aircraft, followed the same pattern as Boeing and then Safran.

266.    Boeing wields tremendous influence over Safran because Boeing is one of the largest customers for its SEP division.  At the same time that SCV, Safran's investment fund, independently approached Zunum with a proposal to invest and co-lead a Series B fundraising round with Boeing, Boeing was actively soliciting SEP to develop a hybrid-electric propulsion system competing with Zunum and based on Zunum's design, which SEP had received from Boeing.

267.    SCV followed the same bait-and-switch pattern as Boeing had, in a parallel fashion, later revealing that Boeing had combined with Safran and its business units to pursue the market opportunity for aircraft serving commercial air travel up to 1,500 miles, commercial hybrid and all-electric aircraft, and commercial hybrid and all-electric propulsion systems that Zunum had identified, while excluding Zunum, to attempt to usurp Zunum's first-mover advantage by delaying or foreclosing Zunum's entry into the market.

268.    On May 10, 2017, Nicolas Franck, an Investment Manager at SCV, had contacted Dr. Kumar with interest in investing in and partnering with Zunum.  Zunum and Safran entered into a non-disclosure agreement on August 18, 2017, to protect information exchanged between Zunum and Safran, and its affiliates, during the course of Safran's consideration of an investment in, and partnership with Zunum.

269.    In September 2017, Zunum also approached SHE and UTAS with an RFI seeking information on a turboshaft tailored to Zunum's targeted power output as a component of

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 64

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    Zunum's hybrid-to-electric propulsion system.  Zunum marked its RFI response as confidential

2    and proprietary.  Consistent with its practice of minimizing disclosure, Zunum limited the

3    specifications identified in the RFI to those necessary for a proposal on the turboshaft.

4         270.    Dr. Kumar informed Mr. Jones and Mr. Fernandes of this RFI.

5         271.    On September 29, 2017, SCV confirmed its interest in collaborating with Zunum

6    and confirmed the prevailing view across the aerospace industry, including in Europe, that

7    electric-powered aircraft was "quite far down the road," but noted that SCV was interested to

8    learn more about the market opportunities that Zunum was pursuing.

9         272.    Dr. Kumar responded to note that Zunum would need to be careful with such

10   information given Safran's uncertain role as a collaborator or competitor.  Safran's Vice

11   President of Corporate Strategy assured Dr. Kumar that they would "find common ground."

12        273.    In October 2017, leaders from Safran and SCV traveled to Kirkland, Washington

13   to meet with Zunum at its facility to explore a collaboration.

14        274.    In November 2017, a team of engineers from SHE and SEP traveled to Zunum's

15   Electric Power Center in Illinois for workshops as part of their due diligence to support the

16   proposed investment in Zunum and to explore a collaboration such as by SHE supplying the

17   turboshaft for Zunum's hybrid-to-electric propulsion system with a paired generator from SEP.

18        275.    On November 28, 2017, following a meeting and workshop between Zunum and

19   Safran in Paris, the Vice President of Safran Research & Technology ("SRT") told Dr. Kumar,

20   "[i]n the field of electrical flight, we see a lot of projects . . . but not so many having a realistic

21   ambition, based on a sounded approach of the need, and a clever choice of the tryptic [sic]

22   'capacity / speed / range' which is key to face such a challenge." (ellipses in original).

23        276.    Safran, a leading supplier of electrical systems and propulsion systems for

24   aircraft, validated the merit of Zunum's approach.

25

277.    In light of the hostility and criticism toward Zunum from the BHE-11 team that had recently been surfaced by Mr. Jones at this time, Dr. Kumar was concerned that BCA would tarnish Zunum's developing goodwill and relationship with Safran.  However, he was unaware that Boeing was already combining with Safran using its BHE-11 replica hybrid aircraft to displace Zunum and corner the emerging markets for commercial hybrid and all-electric aircraft, and propulsion systems, for itself.

278.    On December 22, 2017, SCV issued a letter of interest to invest a minimum of $5 million subject to further due diligence of Zunum's market analysis and aircraft model.   This letter reflected the preliminary approval by Safran's leadership to invest following a presentation by Dr. Kumar to Safran's executive committee, including Safran's Chief Executive Officer. However, further discussions were postponed almost immediately when HorizonX proposed to be Zunum's sole investor in February 2018.

279.    When Zunum renewed those conversations with Safran in May 2018, SCV indicated that its investment would be contingent on Zunum entering into development agreements with the Safran Group's business units.  SCV also met with the leaders at HorizonX managing Boeing's investment in Zunum, supposedly to discuss how SCV and HorizonX would collaborate on an investment in Zunum.

280.    Meanwhile, given the disruptive nature of its technologies, Zunum asserted that the development agreements were conditional on Safran joining Zunum's Board of Directors as an investor, to deflect competitive conflict, as Safran would then have fiduciary obligations to Zunum.

281.    One of the gating factors of SCV's investment in Zunum was evidence of support for the investment by Boeing, which reflected validation of Zunum's technology and plans, but which was also necessary in light of Safran's general dependence on, and deference to, Boeing.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    282.    In March 2018, Zunum expanded development discussions with SEP to several

2    components of the hybrid-to-electric propulsion system.  In May 2018 Zunum opened a due

3    diligence secure electronic data room for SCV with extensive proprietary materials, aligning on

4    a roadmap to close the investment ahead of the start of the summer holidays in France on July

5    14, 2018.

6    283.    Meanwhile SCV and Zunum closed co-development contracts to cement the

7    partnership.  SCV engaged several additional business units to participate in developing systems

8    for the ZA10.

9    284.    These Safran affiliates, including Safran Landing Systems, Safran Nacelles,

10    Safran Cabin, and SEP, coordinated through a program management office overseen by leaders

11    from SCV and SHE, dovetailing with the investment due diligence and the closing of a long-

12    term contract for SHE's production of a turboshaft to serve as a range extender on the ZA10

13    aircraft.

14    285.    In August 2018, Mr. Jones expressed to Dr. Kumar that HorizonX was

15    investigating how best to support Zunum's fundraising efforts and acknowledged that time was

16    of the essence.  Mr. Jones suggested that Boeing could leverage its relationship with Safran.

17    286.    Approximately one week later, on August 15, 2018, JetBlue Technology

18    Ventures' Board Observer on the Zunum Board of Directors asked Mr. Jones what Boeing could

19    do to help secure Safran's investment in Zunum.  Mr. Jones confirmed that Boeing has "the right

20    relationships to call the right people to be influential."

21    287.    However, in August 2018, HorizonX and Boeing reneged on the concept of an

22    MSR and investment at a level greater than 20%, and reduced their offer to maintain an

23    approximately 20% *pro rata* investment stake in Zunum.  This equated to a maximum of $10

24    million of the $50 million fundraising round that Zunum was targeting at that time, thereby

25

1  delaying the entry of service of the ZA10 aircraft to 2023, given Boeing's prior repeated stringing

2  along of Zunum on the MSR.

3    288.    HorizonX and Boeing knew that Zunum's need for additional funding was

4  increasing in urgency, given that Zunum had not received the bridge financing of $10 million

5  that HorizonX had previously proposed in February 2018, and HorizonX had subsequently

6  scaled this down to only $4 million.  Boeing also knew that Zunum was counting on a $5 million

7  investment from SCV to serve as a springboard to additional fundraising.

8    289.    On September 11, 2018, Zunum entered into the Contract 2018 - 09 for the

9  Design, Development, Manufacture, Supply, and Support of the Ardiden 3Z Engine for the ZA10

10  Commuter Aircraft between Safran Helicopter Engines and Zunum Aero for production of the

11  turboshaft component of the hybrid-to-electric propulsion system for the ZA10, which SCV

12  required as a condition for its investment in Zunum.

13    290.    Simultaneously, the investment committee for SCV reviewed the assessment of

14  the ZA10 aircraft by SRT, and on that basis gave approval for the investment to proceed, clearing

15  the final condition for the investment.  Dr. Kumar also presented to the presidents of Safran's

16  business units in a "Grand Oral" on September 19, 2018.

17    291.    Shortly  thereafter,  Zunum  and  Safran  executed  a  broad  co-development

18  agreement with several Safran business units, which SCV also required as a condition for its

19  investment in Zunum.

20    292.    Zunum engaged with SCV and SRT on the assessment, and Zunum provided

21  additional proprietary information to show that SCV and SRT had underestimated the energy

22  density of state-of-the-art battery packs by 50%, while also overestimating the operating costs of

23  the ZA10 by 40%, further improving the business case for the aircraft over what had been

24  presented to the SCV Investment Committee for approval.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 68

293.    Dr. Kumar had repeatedly asked Mr. Jones to follow through on his prior commitment to have Boeing leaders "call the right people to be influential" at Safran. SCV and SHE had emphasized to Zunum that it was critical for key Safran leaders to be contacted by their counterparts at Boeing to confirm Boeing's support for Safran's investment in Zunum. They provided names of the key Safran business unit Presidents to Dr. Kumar, who then sent them to Mr. Jones, who then confirmed that the outreach would occur.

294.    However, on September 28, 2018, Mr. Jones informed Dr. Kumar that SCV had expressed reservations about investing in Zunum due to mixed messages from Boeing regarding its support for the investment. Dr. Kumar again reminded Mr. Jones that it was critical for Boeing leaders to contact their Safran counterparts to demonstrate Boeing's promised support for Zunum.

295.    On October 22, 2018, a contingent from SCV traveled from France to Zunum's office in Bothell, Washington. The SCV contingent had traveled to Washington to close the $15 million SCV and HorizonX investment in Zunum's Series B financing round. Accordingly, Brian Schettler, Managing Director for HorizonX, had arranged to fly in that day for the closing, but cancelled at the last minute and asked Mr. Lohnert to join instead. Zunum was also hosting two other overseas investors that week, who had planned to join the financing following the closing by SCV and HorizonX.

296.    Just prior to the meeting, and to the surprise of the SCV contingent who had traveled from France to close on the investment, the SCV contingent was informed that it was no longer authorized to complete a closing with Zunum, and that the investment no longer had the support of the Safran Presidents.

297.    HorizonX, in turn, used the reversal by SCV as a basis to withdraw its own support for co-leading the Series B financing.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

298.    Dr. Kumar contacted Mr. Jones to urge him to fulfill his commitment for Boeing to endorse Zunum to Safran leaders and to reconcile mixed messages from Boeing, but he declined, noting that the considerable influence Boeing had over Safran resided at BCA, not with HorizonX.   Mr. Knapp had separately been informed by Safran that, contrary to Mr. Jones' repeated assurances, no decision-maker at Safran received any message of support for Zunum from Boeing leadership, and this silence was viewed as a sign of Boeing's lack of support for Zunum.

299.    In December 2018, an Executive Vice President at SHE visited Zunum's office in Bothell, Washington when he was in Seattle for a meeting with Boeing.   He told Dr. Kumar and Mr. Knapp that Alain Sauret, president of SEP, had blocked the investment.   He also noted that Mr. Sauret's business unit was beholden to BCA.   The SHE Executive Vice President also informed Dr. Kumar and Mr. Knapp that Mr. Sauret would not have objected to the investment without BCA's influence.   SEP would also be the business unit primarily involved in working with Boeing on its hybrid-electric propulsion system.

300.    Dr. Kumar and Mr. Knapp were informed that Mr. Sauret's key lieutenant was visiting Boeing concurrently to further their joint hybrid-electric program.   The SHE Executive Vice President also informed them that Stephane Cueille, president of SRT, and a close friend of Mr. Sauret, had joined him in the reversal on SCV's investment decision, even though his business unit had participated in the prior decision by the SCV Investment Committee to proceed.   Moreover, Zunum had since demonstrated to SCV and SRT that they had far underestimated the economics and range of the ZA10 in the analysis that was presented to the SCV Investment Committee.

