1

2

3

4

5

6

7

8

9

10

11

12

13

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ZUNUM AERO, INC.,

                  Plaintiff,

    v.

THE BOEING COMPANY, et al.,

                  Defendants.

CASE NO. C21-0896JLR

ORDER

15

## I.   INTRODUCTION

16   Before the court is Defendants The Boeing Company ("Boeing") and Boeing

17   HorizonX Ventures, LLC's ("HorizonX") (collectively, "Boeing") partial motion to

18   dismiss Plaintiff Zunum Aero, Inc.'s ("Zunum") second amended complaint ("SAC").

19   (Mot. (Dkt. # 62); Reply (Dkt. # 66).[1])  Zunum opposes the motion.  (Resp. (Dkt. # 63).)

20   The court has considered the parties' submissions, the balance of the record, and the

21

22   [1] When citing to the parties' pleadings, the court uses the pleadings' internal pagination
unless otherwise stated.

1   applicable law.  Being fully advised,[2] the court GRANTS IN PART and DENIES IN

2   PART Boeing's motion to dismiss.

3                           **II.   BACKGROUND**

4          This suit centers on hybrid-electric and electric aircraft technology that Boeing,

5   Safran S.A. ("Safran"), and certain of Safran's affiliates[3] allegedly misappropriated from

6   Zunum while falsely assuring Zunum that they would invest in its technology.  (*See* SAC

7   (Dkt. # 60) ¶¶ 1-22.)  The court details the relevant factual background, as alleged by

8   Zunum, before reviewing the procedural background.

9   **A.   Factual Background**

10         Zunum, which was founded in 2013, strived "to develop the word's [sic] first

11  hybrid-electric and all-electric . . . regional aircraft for commercial service and to develop

12  this new market as the first-mover."  (*Id.* ¶¶ 32-33.)  To protect its first-mover advantage,

13  Zunum operated in "stealth mode" from 2013 to 2017 as it executed the initial phases of

14  its business plan.  (*Id.* ¶ 79.)  Afterwards, Zunum sought outside funding from a strategic

15  partner.  (*Id.* ¶ 91.)  It "approached a few of the major aerospace companies to explore

16  investments" and identified Boeing, a leader in the aircraft industry, as a "prospective

17  investor and strategic partner."  (*Id.* ¶¶ 48, 93-94; *see also id.* ¶¶ 91-92 (alleging that it

18

19         [2] Both parties request oral argument (*see* Mot.; Resp.), but the court finds that oral
    argument would not be helpful to its disposition of Boeing's motion, *see* Local Rules W.D.
20  Wash. LCR 7(b)(4).

21         [3] These affiliates include Safran Corporate Ventures, S.A.S. ("SCV"), Safran Electrical &
    Power, S.A.S. ("SEP"), and Safran Helicopter Engines, SASU ("SHE") (collectively with
    Safran, the "Safran Defendants").  Zunum dismissed its claims against the Safran Defendants in
22  October 2021.  (*See* Not. (Dkt. # 43).)

1    "faced limited options for financing" and approached Boeing to obtain "outside

2    funding").)

3        Boeing "quickly became interested" (*id.* ¶ 95) and, as it explored the potential

4    investment, "undertook extensive due diligence to evaluate Zunum's concepts,

5    technologies, and business plans" (*id.* ¶ 105).  The parties entered into a proprietary

6    information agreement in August 2016 (the "2016 PIA") (Nordlund Decl. (Dkt. # 51) ¶ 2,

7    Ex. A ("2016 PIA")), and Boeing was accordingly "granted access to extensive details of

8    Zunum's business plans; go-to-market strategy; patent pending aircraft and propulsion

9    technologies; and development, production, and certification plans," including propriety

10    information such as "confidential whitepapers, technical reports, business plans, and

11    provisional patent applications."  (SAC ¶¶ 104-06, 116-17.)  Boeing eventually invested

12    $5 million, accompanied by the right to appoint a non-voting "Observer" onto Zunum's

13    Board of Directors.[4]  (*See id.* ¶¶ 125-26.)  Pursuant to this appointment, Boeing continued

14    to have "access to information . . . about 'significant business issues' and 'annual

15    operating plans.'"  (*Id.* ¶ 130.)  Thereafter, the Safran Defendants, a French aerospace

16    conglomerate that supplied electrical systems equipment to Boeing and other aircraft

17    manufacturers, allegedly began to show interest in partnering with Zunum as well.  (*See*

18    *id.* ¶¶ 9, 144, 265, 268.)

19    //

20

21        [4] Boeing made its 2017 investment through a convertible promissory note and note
    purchase agreement (collectively, the "2017 Notes"), which were accompanied by an investor
    rights letter (the "2017 IRL").  (*See* SAC ¶¶ 125-26; Nordlund Decl. ¶¶ 3-4, Exs. B-C ("2017
22    Notes"); *id.* ¶ 5, Ex. D ("2017 IRL").)

1    The partnerships began unraveling in 2017 when Boeing allegedly showed signs

2  of its intent to take Zunum's technology for itself.  (*Id.* ¶¶ 152-64.)  In November 2017,

3  Zunum learned that Boeing was developing its own hybrid-electric aircraft that mimicked

4  Zunum's aircraft; Boeing was allegedly engaging its partners, including the Safran

5  Defendants, on developing propulsion for its own aircraft.[5]  (*Id.* ¶¶ 170-71, 174-93.)

6  Zunum's partnership with the Safran Defendants similarly unraveled.  Initially, Safran

7  Defendants' officials expressed interest in Zunum and accessed Zunum's proprietary

8  information when performing their due diligence.  (*Id.* ¶¶ 271, 273-75, 282-83, 292.)

9  However, the Safran Defendants ultimately pulled out of the investment, allegedly

10  because of Boeing's influence.  (*Id.* ¶¶ 296, 299, 348-49.)  Boeing, "in turn, used the

11  reversal by [the Safran Defendants] as a basis to withdraw its own support for co-leading

12  the . . . financing."  (*Id.* ¶ 297; *see also id.* ¶ 166 (alleging that, after completing due

13  diligence, Boeing was "expressing concerns" that Zunum was "overpromising").)

14    Instead of further investing in Zunum, the Safran Defendants and Boeing

15  "deepened their close partnership" by "collu[ding] . . . to usurp Zunum's first-mover

16  advantage in the market for commercial hybrid and all-electric aircraft and propulsion

17  systems."  (*Id.* ¶¶ 305-06.)  The Safran Defendants and Boeing further filed patents for

18  hybrid-electric propulsion technology that is "directly inspired by confidential

19  information that Zunum supplied."  (*Id.* ¶¶ 383-85.)  For example, Zunum alleges that

20

21    [5] Boeing did, however, make another $4 million investment in Zunum in 2018 through a
   convertible promissory note and note purchase agreement (collectively, the "2018 Notes"),

22  which were accompanied by a new investor rights letter (the "2018 IRL").  (*See* SAC ¶¶ 246-47;
   Nordlund Decl. ¶¶ 6-7, Exs. E-F ("2018 Notes"); *id.* ¶ 8, Ex. G ("2018 IRL").)

1   Boeing's Thin Haul Hybrid Electric Propulsion System patent "borrows heavily from

2   Zunum's ZA10 architecture" and Boeing's Active Voltage Control for Hybrid Electric

3   Aircraft ("Active Voltage") patent "relates closely to issues addressed by the control

4   system in an international patent filed by Zunum," raising issues around "inventorship."

5   (*Id.* ¶¶ 384-85.)

6        Ultimately, Zunum failed to obtain any other significant investment, "r[a]n out of

7   operating funds," and "close[d] all of its centers" and laid off all employees in April

8   2019.  (*See id.* ¶¶ 296, 323-356, 368.)