301.    Curiously, Safran appeared to act against its own interests by reversing its decision on its modest $5 million investment in Zunum, which jeopardized up to $20 billion in revenues to SHE over the life of the turboshaft contract, and more, given the broad co-

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  development agreement between Zunum and several Safran business units, executed just the

2  month prior. Zunum had repeatedly asserted to Safran that the agreements were conditional on

3  Safran investing in Zunum and joining its Board of Directors., Safran reversed its investment

4  decision knowing that doing so would immediately jeopardize that vast opportunity.

5  302.    Even 13D Global Strategy & Research, in its November 2018 newsletter,

6  recognized that the turboshaft agreement with Zunum brought significant value to Safran.

7  Noting that Safran "makes engine turbines for hybrid-electric aviation startup Zunum," the

8  newsletter included the Safran stock as a potential candidate for "an aviation transformation

9  portfolio."

10  303.    However, in March 2019, within months of the reversal of Safran's decision to

11  invest in Zunum, the Chief Executive Officer of SHE, Franck Saudo, announced at the Heli-

12  Expo helicopter tradeshow Safran's ambition to become a market leader in Hybrid-Electric

13  Propulsion Systems ("HEPS") by 2025, based on a close collaboration among SEP, SHE, and

14  Safran Power Units.

15  304.    Safran Power Units is a supplier of auxiliary power units ("APUs") for aircraft

16  and a division of SEP. Eric Dalbies, the Executive Vice President responsible for SCV, was

17  appointed to lead Safran Power Units in November 2018, concurrent with Safran's and Boeing's

18  about-face on investing in Zunum.

19  305.    In November 2018, Boeing and Safran also deepened their close partnership by

20  forming a 50-50 joint venture (subsequently named Initium Aerospace) to develop APUs,

21  expanding the product line of Safran Power Units to challenge Honeywell's leadership of that

22  market.

23  306.    Boeing and Safran went further in September 2019 when HorizonX and SCV co-

24  invested in EPS, a developer of advanced batteries for aviation. A press release announcing the

25  investment featured Mr. Schettler, Managing Director of HorizonX, illustrating Boeing's

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 71

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  combination and collusion with Safran to usurp Zunum's first-mover advantage in the market

2  for commercial hybrid and all-electric aircraft and propulsion systems, even though this entailed

3  tremendous damage to Zunum, which was HorizonX's first investment. Mr. Sauret is quoted in

4  the same press release stating, "Safran will collaborate with EPS to offer our customers electric

5  or hybrid-electric propulsion systems with a level of performance that sets us apart from

6  competition." He further claimed that "Safran is already at the cutting edge of this field . . . ."

7  307. Safran had previously rejected hybrid propulsion as unviable before the 2040s,

8  but it had learned about the pathway to near-term hybrid-electric propulsion for aircraft from

9  exposure to Zunum's trade secrets from Boeing, and from Zunum as part of Safran's due

10  diligence on Zunum. Safran and Boeing colluded and combined to use Zunum's proprietary

11  information to compete against Zunum in order to foreclose Zunum from the very markets that

12  Zunum had innovated, identified, and developed.

13  308. In fact, contrary to Mr. Saudo's and Mr. Sauret's assertions to the media in March

14  and September 2019, respectively, it was Zunum and not Safran that was at the cutting-edge of

15  the field. SEP and SHE leaders in the Safran contingent who visited Zunum for the purported

16  closing complimented Zunum on the sophistication of the development activities at the Zunum

17  Electric Power Center in Illinois, noting that these "could be Safran."

18  309. Mr. Sauret's current claim of Safran being at the "cutting edge" of the field are

19  both false and true in some measure. They are belied by the modest power levels and

20  performance of the products unveiled so far, which still fail to meet the capability of the models

21  that they improperly copied. Although SEP has announced the intent to develop electric motors

22  of power levels of up to 500 kW, aligned with Zunum's P0 prototype motor awaiting test in late-

23  2018, the only motors announced by SEP are rated up to 50 kW at a power density of 2.5 kW

24  per kg. The latter is a key metric given low weight is essential for flight. Meanwhile, the Zunum

25  P0 motor is rated at 500 kW at 7 kW per kg, nearly three times lighter per kW of power, and on

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 72

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    track to 10 kW per kg, four times lighter per kW of power, when integrated with Zunum's Quiet

2    Electric Propulsion units.  However, to the degree that SEP has jumped forward based on its

3    copied approach, it is leading the market among incumbent OEMs.

4          310.    Moreover, Safran's conduct has effectively placed it ahead of Zunum by improper

5    copying and corporate interference.  Zunum was on track to start flight testing of its 500 kW

6    hybrid-to-electric propulsion system, an important milestone, in May 2019 when Boeing's and

7    Safran's abrupt reversal in October 2018 drove Zunum into a financial tailspin.  The record of

8    financing transactions by other electrified vehicle ventures would suggest that the successful

9    achievement of that milestone would have multiplied the value of Zunum many times over, thus

10   placing it out of reach of Boeing or Safran.  This interference with Zunum at a vulnerable stage

11   effectively stifled Zunum from reaching this critical milestone, thereby completing an

12   anticompetitive move, and allowing a slower-moving, less-adept incumbent (Safran) to plod

13   forward and still be the current leader among incumbent OEMs.

14         311.    Based on information and belief, Boeing also interfered with a proposed

15   investment from UTAS during this time.

16         312.    Discussions on a partnership between UTAS and Zunum were initiated when the

17   President of UTAS approached Dr. Said to propose collaborating on hybrid propulsion in June

18   2017.  UTAS then followed up with Dr. Said in October 2017 by proposing that UTAS invest in

19   Zunum.

20         313.    Accordingly, in November 2017, a corporate development team from UTAS

21   engaged with Zunum to launch due diligence and lay the groundwork for an investment, while a

22   business development team engaged to flush out what developed into eight areas of collaboration

23   over the following months.  These activities were code-named "Project Hummingbird" within

24   UTAS, alluding to Zunum, which is taken from the Mayan word for hummingbird.

25

1    314.    To support these activities, Zunum provided UTAS an extensive due diligence

2    data room comparable to what it had built to support due diligence by Boeing.  Zunum also

3    provided technical details around the planned areas of collaboration and launched negotiations

4    regarding contractual and intellectual property frameworks.  Zunum's technical leader also

5    engaged in workshops with UTAS's technical staff to help them understand the Zunum hybrid-

6    to-electric technologies, and the targeted requirements, all under the protection of a non-

7    disclosure agreement.

8        315.    In March 2018, Zunum and UTAS continued to discuss a partnership.

9        316.    UTAS proposed joining Boeing and JetBlue Technology Ventures in the bridge

10   to a Series B investment round with a $10 million investment by UTAS in Zunum.  For a period

11   in April 2018, Michael Groenhout, who had been Executive Director of Corporate Strategy and

12   Corporate Development for UTAS, even proposed UTAS becoming Zunum's sole investor, just

13   as Boeing had done in February 2018.

14       317.    UTAS sought to close the investment that it had offered by July 2018 so as to

15   announce its investment in, and partnership with, Zunum at the Farnborough International

16   Airshow, a widely-attended trade fair for the aerospace industry.  This included the parties

17   negotiating a convertible note agreement in June 2018 and discussing coordination between their

18   marketing teams.

19       318.    In late July 2018, UTAS abruptly abandoned its investment proposal stating that

20   it was not prepared to invest in an aircraft manufacturer.  Zunum later learned through

21   HorizonX's Board Observer that the Chief Technology Officer for UTAS had approached the

22   Chief Technology Officer at Boeing, who sat on HorizonX's investment committee overseeing

23   its investment in Zunum, to propose that Boeing and United Technologies partner to develop

24   hybrid aircraft.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 74

319.    Upon information and belief, Boeing actively interfered with the proposed investment by UTAS. As with SEP, UTAS was beholden to Boeing and susceptible to Boeing's substantial influence based on their dominant position in the aircraft industry. In addition, in July 2018, Mr. Jones advised Zunum to trust Safran over UTAS.

320.    However, before its sudden shift, UTAS had been urging Zunum to close on a strategic partnership quickly, for an announcement just a few weeks prior at Farnborough, and had even proposed placing UTAS staff at Zunum's Electric Power Center in Illinois to team with Zunum in a lean cross-functional development environment.

321.    Through 2017, UTAS was also a leading skeptic of electrified propulsion for aircraft. In a wide variety of venues, UTAS leaders noted that electrification was at best a solution for the distant future, requiring "three technological miracles," which was "two-and-a-half too many," for a sector such as aviation.

322.    As with Safran, UTAS's attitude toward the viability of hybrid aircraft dramatically changed after it engaged with Zunum, and UTAS suddenly announced extensive investment into hybrid-electric propulsion following its obtaining access to Zunum's intellectual property, trade secrets, and proprietary information.

**K.    Impact of Boeing's Serial Withdrawals from Forthcoming Investments**

323.    Boeing's pattern of dangling investments and partnership only to renege at the last minute, and assuring Zunum of its continuing C-Suite support even as it colluded and undermined it with Zunum's relationships other partners and investors, was devastating to Zunum's financial condition and its ability to develop strategic relationships, pursue alternative investors, and scale to commercialize its aircraft. Boeing did so, even as its venture capital division, a lead investor in Zunum, committed to play a key role in leading Zunum's fundraising activities by engaging outside investors and driving up valuation.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

324.    In reality, Boeing repeatedly discouraged investors from investing in Zunum, and suppressed the company's valuation. The pattern of undermining partook of breaches of contract and other duties, including fiduciary duties, as well as engaging in an overarching pattern of misleading and inducing reliance in a manner that was, as a totality, harmful, unfair, and deceptive.

325.    For example, the Series B investment round that Zunum was raising in January 2018 targeted a raising of funds of $80 to $90 million, with Zunum valued between $240 to $400 million, targeting sale of up to 30% of ownership of the company, which is typical for a venture financing round.

326.    When Boeing and HorizonX induced Zunum to halt its Series B investment round to negotiate an MSR for Boeing to become a sole investor, it committed to a $10 million in bridge financing within a month on terms that were consistent with the Series B investment round. Boeing then took several months to propose an agreement for the bridge financing, placing Zunum in jeopardy, and proposed a $40 million cap on Zunum's valuation.

327.    The $40 million cap proposed would make it all but impossible for Zunum to raise a subsequent Series B on anywhere near the proposed valuation of $240 to $400 million, contrary to Boeing's assurance that the bridge financing was intended to carry or bridge Zunum to the Series B round of funding.

328.    Moreover, it would enable HorizonX and Boeing to take on majority ownership of Zunum, and therefore effective control of Zunum, with a modest subsequent investment given that the cap would inevitably anchor subsequent valuations.

329.    When Zunum requested an uncapped investment or a cap aligned to the valuation of $240 to $400 million proposed for the subsequent Series B investment round, HorizonX reduced the bridge financing to $4 million, forcing Zunum to scale back its development plan to curtail costs and delaying the entry of the ZA10 from 2022 to 2023. This was contrary to Mr.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 76

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  Jones's prior urging of Zunum to continue scaling up development for a planned launch in 2022,

2  which required undiminished spending even while Zunum's financial resources were being

3  depleted.