9   **B.    Procedural History**

10       Zunum filed this lawsuit against Boeing, Safran, and certain affiliates of Safran on

11  November 23, 2020 in King County Superior Court.  (State Records (Dkt. # 2) at 7.[6]

12  Shortly thereafter, Zunum filed its first amended complaint ("FAC"), which includes

13  claims for:  (1) breach of the 2016 PIA (FAC (Dkt. # 1-1) ¶¶ 405-25); (2) breach of the

14  2017 IRL (*id.* ¶¶ 426-41); (3) breach of the 2018 investor rights letter (the "2018 IRL")

15  (*id.* ¶¶ 442-50); (4) breach of the implied covenant of good faith and fair dealing (*id.*

16  ¶¶ 451-60); (5) breach of fiduciary duty (*id.* ¶¶ 461-77); (6) declaratory judgment (*id.*

17  ¶¶ 478-82); (7) tortious interference with business expectancy (*id.* ¶¶ 483-92);

18  (8) violation of Washington Trade Secrets Act ("WTSA") (*id.* ¶¶ 493-512); (9) violation

19  of Washington Consumer Protection Act ("WCPA")—antitrust conspiracy (*id.*

20  ¶¶ 513-29); (10) violation of WCPA—attempted monopolization (*id.* ¶¶ 530-42);

21

22          _____

            [6] The court uses the CM/ECF page numbers when citing to the state court records.

ORDER - 5

1    (11) violation of Securities Act of Washington ("WSSA") (*id.* ¶¶ 543-69); and (12)

2    violation of WCPA—unfair competition (*id.* ¶¶ 570-76).[7]   Boeing filed a motion to

3    dismiss seven of the counts in the FAC for failure to state a claim, which the King

4    County Superior Court Judge summarily denied.  (*See* State Records at 313-51; 1165-66.)

5         In July 2021, Boeing answered the complaint and filed multiple counterclaims.

6    (*See* Answer (Dkt. # 1-2).)  Boeing and the Safran Defendants then removed the case to

7    this court.  (NOR (Dkt. # 1).)  Zunum sought to remand the case back to King County

8    Superior Court, but this court denied its motion.  (*See* Remand Mot. (Dkt. # 26); 8/17/21

9    Order (Dkt. # 36).)  Zunum dismissed its claims against the Safran Defendants, who had

10   not yet answered the FAC, in October 2021.  (*See* Not.; *see also* Dkt.)  Two months later,

11   Boeing amended its counterclaims to add an additional claim for declaratory relief based

12   on a recently issued patent.  (*See* Mot to Amend (Dkt. # 46); Boeing FAA (Dkt. # 48);

13   *see also* Zunum Answer (Dkt. # 49).)

14        On April 14, 2022, Boeing filed a motion for partial judgment on the pleadings on

15   Zunum's WCPA antitrust conspiracy (FAC ¶¶ 513-29), WCPA attempted

16   monopolization (*id.* ¶¶ 530-42), WCPA unfair competition (*id.* ¶¶ 570-76), WSSA (*id.*

17   ¶¶ 543-69), and breach of fiduciary duty (*id.* ¶¶ 461-77) claims.  (MJOP (Dkt. # 50) at 1.)

18   The court granted Boeing's motion, dismissing Zunum's WCPA unfair competition,

19   WSSA, and breach of fiduciary duty claims with prejudice and dismissing Zunum's

20   WCPA antitrust conspiracy and WCPA attempted monopolization claims without

21

22   _____
     [7] Zunum asserts some claims against Boeing and HorizonX jointly and some claims
     against them individually.

1  prejudice and with leave to amend.  (*See* 6/13/22 Order (Dkt. # 58) at 43.)  Shortly after,

2  Zunum filed its SAC (*see* SAC; Dkt.) and a motion for reconsideration of the court's

3  dismissal of its WCPA unfair competition and WSSA claims, which the court denied (*see*

4  MFR (Dkt. # 59); 6/29/22 Order (Dkt. # 61)).

5                                    **III.    ANALYSIS**

6        Boeing now asks the court to dismiss Zunum's WCPA antitrust conspiracy (SAC

7  ¶¶ 499-522), WCPA attempted monopolization (*id.* ¶¶ 523-36), and tortious interference

8  with business expectancy (*id.* ¶¶ 469-78) claims under Federal Rule of Civil Procedure

9  12(b)(6).  (Mot. at 2.)  The court evaluates each claim in turn.  The court begins by

10  setting forth the standard of review before turning to Boeing's motion.

11  **A.    Standard of Review**

12        Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for

13  "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To

14  survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

15  as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

16  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

17  claim is facially plausible "when the pleaded factual content allows the court to draw the

18  reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556

19  U.S. at 678.  While "detailed factual allegations" are not required, a complaint must

20  include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*

21        When considering a Rule 12(b)(6) motion, the court may consider the complaint,

22  documents attached to the complaint, documents incorporated therein, or matters of

1    judicial notice.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003);

2    *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  The court must

3    accept the non-moving party's well-pleaded factual allegations as true and draw all

4    reasonable inferences in favor of the non-moving party.  *See Hines v. Youseff*, 914 F.3d

5    1218, 1227 (9th Cir. 2019); *Daniels-Hall*, 629 F.3d at 998.  However, the court is not

6    required to accept as true "allegations that are merely conclusory, unwarranted

7    deductions of fact, or unreasonable inferences."  *Daniels-Hall*, 629 F.3d at 998 (noting

8    that the court is also not required "to accept as true allegations that contradict exhibits

9    attached to the [c]omplaint or matters properly subject to judicial notice"); *Chavez v.*

10   *United States*, 683 F.3d 1102, 1008 (9th Cir. 2012) (stating that the court is not required

11   to accept as true legal conclusions or "formulaic recitation[s] of the elements of a cause

12   of action").

13   **B.    WCPA Antitrust Conspiracy Claim**

14   RCW 19.86.030 prohibits any "contract, combination, . . . or conspiracy in

15   restraint of trade or commerce."  This provision "is essentially identical to section 1 of

16   the Sherman Act," and "courts are to be guided by federal decisions interpreting

17   comparable federal provisions" when construing RCW 19.86.030 claims.  *See Murray*

18   *Pub. Co. v. Malmquist*, 832 P.2d 493, 497 (Wash. Ct. App. 1992).  To establish an

19   antitrust conspiracy claim, Zunum must plead sufficient facts to establish:  "(1) the

20   existence of an agreement, and (2) that the agreement was [a]n unreasonable restraint of

21   //

22   //

1  trade" under either a per se rule of illegality or a rule of reason analysis.[8]  *FTC v.*

2  *Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (emphasis omitted) (quoting *Aerotec*

3  *Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016)); *see also*

4  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021).

5        For the purposes of the instant motion, the court assumes, without deciding, that

6  Boeing and the Safran Defendants agreed to "exclud[e] Zunum from the worldwide

7  market for aircraft serving commercial air travel up to 1,500 miles, commercial hybrid

8  and all-electric aircraft, and commercial hybrid and all-electric propulsion systems" (the

9  "Alleged Markets").  (SAC ¶ 501; *see also id.* ¶ 502 (alleging that Boeing and the Safran

10  Defendants "did this through a systematic and coordinated campaign to deny Zunum

11  access to additional funding and to key inputs, like funding, aerostructures support, and

12  support for a turboshaft").)  Thus, the court focuses on whether such an agreement was an

13  unreasonable restraint of trade.  A plaintiff must sufficiently plead that the restraint of

14  trade is unreasonable under either a per se approach or the rule of reason analysis.[9]

15  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022).

16

17      [8] In addition to proving injury to competition, a private antitrust plaintiff must also plead
"antitrust injury," meaning they must allege that "they are the proper parties to bring the antitrust

18  action because they were harmed by the defendants' contract, combination, or conspiracy, and
the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct."  *In
re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (citing *Brantley v.*

19  *NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (noting that this is also referred to as
"antitrust standing")).