4         330.    The delayed Series B, followed by another delay to a reduced bridge loan

5  financing, forced Zunum to reduce its Series B fundraising target from $80 to $90 million to $40

6  to $50 million in June 2018, depressing its implied valuation from $240 to $400 million down to

7  $160 to $200 million. Zunum had no choice but to adopt this approach because of the financial

8  jeopardy caused by these funding delays.

9         331.    At this time, Boeing still claimed to be working towards an MSR with Zunum,

10  while UTAS and Safran planned to invest an additional $15 million towards the bridge facility

11  in July 2018. Meanwhile, the $30 million investment from Hong Kong had stalled given

12  uncertainty due to the impending passage of the Foreign Investment Risk Review Modernization

13  Act of 2018 ("FIRRMA"), enacted in August 2018.

14         332.    UTAS abruptly reversed its commitment to invest in late July, and Boeing

15  reversed on the MSR for the second time in early August, informing Zunum that its participation

16  would therefore be 20% of the raise, or $10 million or the proposed reduced $50 million Series

17  B. Boeing also required a separate co-lead investor for the next investment round and that the

18  valuation be set by others given Boeing's refusal to do so, contradicting Mr. Jones's prior

19  statement that HorizonX would support Zunum as an investor to "drive up the valuation."

20         333.    Boeing's interference with the establishment of a value for Zunum suppressed the

21  financing terms further. Zunum enlisted SCV to value the company in partnership with an

22  aviation-focused investor who was raising funds to invest in Zunum. The two valued Zunum at

23  $125 million in September 2018 down from the already previously reduced Series B valuation

24  of $160 to $200 million.

25

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

334.    Further delays in the closing with SCV pushed the closing date to October 22, 2018, well past the time that Zunum had run out of operating funds. Meanwhile, Zunum had cleared all conditions to the SCV and Boeing financing, including further negotiation with SCV to meet its target to acquire 5% of Zunum.

335.    As a result, in reliance on SCV's assurances that its investment would close by October, Zunum leaders made the difficult decision to expose the company to liabilities upwards of $4 million to avoid furloughs and loss of wages because financing was just weeks away. The founders of Zunum stopped drawing a salary in September 2018 and have remained engaged in the recovery unpaid ever since, as when Zunum was operating in stealth mode.

336.    The abrupt reversal by Boeing and SCV on co-leading the Series B round in October 2018 sent Zunum into a tailspin. Boeing reiterated its commitment to invest $10 million conditional on Zunum finding a co-lead to replace SCV. Zunum had developed investors to follow SCV and Boeing and engaged an investment bank to build on this pipeline to close the round urgently.

337.    Nevertheless, given its finances, Zunum had no choice but to take immediate, drastic measures in order to survive. It furloughed all employees, launched outreach to other aerospace programs to find contract work to engage its engineers, and raised emergency loans to cover the limited operating costs that remained.

338.    Boeing also proposed to send Zunum contract work to help it retain its engineers. Moreover, given Zunum's urgent hunt for a co-lead investor to join Boeing due to Boeing's changing position on the Series B financing, Mr. Jones and Dr. Kumar also scheduled HorizonX to view Zunum's program to fast-track due diligence ahead of its investment. Mr. Jones also noted that the Boeing team performing the review would also use that exposure to Zunum talent and facilities to identify contracting opportunities in order to help Zunum during its time of financial distress.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

339.    Although pitched as a due diligence review, HorizonX sent in a panel of senior engineers from Boeing and Aurora to perform a "Zunum IP assessment." During the review, Zunum's technical leaders were repeatedly interrupted and asked to focus purely on describing intellectual property, and other acquirable Zunum resources.

340.    One of the leaders from Aurora, who was on Zunum's Advisory Board prior to joining Boeing, subsequently travelled to Zunum's Electric Power Center in Illinois, purportedly to review the facility first-hand as a possible service provider to Aurora, when in reality the effort was to gather competitive information.

341.    Through these actions, Mr. Jones and others at Boeing illustrated their preference for Zunum to go under so that they could to strip-mine what remained.

342.    These actions included a coordinated campaign to recruit Zunum staff, even as Zunum was racing to find alternative funding. Zunum actually closed three contracts with startup aerospace programs to retain employees, while pursuing co-lead prospects with the investment bank.

343.    Mr. Jones attempted to allay Dr. Kumar's concerns about Boeing poaching Zunum's employees, writing, "The last thing Boeing wants to do is to extend support only to have it seen as poaching employees and have a statement of work related to electrics create a perception of IP infringement." However, this is exactly what Boeing went on to do, which has created both the perception and reality of intellectual property misappropriation.

344.    In keeping with Boeing's pattern of inducing reliance and then failing to deliver, Boeing never offered Zunum any contract work. Instead, armed with visibility into Zunum talent pool from the salvage-hunting "Zunum IP assessment" and on the timing of furloughs known only to Zunum's Board of Director, Boeing launched a systematic and coordinated campaign to poach talent timed for the day after the furloughs were announced across all three Zunum centers. Based on information and belief, this effort had been prepared well before, while these duty-

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 79

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

bound individuals were supposedly helping Zunum to find contract work. In actuality, the perilous and vulnerable state that Zunum had been placed in was due to a series of misuses of Zunum's trade secrets and confidential information, false pretenses regarding investment inquiries and negotiations, and now a recruiting effort masked as revenue-triage assistance for Zunum's benefit. This recruitment effort included personal outreach by the Aurora leaders who had participated in the sham assessment to Zunum engineers, encouraging them to apply to roles at Aurora.

345.    Faced with this onslaught from Boeing on his engineers, the leader of the Zunum center in Indiana reached out to Mr. Jones to inquire why this was happening. Mr. Jones confirmed that he was aware of the campaign and that it had been timed to coincide with the furloughs. Those furloughs in turn were the result of Boeing's shifting and declining promises to secure additional funding. Mr. Jones also noted that Boeing was very impressed by Zunum talent and could explore options to absorb the Indiana facility.

346.    Thus, Mr. Jones, through his fiduciary role as an Observer on the Zunum Board of Directors, exploited his access to confidential information about Zunum's financials and the timing of its furloughs to enable Boeing to attempt to strip-mine Zunum's intellectual property and talent to Zunum's detriment in order to further Boeing's own programs. Meanwhile, UTAS also proposed to send Zunum contract work, but did not follow through. UTAS also proposed to purchase Zunum's patent portfolio, and on hearing this, HorizonX also asked to be informed in advance of any such distressed sale.

347.    Meanwhile, Zunum continued to receive information on the dynamics that led to the sudden withdrawal of SCV's imminent investment.

348.    In November 2018, Zunum learned that, contrary to the repeated assurances from Mr. Jones at HorizonX, no senior leader at Boeing had ever contacted the leaders of key Safran

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 80

1   business units to support Zunum as promised.  The Safran business units viewed Boeing's silence

2   as Boeing withdrawing support for Zunum.

3       349.    Then, in December 2018, Zunum learned from an Executive Vice President at

4   SHE that the President of SEP had blocked SCV's investment in Zunum.  The executive

5   informed Zunum that the SEP President was beholden to Boeing and would only have blocked

6   the investment with encouragement or instruction from Boeing to do so.  The executive also

7   noted to Zunum that the SEP leadership was in Washington State at the time to engage with

8   Boeing on a separate hybrid-electric concept.

9       350.    Despite Boeing's assault on Zunum's assets, Zunum's urgent fundraising

10  campaign was starting to bear fruit in January 2019.  The uncertainty that FIRRMA had caused

11  for foreign investments had cleared, and Zunum re-engaged with the investor from Hong Kong

12  that HorizonX had traveled with Dr. Kumar to visit the year prior.

13      351.    Prior to the Chinese New Year, Zunum received a term sheet from the investor

14  for a $15 million investment, valuing the company now at $88 million, down from the most

15  recently previously reduced valuation of $125 million, with a closing targeted for February 2019.

16  Given FIRRMA, the investor had agreed with Zunum for the investment to be non-controlling,

17  with ownership limited to 9.9%, and with no rights to any technical information, or to participate

18  in Zunum's corporate governance.

19      352.    However, Boeing's pattern of interference in Zunum's fundraising continued.  In

20  early February 2019, on hearing of Zunum closing $15 million with the investor in Hong Kong,

21  HorizonX abruptly withdrew its commitment to co-lead with $10 million, even though it was

22  fully aware that Zunum's entire pipeline of investors had been cultivated on the basis that Boeing

23  was leading the investment with $10 million.  In effect, Boeing set increasingly higher bars, and

24  when Zunum met them, like finding a co-lead investor, reneged, all the while proceeding with

25

1    its own internal effort competing directly against Zunum by using trade secrets misappropriated

2    from Zunum.

3         353.    Mr. Jones, who was promoted to the Vice President of HorizonX when Safran

4    withdrew from investing in Zunum, represented that HorizonX's withdrawal of support was

5    related to internal sensitivity around co-investing with a China-based investor. This was

6    implausible because Mr. Jones had previously joined Zunum in China to cultivate this very

7    relationship. Furthermore, the non-controlling equity structure without information rights would

8    have addressed any such sensitivity. Mr. Jones also noted that an investment by this investor

9    meant that Boeing could no longer contemplate the MSR that it had dangled in front of Zunum

10   for the past year.

11        354.    When Zunum and the investor in Hong Kong were engaging on closing

12   documents in March 2019, HorizonX followed by purporting to require that Zunum repay its

13   promissory notes with Boeing, causing further disruption in the closing mechanics. HorizonX

14   later agreed to convert the 2017 Note and extend the 2018 Note for 18 months. However, the

15   new investor declined to transfer funds as scheduled, claiming a change of heart due to the recent

16   crashes of the Boeing 737 MAX.

17        355.    Zunum had maintained its facilities on life-support in anticipation of financing,

18   with a subset of its engineers engaged on contracts with several aerospace ventures, though most

19   of the remainder resigned. But this final blow in April 2019 forced Zunum to close all of its

20   centers and lay off all employees, to minimize spend for what was expected to be a much more

21   arduous recovery, especially given the need to disclose these claims to any prospective investor.

22        356.    This loss of its engineers, who had collectively built an unmatched electrified

23   aircraft and propulsion development capability, dealt a severe blow to Zunum.

24        357.    Leaks by Safran and HorizonX to the media further damaged Zunum's

25   fundraising activities during this period. These leaks disclosed financial troubles at Zunum and

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 82

1    the withdrawal of Boeing's and Safran's support for the company, but with no reference to their
2    role in causing Zunum's financial distress.

3        358.    In an article on Safran's ambitions to become a leader in HEPS technology by
4    2025, *Aviation International News* noted in March 2019 that the Zunum turboshaft "contract is
5    considered by Safran as a 'sleeping project,' since Zunum Aero has run into financial trouble."

6        359.    HorizonX went further in an August 2019 article in *Aviation International News*
7    titled "Zunum's Electric Airliner Prospects Appear Increasingly Remote," which reported that
8    in "September 2018, Logan Jones, vice president of Boeing's HorizonX 'innovation cell' quietly
9    stepped down as the airframer's representative on the Zunum Aero Board – apparently signaling
10   the end of Boeing's backing of the company." Mr. Jones confirmed this timeline on his LinkedIn
11   profile which lists him on the Zunum Board of Directors from February 2017 to September 2018.
12   However, HorizonX did not inform Zunum of any change, until Zunum addressed the issue in
13   its response to HorizonX's demand for repayment in December 2019. HorizonX later sent
14   documentation as if the change had happened earlier, effectively acknowledging that it had
15   pulled support back long before, but just had not told Zunum, effectively misleading it.