20      [9] A third test, the "quick look" analysis, falls somewhere between the rule of reason

21  analysis and per se approach.  The "quick look" analysis is an abbreviated form of the rule of
reason that may be used when "an observer with even a rudimentary understanding of economics

22  could conclude that the arrangements in question could have an anticompetitive effect on
customers and markets."  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (rule of reason is a

1    A small group of restraints "have such predictable and pernicious anticompetitive

2    effect, and such limited potential for procompetitive benefit, that they are deemed

3    unlawful per se." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th

4    Cir. 2011) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *Ohio v. Am. Express

5    Co.*, — U.S. —, 138 S. Ct. 2274, 2283 (2018) (stating that these types of restraints

6    "always or almost always tend to restrict competition and decrease output").

7    Accordingly, such restraints "are conclusively presumed to be unreasonable and therefore

8    illegal without elaborate inquiry as to the precise harm they have caused or the business

9    excuse for their use." *Harris*, 651 F.3d at 1133 (quoting *Nw. Wholesale Stationers, Inc.

10   v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)).  Because per se treatment

11   is reserved for conduct that is "manifestly anticompetitive" and without "any redeeming

12   virtue," the Supreme Court has "expressed reluctance to adopt per se rules where the

13   economic impact of certain practices is not immediately obvious." *Harris*, 651 F.3d at

14   1133 (first quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886

15   (2007); and then quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).

16   "Restraints that are not unreasonable per se are judged under the 'rule of reason.'"

17   *Qualcomm*, 969 F.3d at 989 (quoting *Am. Express*, 138 S. Ct. at 2283).  This is the

18   default standard under which most antitrust claims are analyzed.  *See State Oil*, 522 U.S.

19   at 10; *see also Harris*, 651 F.3d at 1133.  This test "requires courts to conduct a

20   fact-specific assessment of 'market power and market structure . . . to assess the

21

22   continuum and must be applied in a case-specific manner).  Because neither party advocates for
     nor applies the quick look analysis, the court also declines to do so.

1  [restraint]'s actual effect' on competition." *State Oil*, 522 U.S. at 10 (quoting *Am.*

2  *Express*, 138 S. Ct. at 2283); *Harris*, 651 F.3d at 1133 ("[A] plaintiff [must] 'demonstrate

3  that a particular contract or combination is in fact unreasonable and anticompetitive.'"

4  (quoting *Dagher*, 547 U.S. at 5)).  Courts "examine 'the facts peculiar to the business, the

5  history of the restraint, and the reasons why it was imposed,' to determine the effect on

6  competition in the relevant product market." *See In re NFL's Sunday Ticket*, 933 F.3d at

7  1150 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).

8  　　　Below, the court discusses whether the alleged restraint is per se unlawful or

9  whether it is unreasonable under the rule of reason analysis.

10  　　　1.  <u>Per Se Violation</u>

11  　　　While the SAC is "silent as to the specific type of established per se violation," the

12  court again accepts Zunum's characterization of its alleged per se violation as a "boycott"

13  between Boeing and the Safran Defendants, which denied Zunum "access to additional

14  funding and to key inputs."  (*See* 6/13/22 Order at 14; Resp. at 3; SAC ¶¶ 502, 504.)  As

15  the court previously noted (*see* 6/13/22 Order at 14), "precedent limits the per se rule in

16  the boycott context to cases involving horizontal agreements among direct competitors."

17  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also Am. Express*, 138

18  S. Ct. at 2283-84 ("Typically only 'horizontal' restraints—restraints 'imposed by

19  agreement between competitors'—qualify as unreasonable per se." (quoting *Business*

20  *Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988))).  On the other hand,

21  vertical agreements—i.e., agreements made up and down a supply chain, such as between

22  a manufacturer and a supplier or retailer—"are analyzed under the rule of reason." *In re*

*Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191-92 (9th Cir. 2015). Accordingly, Zunum's ability to establish a per se violation based on the alleged boycott between Boeing and the Safran Defendants turns on whether the boycott was the product of a horizontal agreement.

In its June 13, 2022 order, the court concluded that "the alleged agreement between Boeing and the Safran Defendants to exclude Zunum from the Alleged Markets was [not susceptible to per se treatment because it was] not an 'agreement between competitors,' *Am. Express*, 138 S. Ct. at 2283-84, as the Safran Defendants are suppliers to Boeing, not competitors." (*See* 6/13/22 Order at 14 (citing FAC ¶¶ 8, 521).) While Zunum continues to allege the Safran Defendants are suppliers to Boeing in its SAC (*see, e.g.*, SAC ¶¶ 9, 171, 264-66, 507), it now also alleges, on "information and belief," that the Safran Defendants and Boeing compete in the markets for commercial "hybrid-electric and all-electric aircraft and propulsion" systems and "electric air taxis" by filing "numerous patents" and "developing . . . technologies . . . based on information derived from Zunum" (*id.* ¶¶ 380-81). Referencing those newly added allegations, as well as other allegations in the SAC,[10] Zunum asks the court to conclude that the alleged agreement is horizontal because while the Safran Defendants may be suppliers to Boeing

---

[10] The court admonishes Zunum for making statements like "[t]he SAC further pleads numerous allegations that support its theory of a per se violation" and string citing to more than sixty paragraphs. (*See* Resp. at 3.) Rather than identify the individual facts that support Zunum's theory of competition, Zunum asks the court to go find the facts to support Zunum's theory. The court declines to do Zunum's work for it; "[j]udges are not like pigs, hunting for truffles buried in briefs." *A.H. Lundberg Assocs., Inc. v. TSI, Inc.*, No. C14-1160JLR, 2016 WL 9226998, at *10 (W.D. Wash. Feb. 18, 2016).

1   in some contexts, they are horizontal competitors with Boeing in the markets for

2   "hybrid-electric and all-electric aircraft and propulsion" systems and "electric air taxis"

3   (*id.*).  (*See* Resp. at 3-4 (citing SAC ¶¶ 303, 305, 379-81, 383-85).)

4        Boeing disagrees.  (Mot. at 6-8; Reply at 1-3.)  It argues that Zunum fails to

5   establish a horizontal agreement because:  (1) the SAC still alleges that the Safran

6   Defendants are suppliers to Boeing; (2) the Safran Defendants and Boeing cannot be

7   competitors in the markets for "hybrid-electric and all-electric aircraft and propulsion"

8   systems and "electric air taxis" because such markets do not exist; (3) the timeline

9   underlying Zunum's horizontal competition theory is "self-defeating" because Zunum

10  alleges that Boeing and the Safran Defendants "agreed to shut Zunum out, and then

11  became competitors through the use of Zunum's intellectual property"; and (4) Zunum's

12  theory of horizontal competition—that Boeing and the Safran Defendants "conspired

13  together to take down Zunum," "but later parted ways to compete against each other with

14  Zunum's proprietary information"—"is implausible on its face."  (Mot. at 7-8 (emphasis

15  omitted); Reply at 2-3.)