16       360.    In retrospect, this statement is consistent with Boeing's actions in September
17   2018, when it signaled a lack of support for Zunum to Safran leadership, took steps to strip-mine
18   Zunum's intellectual property and talent, and then withdrew its proposed $10 million, after
19   Safran abruptly reversed its investment plans.

20       361.    At the time, however, HorizonX repeatedly misled Zunum by asserting its support
21   for the financing and insisting that HorizonX would cause Boeing to communicate that support
22   to the Safran leaders. HorizonX maintained this false message of assurances to Zunum through
23   February 2019, inducing Zunum into financial distress by expending the last of its emergency
24   funds in a futile search for a co-lead of the supposed Series B financing with Boeing. HorizonX
25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 83

1   kept Mr. Jones in his role as Observer on the Zunum Board of Directors to keep up the false

2   impression of continuing support and fiduciary involvement.

3       362.    Zunum was in the process of closing a financing in August 2019 led by an

4   aerospace entrepreneur, who withdrew after senior executives at his company feared retaliation

5   from the aerospace OEMs.   Then, in December 2019, when Zunum was preparing to close $5

6   million in interim financing with a syndicate of investors from Europe and Asia, HorizonX

7   demanded repayment of the convertible notes, reversing its commitment in April 2019 to extend

8   the notes by 18 months so that Zunum could recover.   The fresh threat from Boeing caused that

9   fundraising opportunity to evaporate.

10      363.    It also severely constrained Zunum's already difficult financial recovery to a

11  small set of global investors with the appetite and resources to place much greater funds at risk

12  in light of the demands from HorizonX and the apparent hostility of major aerospace players.

13  Yet Zunum has persevered, although progress stalled for much of 2020 due to the COVID-19

14  pandemic.

15      364.    Boeing also interfered with other investors.   Mr. Jones destroyed JetBlue

16  Technology Ventures' trust in Zunum when he attacked Dr. Kumar in November 2018 on false

17  grounds and insisted that he be removed because he had previously raised concerns around

18  Boeing's conduct with respect to Zunum's intellectual property.   In effect, he portrayed Dr.

19  Kumar's concerns about Boeing's trade secret theft as a basis for Boeing disliking him, and a

20  reason why JetBlue Technology Ventures should not do business with him.

21      365.    Zunum was informed that two of the investors that Zunum was developing in

22  December 2018 and January 2019 had independently contacted senior executives at Boeing and

23  HorizonX for feedback about Zunum and had been discouraged from investing.

24

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 84

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

366.    Zunum had introduced Mitsubishi to HorizonX in 2018 when Mitsubishi was pursuing an investment in Zunum. In 2020, Zunum learned that HorizonX had falsely informed Mitsubishi that Zunum had liquidated its assets.

367.    In June 2020, Zunum learned that Boeing had redirected to Aurora funds that it had previously earmarked to support Zunum.

368.    The series of events of repeated promises, assurances, induced reliance, followed by interfering, undermining and delays, then overt subversion and wrongful conduct resulted in the effective disablement and attempted dismantlement of Zunum by Boeing and Safran. The motive of disrupting competition, new markets, and models that affect an effective lock on short-haul flight aircraft, and technological capture for Boeing and Safran, suggests that these events are all part of a common, hostile plan of collusion evident in the naked theft of trade secrets demonstrated in the BHE-11 and shared by Boeing with Safran.

**L.    Boeing and Safran Misappropriated Zunum's Trade Secrets**

369.    Based on information and belief, HorizonX, Boeing, Safran, SCV, SEP, and SHE, used their extensive due diligence and technological assessments of Zunum, and HorizonX's Board Observer, to misappropriate Zunum's intellectual property, trade secrets, and proprietary information.

370.    For example, Boeing necessarily disclosed to Safran and UTAS substantial detail on the technologies, market opportunity, and economic viability of the Zunum ZA10 hybrid-to-electric aircraft and propulsion system in engaging with Safran and UTAS in the summer and fall of 2017 on the Boeing BHE-11 aircraft, when inducing Safran and UTAS to initiate work on a hybrid-electric propulsion system for the BHE-11. Boeing planned to commercialize the BHE-11 in 2024, at operating and acquisition costs significantly below an equivalent conventional aircraft, such as the Pilatus PC-12. Thus, Boeing dramatically reversed its prior assertions that commercial hybrid aircraft were not viable ahead of the 2040s, and would be economically

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 85

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  uncompetitive, disclosing many elements of Zunum's zealously guarded innovative and

2  contrarian perspectives to powerful competitors.  It also encouraged these competitors to enter

3  the market for hybrid propulsion in partnership with Boeing, thus excluding Zunum and

4  foreclosing Zunum's first-mover advantage.  Based on disclosures by the Executive Vice

5  President of SHE to Zunum in December 2018, announcements in 2019, and patents filed by

6  Boeing and Safran in 2018 and 2019 which were, on information and belief based on incomplete

7  information, curiously aligned with Zunum's own patent filings, it appears that Boeing's

8  combination with Safran has continued.

9          371.    In order for these entities to assess feasibility and prepare a properly-scoped

10  proposal for production of a hybrid-to-electric propulsion system, they would have needed to

11  know the required specifications and extensive technical detail, which Boeing could only have

12  obtained from its extensive due diligence of Zunum.

13          372.    Based on information and belief, Safran also attempted to usurp the technology

14  that Zunum innovated and the business opportunity that Zunum innovated and developed,

15  through Safran's program to pursue its own, competitive hybrid propulsion, which is staffed by

16  many of the same leaders and engineers who led Safran's engagement with Zunum.

17          373.    SCV expressly conditioned its proposed investment on Zunum entering into

18  development agreements with Safran business units, which Zunum did.

19          374.    This gave Safran extensive access to Zunum's technology and a market roadmap

20  through investment due diligence and development of collaboration plans, subject to appropriate

21  confidentiality and trade secret protection.

22          375.    However, only a few weeks after Zunum and the Safran business units entered

23  into a long-term turboshaft and joint development agreement, SCV abruptly reneged on its

24  proposed investment.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 86

376.    Within months of the reversal, Safran announced its intent to lead the market for hybrid-electric propulsion systems by 2025.  Safran also moved up its timeline for a short-haul hybrid aircraft to 2025, which it had targeted for 2041 prior to its exposure to Zunum's proprietary information.  Safran also moved up its projected timeline for a regional hybrid aircraft to 2030 from 2049 previously.  These shifts are by 16 and 19 years.  Safran also published a website and brochure promoting its work on commuter aircraft that closely mimics the market opportunity that Zunum disclosed to Boeing and later to SCV.  For example, Safran's website states: "Safran is also interested in another application: small commuter aircraft in the 10-passenger class.  Hybrid propulsion architectures could make these planes a competitive proposition for regular rounds of a few hundred miles in certain parts of the world.  The United States, for example, has more airports than any other country, yet an estimated 80% of them are underused or unused due to the difficulty of operating conventional airplanes profitably over short distances, and especially the overly restrictive noise regulations at those local airfields. While all electric propulsion is unrealistic in the near term, a variety of hybrid designs are entirely conceivable."

377.    On November 29, 2018, the President of Safran Research & Technology gave a presentation to its investors at Safran's annual Capital Markets Day.  This presentation unveiled a roadmap for electric propulsion accelerated 16-19 years sooner than Safran had previously projected.

378.    This vision is directly contrary to what SCV expressed to Zunum in 2017 as its understanding based on its conventional wisdom regarding the infeasibility in the near to mid-term of hybrid-electric propulsion.  Safran had determined then that such an aircraft was not viable until the 2040s, but access to Zunum's technologies enabled this vast conglomerate to accelerate its development plans by decades.  Moreover, it was precisely to counter disbelief at Safran in due diligence that Zunum provided it with an extensive body of confidential

information to demonstrate otherwise. The Safran website also promotes products, such as series hybrid propulsion for vertical takeoff aircraft, premised on technology that Zunum advanced and patented in 2014, as well as associated know-how and trade secrets.

379.    In June 2019, Safran announced a partnership with Airbus and French airframer Daher, supported by France through CORAC, the French Civil Aviation Research Council, to develop a hybrid-propulsion aircraft demonstrator known as EcoPulse. This demonstrator passed its Preliminary Design Review in December 2020, a key step toward first flight tests scheduled in 2022. Given Daher's line of turboprop aircraft, this partnership will enable entry by Daher into the market Zunum had developed with the Zunum ZA10 aircraft.

380.    Despite combining through joint investments, such as in EPS in September 2019, Safran and Boeing also competed in the markets for commercial hybrid and all-electric propulsion systems. Both Safran and Boeing have been, separately, developing commercial hybrid and all-electric propulsion technologies, upon information and belief, based on information derived from Zunum. Boeing's and Safran's activity in the markets for hybrid-electric and all-electric aircraft and propulsion is reflected in the numerous patents that they each have filed following exposure to Zunum information in recent years. This includes patenting in at least four distinct areas: hybrid-electric powertrains, series hybrid controls, 3x3 electric drives and related multi-inverters, and electric propulsors.

381.    Thus, both Boeing and Safran emerged as competitors to Zunum by misusing its proprietary information, and Boeing for a period sought to acquire Zunum with its proposal to become a sole investor via Project Catalyst or MSR. Meanwhile, Safran's partnership with Airbus and Daher put it into competition with Boeing in the market for commercial aircraft serving air travel up to 1,500 miles. This is Boeing's mainstay market, which Safran entered through this Airbus-Daher partnership. Boeing and Safran are competing similarly in the market for electric air taxis. Boeing acquired a majority stake in Wisk, which is commercializing all-

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 88

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    electric urban air taxis.  Wisk has developed its own all-electric propulsion system.  Safran has

2    partnered to power other air taxi ventures with its competing all-electric propulsion system.

3         382.    In May 2020, Safran announced its partnership with Sabrewing to provide hybrid-

4    electric propulsion for its Rhaegel-A vertical takeoff aircraft.  This appears, on information and

5    belief based on incomplete information, to draw on technologies that Zunum patented in 2014,

6    and associated other protected technologies, which Zunum provided to Safran to support due

7    diligence for its investment and scoping of a collaboration with Zunum.  Several of the plans

8    announced appear to be derived from information learned from Zunum, including the hybrid

9    vertical take-off aircraft, series hybrid propulsion, electric ducted propulsors, operational

10   requirements, and commercial terms related to the Ardiden 3 turboshaft as a range extender.

11        383.    In September 2018, a Safran entity filed a patent for a hybrid propulsion assembly

12   for aircraft that is, on information and belief, directly inspired by confidential information that

13   Zunum supplied to SCV and its affiliates in connection with their due diligence for an investment

14   in Zunum.

15        384.    In addition, in December 2018, Boeing filed a patent for a Thin Haul Hybrid

16   Electric Propulsion System, which is part of what underlies the Boeing BHE-11 model.  This

17   patent, on information and belief, borrows heavily from Zunum's ZA10 architecture, which

18   Zunum has yet to disclose publicly, but which Boeing had access to through its due diligence of

19   Zunum, meetings of Zunum's Board of Directors, and other access to Zunum's confidential

20   information.

21        385.    On March 1, 2019, Boeing filed a patent for an Active Voltage Control for Hybrid

22   Electric Aircraft, which patent was granted on March 17, 2020.  This patent, on information and

23   belief, relates closely to issues addressed by the control system in an international patent filed by

24   Zunum in August 2018.  A precondition for patent issuance is a representation of inventorship,

25   which means that it did not exist previously, and that someone else did not invent it.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 89

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

386.    Notably, one of the inventors listed on Boeing's voltage control patent was a Senior Technical Fellow for BCA who was involved in designing the BHE-11, who was one of the commenters in the spreadsheet that was inadvertently shared with Zunum in April 2018 and who attended Boeing's "investment" assessment of Zunum's intellectual property in November 2018.