16        On the present record, the court finds that Zunum's newly added allegations fail to

17  plausibly establish that the alleged boycott was the product of a horizontal, rather than a

18  vertical, agreement.  The court cannot credit Zunum's theory of horizontal competition

19  because Zunum has not established that the markets that Boeing and Safran allegedly

20  compete in—i.e., the markets for "hybrid-electric and all-electric aircraft and propulsion"

21  systems and "electric air taxis" (SAC ¶¶ 380-81)—actually exist, as discussed in more

22  detail below.  (*See* 6/13/22 Order at 20-21 (concluding that a market for "hybrid-electric

1   and all-electric aircraft" "has yet to be established" and that Zunum has not established

2   that . . . all-electric air taxies . . . currently exist[]"); SAC ¶ 535 (alleging that "[t]he

3   market for commercial hybrid or all-electric aircraft and propulsion systems is still

4   emerging").[11])  The fact that Boeing and the Safran Defendants were not competitors in

5   an existing market when they allegedly agreed to exclude Zunum from the Alleged

6   Markets is fatal to Zunum's efforts to establish a per se violation.[12]  *See Siegler*, 2019

7   WL 581719, at *11-12 (stating that a viable antitrust claim "depend[s] on a defendant's

8   anti-competitive actions vis-à-vis an established, clearly-defined market," not one that

9   "has yet to be established").  Finally, the court agrees with Boeing's contention that

10  Zunum's theory of horizontal competition between Boeing and the Safran Defendants is

11  implausible on its face and thus fails under Rule 12(b)(6)'s standard.  (*See* Mot. at 7-8;

12

13

_____

14  [11] (*See also, e.g.*, SAC ¶ 32 (alleging that Zunum was formed to "develop the word's [sic]
    first hybrid-electric and all-electric . . . regional aircraft for commercial service and to develop
    this new market as the first-mover"); *id.* ¶ 39 (admitting that it never produced such an aircraft
    and only had a "ground prototype"); *id.* ¶ 402 (calling the markets for commercial hybrid and
    all-electric aircraft, and commercial hybrid-electric and all-electric propulsion systems "nascent
    markets"); *id.* ¶¶ 369-98 (failing to allege that any entities currently selling completed,
    commercial hybrid-electric or all-electric aircraft or commercial hybrid-electric and all-electric
    propulsion systems).)

15

16

17

18  [12] Zunum cites numerous cases to support its argument that "[t]he nascency of a market is
    not fatal to an antitrust claim."  (*See* Resp. at 6.)  However, the cases Zunum cites in no way
    undermine the court's holding that where an alleged market "has yet to be established," an
    antitrust plaintiff's reliance on that market "is facially unsustainable."  (*See* 6/13/22 Order at 20
    (first citing *Siegler v. Sorrento Therapeutics, Inc.*, No. 18-cv-1681, 2019 WL 581719, at *11-12
    (S.D. Cal. Feb. 13, 2019) ("If there is no extant product market, then it necessarily follows that
    there is no viable anti-trust claim."); and then citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513
    F.3d 1038, 1044 (9th Cir. 2008) ("Plaintiff must allege . . . that a 'relevant market' exists . . . .""));
    *see also* Reply at 2-3 & n.2 (explaining why the cases Zunum cites do not "stand[] for the
    proposition that merely labeling a market as 'nascent' or 'emerging' permits plaintiffs to evade
    the requirement to plead an existing market with defined attributes")).)

19

20

21

22

1   Reply at 2-3; SAC ¶¶ 380-81, 501-02); *see also, e.g.*, *Lombardo v. Alhambra Police*

2   *Dep't*, No. 15-cv-6262, 2015 WL 9906167, at *4 (C.D. Cal. Dec. 15, 2015) (dismissing

3   claim where "the allegations . . . are so irrational and implausible as to be frivolous").

4        For these reasons, the court again concludes that "the agreement alleged by

5   Zunum . . . is simply not susceptible to per se treatment under the controlling law." (*See*

6   6/13/22 Order at 14); *see also Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332,

7   1337 n.2 (9th Cir. 1983) ("The district court properly found per se analysis inappropriate

8   because Brandt and Hallett were not competitors. Any 'group boycott' therefore

9   consisted of a vertical agreement, to which the rule of reason applies."); *Orchard Supply*

10  *Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1357 (N.D. Cal. 2013)

11  (rejecting plaintiff's argument that a conspiracy involving "manufacturers, distributors,

12  and a retailer" was per se unlawful because a manufacturer's agreements with its

13  distributors are vertical agreements, to which per se analysis does not apply).

14  Accordingly, the court must analyze whether the alleged restraint of trade is unreasonable

15  under the rule of reason.

16        2.  Rule of Reason

17        Under the rule of reason's "three-step, burden-shifting framework, courts must

18  determine if a practice unreasonably restrains trade by "analyz[ing] the degree of harm to

19  competition along with any justifications or procompetitive effects to determine whether

20  the practice is unreasonable on balance." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

21  1410 (9th Cir. 1991). As "[a] threshold step," the court must "accurately define the

22  relevant market, which refers to 'the area of effective competition.'" *See Qualcomm*, 969

1  F.3d at 992 (quoting *Am. Express*, 138 S. Ct. at 2285 ("[C]ourts usually cannot properly

2  apply the rule of reason without an accurate definition of the relevant market.")).

3            *a.  Establishing a Relevant Market*

4        The relevant market must include "both a geographic market and a product

5  market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  The geographic

6  market extends to the "'area of effective competition' . . . where buyers can turn for

7  alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir.

8  2001); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984)

9  (defining geographic market as the "'economically significant' area of effective

10  competition in which the relevant products are traded").  A product market "must

11  encompass the product at issue as well as all economic substitutes for the product."

12  *Newcal Indus.*, 513 F.3d at 1045.  Economic substitutes are those that have a "reasonable

13  interchangeability of use" or sufficient "cross-elasticity of demand" with the relevant

14  product.  *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).[13]  Finally,

15  the relevant market must include "the group or groups of sellers or producers who have

16  actual or potential ability to deprive each other of significant levels of business."

17  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

18  //

19

---

20        [13] Cross-elasticity of demand refers to "the extent to which consumers will change their
consumption of one product in response to a price change in another."  *Eastman Kodak Co. v.*

21  *Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992).  Reasonable interchangeability of use refers
to whether consumers could use the products for the same purposes and depends on the products'

22  "price, use[,] and qualities."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395
(1956).

1    Without an "accurate definition of the relevant market" "there is no way to

2    measure [the defendant's] ability to lessen or destroy competition." *Am. Express*, 138 S.

3    Ct. at 2285 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382

4    U.S. 172, 177 (1965)).  Thus, while plaintiffs need not plead a relevant market with

5    specificity, "a complaint may be dismissed under Rule 12(b)(6) if the complaint's

6    'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045;

7    *Tanaka*, 252 F.3d at 1063 ("Failure to identify a relevant market is a proper ground for

8    dismissing a Sherman Act claim."  (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*,

9    182 F.3d 1096, 1105 (9th Cir. 1999)).  For example, a relevant market definition may be

10   "facially unsustainable" where "the plaintiff fails to define its proposed relevant market

11   with reference to the rule of reasonable interchangeability and cross-elasticity of demand,

12   or alleges a proposed relevant market that clearly does not encompass all interchangeable

13   substitute products even when all factual inferences are granted in plaintiff's favor."

14   *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1224-25 (C.D. Cal. 2012)

15   (quoting *Colonial Med. Group, Inc. v. Catholic Healthcare W.*, No. 09-2192 MMC, 2010

16   WL 2108123, at *3 (N.D. Cal. May 25, 2010)); *see also Nicolosi Distrib., Inc. v.

17   FinishMaster, Inc.*, No. 18-cv-03587-BLF, 2019 WL 1560460, at *5 (N.D. Cal. Apr. 10,

18   2019) (rejecting a geographic market based on county lines where there was no plausible

19   explanation for excluding other neighboring counties).

20          *b.  Zunum's Proposed Geographic and Product Markets*

21          The court previously concluded that Zunum's proposed geographic markets—

22   "national and international"—and product markets—the "hybrid-electric and all-electric

1  aircraft" market; the market for "short-haul flights under 1,500 miles"; and market for

2  "integrated door-to-door travel"—were "facially unsustainable." (*See* 6/13/22 Order at

3  17-22.) With respect to the proposed product markets, the court stated that:

4  (1) "Zunum's alleged product market for 'hybrid-electric and all-electric aircraft' is

5  facially unsustainable because such a market has yet to be established (*id.* at 19-20);

6  (2) "Zunum fails to plausibly establish a market for short-haul flights under 1,500 miles"

7  because it is unclear whether "this alleged market encompasses products or services" (*id.*

8  at 20-21); and (3) the market for "integrated door-to-door travel" is deficient because

9  "Zunum does not plead any facts showing what exactly such a market encompasses" (*id.*

10 at 21-22 ("[T]he court is unconvinced that [defining this market as including "all-electric

11 air taxies"] would be sufficient because Zunum has not established that such a

12 product . . . currently exists.")). The court noted that if Zunum chose to amend its

13 antitrust conspiracy claim, it must address the aforementioned deficiencies and "take care

14 to define the proposed market(s) 'with reference to the rule of reasonable

15 interchangeability and cross-elasticity of demand.'" (*Id.* at 22 (quoting *RealPage, Inc. v.*

16 *Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1224 (C.D. Cal. 2012)).)