387.    Boeing's patents also reveal that it is, on information and belief, pursuing a series hybrid architecture, following Zunum's unique approach.  This is an approach that Boeing's engineers had previously rejected prior to gaining access to Zunum's trade secrets and proprietary information.

388.    In an October 2019 issue of *Northwest Aerospace News Magazine*, Boeing described an approach for "the right economics for affordable transportation" and intermodal convenience, which is a key component of Zunum's overall strategy, including the total-cost door-to-door metric that Zunum used as key basis for its development.  Boeing had not previously focused on these features, but it learned of them from Zunum through HorizonX's request for information on Zunum's unpublished patent filing on multi-modal transport and its proprietary modeling of transportation markets, which Zunum had shared pursuant to the 2017 IRL.

389.    In 2020, John Langford, who was the Chief Executive Officer of Aurora, left to found Electra.aero, an electric aviation venture that now competes directly with Zunum in the markets for aircraft serving commercial air travel up to 1,500 miles, and commercial hybrid and all-electric aircraft, and commercial hybrid-electric and all-electric propulsion systems that Zunum had disclosed to Boeing beginning in 2016.  Mr. Langford had traveled to Zunum's offices in early 2018, shortly after Boeing acquired Aurora.  Dr. Bradley, who was a Technical Fellow at BCA and heavily involved in the due diligence of Zunum as well as involved in the BHE-11 replica of the ZA10, also left to join Electra.aero.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 90

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

390.    The trade secrets and proprietary information that Zunum was required to share with HorizonX and Boeing as part of their due diligence are also transformational for the next generation of Boeing's single-aisle class of aircraft.  The engineers and technological leaders at Boeing, including personnel from BCA and Aurora, responsible for shaping the next generation of Boeing aircraft were heavily exposed to Zunum's technology.

391.    In December 2019, *The Economist* magazine forecast that Boeing would have to consider hybrid-electric propulsion for its next generation of aircraft.  Otherwise, Boeing would be locked into aircraft design and technology that will be rendered obsolete by the concepts that Zunum has introduced.  Boeing's only competitor, Airbus, had also announced that its next generation of airliner will likely be hybrid-electric, and Boeing will have no choice but to follow suit to remain a dominant force in its primary market.  *The Economist* reiterated the need for Boeing to prepare for the next battle with Airbus in October 2020, after Airbus unveiled plans to bring net-zero emissions aircraft to market by 2035.

392.    Furthermore, in late-November 2020, Steven Udvar-Hazy, the Chief Executive Officer of Air Lease Corporation, who is one of the most influential voices in the aircraft leasing community, said at the Skift Aviation Forum that he expects the next clean-sheet aircraft from Boeing and Airbus to feature hybrid propulsion.  He noted that conventional turbofan technology is touching the limit of what it can achieve for efficiency: "I have serious doubts that either Boeing or Airbus can design an all new airplane using current aerodynamic engine technologies that can have a meaningful – let's call it double-digit advantage over what we already have," he said, adding: "So what I see evolving is more of a hybrid."

393.    Mr. Udvar-Hazy also noted that he sees hybrid propulsion as a transition to zero-carbon alternatives such as all-electric or hydrogen-powered aircraft, verifying the vision that Zunum has designed technology and a pathway to achieve.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

394. Meanwhile, in July 2020, Roland Berger, a leading European consultancy, announced a path to net-zero emissions for global aviation with an imperative to invest in new propulsion technologies and deploy them in range-appropriate missions, identifying all-electric, hybrid-electric, and fuel cell aircraft as key to aircraft used for flights up to 3,700 miles, all addressed by Zunum's flexible hybrid-to-electric propulsion technologies.

395. This is consistent with Boeing's and HorizonX's mandate to identify groundbreaking technology that threatens to disrupt Boeing's business model and to propel it into the next century of aircraft design and manufacture in the era starting with its centennial year in 2016, about the same time that Zunum began discussions with Boeing.

396. The widespread misappropriation and dissemination of Zunum trade secrets was enabled by the absence of any "clean process" at Boeing or Safran to protect Zunum's proprietary information, exposing Zunum's proprietary information to many senior technical and commercial leaders from across Boeing and Safran business units. Such "clean" processes are a well-established practice in investment and mergers and acquisitions due diligence processes, precisely to prevent this form of misuse and the foreseeable damages that could flow from misappropriation of trade secrets.

397. Boeing did so despite Mr. Fernandes recognizing in July 2016 that such exposure "would put the tech fellow's ability to perform their job at risk within the company because Zunum's roadmap includes airplanes of many sizes with subsystems that are and may become highly relevant to what we do in our core businesses today." Mr. Jones acknowledged this issue in April 2018 when Dr. Kumar notified him of the continuing misappropriation disclosed in the Boeing spreadsheet, informing Dr. Kumar that HorizonX had implemented policies to ensure Boeing personnel engaged with a portfolio company are disallowed from working in any related area at Boeing in the future. However, Boeing never followed through with implementing such protections with respect to Zunum's proprietary information, trade secrets, and other confidential

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 92

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    information. On the contrary, Boeing seemed to implement a pattern or program of
2    systematically disseminating Zunum's proprietary information, trade secrets, and other
3    confidential information throughout Boeing. For example, Mr. Jones subsequently directed a
4    panel of senior Boeing engineers, engaged in similar programs across Boeing, to travel to Zunum
5    to assess its IP in November 2018, in an apparent strip-mining exercise.

6        398.    Boeing and Safran went further by intentionally exposing Zunum and its
7    proprietary information to a range of individuals that had been tasked specifically to launch
8    competing businesses. For instance, Boeing combined HorizonX (a venture capital arm), led by
9    Mr. Schettler and receiving insight into future markets and technologies, with a Disruptive
10   Innovation unit (responsible for launching businesses with Boeing), led by Mr. Fernandes, and
11   thereby created a channel for Boeing to build businesses to capitalize on that insight. In fact,
12   Mr. Fernandes took on leadership of the Disruptive Innovation unit immediately after concluding
13   due diligence on Zunum, moving immediately to lead activities such as the competing BHE-11
14   program and exploring Zunum's technologies, while continuing to serve on Zunum's Advisory
15   Board through the end of the 2017. Mr. Nordlund and Dr. Kunz, along with most of the
16   HorizonX staff, transitioned to Boeing Next, a rebranding of the Disruptive Innovation unit, after
17   exposure to extensive Board-level information on Zunum's technologies and plans. Mr.
18   Fernandes now serves as Vice President of Strategy at BCA, where he is in a position to apply
19   his extensive knowledge of the disruptive impact of hybrid-to-electric aircraft on Boeing's
20   single-aisle airliners on flights up to 1,500 miles.

21   **M.    Exclusionary Conduct**

22       399.    Boeing's conduct reflects a systematic and concerted effort to exclude Zunum
23   from the marketplace by impeding its ability to raise external funds, keeping Zunum beholden
24   to Boeing while also sidelining it, and launching its own directly competing initiative to exploit
25   the opportunities and technology that Zunum had identified, innovated, developed, and owns.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

400.    It did this through a calculated campaign to extract and then exploit Zunum's intellectual property under the guise of investment due diligence and strategic collaboration on development of the ZA10. Trade secrets that became part of Boeing's portfolio help it to protect and further advance its dominant market position in the aircraft manufacturing industry, but dispersion of trade secrets to others, including partners such as Safran, staff that leave to found startups, or simply talking publicly, dissipates those trade secrets, making them no longer defendable as trade secrets. This in turn destroys the ability of another (non-Boeing, non-Safran) market mover to claim exclusivity or a competitive advantage. That in turn undermined Zunum's ability to finance its first-mover advantage, preserving the status quo and advantage of the dominant player, Boeing (along with its systems providers, such as Safran).

401.    SCV, SEP, and SHE followed a similar plan, meanwhile working directly with Boeing and HorizonX to pursue and then exploit Zunum's innovation while excluding Zunum.

402.    Boeing combined with Safran to replicate Zunum's ZA10 aircraft so that Zunum could not compete with Boeing and to position Boeing to dominate the nascent markets for commercial hybrid and all-electric aircraft, and commercial hybrid-electric and all-electric propulsion systems, which threatened to cannibalize up to 80% of the current flight share of Boeing's 737 aircraft.

403.    As evidence of Boeing's collusion with Safran, in September 2019, SEP and HorizonX announced an investment in Electric Power Systems, touting that "Safran will collaborate with EPS to offer our customers electric or hybrid-electric propulsion systems with a level of performance that sets us apart from the competition."

404.    Notably, in October 2018, SCV had requested extensive detail and support from Zunum on its investigation into aviation battery systems. Zunum provided extensive information concerning its review of such systems and proprietary analysis of benchmarks for a range of potential suppliers, including Electric Power Systems. Effectively, the combination colluded to

usurp Zunum's first-mover advantage by cutting Zunum out of the middle in order to control the technology and market which Zunum had innovated.

405.    Boeing's combination with these Safran entities also stifled Zunum's ability to attract investments.

406.    Boeing leveraged its influence with Safran to interfere with its anticipated investment in Zunum and to hobble Zunum's ability to raise funds for its continued development and near-term commercialization of the ZA10, in order to enable Boeing to control the technology and market which Zunum had innovated.

407.    While Zunum was actively cultivating partnerships with Safran and UTAS, Boeing was engaging both to explore development of Boeing's BHE-11 replica of the ZA10.

## V.    CAUSE OF ACTION - COUNT I:
## BREACH OF PROPRIETARY INFORMATION AGREEMENT (AGAINST BOEING)

408.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

409.    Zunum and Boeing entered into the PIA dated August 16, 2016.

410.    The PIA is a valid contract supported by a mutual exchange of consideration and remains in full force and effect.

411.    The PIA is governed by Washington law.

412.    In the PIA, the parties acknowledged that they "consider their materials and information to be proprietary and are only willing to provide such materials and information subject to certain conditions and restrictions."

413.    Section 2 of the PIA provides:

> Each Party agrees that it will preserve in confidence, not disclose to others, and not use (except for the purpose set forth in Recital A. of this Agreement) any and all Proprietary Information received from the other Party prior to and after execution of this Agreement; provided that Proprietary Information, when first received from the disclosing party, must be either (i) in written form and marked with an appropriate

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

restrictive legend or (ii) not in written form but initially identified to the receiving party as proprietary and/or confidential and thereafter promptly confirmed, in writing to the receiving Party within 30 days, as being Proprietary Information.

414.    The purpose set forth in Recital A was for "executive level discussions to explore the feasibility of potential projects in the field of electric based power systems for aviation use."

415.    Section 1 of the PIA defines Proprietary Information "to mean all proprietary, confidential, and/or trade secret information disclosed by either Party to the other and pertaining to aircraft and propulsion technologies to power hybrid-electric regional air networks . . . ."

416.    Section 3 of the PIA provides that "nothing in this Section shall be deemed to restrict inadvertent use of general ideas, concepts, processes and techniques retained in the unaided memory of a Party's Representatives . . . ."

417.    Between August 16, 2017, and February 1, 2017, Zunum disclosed a substantial volume of proprietary information concerning the disruptive market opportunity that Zunum had identified for replacing conventional commercial aircraft with hybrid-to-electric aircraft, extensive modeling and analysis concerning the economic opportunity and technological components necessary to pursue the opportunity, and its unique hybrid-to-electric propulsion systems, including systems, tools, devices, formulae, software, algorithms, and other trade secrets.