17        In its SAC, Zunum identifies the proposed geographic market as "worldwide" and

18 the proposed product markets as (1) "aircraft serving commercial air travel up to 1,500

19 miles"; (2) "commercial hybrid and all-electric aircraft"; and (3) "commercial hybrid and

20 all-electric propulsion systems." (SAC ¶¶ 501, 516.) Boeing argues that the three

21 proposed product markets "are virtually identical to the three that this [c]ourt already

22 //

1    considered and rejected in the FAC" and fail for several reasons.  (Mot. at 8.)  The court

2    evaluates Zunum's proposed product markets in turn.

                    i.    Product Market for Aircraft Serving Commercial Air Travel up to 1,500
                          Miles

4           With respect to Zunum's "aircraft serving commercial air travel up to 1,500 miles"

5    market, Boeing argues that this proposed market fails because it is arbitrary.[14]  (Mot. at 9;

6    Reply at 4-5.)  It notes that "'[c]ommercial flights up to 1,500 miles' . . . can be flown by

7    virtually any commercial aircraft," including "the aircraft Zunum places in this Alleged

8    Market ('single-aisles, twin-aisles, regional jets, and turboprops'), as well as the ones it

9    arbitrarily excludes ('business jets and small passenger aircraft')."  (Mot. at 9 (quoting

10   SAC ¶¶ 32, 516).)  Boeing further notes that the "SAC offers no reason why 'regional

11   jets[] and turboprops' are not interchangeable with 'business jets' and 'small passenger

12   aircraft' (an entirely undefined term), but are interchangeable with large jets (i.e.,

13   'single-aisles[] and twin-aisles')."  (*Id.* (quoting SAC ¶ 516).)

14          Zunum's response illustrates the arbitrary line-drawing from which its proposed

15   product market continues to suffer.  In an attempt to justify the proposed market's

16   boundaries, Zunum redefines the parameters of the proposed market, noting that it

17   includes:  "(a) short-haul aircraft such as turboprops and regional jets, 100% of which

18

19   _____

20       [14] Boeing alleges that the proposed market "has the same flaw the [c]ourt previously
identified as to the FAC's alleged market for 'short-haul flights under 1,500 miles'—it is entirely
'unclear whether this alleged market encompasses products or services,' or perhaps both."  (Mot.

21   at 8 (quoting 6/13/22 Order at 20).)  However, the allegations in the SAC sufficiently establish
that the market encompasses only products, specifically "single-aisles, twin-aisles, regional jets,
and turboprops."  (*See* SAC ¶ 516 (stating that this market includes the above-mentioned

22   products but does not include "business jets and small passenger aircraft"); Resp. at 8.)

1    departures are to distances less than 1,500 miles; (b) medium-haul single-aisles, 80%

2    which departures are to 1,500 miles; and (c) long-haul twin-aisles, 20% of which

3    departures are to 1,500 miles."  (Resp. at 9.)  However, none of these specifications

4    appear in the SAC.  (*See generally* SAC); *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F.

5    Supp. 3d 42, 59 (N.D. Cal. 2020) (noting that plaintiff could not amend complaint

6    through opposition to a motion to dismiss).  Zunum also claims that its first proposed

7    product market excludes "small turboprops," "piston aircraft," and "air taxis"—even

8    though the SAC includes turboprops in the market definition, says nothing about piston

9    aircraft, and relies on an alleged market for air taxis to supposedly show competition in

10   the market.  (*See* Resp. at 8; *see also* SAC ¶¶ 516, 381.)  The court agrees that these

11   statements demonstrate "that Zunum is gerrymandering this Alleged Market on the fly—

12   in a way that conveniently tracks its goal of developing aircraft with a 1,500-mile range

13   by 2030."  (Reply at 4 (citing SAC ¶ 35).)

14       Additionally, Zunum claims that its market is not arbitrarily defined because the

15   1,500-mile number is "consistent with 'short-haul' ranges, a common metric used by

16   airlines" and "with [the] 'generally accepted' segmentation [of the commercial aircraft

17   market]," citing a Commission of the European Communities decision regarding the

18   *Boeing/McDonnell Douglas* merger and a Japanese "market forecast."  (Resp. at 9-10.)

19   However, the SAC "contains no factual allegations that purchasers of aircraft actually use

20   this metric, and [Zunum's] only support for this claim is a Japanese 'market forecast' that

21   postdates the underlying allegations and was not even provided to the [c]ourt."  (Reply at

22   //

1   4 (citing Resp. at 9-10); *see generally* SAC (lacking any mention of this Japanese

2   "market forecast").)

3       Moreover, the *Boeing/McDonnell Douglas* decision that Zunum relies on does not

4   support its proposed market.  Indeed, that decision noted that the market for large

5   commercial jet aircraft, like Boeing's 737, is distinct from the regional jet market because

6   the manufacturers in the large commercial jet aircraft market do not "have products

7   below the 100 seat/1,700 nautical mile maximum-range thresholds, which are considered

8   to be the approximate combined upper limits for the specific requirements of regional

9   carriers."  *See Boeing/McDonnell Douglas* (Case IV/M.877), Commission Decision

10  97/816/EC [1997] OJ L 336/16, ¶ 15, https://tinyurl.com/bjzx84km.[15]  Thus, that decision

11  did not declare that a market consisting of "aircraft serving commercial air travel of up to

12  1,500 miles" (SAC ¶¶ 501, 516) is consistent with "[the] 'generally accepted'

13  segmentation [of the commercial aircraft market]" (Resp. at 9-10).  "Zunum's "attempt to

14  declare an equivalency between th[e] limit of 1,700 nautical miles (roughly 1,950 miles)

15  [described in the *Boeing/McDonnell Douglas* decision] and its own invented '1,500 mile'

16  metric merely demonstrates that Zunum's market allegations are arbitrary and detached

17  from reality."  (Reply at 5.)  In any event, Zunum cannot supplement its SAC with unpled

18  allegations attempting to justify the boundaries of its first proposed product market.  *See,*

19

20      [15] Both parties cite to the European Commission's decision and the court finds it
    appropriate to take judicial notice of the decision in order to discuss its contents. *See, e.g.*, *In re*
21  *European Gov. Bonds Antitrust Litig.*, No. 19 Civ. 2601, 2022 WL 768680, at *5 (S.D.N.Y. Mar.
    14, 2022) (taking judicial notice of European Commission decision on motion to dismiss); *In re*
22  *German Auto. Man. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063 n.2 (N.D. Cal. 2019) (taking
    judicial notice of European Commission press release on motion to dismiss).

1  *e.g.*, *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 617 (N.D. Cal. 2020) (dismissing

2  antitrust claim where scope of the product market was not clearly set forth in complaint);

3  *Allan & Assocs. Ltd.*, 445 F. Supp. 3d at 59 (noting that plaintiff could not amend

4  complaint through opposition to a motion to dismiss).  Nor can Zunum "ignore economic

5  reality and 'arbitrarily choose the product market relevant to its claims.'"  *Epic Games,*

6  *Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1015 (N.D. Cal. 2021) (quoting *Buccaneer*

7  *Energy (USA) v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017)).