418.    The information that Zunum disclosed to Boeing pursuant to the PIA was Proprietary Information as defined in the PIA.

419.    The information that Zunum disclosed to Boeing pursuant to the PIA was generally unknown to Boeing and in the aerospace industry.

420.    The information that Zunum disclosed to Boeing pursuant to the PIA gave Zunum a competitive advantage that Boeing usurped and then exploited through breach of the PIA.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

421.    Zunum vigorously guarded the information that it disclosed to Boeing pursuant to the PIA.

422.    The information that Zunum disclosed to Boeing pursuant to the PIA in written form was marked as confidential or proprietary.

423.    Boeing breached the PIA by disseminating the information widely within Boeing and disclosing the information that Zunum shared with it with third parties, including SEP and SHE, through Boeing's request for bids for a hybrid-electric propulsion system for the BHE-11.

424.    Upon information and belief, Boeing also breached the PIA by disclosing the information that Zunum shared with it with Aurora, which Aurora appears to have used to prepare a white paper purporting to dispute Zunum's data and results.

425.    Boeing breached the PIA by using the information that Zunum shared with it for purposes other than as set forth in Recital A, including to develop the BHE-11, and to provide to its staff that discussed, used, and disclosed such information, including in going on to form new ventures that have benefitted from unrestricted use of Zunum's proprietary information.

426.    Boeing breached the PIA by retaining and using Proprietary Information disclosed pursuant to the PIA in written notes and other documents.

427.    As a result of Boeing's breaches of the PIA, Zunum has suffered damages in an amount to be established at trial.

428.    As a result of Boeing's breaches of the PIA, Zunum has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

## VI.    CAUSE OF ACTION - COUNT II:
### BREACH OF 2017 INVESTOR RIGHTS LETTER (AGAINST BOEING AND HORIZONX)

429.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

430.    The 2017 IRL is a valid contract integrated with the March 17, 2017, Convertible Promissory Note and Note Purchase Agreement between Zunum and Boeing, and is supported by a mutual exchange of consideration.

431.    The 2017 IRL is governed by Delaware law.

432.    In Section 5 of the 2017 IRL, Boeing agreed "to keep confidential and not disclose, divulge, or use for any purpose (other than to manage its investment in [Zunum], the 'Purpose'), any confidential information obtained from [Zunum] from and after the date of this Agreement . . . ."

433.    Section 5 also provides that "[n]otwithstanding the foregoing, the Investor will have the right to use and exploit Residuals for any purpose. 'Residuals' means ideas, information, and understandings retained in the unaided memory of the Investor's personnel as a result of their access to, review, evaluation or use of Confidential Information for the Purpose."

434.    On May 1, 2018, Boeing transferred all of its rights and interests in the 2017 Convertible Promissory Note, Note Purchase Agreement, and 2017 IRL to HorizonX pursuant to a Transfer Agreement.

435.    The Transfer Agreement expressly confirmed that Boeing "agree[d] to continue to be bound by Section 5 of the [2017 IRL] with respect to all Confidential Information (as defined in the [2017 IRL]) disclosed to [Boeing] through the date of this Agreement . . . ." Transfer Agreement § 1.

436.    Between March 17, 2017, and May 1, 2018, Zunum disclosed to Boeing Confidential Information concerning: (a) detailed ZA10 aircraft designs and specifications, breakdowns and performance, including trade-offs relative to alternate variants; (b) ZA10 economics; (c) market entry strategy; (d) certification activities and plans; (e) hybrid-to-electric powertrain and electric propulsion system development programs; (f) electric motor systems development programs; (g) range extender strategy and selection; (h) progress on battery pack

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    integration; (i) multi-modal strategy; (j) disruptive tradeoff algorithms; (k) lean cross-

2    disciplinary development plan and budgets to entry in 2022; (l) flight testbed plans and roadmap;

3    (m) key customers; and (n) key personnel.

4        437.    Boeing breached Section 5 of the 2017 IRL by using Zunum's Confidential

5    Information, including its aided memory thereof, to develop the BHE-11 replica of the ZA10

6    and to compete directly against Zunum.

7        438.    In particular, personnel in Boeing's BCA unit took, retained, and used written

8    notes of Zunum's Confidential Information as reflected in the slides that BCA presented on

9    December 12, 2017. In addition, personnel from Aurora also prepared a whitepaper purporting

10    to challenge Zunum's data and results.

11        439.    On information and belief, Boeing also breached Section 5 of the 2017 IRL by

12    disclosing Zunum's Confidential Information to SEP and SHE though a solicitation for bids for

13    a hybrid-electric propulsion system for the BHE-11.

14        440.    HorizonX breached, or aided and abetted a breach, of Section 5 of the 2017 IRL

15    by also taking, retaining, and using written notes of Zunum's Confidential Information, as

16    reflected in the spreadsheet with commentary that Dr. Kunz inadvertently sent to Dr. Kumar in

17    April 2018.

18        441.    HorizonX's and Boeing's breach of the 2017 IRL also includes their launch of

19    the Boeing NeXt project to the degree that it exploited Zunum's trade secrets in the areas of

20    hybrid-to-electric propulsion, multi-modal traffic integration, and electric vertical takeoff and

21    landing.

22        442.    Boeing also breached the 2017 IRL by using its Observers on Zunum's Board of

23    Directors and Advisory Board to gain access to confidential and proprietary information to use

24    for Boeing's competing programs, including the BHE-11 and Boeing NeXt, as revealed in Mr.

25

Sinnett's announcement that the BHE-11 would also adopt the unique 12-passenger layout of the ZA10.

443.    As a result of Boeing's and HorizonX's breaches of the 2017 IRL, Zunum has suffered damages in an amount to be established at trial.

444.    As a result of Boeing's and HorizonX's breaches of the 2017 IRL, Zunum has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

## VII.    CAUSE OF ACTION – COUNT III:
## BREACH OF 2018 INVESTOR RIGHTS LETTER (AGAINST HORIZONX)

445.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

446.    The 2018 IRL is a valid contract integrated with the May 1, 2018, Convertible Promissory Note and Note Purchase Agreement between Zunum and HorizonX and is supported by a mutual exchange of consideration.

447.    The 2018 IRL is governed by Delaware law.

448.    In Section 5 of the 2018 IRL, HorizonX agreed "to keep confidential and not disclose, divulge, or use for any purpose (other than to manage its investment in [Zunum], the 'Purpose'), any confidential information obtained from [Zunum] from and after March 17, 2017 . . . ."

449.    Section 5 also provided that "[n]otwithstanding the foregoing, the Investor will have the right to use and exploit Residuals for any purpose.  'Residuals' means ideas, information, and understandings retained in the unaided memory of the Investor's personnel as a result of their access to, review, evaluation or use of Confidential Information for the Purpose."

450.    Zunum divulged substantial Confidential Information to HorizonX pursuant to the 2018 IRL.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 100

451.    HorizonX breached the 2018 IRL by using Confidential Information obtained from Zunum to attempt to poach its employees, which was not a permitted use of Zunum's Confidential Information.

452.    As a result of HorizonX's breaches of the 2018 IRL, Zunum has suffered damages in an amount to be established at trial.

453.    As a result of HorizonX's breaches of the 2018 IRL, Zunum has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

## VIII.    CAUSE OF ACTION – COUNT IV:
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST BOEING AND HORIZONX)

454.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

455.    Each of the PIA, 2017 IRL, and 2018 IRL, as well as the 2017 Note and 2018 Note, are subject to an implied covenant of good faith and fair dealing.

456.    The 2017 IRL and 2018 IRL gave Boeing, and later HorizonX, a right of first refusal to participate in new investments in Zunum and a right of first negotiation to provide work for development or production of the ZA10 or other Zunum aircraft, except with respect to the hybrid-electric propulsion system.

457.    Boeing misused these contractual rights not for *bona fide* or genuine exercises of its contractual rights but to impede Zunum's ability to obtain additional investments or to achieve partnerships with other suppliers or OEMs for scopes of work necessary for the continued development and production of the ZA10 and other Zunum technology.

458.    For example, in February 2018, Boeing induced Zunum to abandon its fundraising as a precondition for a bridge financing of $10 million and a joint venture with Boeing that Boeing had no intent on closing with Zunum.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 101

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

459.    In addition, Boeing consistently held itself out as an interested aerostructures partner with Zunum and used that as a basis to undertake extensive due diligence of Zunum's technology.

460.    Boeing used these rights to gain access to Zunum's trade secrets and proprietary information, which it has used and is using to compete against Zunum and exclude Zunum from the market opportunity and roadmap thereto that Zunum has identified and disclosed to Boeing.

461.    The 2017 Note and 2018 Note include a call (demand for payment) feature that Boeing has used strategically to demand repayment when Zunum was most financially vulnerable, with such vulnerability being caused by Boeing's own actions.

462.    As a result of Boeing's and HorizonX's breaches of the covenant of good faith and fair dealing, Zunum has suffered damages in an amount to be established at trial.

463.    As a result of Boeing's and HorizonX's breaches of the covenant of good faith and fair dealing, Zunum has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

## IX.    CAUSE OF ACTION - COUNT VI:[1]
## DECLARATORY JUDGMENT (AGAINST HORIZONX)

464.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

465.    HorizonX has sought to compel repayment of the 2017 Convertible Promissory Note and Note Purchase Agreement, as well as the 2018 Convertible Promissory Note and Note Purchase Agreement.

466.    The 2017 Note and 2018 Note are governed by Delaware law.

467.    A genuine dispute exists as to whether Zunum is obligated to repay the 2017 or 2018 Notes.

---

[1] To avoid potential confusion, Zunum has removed counts pleaded in the First Amended Complaint that were dismissed, *with prejudice*, but has not re-numbered the remaining Counts.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 102

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

468.    Zunum seeks a declaration that its obligation to repay the 2017 or 2018 notes were extinguished by: (a) Boeing's and HorizonX's prior, material breaches of the integrated 2017 IRL and 2018 IRL, as pleaded in Counts II and III, above; (b) Boeing's and HorizonX's prior, material breaches of the implied covenant of good faith and fair dealing, as pleaded in Count IV, above; and (c) by Boeing's and HorizonX's frustration of performance, causation of supervening impossibility or impracticability of performance, and frustration of purpose; *inter alia*.

## X.    CAUSE OF ACTION - COUNT VII: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY (AGAINST BOEING)

469.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

470.    Through its fundraising and development efforts, Zunum developed valid business expectancies with several investors and business partners, including SCV and UTAS.

471.    SCV expressed an interest in investing in Zunum, and Zunum had made substantial progress toward closing on investments with SCV.

472.    Boeing was aware of this business relationship, including due to its control of HorizonX and Mr. Jones's position as an Observer on Zunum's Board of Directors, through its (and later HorizonX's) preferred access to information and Zunum's management as well as due to contractual rights to notice pursuant to the 2017 IRL and 2018 IRL.

473.    Boeing interfered with each of these business expectancies, resulting in the termination of Zunum's relationship with each such party.

474.    For example, Boeing interfered with SCV's investment in Zunum by exerting influence of the President of SEP to block the investment.

475.    Boeing's and HorizonX's interferences were accomplished with improper means and for improper purposes.

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

476.     These improper means included with and by use of misappropriated proprietary information, trade secrets, and intellectual property in breach of restrictive covenants in at least three agreements and the attendant covenant of good faith and fair dealing.  The improper means also included Boeing's breach of its fiduciary duties to Zunum as an investor with Board observation rights, including as to confidential financial plans, and finance constraints and vulnerabilities.