8        Boeing next argues that Zunum's first proposed product market fails because

9  Zunum failed to follow the court's direction to define its Alleged Markets with reference

10 to the rule of reasonable interchangeability of use, which "refers to whether consumers

11 could use the products for the same purposes and depends on the products' 'price, use[,]

12 and qualities.'"  (*See* Mot. at 10-11 (quoting 6/13/22 Order at 16 & n.4).)  Boeing notes

13 that the European Commission, in the *Boeing/McDonnell Douglas* decision, "emphasized

14 that, on the demand side, consumers generally approach purchasing decisions based on

15 'operating requirements' (e.g., routes to be flown, optimal seating or loading, flight

16 frequency, and the availability of airport slots), 'technical requirements' (e.g.,

17 performance, reliability, and maintenance and service networks), and 'economic and

18 financial aspects' (e.g., purchase price, forecasted operating revenues and costs, and

19 residual value)."  (*Id.* at 10 (citing *Boeing/McDonnell Douglas* (Case IV/M.877), ¶ 14).)

20 It contends that "[t]hese customer considerations underscore the implausibility of how

21 Zunum has attempted to gerrymander its first Alleged Market," which "has nothing to do

22 with things that consumers actually care about, such as routes to be flown, the availability

1  of airport slots, maintenance and service networks, and purchase price." (*Id.* at 10-11

2  ("Indeed, Zunum's attempt to lump large jets and regional jets together is fundamentally

3  wrong.").)

4        The court agrees.  Zunum fails to point to allegations in the SAC that specifically

5  describe why the products it identifies as being in the first proposed product market are

6  reasonably interchangeable in light of common customer considerations, like those

7  discussed above—i.e., operating requirements, technical requirements, and economic and

8  financial aspects.  (*See generally* Resp.; SAC); *Boeing/McDonnell Douglas* (Case

9  IV/M.877), ¶ 14.  Instead, it points to the paragraph of the SAC that alleges that

10  "[i]nterchangeability of use in the market for aircraft serving commercial air travel up to

11  1,500 miles is driven primarily by 'Cost per Available Seat Mile' ["CASM"] of the

12  aircraft."  (Resp. at 8 (quoting SAC ¶ 517).)  Zunum then claims, without support from

13  the SAC, that "CASM is an integrated economic metric that carriers use, which includes

14  the cost of fuel, electricity, maintenance and service, as well as the purchase price per

15  available seat mile through depreciation and amortization of the aircraft."  (*Id.* at 10.)

16  CASMs, in Zunum's view, "explain why certain aircraft that technically can fly between

17  0 and 1,500 miles are not interchangeable because they are not economically competitive

18  for commercial air travel, such as business jets and small passenger aircraft like small

19  turboprops, piston aircraft, or air taxis."  (*Id.* at 8 ("CASMs for conventional aircraft

20  increase steeply as the size of the aircraft decreases, the precise economic condition that

21  Zunum's innovations invert."  (citing SAC ¶ 517)).)

22  //

Even though Zunum's interchangeability of use argument essentially revolves around CASMs, Zunum again improperly relies on unpled allegations, regarding what CASMs are and why they are the proper metric to establish interchangeability of use, to attempt to plausibly establish this proposed market.  Moreover, even if CASMs were a proper metric to evaluate interchangeability of use, the paragraphs in the SAC that discuss CASMs do not answer the question of whether the products within Zunum's first proposed product market are, in fact, reasonably interchangeable.  For example, the SAC "includes no factual allegations permitting the inference that 'single-aisles, twin-aisles, regional jets, and turboprops" are so comparable in CASM that they are reasonably interchangeable, and thus, that Zunum is justified in placing them in the same market. (*See* Reply at 5 (quoting SAC ¶ 516 (describing the type of aircraft in Zunum's first proposed product market).)  "In fact, the [SAC] implies the opposite:  because the CASM for 'conventional aircraft' 'increas[es] very steeply as the size of the aircraft decreases,' the smallest aircraft in the first Alleged Market must be vastly different in CASM from the largest aircraft" in that market.  (*Id.* (quoting SAC ¶ 517).)  Additionally, with respect to the CASM metric, the allegations in the SAC do not explain why "business jets and small passenger aircraft" are excluded from its market definition, despite the inclusion of "regional jets" and "turboprops."  (*See generally* SAC.)  Based on the allegations in the SAC, the court is unable to plausibly conclude that Zunum's first proposed product market comports with the "commercial realities" faced by customers and includes

//

//

products that are reasonably interchangeable in light of consumer considerations.[16] *Epic Games*, 559 F. Supp. 3d at 1015 (quoting *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)).

For the above-mentioned reasons, Zunum fails to plausibly establish a market for "aircraft serving commercial air travel up to 1,500 miles."

      ii.  Product Markets for Commercial Hybrid and All-electric Aircraft and Commercial Hybrid and All-electric Propulsion Systems

Turning to Zunum's "commercial hybrid and all-electric aircraft" and "commercial hybrid and all-electric propulsion systems" markets, Boeing argues that these proposed markets are deficient because they "do not exist, let alone satisfy the reasonable interchangeability and cross-elasticity of demand requirements."[17]  (Reply at 6; Mot. at 12.)  As noted above, the court has already held that a "hybrid-electric and all-electric aircraft" market does not "currently exist."  (6/13/22 Order at 19-20.)  Rather than add allegations to dispute that point, the SAC admits that the "commercial hybrid

---

[16] Because Zunum's first proposed product market is arbitrarily drawn and is not defined with reference to the rule of reasonable interchangeability of use, the court does not address Boeing's argument that Zunum also fails to plead facts supporting cross-elasticity of demand. (*See* Mot. at 11-12.)

[17] (*See, e.g.*, SAC ¶ 32 (alleging that Zunum was formed to "develop the word's [sic] first hybrid-electric and all-electric . . . regional aircraft for commercial service and to develop this new market as the first-mover"); *id.* ¶ 39 (admitting that it never produced such an aircraft and only had a "ground prototype"); *id.* ¶ 402 (calling the markets for commercial hybrid and all-electric aircraft, and commercial hybrid-electric and all-electric propulsion systems "nascent markets"); *id.* ¶¶ 369-98 (failing to allege that any entities currently selling completed, commercial hybrid-electric or all-electric aircraft or commercial hybrid-electric and all-electric propulsion systems); *id.* ¶ 385 (alleging that "[t]he market [sic] for commercial hybrid or all-electric aircraft and propulsion systems is still emerging").)

and all-electric aircraft" and "commercial hybrid and all-electric propulsion systems" markets are "still emerging."[18]  (*See* SAC ¶ 535; *see also id.* ¶ 277 (same).)

Zunum attempts to avoid this admission and establish the existence of these markets by alleging that it had "launch orders" for its ZA10 aircraft.  (*See* Resp. at 11 (citing SAC ¶ 47).)  However, the SAC says nothing else about these alleged "launch orders" such that the court could infer the existence of a product market, "nor does it say anything to suggest Boeing or Safran ever had any order for a competing product or with the same customers, and it admits that Zunum never completed a prototype engine, much less an aircraft."  (*See* Reply at 6 (citing SAC ¶¶ 39, 47); *see generally* SAC).  And while Zunum argues that there is a "long lead time to certification and production" in the aviation industry (*see* Resp. at 11-12),[19] such an argument simply underscores the fact that second and third proposed product markets will not come into existence anytime soon.  The court agrees that "admittedly nascent technology many years from ripening into a product cannot support an antitrust claim."  (Reply at 6); *see Siegler*, 2019 WL 581719, at *12 ("If there is no extant product market, then it necessarily follows that there is no viable anti-trust claim.").  Accordingly, the court concludes that Zunum's

---

[18] As noted above, *see supra* Section III.B.1, Zunum again fails to provide the court with cases to support its argument that "[t]he nascency of a market is not fatal to an antitrust claim" (*see* Resp. at 6).