477.     These improper motives included for the purpose of attempting to restrain trade and exclude Zunum from the market opportunities that it had innovated and was in the process of developing through a pathway disclosed to Boeing and HorizonX.

478.     As a result of these interferences with Zunum's business relationships and expectancies, Zunum has suffered damages in an amount to be established at trial.

## XI.    CAUSE OF ACTION - COUNT VIII: VIOLATION OF WASHINGTON TRADE SECRETS ACT (AGAINST ALL DEFENDANTS)

479.     Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

480.     Zunum owns trade secrets across several subject-matter areas relating to commercial hybrid-electric or all-electric aircraft and propulsion, and related market opportunities, as alleged above in paragraphs 80-90.

481.     Boeing and HorizonX obtained access to trade secrets belonging to Zunum pursuant to agreements that strictly prohibited any use other than to evaluate an investment, manage the investment, or explore other collaboration with Zunum.

482.     For example, Zunum provided Boeing and HorizonX with access to dozens of documents and studies reflecting Zunum's trade secrets and proprietary analyses on numerous topics, including, *inter alia*: (i) Zunum Aero detailed product, technology, market and financials; (ii) Zunum Aero market detail: commercial, cargo, business, and military; (iii) Zunum Aero

door-to-door proposition and market sizing; (iv) Zunum Aero long-range costing and financial model; (v) Zunum Aero 18-month development and operating plan; (vi) Zunum Aero differentiation and production strategy; (vii) Zunum Aero differentiation vs Urban Air Mobility; (viii) Confidential workshop presentation: Operating costs of strong hybrid aircraft; (ix) Aircraft and propulsion key underlying forecasts detail; (x) ZA10 aircraft and propulsion design and development detail; (xi) ZA10 electric fan benchmarking and risk assessment; (xii) ZA10 aircraft and propulsion economics detail; (xiii) ZA10 aircraft and propulsion FAA certification plan detail; (xiv) ZA10 aircraft and propulsion development plan and resourcing detail; (xv) ZA10 aircraft and propulsion production plan and resourcing detail; (xvi) ZA10 aircraft development and production headcount, resource, and financing model; (xvii) ZA10 aircraft prototype and risk reduction plan; (xviii) ZA10 aircraft bridge workshop with Boeing BHE-11 team, December 2017; (xix) ZA10 aircraft materials and manufacturing trades, June 2018; (xx) ZA10 P0 500 kW electric drive drawings release, August 2018; (xxi) ZA10 and ZA50 benchmarking to the Airbus A320, August 2018; (xxii) Zunum capability development and ZA10 technical progress, August 2018; (xxiii) Zunum Aero Technology Review for Boeing, March 2017; (xxiv) Zunum Aero Drilldown for Boeing CTO, December 2017; (xxv) Zunum Aero Intellectual Property Overview, November 2018; (xxvi) Provisional Patent Filing: Range-Optimized Hybrid to all-Electric Airlines and VSTOL Aircraft; (xxvii) Provisional Patent Filing: Systems and Methods for Implementing Fast and Flexible Multi-Modal Transport; (xxviii) Provisional Patent Filing: Methods for Implementing Quiet, Efficient, and Lightweight Electrically-Driven Propulsion for Regional Aircraft; (xxix) Confidential whitepaper: Commercially viable reduction of aviation carbon emissions, Response to report by the National Academies of Sciences, Engineering and Medicine titled "Commercial Aircraft Propulsion and Energy Systems Research: Reducing Global Carbon Emissions"; (xxx) Confidential Whitepaper: Our Battery Technology Strategy;

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

and (xxxi) Zunum Aero Technical Assets: Breakthrough Quiet Hybrid-Electric Aircraft and Support Regional Air Transport Networks; along with numerous other documents and studies.

483.    Boeing and HorizonX also owed a fiduciary duty to Zunum to act in its best interests.

484.    Boeing has improperly used Zunum's trade secrets to replicate Zunum's proprietary aircraft design and attempt to usurp and exploit Zunum's innovation reflected in its trade secrets as well as Zunum's first-mover advantage in order for Boeing to dominate the markets for commercial hybrid and all-electric aircraft and propulsion beginning with smaller aircraft for short-haul flights, to the exclusion of other competitors including Zunum.

485.    Boeing also improperly disclosed Zunum's trade secrets to third parties including Safran, SEP, SHE, and UTAS without Zunum's express or implied consent.

486.    SEP and SHE knew or should have known that the information disclosed to it by Boeing was proprietary to Zunum because SCV was contemplating an investment in Zunum and was deeply engaged in investment due diligence, diligence concerning SHE's production of the turboshaft for the ZA10, and general diligence concerning a wide range of collaboration agreements SCV required as a precondition to an investment in Zunum.

487.    Safran, SCV, SEP, and SHE also obtained access to Zunum's trade secrets pursuant to agreements directly with Zunum that strictly prohibited any use other than to evaluate an investment or explore other collaboration with Zunum.

488.    Safran, SCV, SEP, and SHE have improperly used the Zunum trade secrets that they obtained from Boeing and directly from Zunum, to compete against Zunum and combine with Boeing in the attempt to exclude Zunum from the markets for aircraft serving commercial air travel up to 1,500 miles, commercial hybrid and all-electric aircraft, and commercial hybrid and all-electric propulsion systems.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

489.    HorizonX and SCV have also improperly used the trade secrets they obtained from Zunum to identify and pursue investment decisions such as their joint investment in Electric Power Systems.

490.    The improper uses or disclosures by Boeing, HorizonX, Safran, SCV, SEP, and SHE give these entities individually and in combination an unjust competitive advantage presently valued at hundreds of millions of dollars and on a trajectory to be used to earn billions of dollars in annual revenue.

491.    Zunum vigilantly protected its trade secrets through limited disclosures on an as-needed basis, disclosing information only pursuant to strict non-disclosure agreements, seeking timely patent protection, providing materials through investment due diligence through a secure data room, and requiring its employees to enter into non-disclosure agreements and non-competition agreements.

492.    Zunum's trade secrets hold tremendous value, and their misappropriation by Boeing, HorizonX, Safran, SCV, SEP, and SHE is giving each a significant competitive advantage, including by way of forestalling or undermining competition for their incumbent legacy products.

493.    The misappropriation by Boeing, HorizonX, Safran, SCV, SEP, and SHE was willful and malicious.

494.    The ongoing, improper use of Zunum's trade secrets by Boeing, HorizonX, Safran, SCV, SEP, and SHE has proximately caused Zunum damages in an amount to be established at trial.

495.    Pursuant to RCW 19.108.030, Zunum is also entitled to exemplary damages in an amount not exceeding twice its actual damages.

496.    Pursuant to RCW 19.108.040, Zunum is entitled to an award of its attorneys' fees.

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

497.    The ongoing, improper use of Zunum's trade secrets also serves to attempt to exclude Zunum from the market and eliminate it as a competitor, causing Zunum irreparable harm.

498.    If the Court determines that it would be infeasible to prohibit future or ongoing use of Zunum's trade secrets by Boeing, HorizonX, Safran, SCV, SEP, and SHE, the Court should expressly condition any future use on payment of a reasonable royalty to Zunum.

## XII.    CAUSE OF ACTION - COUNT IX:
### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT (RCW 19.86.030) (AGAINST ALL DEFENDANTS)

499.    Zunum restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

500.    The conduct of Boeing, HorizonX, SCV, Safran, SEP, and SHE violates RCW 19.86.030, which prohibits any "contract, combination, . . . or conspiracy in restraint of trade or commerce . . . ."

501.    Boeing and HorizonX on the one hand, combined and conspired with Safran, SCV, SEP, and SHE the other hand, to restrain trade by excluding Zunum from the worldwide market for aircraft serving commercial air travel up to 1,500 miles, commercial hybrid and all-electric aircraft, and commercial hybrid and all-electric propulsion systems.

502.    Boeing, HorizonX, Safran, SCV, SEP, and SHE did this through a systematic and coordinated campaign to deny Zunum access to additional funding and to key inputs, like funding, aerostructures support, and support for a turboshaft, all of which were necessary for Zunum to continue its operations.

503.    This conduct has foreclosed and continues to foreclose competition in these markets and has delayed the introduction of hybrid-to-electric propulsion for aircraft to compete with conventional aircraft which limit consumer travel options and convenience and are less cost-effective and generate more noise and air pollution.

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 108

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    504.    The conduct of Boeing, HorizonX, Safran, SCV, SEP, and SHE is illegal *per se*.

2    505.    Alternatively, the conduct of Boeing, HorizonX, Safran, SCV, SEP, and SHE

3    violates the rule of reason by attempting to establish control of the market for commercial hybrid-

4    electric and all-electric aircraft and propulsion systems at an early stage and foreclosing

5    competition including competition by Zunum, the innovative first-mover in the field.

6    506.    Boeing, HorizonX, Safran, SCV, SEP, and SHE were not meaningfully engaged

7    in or pursuing hybrid or all-electric propulsion for commercial aircraft prior to 2017.  In fact,

8    they thought it was not technologically or economically feasible.

9    507.    SEP and SHE are main suppliers of key components of electronic systems for

10    Boeing aircraft.

11    508.    Boeing met or interacted with SEP in mid-2017 when it solicited a proposal from

12    SEP, and likely other Safran business units, to provide a hybrid-electric propulsion system for

13    the BHE-11.

14    509.    SCV informed Zunum that it was contacting HorizonX (controlled by Boeing) in

15    late 2017 or early 2018, supposedly with respect to coordinating on a Series B round of

16    investments in Zunum, although that never materialized.

17    510.    As Dr. Kumar and Mr. Knapp learned in December 2018, Alain Sauret, President

18    of SEP, blocked the investment by SCV at Boeing's behest.

19    511.    As described above, this timing overlapped with Boeing's and HorizonX's

20    repeatedly stringing Zunum along with regard to proposed financing and BCA's development of

21    the BHE-11, which competed directly with Zunum's ZA10.

22    512.    Likewise, Boeing foreclosed Zunum from obtaining funding from other sources

23    at a time when it was critical for Zunum, and Boeing knew it was critical for Zunum, and also

24    foreclosed Zunum's access to essential inputs including the turboshaft from SHE.

25

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

513.    The conduct of Boeing, HorizonX, Safran, SCV, SEP, and SHE harms Zunum as well as consumers because they delayed competition from Zunum and ultimately devastated it as a competitor in the markets for commercial hybrid and all-electric propulsion systems.

514.    The conduct of Boeing, HorizonX, Safran, SCV, SEP, and SHE is unreasonable and has substantial anti-competitive effects, including reducing viable options to reduce air emissions, noise pollution, and delaying the introduction of more cost-effective and convenient regional air travel for consumers.

515.    The relevant geographic market is worldwide.

516.    The relevant product markets are: (a) aircraft serving commercial air travel up to 1,500 miles; (b) commercial hybrid to all-electric aircraft; and (c) commercial hybrid to all-electric propulsion systems.  The market for aircraft serving commercial air travel up to 1,500 miles today includes single-aisles, twin-aisles, regional jets, and turboprops, all of which have reasonable interchangeability of use over these distances.  This market would exclude business jets and smaller passenger aircraft.  As is occurring across all classes of electrified terrestrial transport driven by the renewables transformation, conventional aircraft will progressively be displaced over these ranges by commercial hybrid and all-electric aircraft and propulsion systems.  Interchangeability of use across the two will be severely limited over time due to economics, emissions, passenger preferences, and legislation.  This shift will be even more pronounced over routes and schedules, e.g., non-hub airports, that conventional aircraft cannot serve economically.