[19] Again, these allegations appear nowhere in the SAC and Zunum cannot rely on them to bolster its claim.  (*See generally* SAC (lacking lead time allegations)); *see Allan & Assocs. Ltd.*, 445 F. Supp. 3d at 59.  Nor can Zunum rely on its unpled allegations regarding hybrid and all-electric aircraft and hybrid and all-electric propulsion system projects pursued by other parties (*see* Resp. at 12) to establish the existence of its second and third proposed product markets.  *See Allan & Assocs. Ltd.*, 445 F. Supp. 3d at 59.

1    proposed product markets for "commercial hybrid and all-electric aircraft" and

2    "commercial hybrid and all-electric propulsion systems" are facially unsustainable

3    because such markets have yet to be established.[20]  *See Siegler*, 2019 WL 581719, at *12;

4    *Newcal Indus.*, 513 F.3d at 1044 ("Plaintiff must allege . . . that a 'relevant market'

5    exists . . . .").

6            In sum, Zunum's Alleged Markets are facially unsustainable.  *Newcal Indus.*, 513

7    F.3d at 1045; *Tanaka*, 252 F.3d at 1063.  Therefore, the court DISMISSES Zunum's

8    WCPA antitrust conspiracy claim (Count IX).  Whether to grant leave to amend is

9    generally within the discretion of the district court.  *In re Daisy Sys. Corp.*, 97 F.3d 1171,

10   1175 (9th Cir. 1996).  This discretion is particularly broad where the plaintiff has

11   previously filed an amended complaint.  *Sisseton–Wahpeton Sioux Tribe v. United States*,

12   90 F.3d 351, 355 (9th Cir. 1996).  Here, Zunum has already had an opportunity to remedy

13   the deficiencies with respect to its Alleged Markets (*see* 6/13/22 Order at 22, 42-43;

14   SAC) and has not requested leave to amend nor proposed any new facts or legal theories

15   that it could not have incorporated into prior iterations of its complaint (*see generally*

16   Dkt.; Resp.).  *See, e.g.*, *Turner v. Cnty. of Los Angeles*, 18 F. App'x 592, 597 (9th Cir.

17   2001) (concluding that the court did not abuse its discretion in denying the second

18   amended complaint with prejudice and without leave to amend where the court had

19   already allowed the plaintiff to amend their complaint with instructions on how to cure

20

21          [20] Because Zunum's second and third proposed product markets do not exist, the court
     does not address Boeing's arguments regarding Zunum's failure to sufficiently define the
22   boundaries of these two markets and demonstrate that there is reasonable interchangeability of
     use and cross-elasticity of demand within these two markets.  (*See* Reply at 6-7; Mot. at 12-13.)

1   the complaint's deficiencies); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir.

2   2008) ("Appellants fail to state what additional facts they would plead if given leave to

3   amend . . . . Accordingly, amendment would be futile.").  Therefore, the court concludes

4   that further amendment to this claim would be futile and DISMISSES Zunum's WCPA

5   antitrust conspiracy claim with prejudice and without leave to amend.

6   **C.      WCPA Attempted Monopolization Claim[21]**

7           RCW 19.86.040 makes it "unlawful for any person to monopolize, or attempt to

8   monopolize or combine or conspire with any other person or persons to monopolize any

9   part of trade or commerce."  This provision is "equivalent" to Section 2 of the Sherman

10  Act.  *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1350 (9th Cir. 1986); *Ceiling &*

11  *Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1393 n.2 (W.D.

12  Wash. 1993) (Section 19.86.040 "essentially follows [S]ection 2 of the Sherman Act.").

13  To state a claim for attempted monopolization, Zunum must allege facts that, if true, will

14  prove:  (1) specific intent to control process or destroy competition; (2) predatory or

15  anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous

16  probability of achieving "monopoly power"; and (4) a causal antitrust injury.  *Khalid v.*

17  *Microsoft Corp.*, 409 F. Supp. 3d 1023, 1032 (W.D. Wash. 2019) (citing *Rebel Oil Co. v.*

18  *Atl. Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995)).

19          "A threshold step in any antitrust case is to accurately define the relevant

20  market . . . ."  *Qualcomm*, 969 F.3d at 992; *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*

21

22          _____

    [21] Zunum brings this claim against Boeing individually.  (*See* SAC at 112.)

1   *of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (noting that, in assessing injury to

2   competition, courts must focus on anticompetitive effects "in the market where

3   competition is [allegedly] being restrained").  As such, an attempted monopolization

4   claim, like an antitrust conspiracy claim, requires a plaintiff to sufficiently define the

5   relevant market.  *See Newcal Indus.*, 513 F.3d at 1044 & n.3 (stating that a plaintiff is

6   required to define the relevant market under Section 1 of the Sherman Act, which

7   governs restraints of trade, and Section 2 of the Sherman Act, which governs

8   monopolization and attempted monopolization); *see also Murray*, 832 P.2d at 500 ("A

9   successful claimant under RCW 19.86.040 must also show an unreasonable restraint on

10   competition.  Because Malmquist failed to establish an actual injury to competition under

11   RCW 19.86.030, his claim under RCW 19.86.040 fails for the same reason.").

12        Because Zunum's Alleged Markets are facially unsustainable, *see supra* Section

13   III.B, the court is unable to determine whether Boeing's alleged conduct actually injured

14   competition.  As noted in the court's June 13, 2022 order, "Zunum's failure to state an

15   antitrust conspiracy claim under RCW 19.86.030 is dispositive of [its attempted

16   monopolization claim] as well."  (*See* 6/13/22 Order at 24); *see, e.g.*, *PBTM LLC v.

17   Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178-82 (W.D. Wash. 2021) (dismissing the

18   plaintiff's RCW 19.86.040 and 19.856.030 claims, as well as its claims under Sections 1

19   and 2 of the Sherman Act, for failure to adequately plead a relevant product market);

20   *CaptiveAire Sys., Inc. v. ITW Food Equip. Grp., LLC*, No. C09-0244JLR, 2009 WL

21   10676075, at *5 (W.D. Wash. Sept. 28, 2009) (dismissing the plaintiff's RCW 19.86.040

22   claim because a plaintiff "must establish an unreasonable restraint on competition to

1    prevail on a monopolization or attempted monopolization claim under RCW 19.86.040,"

2    and the plaintiff failed to do so "because it does not define the relevant geographic

3    market"). Accordingly, the court DISMISSES Zunum's WCPA attempted

4    monopolization claim (Count X) because Zunum's Alleged Markets are facially

5    unsustainable. *Newcal Indus.*, 513 F.3d at 1045; *Tanaka*, 252 F.3d at 1063. The district

6    court has broad discretion to deny leave to amend where the plaintiff has previously filed

7    an amended complaint. *Sisseton–Wahpeton Sioux Tribe*, 90 F.3d at 355. For the same

8    reasons that the court dismissed Zunum's WCPA antitrust conspiracy claim with

9    prejudice and without leave to amend, *see supra* Section III.B.2, the court concludes that

10   further amendment to this claim would be futile and DISMISSES Zunum's WCPA

11   attempted monopolization claim with prejudice and without leave to amend.

12   **D.    Tortious Interference Claim[22]**

13           A party claiming tortious interference with a contractual relationship or business

14   expectancy must prove: "(1) that a valid contractual relationship or business expectancy

15   existed; (2) that the defendant knew of that relationship or expectancy; (3) that the

16   defendant intentionally interfered by inducing or causing a breach or termination of that

17   relationship or expectancy; (4) that the defendant interfered with an improper purpose or

18   by improper means; and (5) that damage to the plaintiff resulted from the interference."

19   *Libera v. City of Port Angeles*, 316 P.3d 1064, 1068 (Wash. Ct. App. 2013) (citing *Pac.*

20   *Nw. Shooting Park Ass'n v. City of Sequim*, 144 P.3d 276 (Wash. 2006)). A plaintiff

21

22           [22] Zunum brings this claim against Boeing individually. (*See* SAC at 103.)