517.    Interchangeability of use in the market for aircraft serving commercial air travel up to 1,500 miles is driven primarily by "Cost per Available Seat Mile" (CASM) of the aircraft, with a long history of aircraft rendered uncompetitive by lower cost platforms.  Another key factor driving interchangeability is the ability of an aircraft to serve a route economically, and which requires sizing the aircraft to match demand on that route.  A related factor is convenience

to passengers, who will prefer nearby airports, and convenient schedules, over distant hubs, and limited departures. CASMs for conventional aircraft suffer from powerful scale economics, increasing very steeply as the size of the aircraft decreases. This has led to the dominance of single- and twin-aisles, sweeping generations of smaller aircraft from the skies, progressively reducing commercial air service to large airliners serving a declining set of large hubs. Boeing's share of this market equaled 50.3% in 2018.

518.    The market for commercial hybrid and all-electric aircraft is a subset of the market for aircraft serving commercial air travel up to 1,500 miles, differentiated by lower CASMs and emissions than commercial aircraft of equivalent size. This market is further differentiated in that it enables smaller aircraft to approach the CASMs of the single- and twin-aisles, thus leveling the playing field, opening up routes and schedules that conventional aircraft are unable to serve economically. Several major agencies across the United States, United Kingdom, and Europe are now pursuing this market programmatically.

519.    The combination of lower CASMs, further enhanced by green subsidies, Carbon taxes, emissions trading schemes, and strong passenger preference for green aviation (Flygskam in Europe) will limit interchangeability with conventional aircraft. Legislation will take this further. Several jurisdictions have passed laws requiring commercial air travel to be electrified for shorter flights, and others have banned conventional aircraft entirely. After a year engaged with Zunum, Norway passed legislation in 2018 to require all domestic commercial air to be electrified by 2040. France followed in 2021 by banning conventional flights under 2.5 hours where high-speed trains are available. Washington was the first state to pass legislation to promote electrified aviation in 2018, and others have since followed.

520.    Similar limitations on interchangeability of use are already operative in terrestrial transport. The closest analogue to the markets in question are hybrid and all-electric buses and propulsion systems, which are displacing conventional buses on all trips other than long intercity

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 111

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1  journeys, driven by economics, emissions, and legislation.  Many jurisdictions around the world

2  have already passed laws to restrict or phase-out sales of conventionally powered cars, and the

3  pattern is repeating across all other forms of transport that see benefit from electrification.

4       521.    Boeing is counting on this to occur in Urban Air Mobility, wherein all-electric

5  vertical take-off air taxis are expected to displace conventionally powered helicopters, and which

6  market it is pursuing via its majority stake in Wisk, a leader in the segment.  Boeing acted

7  similarly in the markets for commercial hybrid electric and all-electric aircraft and propulsion

8  systems by pursuing its program focused on 12-50 seat hybrid airliners, misusing trade secrets

9  and proprietary information from Zunum, the leader in the segment, holding it in a tight embrace

10 via Project Catalyst and the MSR.  Boeing even sought to step to the front of the emerging market

11 for supersonic aircraft, taking a 33% stake in Aerion in 2019, a leader in the segment, but which

12 collapsed for lack of funds in 2021 when Boeing declined to invest further.  Boeing's failed

13 attempt to acquire Embraer Commercial Airplanes was similarly intended to extend Boeing's

14 dominance over the market for aircraft serving commercial air travel up to 1,500 miles.  Mr.

15 Jones even spoke about the complementarity of the assets Boeing was acquiring from Embraer

16 and Zunum, given applicability of the Zunum commercial hybrid and all-electric aircraft and

17 propulsion technologies to the market the Embraer dominated with ATR.

18      522.    Pursuant to RCW 19.86.090, Zunum is entitled to its actual damages; an increase

19 in its damages by up to three times Zunum's actual damages; attorneys' fees; and injunctive

20 relief to prevent ongoing, anti-competitive conduct of Boeing, HorizonX, SCV, SEP, and SHE.

21 **XIII.    CAUSE OF ACTION – COUNT X:**
**VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT (RCW 19.86.040)**
22 **(AGAINST BOEING)**

23      523.    Zunum restates, re-alleges, and incorporates by reference each of the allegations

24 set forth in the preceding paragraphs as if fully set forth herein.

25

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 112

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    524.    Boeing's conduct violates RCW 19.86.040, which makes it "unlawful for any

2    person to monopolize, or attempt to monopolize or combine or conspire with any other person

3    or persons to monopolize any part of trade or commerce."

4    525.    Boeing is attempting to monopolize the worldwide markets for aircraft serving

5    commercial air travel up to 1,500 miles, commercial hybrid and all-electric aircraft, and

6    commercial hybrid and all-electric propulsion systems.

7    526.    Boeing has undertaken anti-competitive conduct with the specific intent to

8    foreclose or exclude Zunum and other would-be competitors from these markets.

9    527.    Boeing's position in a duopoly with Airbus in the market for larger aircraft and

10   the barriers to entry in the markets for aircraft serving commercial air travel up to 1,500 miles,

11   commercial hybrid and all-electric aircraft, and commercial hybrid and all-electric propulsion

12   systems, create a dangerous probability that Boeing will achieve monopoly power in the markets

13   for commercial hybrid and all-electric aircraft and propulsion systems.

14   528.    Limited access to capital has long been recognized to be a key barrier to new

15   entrants in commercial aircraft or propulsion. Boeing has deep access to capital, which it denied

16   to Zunum by repeatedly interfering in its painstaking efforts to break this critical barrier. This is

17   precisely the reason why there have been very few entrants in the commercial aircraft or

18   propulsion market for the past many decades, and each of them either state-owned or subsidiary

19   of an existing participant: ATR, 50% owned by Airbus, entered in 1985; Embraer, previously a

20   Brazilian government sponsored enterprise, entered in the mid-1990s; and Comac, a Chinese

21   government sponsored enterprise, entered in 2016. This lack of capital is why both companies

22   that Boeing acquired large stakes in to lead the emerging urban air mobility and supersonic

23   markets happened to have been founded and bankrolled by billionaires: Wisk (JV with Kitty

24   Hawk) by Larry Page, co-founder of Google; and Aerion by Robert Bass, a financier. As a result,

25

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1   there is a dangerous probability that Boeing will achieve monopoly power in the markets for

2   commercial hybrid and all-electric aircraft and propulsion systems.

3       529.    According to public sources, Boeing maintains a worldwide market share

4   upwards of 40% in the market for production and integration of large-body aircraft, and, in North

5   America, closer to 60% (before the recent production halts of certain 737 manufacturing).

6       530.    As reflected in Mr. Sinnett's interview in *Aviation Week* in August 2017, Boeing

7   is attempting to leverage its dominant position in this market to attempt to dominate the

8   worldwide markets for aircraft serving commercial air travel up to 1,500 miles, commercial

9   hybrid and all-electric aircraft, and commercial hybrid and all-electric propulsion systems. This

10  would give it an opportunity to establish monopolies in these markets.

11      531.    Boeing's conduct has substantial anti-competitive effects, including reducing

12  viable options to reduce air emissions and noise pollution, and delaying the provision of more

13  cost-effective and convenient regional air travel.

14      532.    Boeing has also sought to foreclose competition by patenting Zunum's trade

15  secrets and proprietary information. Patents, if valid, would create a governmentally-sanctioned

16  monopoly. False claims to patents are attempts to create such a monopoly through false

17  statements about inventorship.

18      533.    Boeing's misappropriation and improper patenting of Zunum's trade secrets and

19  proprietary information imposes artificial impediments to competition in the worldwide markets

20  for aircraft serving commercial air travel up to 1,500 miles, commercial hybrid and all-electric

21  aircraft, and commercial hybrid and all-electric propulsion systems, and in Zunum's ability to

22  access necessary capital to compete in that market.

23      534.    Boeing's conduct has also starved Zunum of capital, forcing it to seek investments

24  on far less favorable terms, thereby raising its cost of capital and delaying its anticipated market

25  entry by at least two years, if not far longer. Boeing's conduct also foreclosed Zunum's access

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 114

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1    to other essential supplies including capital. This delay is especially harmful in a capital-

2    intensive industry such as the aerospace industry where financial capital is a necessary upstream

3    supply. If such capital is delayed, constrained, or foreclosed, it can effectively delay or foreclose

4    competition even by an innovative first-mover.

5        535.    The market for commercial hybrid or all-electric aircraft and propulsion systems

6    is still emerging, so a combination of entrenched, dominant firms in airframe, systems

7    integration, engine and propulsion, and secondary electronic systems, can foreclose competition,

8    especially given the traditional barriers to entry, including high capital-intensity, that already

9    serve to stifle competition.

10       536.    Pursuant to RCW 19.86.090, Zunum is entitled to its actual damages; an increase

11   in its damages by up to three times Zunum's actual damages; attorneys' fees; and injunctive

12   relief to prevent ongoing, anti-competitive conduct.

13                        **XIV.    JURY DEMAND**

14       Zunum demands a jury trial on all claims so triable.

15                        **XV.    PRAYER FOR RELIEF**

16       WHEREFORE, Zunum prays that the Court grant it the following relief:

17   A.    Compensatory, consequential, exemplary, punitive, and multiple damages on all

18        claims so permitted;

19   B.    Prejudgment interest;

20   C.    Permanent injunctive relief to enjoin: (i) ongoing use of Zunum's trade secrets by

21        Boeing, HorizonX, SCV, SEP, and SHE; and (ii) ongoing anti-competitive and

22        exclusionary conduct by HorizonX, SCV, SEP, and SHE;

23   D.    A declaration that all rights of Boeing or HorizonX under the 2017 Convertible

24        Promissory Note and the 2018 Convertible Promissory Note are extinguished,

25

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

including any obligation by Zunum to repay either note or permit Boeing or HorizonX to convert any balance owed to equity in Zunum;

E.    Attorneys' fees pursuant to the PIA, RCW 19.86.090, RCW 19.108.040; and RCW 21.20.435;

F.    Any other equitable and injunctive relief necessary to prevent and remedy the anti-competitive conduct alleged herein; and

G.    Such other and further relief as the Court deems just and proper.

DATED this 27th day of June, 2022.

/s/ Colin R. Hagan
Colin R. Hagan*
David J. Shlansky*
**SHLANSKY LAW GROUP, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
Tel:    (617) 370-8321
Fax:    (866) 257-9530
Email: Colin.Hagan@slglawfirm.com
          David.Shlansky@slglawfirm.com


/s/ Eliot M. Harris
Eliot M. Harris, WSBA #36590
**WILLIAMS, KASTNER & GIBBS PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Tel:    (206) 628-6600
Fax:    (206) 628-6611
Email: eharris@williamskastner.com

*Admitted pro hac vice*

**Attorneys for Plaintiff**
**Zunum Aero, Inc.**

PLAINTIFF ZUNUM AERO, INC.'S SECOND AMENDED
COMPLAINT - 116

Shlansky Law Group, LLP
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200

1

## <u>CERTIFICATE OF SERVICE</u>

2    I certify under penalty of perjury that on June 27, 2022, I caused to be electronically filed

3 the forgoing document using CM/ECF, which will send notification of this filing to all counsel

4 of record via electronic mail.

5    DATED this 27th day of June, 2022.

6

7         */s/ Colin R. Hagan*
           Colin R. Hagan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF SERVICE

**Shlansky Law Group, LLP**
1 Winnisimmet Street
Chelsea, MA 02150
(617) 492-7200