1     needs to show either improper means *or* an improper purpose, not both, to establish the

2     fourth element of their tortious interference claim.  *See Pleas v. City of Seattle*, 774 P.2d

3     1158, 1163 (Wash. 1989) (noting that a cause of action for tortious interference can arise

4     from "*either* the defendants' pursuit of an improper objective of harming the plaintiff *or*

5     the use of wrongful means that in fact cause injury to plaintiff's contractual or business

6     relationships" (emphasis added)); *Woods View II, LLC v. Kitsap Cnty.*, 352 P.3d 807,

7     824-25 (Wash. Ct. App. 2015) ("While improper purpose and improper means are

8     separate inquiries, 'impropriety may be more easily found if the means of interference

9     was wrongful.'" (quoting *Pleas*, 774 P.2d at 1164)).  "'Interference for improper

10    purpose' is interference with an intent to harm" the plaintiff, and "'[i]nterference by

11    improper means' is interference that violates a statute, a regulation, a recognized rule of

12    common law, or an established standard of the trade or profession.'"  6A

13    WASHINGTON PRACTICE:  WASHINGTON PATTERN JURY INSTRUCTIONS:

14    CIVIL WPI 352.03 (7th ed. 2022); *see also Westmark Dev. Corp. v. City of Burien*, 166

15    P.3d 813, 822-23 (Wash. Ct. App. 2007) (approving the use of this jury instruction to

16    define improper purpose); *Greensun Grp., LLC v. City of Bellevue*, 436 P.3d 397, 408

17    (Wash. Ct. App. 2019) ("To show improper means, the plaintiff must demonstrate the

18    defendant had a duty not to interfere.  To establish such a duty, the plaintiff may point to

19    a statute, regulation, recognized common law, or established standard of trade or

20    profession."  (citation omitted)).

21         In its SAC, Zunum alleges that "[t]hrough its fundraising and development efforts,

22    Zunum developed valid business expectancies with several investors and business

1   partners, including [the Safran Defendants] and UTAS." (SAC ¶ 470.)  It contends that

2   "Boeing was aware of [Zunum and the Safran Defendants'] business relationship" (*id.*

3   ¶¶ 471-72.) and "interfered with each of these business expectancies" through "improper

4   means and for improper purposes," resulting in the termination of Zunum's relationship

5   with each such party (*id.* ¶¶ 473, 475, 478).  Zunum alleges that "[t]hese improper means

6   included with and by use of misappropriated proprietary information, trade secrets, and

7   intellectual property in breach of restrictive covenants in at least three agreements and the

8   attendant covenant of good faith and fair dealing.  The improper means also included

9   Boeing's breach of its fiduciary duties to Zunum as an investor with Board observation

10  rights, including as to confidential financial plans, and finance constraints and

11  vulnerabilities." (*Id.* ¶ 476.)  Zunum further alleges that Boeing's "improper motives

12  included for the purpose of attempting to restrain trade and exclude Zunum from the

13  market opportunities that it had innovated and was in the process of developing through a

14  pathway disclosed to [Boeing]." (*Id.* ¶ 477.)

15      Boeing argues that Zunum's "failure to plead that Boeing used 'improper means'

16  to interfere with a valid business expectancy and cause[d] 'resultant damage[s]' is

17  dispositive" of its claim.  (Mot. at 23 (quoting *Pac. Nw. Shooting Park*, 144 P.3d at 280).)

18  First, Boeing contends that "Zunum cannot establish 'improper means' based on claims

19  that have been dismissed (i.e., breach of fiduciary duty) or should now be dismissed with

20  prejudiced (i.e., antitrust)." (*Id.* at 24; *see also* Resp. at 23-24 (failing to contest this

21  point).)  The court agrees.  *See, e.g.*, *Moore v. Com. Aircraft Interiors, LLC*, 278 P.3d

22  197, 200-01 (Wash. Ct. App. 2012) (concluding that the plaintiff could not show

1    improper means based on a statutory violation when the plaintiff failed to prove each

2    element of that statutory claim).  Thus, having dismissed Zunum's breach of fiduciary

3    (*see* 6/13/22 Order at 41) and antitrust claims, *see supra* Sections III.B-C, Zunum cannot

4    use those claims to establish the improper means element of its tortious interference

5    claim.

6        The remaining improper means alleged in the SAC are based on Zunum's claims

7    for trade secret misappropriation, breach of contract, and breach of the implied covenant

8    of good faith and fair dealing.  (*See, e.g.*, SAC ¶ 476.)  While Boeing argues that Zunum

9    fails to establish improper means based on these remaining claims (*see* Mot. at 24; Reply

10   at 11-12), it does not address whether the improper purpose alleged in the SAC is also

11   deficient (*see generally* Mot. at 24; Reply at 11-12).  (*See* SAC ¶ 477 ("[Boeing's]

12   improper motives included for the purpose of attempting to restrain trade and exclude

13   Zunum from the market opportunities that it had innovated and was in the process of

14   developing through a pathway disclosed to [Boeing].").)  Because a plaintiff only needs

15   to show "*either* that the defendant had an improper purpose *or* that the defendant used

16   improper means" to establish the fourth element of a tortious interference claim, *Woods*

17   *View II*, 352 P.3d at 824-25 (emphasis added), and because Boeing failed to address

18   whether Zunum's improper purpose allegations fail to establish "interference with an

19   intent to harm,"[23] 6A WASHINGTON PRACTICE, *supra*, WPI 352.03, dismissal of

20

21       [23] "The terms [improper means and improper purpose] are not synonymous." *Woods*
     *View II*, 352 P.3d at 824-25.  To the extent that Boeing implicitly argues that the dismissal of
22   Zunum's antitrust claims requires the court to reject the improper purpose alleged in the SAC
     (*see* SAC ¶ 477), the court cannot accept that conclusion absent supporting case law.  *See, e.g.*,

1    Zunum's tortious interference claim is inappropriate at this time.  To avoid piecemeal

2    litigation of this claim, the court declines to address whether Zunum has alleged improper

3    means based on its claims for trade secret misappropriation, breach of contract, and

4    breach of the implied covenant of good faith and fair dealing,[24] as a finding that Zunum

5    failed to sufficiently allege improper means would not dispose of this claim.  Therefore,

6    Boeing's motion to dismiss is DENIED with respect to Zunum's tortious interference

7    claim (Count VII).

8                              **IV.    CONCLUSION**

9            For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART

10   Boeing's partial motion to dismiss Zunum's SAC (Dkt. # 62).  The court GRANTS

11   Boeing's motion with respect to Zunum's WCPA antitrust conspiracy and WCPA

12   attempted monopolization claims and DISMISSES those claims with prejudice and

13   without leave to amend.  The court DENIES Boeing's motion with respect to Zunum's

14   tortious interference with business expectancy claim.

15   //

16   //

17   _____

18   *United Fed'n of Churches, LLC v. Johnson*, No. C20-0509RAJ, 2022 WL 1128919, at *9 (W.D. Wash. Apr. 15, 2022) ("Although Defendants are correct that the 'improper means' prong of the fourth element requires a violation of a 'statute, regulation, common law rule, or professional

19   standard,' the 'improper purpose' prong bears no such requirement.").

20      [24] The court does, however, note that it agrees with Boeing's contention that Zunum cannot support its improper means allegations with unpled allegations.  (*Compare* Resp. at 23

21   ("Zunum has pleaded that Boeing had a duty not to interfere, including under trade custom."), *with* Reply at 12 ("Zunum claims to have 'pleaded that Boeing had a duty not to interfere, including under trade custom'—words never mentioned in the SAC.")); *see Allan & Assocs.*

22   *Ltd.*, 445 F. Supp. 3d at 59.

Dated this 12th day of August, 2022.

_____
JAMES L. ROBART
United States District Judge