1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

ZUNUM AERO, INC.,                                    CASE NO. C21-0896JLR

11                                      Plaintiff,             ORDER

                    v.

12

THE BOEING COMPANY, et al.,

13

                                    Defendants.

14

15                          **I.   INTRODUCTION**

16        Before the court is Defendants The Boeing Company and Boeing HorizonX

17   Ventures, LLC's (together, "Boeing") motion for judgment as a matter of law or, in the

18   alternative, for a new trial.  (Mot. (Dkt. # 695); Reply (Dkt. # 740).)  Plaintiff Zunum

19   Aero, Inc. ("Zunum") opposes the motion.  (Resp. (Dkt. # 737).)  The court has

20   considered the parties' submissions, the relevant portions of the record, and the

21   //

22   //

1   applicable law.  Being fully advised,[1] the court GRANTS Boeing's motion for judgment

2   as a matter of law.

3                            **II.    BACKGROUND**[2]

4          Zunum strived to be the Tesla of commercial aviation.  Its founders, Matt Knapp

5   and Dr. Ashish Kumar, believed their company could make air travel greener, faster, and

6   more affordable using electric and hybrid-electric ("HE") technologies.  Operating a jet

7   startup, however, is an expensive endeavor.  Before Zunum could shock the industry, it

8   needed some money.

9          In August 2016, Zunum identified Boeing as a potential investor.  The companies

10  executed a proprietary information agreement (the "2016 PIA"), under which Boeing

11  agreed to keep Zunum's information confidential, and Zunum agreed to share some of its

12  proprietary documents with Boeing.  Boeing liked what it saw:  in March 2017, Boeing

13  loaned Zunum $5,000,000 through a note purchase agreement (the "2017 NPA"), and in

14  May 2018, it loaned Zunum an additional $4,000,000 (the "2018 NPA").  Each NPA was

15  executed alongside an investment rights letter, under which Zunum shared more

16  proprietary information with Boeing for limited purposes, such as evaluating Zunum's

17  technical claims (the "2017 IRL" and "2018 IRL").

18  //

---

19        [1] Neither party requests oral argument (*see* Mot. at 1; Resp. at 1), and the court
20  concludes that oral argument would not aid in its disposition of Boeing's motion, *see* Local
     Rules W.D. Wash. LCR 7(b)(4).  Boeing also filed a notice of supplemental authority (Not. (Dkt.
21  # 743)), which the court concludes is irrelevant to the court's analysis because it concerns
     damages, which the court does not reach in this order.

22        [2] For additional background information, see the court's summary judgment orders.
     (4/22/24 Order (Dkt. # 560); 5/9/24 Order (Dkt. # 601).)

1     Boeing was not the only company with which Zunum was interested in forming an

2     alliance.  In addition to the American aerospace titan, Zunum had hoped to partner with

3     United Technologies Aerospace Systems ("UTAS") and companies associated with

4     Safran S.A. ("Safran").  UTAS and Safran, however, did not invest in Zunum.  Nor did

5     any other company.  By October 2018, Zunum was out of runway, and Boeing was

6     unwilling to invest more.  Unable to secure additional funding, Zunum furloughed its

7     employees and shuttered its doors.

8     Zunum persisted functionally as a non-operating entity.  Mr. Knapp and Dr.

9     Kumar continued to believe in Zunum's technology, however, and they wanted to know

10    why Zunum had crashed before it ever caught flight.  Their answer?  Boeing.  In

11    November 2020, Zunum sued Boeing in King County Superior Court.  Zunum threw the

12    kitchen sink at Boeing, bringing counts for:  (1) violation of the Washington Uniform

13    Trade Secrets Act ("WUTSA"); (2) breach of the 2016 PIA; (3) breach of the 2017 IRL;

14    (4) breach of the 2018 IRL; (5) declaratory judgment of no obligation to repay the 2017

15    and 2018 NPAs; (6) breach of the implied covenant of good faith and fair dealing;

16    (7) breach of fiduciary duty; (8) tortious interference with a business expectancy;

17    (9) violation of the Washington Consumer Protection Act ("WCPA") for an unlawful

18    contract, combination, or conspiracy in restraint of trade; (10) violation of the WCPA for

19    unlawful monopolization; (11) violation of the WCPA for unfair practices harmful to the

20    public interest; and (12) violation of the Securities Act of Washington ("SAW").  (1st

21    Am. Compl. (Dkt. # 1-1) ¶¶ 405-576.)  Zunum alleged that "Boeing stole Zunum's

22    //

technology and disclosed it to Boeing's partners to accelerate Boeing's own roadmaps by two decades, while intentionally hobbling Zunum." (*Id.* ¶ 20.)

Boeing fired back, filing counterclaims for: (1) breach of the 2017 NPA; (2) breach of the 2018 NPA; (3) declaratory judgment of no breach of the 2017 IRL; (4) declaratory judgment of no breach of the 2018 IRL; and (5) declaratory judgment of patent inventorship. (1st Answer (Dkt. # 1-2).) Boeing responded that it "wanted Zunum to succeed" but ultimately could not handle the turbulence of Mr. Knapp's and Dr. Kumar's mismanagement and "lack[ of] a realistic business plan." (*Id.* ¶¶ 19, 21.) According to Boeing, Mr. Knapp and Dr. Kumar refused to "accept help [Zunum] obviously needed" while "insist[ing] on a valuation well in excess of $100 million," despite Boeing's and other companies' disagreement. (*Id.* ¶¶ 18, 20.)

Boeing removed the case to this court in July 2021. (Removal Not. (Dkt. # 1).) The following month, the parties estimated a trial length of 10 days, noting that "[t]he number of trial days required may be fewer if any claims are resolved via motion practice prior to trial." (JSR (Dkt. # 37) at 8.) The court gave the parties eight days to conduct their trial. (*See* 9/23/21 Sched. Order (Dkt. # 42).) As the case propelled toward trial, it became considerably leaner. By early May 2024, Boeing had prevailed on Zunum's claims for breach of the 2018 IRL, declaratory judgment, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and violations of the WCPA and SAW. (*See generally* 6/13/22 Order (Dkt. # 58); 8/12/22 Order (Dkt. # 67); 4/22/24 Order; 5/9/24 Order.) Boeing had also prevailed on its counterclaims for breach of the 2017 and 2018 NPAs, declaratory judgment of no breach of the 2018 IRL, and

1    declaratory judgment of patent inventorship.  (*See generally* 4/22/24 Order; 5/9/24

2    Order.)  As a result, all that was left for trial were Zunum's claims for trade secret

3    misappropriation, breach of the 2016 PIA and 2017 IRL, and tortious interference with

4    business expectancies concerning UTAS and Safran.  (*See generally* Pretrial Order (Dkt.

5    # 742).)  Although the scope of trial was dramatically narrowed, the court did not shorten

6    the trial beyond what it originally allowed for in its scheduling order.  The eight-day trial

7    took off on May 16, 2024, with the court giving each side 19.5 hours to present its case.

8    (*See* 3/25/24 Min. Entry (Dkt. # 487).)  During trial, the court granted the parties an

9    additional 90 minutes each for closing arguments.  (5/23/24 Tr. (Rough)[3] at 7:14-18.)

10          At the outset of trial, the court provided the jurors with short descriptions of each

11   of Zunum's alleged trade secrets which were derived from a modified interrogatory

12   response Zunum submitted to the court.  (*See generally* Ex. 2000.  Zunum Modified Rog

13   (Dkt. # 625 (sealed)).)  The court did so to ensure that the jurors would "be on the same

14   page [as the parties] about what exactly Zunum claims are [its] trade secrets."  (5/1/24

15   Pretrial Hr'g Tr. (Dkt. # 594) at 27:3-7.)  The court rejected Zunum's proposed trade

16   secret descriptions, which consisted of more than "500 pages of definitions and

17   accompanying exhibits," because it was "too voluminous" to be helpful to the jury.

18   (5/14/24 Min. Order (Dkt. # 634) at 1-2.)  The court explained to the jurors that Exhibit

19   2000 was "the equivalent of a demonstrative" and instructed that they "should not take

20

21          [3] Because the parties rely on the court reporter's daily rough transcripts for their
     post-trial briefing, the court also cites the rough transcripts in this order.  (*See generally* Mot.;
     Resp.; Reply.)  The court notes, however, that the rough transcripts are not the definitive record

22   of the trial proceedings.

1   this exhibit to mean that Zunum possessed the information discussed therein, [or] that any

2   information therein constitutes a trade secret."  (5/17/24 Tr. (Rough) at 92:20-22,

3   94:14-22.)

4          Zunum's first witness was Mr. Knapp, whose testimony took the majority of the

5   trial day on May 17.  (*See id.* at 73:2-200:14.)  During that time, he briefly discussed

6   some, but not all, of Zunum's 19 alleged trade secrets ("ATSs"), the 2016 PIA, the 2017

7   IRL and Boeing's corresponding $5 million investment, and Zunum's attempts to secure

8   investments from UTAS and Safran.  (*See generally id.*)  Zunum called several Boeing

9   employees during its case-in-chief, primarily to discuss Boeing's relationship with

10  Zunum and Boeing's purported use of Zunum's "secret sauce."[4]  Zunum did not call its

11  first expert until May 22, the fifth day of trial.  That expert, Viswanath Tata, testified on

12  direct for approximately 42 minutes.  (*See* 5/22/24 Tr. (Rough) at 12:16-41:14.)  In that

13  time, he attempted to introduce the jury to seven alleged trade secrets, explain why those

14  trade secrets met the statutory definition of a trade secret, and describe Boeing's

15  purported use of Zunum's trade secret information.  (*See generally id.*)  Zunum's next

16  expert, Luiz Andrade, also attempted to discuss seven alleged trade secrets in just 42

17  minutes on direct.  (*See id.* at 132:7-154:6.)  Dr. Kumar's testimony began later on May

18  22 and stretched into the morning of May 23.  (*See id.* at 207:10-214:12; 5/23/24 Tr.

19  (Rough) at 8:21-63:23.)  During that time, he discussed the 2016 PIA, the 2017 IRL, and

20  //

21       [4] Boeing employee Steven Shumate wrote in a January 2017 email that he sensed Zunum
22  had a "secret sauce."  (Ex. 98 at 1.)  That phrase was repeated nearly 40 times over the course of
     the trial, including six times in Zunum's closing argument.

1  Zunum's relationships with UTAS and Safran.  (*See* 5/22/24 Tr. (Rough) at

2  207:10-214:12; 5/23/24 Tr. (Rough) at 8:21-63:23.)  Dr. Kumar did not discuss any

3  specific alleged trade secrets by number, but he did testify that Zunum kept its alleged

4  trade secret information confidential and was seeking $163 million in damages for "the

5  destruction of the company."  (5/23/24 Tr. (Rough) at 19:12-15, 62:5-9.)  Zunum spent

6  the rest of May 23 with another Boeing witness and called its final trade secret expert—

7  Donald Garvett—on May 24.  Zunum spent just 33 minutes examining Mr. Garvett on

8  direct regarding Zunum's final five alleged trade secrets.  (5/24/24 Tr. (Rough) at

9  29:8-50:19.)  Zunum had just enough time remaining of its original 19.5 hours to put on

10  its damages expert before resting later that day.  (*Id.* at 79:10-164:8.)  Zunum did not call

11  any witnesses from UTAS or Safran.

12      After Zunum rested, Boeing moved under Federal Rule of Civil Procedure 50(a)

13  for judgment as a matter of law on Zunum's claims.  (*See id.* at 196:21-197:4.)  With

14  respect to Zunum's claim for trade secret misappropriation, Boeing argued that Zunum

15  had failed to "identif[y] with the requisite specificity, what the trade secrets are" or

16  "identif[y] what specific elements of the trade secrets were already developed."  (*Id.* at

17  197:6-10.)  Boeing also argued that Zunum had failed to specify "what elements of these

18  trade secrets were valuable," "what elements of the trade secrets were not already made

19  public through [Zunum's] own disclosure," or what "was used by [Boeing]."  (*Id.* at

20  197:15-24.)

21      Boeing argued that Zunum's breach of contract claims likewise failed "for the

22  same reasons particularly given [Zunum] has identified that it is the same things that

1   underlie their trade secret claim that underlie their breach of contract claim[s]." (*Id.* at

2   198:4-8.)  Boeing also argued that Zunum failed to present evidence showing that

3   Boeing's "use of any purportedly confidential information . . . was unauthorized or

4   improper." (*Id.* at 198:9-13.)

5   　　　Finally, regarding tortious interference with Zunum's expectancies with UTAS

6   and Safran, Boeing argued that "the only evidence in the record is Zunum chose not to do

7   those deals.  Zunum thought the deals were bad, they thought the contracts were

8   egregious, they thought they were being taken advantage of.  In Zunum's own words[,]

9   they walked away from these deals." (*Id.* at 198:16-22.)  Boeing further argued that

10   "we've seen no paper about these deals, [and] no commitment from any of these

11   companies is in the record." (*Id.* at 198:25-199:1.)  The court reserved ruling on

12   Boeing's Rule 50(a) motion.

13   　　　The jury returned a mixed verdict, finding for Zunum on some claims and Boeing

14   on others. (*See generally* Verdict (Dkt. ## 684 (sealed), 685 (redacted)).)  The jury found

15   that Boeing had willfully misappropriated 11 of the 19 alleged trade secrets, breached the

16   2017 IRL, and tortiously interfered with Zunum's business expectancy with Safran. (*See*

17   *generally id.*)  The jury awarded Zunum $67.08 million for trade secret misappropriation

18   and breach of contract, $14.15 million for unjust enrichment as a result of the trade secret

19   misappropriation, and $11.56 million for tortious interference. (*Id.* at 5, 7, 9.)  The jury

20   also found, however, that Boeing had not breached the 2016 PIA or tortiously interfered

21   with Zunum's business expectancy with UTAS, and that Zunum had failed to mitigate

22   *//*

1   $20.82 million in damages.  (*Id.* at 6, 8, 10.)  Altogether, it was an electrifying win for

2   Zunum.

3          To ensure that it was fully briefed on all issues, the court permitted the parties to

4   file overlength briefs with respect to Boeing's renewed motion under Federal Rule of

5   Civil Procedure 50(b).  (*See* 6/7/24 Order (Dkt. # 691).)  Boeing's motion is now ripe for

6   review.

7                                  **III.    ANALYSIS**

8          The court provides the relevant legal standard before turning to Zunum's claims

9   for trade secret misappropriation, breach of contract, and tortious interference.

10  **A.    Rule 50(b) Legal Standard**

11         "Under Rule 50, a court should render judgment as a matter of law when 'a party

12  has been fully heard on an issue and there is no legally sufficient evidentiary basis for a

13  reasonable jury to find for that party on that issue.'"  *Reeves v. Sanderson Plumbing*

14  *Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  This is a "very

15  high" standard.  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).  The

16  jury's verdict "must be upheld if it is supported by substantial evidence," that is,

17  "evidence adequate to support the jury's conclusion, even if it is also possible to draw a

18  contrary conclusion from the same evidence."  *Johnson v. Paradise Valley Unified Sch.*

19  *Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).  In conducting its analysis, "the court should

20  review all of the evidence in the record," "draw[ing] all reasonable inferences in favor of

21  the nonmoving party, and it may not make credibility determinations or weigh the

22  evidence."  *Reeves*, 530 U.S. at 150; *see also Lakeside-Scott v. Multnomah Cnty.*, 556

1    F.3d 797, 802-03 (9th Cir. 2009) (noting that judgment as a matter of law "is appropriate

2    when the jury could have relied only on speculation to reach its verdict").  Ultimately,

3    "[t]he test is whether 'the evidence, construed in the light most favorable to the

4    nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary

5    to that of the jury.'"  *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016)

6    (quoting *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002)).

7         "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is

8    limited to the grounds asserted in the pre-deliberation Rule 50(a) motion."  *E.E.O.C. v.*

9    *Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *see also* Fed. R. Civ. P.

10   50(b) (governing renewed motions for judgment as a matter of law).  "Thus, a party

11   cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law

12   under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'"  *Id.* (quoting

13   *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

14   **B.    Trade Secret Misappropriation**

15        Boeing argues that it is entitled to judgment as a matter of law on Zunum's claim

16   for trade secret misappropriation because Zunum failed to:  (1) sufficiently identify its

17   alleged trade secrets; (2) provide substantial evidence that the alleged trade secrets were

18   valuable and not generally known or readily ascertainable; and (3) provide substantial

19   evidence that Boeing improperly used the alleged trade secrets.  (*See* Mot. at 9-25.)

20   Zunum counters that (1) it was not required to identify the alleged trade secrets "with

21   //

22   //

1  'particularity,'"[5] (2) regardless, it provided substantial evidence identifying the alleged

2  trade secrets, (3) its experts explained why the alleged trade secrets were novel and

3  valuable, and (4) direct and circumstantial evidence adequately supports the jury's

4  findings of misappropriation.  (Resp. at 1, 5, 9, 11-13.)  The court agrees with Boeing that

5  Zunum failed to identify any of its alleged trade secrets with sufficient particularity or

6  prove by substantial evidence that its alleged trade secrets derived value from not being

7  generally known to or readily ascertainable by others.  The court therefore does not

8  consider whether substantial evidence supports the jury's findings of misappropriation.

9  *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (finding that

10  a failure to "specifically identify the[] trade secrets" meant that the court could not

11  "determine whether [the defendant] ha[d] misappropriated any trade secrets").

12      1.    Trade Secret Standard

13      The first element of a trade secret misappropriation claim requires the plaintiff to

14  establish that it "possessed a trade secret."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*,

15  978 F.3d 653, 657 (9th Cir. 2020) (interpreting the federal Defend Trade Secrets Act

16  ("DTSA")); *see also Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp.,*

17  *PLLC*, No. C23-1239MJP, 2024 WL 381180, at *3 (W.D. Wash. Feb. 1, 2024) ("The

18  //

---

19      [5] Zunum also argues that Boeing waived its "particularity" argument because it

20  "requested an instruction in this vein pre-trial, but did not object that the final instructions omitted it."  (Resp. at 9.)  Such waiver, however, applies only to Boeing's "[c]hallenges to jury

21  instructions," *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018), and Boeing preserved this argument in its oral summary of its Rule 50(a) motion (*see* 5/24/24 Tr. (Rough) at

22  197:5-10 (arguing that Zunum failed to identify the alleged trade secrets "with the requisite specificity")).

1  elements of a DTSA and UTSA claim are substantially similar.")  A trade secret is any

2  information that "[d]erives independent economic value . . . from not being generally

3  known to, and not being readily ascertainable by proper means by, other persons" and

4  "[i]s the subject of efforts that are reasonable under the circumstances to maintain its

5  secrecy."  RCW 19.108.010(4).

6         In order for a factfinder to determine whether information meets the statutory

7  definition of a trade secret, the plaintiff must "describe the subject matter of the trade

8  secret with *sufficient particularity* to separate it from matters of general knowledge in the

9  trade or of special knowledge of those persons . . . skilled in the trade."  *InteliClear*, 978

10  F.3d at 658 (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir.

11  1998)).  Zunum argues that the "WUTSA does not require testimony identifying trade

12  secrets with 'particularity'" (Resp. at 9), but Washington courts are clear that trade secret

13  plaintiffs "must provide specific, concrete examples illustrating that the . . . information

14  meets the requirements for a trade secret" as part of their "burden of proving a trade

15  secret," *Belo Mgmt. Servs., Inc. v. Click! Network*, 343 P.3d 370, 375 (Wash. Ct. App.

16  2014).  This requirement makes sense; "[c]ourts and juries . . . require precision because

17  . . . the district court or trier of fact will not have the requisite expertise to define what the

18  plaintiff leaves abstract."  *InteliClear*, 978 F.3d at 658; *see also Barrett Bus. Servs., Inc.*

19  *v. Colmenero*, No. 1:22-CV-3122-TOR, 2023 WL 8935046, at *2 (E.D. Wash. Dec. 27,

20  2023) (noting, at summary judgment, that a plaintiff asserting trade secret claims under

21  Washington law "must describe the alleged unique, innovative, or novel information with

22  specificity").  A plaintiff's "fail[ure] to clearly identify the trade secret that it claims

1  [was] misappropriated" means that "no reasonable jury could find that [the plaintiff]

2  owned a trade secret, much less that [the defendant] misappropriated it." *Workplace*

3  *Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1159 (S.D. Cal.

4  Mar. 28, 2023) (interpreting the DTSA and California's Uniform Trade Secrets Act); *see*

5  *also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002) (interpreting

6  the Wisconsin Uniform Trade Secrets Act and affirming grant of summary judgment to

7  defendants because the plaintiff's trade secret descriptions were not "specific enough"

8  and failed to "separate the trade secrets from [any] other information").

9      2.    Alleged Trade Secret 1

10     Zunum alleged that ATS 1 "comprises certain design requirements and objectives

11 for hybrid-electric aircraft relating to three categories of information:  (1) range, speed,

12 payload, and economics; (2) aircraft; and (3) noise and runway."  (Ex. 2000 at 1.)

13     First, Zunum did not sufficiently identify ATS 1 at trial.  Mr. Knapp identified a

14 single slide from Exhibit 762 that reflected a "subset" of Zunum's design requirements

15 and objectives and noted that the remaining information related to ATS 1 "would be in

16 various places in our documents."  (5/17/24 Tr. (Rough) at 103:3-19, 105:24-106:04; *see*

17 Ex. 762, at 3.)  Zunum never identified those other documents.  Instead, its expert Mr.

18 Tata identified one slide of Exhibit 267 as "describ[ing] what the technical high level

19 specification or requirements are," including the number of seats and mileage range.

20 (5/22/24 Tr. (Rough) at 33:4-5; Ex. 267, at 16.)  After Boeing introduced an article

21 during Mr. Tata's cross-examination that publicly disclosed many of those design

22 requirements (*see* Ex. A-774), Zunum's attorney acknowledged outside of the jury's

1    presence that ATS 1 had "dozens of subparts" the jury was not aware of (5/22/24 Tr.

2    (Rough) at 64:6-8; *see id.* at 64:8-10 ("We have a misleading impression created that all

3    he analyzed and rendered his opinion on was seats, length, and that that was all

4    public.")).  Zunum simply failed to provide the jury with any means of reasonably

5    determining the metes and bounds of ATS 1.  Without knowing the extent of what ATS 1

6    did or did not encompass, the jury could not have reasonably found that ATS 1 was a

7    trade secret or that Boeing misappropriated it.

8         Second, Mr. Tata's conclusory testimony was insufficient to establish that ATS 1

9    derived value from not being generally known to or readily ascertainable by proper

10   means by other persons.  *See* RCW 19.108.010(4)(a).  Mr. Tata testified that, for each of

11   the alleged trade secrets he reviewed, he concluded that they "were novel, valuable, [and]

12   kept secret."  (5/22/24 Tr. (Rough) at 32:19-23.)  Mr. Tata did not explain how he

13   reached that conclusion with respect to ATS 1,[6] nor did he identify what portions of ATS

14   1 were secret.  (*See id.* at 32:24-33:13.)  And as Mr. Tata acknowledged during

15   cross-examination, many of the design requirements he discussed as part of ATS 1 were

16   disclosed in Zunum's public marketing materials.  (*Id.* at 52:11-56:2 (discussing number

17

18        [6] Mr. Tata briefly explained his "methodology" for determining whether each alleged
     trade secreted derived value from its secrecy, using ATS 3 as an example.  (5/22/24 Tr. (Rough)
19   at 21:12-16.)  Mr. Tata's "methodology," however, is simply the result of his "own experience"
     and possibly the result of research he "directed . . . to kind of survey what the industry was using
     during the relevant time period."  (*Id.* at 18:1-8.)  He also testified that he "looked . . . [at]
20   Boeing documentation . . . to understand what the Boeing technical experts thought of the
     novelty of [the alleged trade secrets]."  (*Id.* at 19:25-20:3.)  Mr. Tata did not, however, explain
21   how his experience informed his conclusions with respect to the other alleged trade secrets, what
     his supposed "survey" revealed concerning the technology comprising each alleged trade secret,
22   or what "Boeing documentation" supported his conclusions with respect to each alleged trade
     secret.

1    of seats, range and maximum cruise speed, runway information, landing distance, and

2    "numerous other performance figures for the Zunum aircraft concept").)  During redirect,

3    Mr. Tata testified that Zunum's marketing materials had "no impact whatsoever" on his

4    misappropriation analysis and emphasized that ATS 1 was "the specific technical

5    requirements which [are] used by an engineering organization as their instructions . . . to

6    design an airplane." (*Id.* at 71:11-19.)  Again, however, Mr. Tata never explained what

7    those "specific technical requirements" were or why they derived value from not being

8    generally known to or readily ascertainable by others.  (*See id.*)

9            Zunum argues that, under Federal Rule of Evidence 705, its "experts could 'state

10   [their] opinion—and give the reasons for it—without first testifying to the underlying

11   facts or data." (Resp. at 6 (quoting Fed. R. Evid. 705).)  The first issue with Zunum's

12   argument is that its experts failed to "give the reasons for" their opinions concerning

13   whether the alleged trade secrets met the statutory definition of a trade secret.  *See* Fed.

14   R. Evid. 705.  The second issue is that Rule 705 concerns the "manner of presenting

15   testimony at trial," not the sufficiency of that testimony to carry a party's burden of proof

16   on an issue.  Fed. R. Evid. 705 advisory committee's note to 1993 amendment; *see*

17   *United States v. Various Slot Machs. on Guam*, 658 F.2d 697, 700-01 (9th Cir. 1981)

18   (holding that conclusory expert statements were not "in themselves sufficient" under

19   Rule 705 to establish a genuine issue of material fact and noting that "an expert must

20   back up his opinion with specific facts"); *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470

21   (D.C. Cir. 1992) (noting that "the issue of admissibility of an expert's opinion under

22   Rules 703 and 705 is separate and distinct from the issue whether the testimony is

1   sufficient to withstand a motion for summary judgment under Rule 56"); *see also*

2   *McSherry v. City of Long Beach*, 423 F.3d 1015, 1020 (9th Cir. 2005) ("[T]he standard

3   for granting a motion for summary judgment is identical to that for granting a judgment

4   as a matter of law[.]").  Without citing Evidence Rule 705, other courts have held that

5   "[c]onclusory expert testimony does not qualify as substantial evidence."  *TQ Delta, LLC*

6   *v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019); *see also Sea Robin Pipeline Co.*

7   *v. Fed. Energy Regul. Comm'n*, 795 F.2d 182, 188 (D.C. Cir. 1986) ("[I]nordinate faith in

8   the conclusory assertions of an expert . . . cannot satisfy the requirement" of "substantial

9   evidence.").  Because Zunum failed to provide any non-conclusory testimony or other

10  evidence that ATS 1 derived value from not being generally known to or readily

11  ascertainable by proper means by other persons, it failed to provide substantial evidence

12  to support the jury's finding that ATS 1 was a trade secret.

13          In sum, because Zunum failed to properly identify ATS 1 or provide

14  non-conclusory testimony that ATS 1 derived value from not being generally known to or

15  readily ascertainable by proper means by other persons who could obtain economic value

16  from its use, substantial evidence does not support the jury's verdict with respect to ATS

17  1.

18          3.      Alleged Trade Secret 2

19          Zunum alleged that ATS 2 "comprises a compilation of data concerning the

20  components of hybrid-electric aircraft, as well as forecasts from that data.  The

21  component data concerns the following:  (1) batteries and battery packs; (2) range

22  //

1    extending generators; (3) other hybrid-electric powertrain components; and (4) aircraft."

2    (Ex. 2000 at 1.)

3            First, Zunum did not sufficiently identify ATS 2 at trial.  Similar to what he did for

4    ATS 1, Mr. Knapp identified a single slide of Exhibit 762 that he described as "a good

5    illustration of Trade Secret 2."  (5/17/24 Tr. (Rough) at 116:14-15; Ex. 762 at 36.)  It is

6    unclear, however, what aspects of that "illustration"—a slide titled "[w]eight validation

7    by major group"—Zunum claims comprise ATS 2.  (*See* Ex. 762 at 36.)  It is also unclear

8    what information comprising ATS 2 is missing from that slide.  For example, the slide

9    does not discuss range extending generators or other powertrain components.  (*See id.*)

10   Moreover, the bottom of the slide lists as its "[s]ource" a book titled "Roskam Airplane

11   Design Vol 1"—indicating the slide contains non-trade secret information from an

12   external source.  (*Id.*)  Mr. Tata described ATS 2 as "the compilation of important data

13   for key components" but never told the jury what those components are.  (5/22/24 Tr.

14   (Rough) at 33:20-22.)  He testified that his demonstratives contained "Zunum's

15   forecasted component data, which was their trade secret" (*id.* at 34:5-6), but those slides

16   only touched on battery data.  (*See id.* at 56:12-14, 57:13-15.)  Zunum's counsel later

17   clarified that Mr. Tata's "battery collection" slide "is not what Trade Secret 2 is."

18   (5/24/24 Tr. (Rough) at 230:1-5.)  Boeing's argument that Zunum "presented no evidence

19   at all pertaining to the second and third categories of information comprising" ATS 2 in

20   Exhibit 2000 goes unanswered (Mot. at 11.  *See generally* Resp.), and it is clear that

21   Zunum failed to inform the jury "what Trade Secret 2 is" during its expert's direct

22   examination (5/24/24 Tr. at 230:5).  Without knowing what ATS 2 did or did not

1   encompass, the jury could not have reasonably found that ATS 2 was a trade secret or

2   that Boeing misappropriated it.

3          Second, Mr. Tata's conclusory testimony was insufficient to establish that ATS 2

4   derived value from not being generally known to or readily ascertainable by proper

5   means by other persons.  *See* RCW 19.108.010(4)(a).  Mr. Tata's testimony that ATS 2

6   was "novel, valuable, [and] kept secret" falls short of substantial evidence.  (5/22/24 Tr.

7   (Rough) at 32:19-20.)  Mr. Tata did not explain how he reached that conclusion with

8   respect to ATS 2, nor did he identify what portions of ATS 2 were even secret.  (*See id.* at

9   33:18-34:10.)  Indeed, Mr. Tata testified that ATS 2 comprised "compilations of public

10  battery data" and that "[s]omebody . . . who has a deep familiarity with batteries . . .

11  could readily ascertain the datasets and the public sources containing the datasets that

12  Zunum compiled."  (*Id.* at 57:16-17, 58:24-59:9 (impeaching Mr. Tata with his

13  deposition testimony).)  Mr. Tata's testimony is at best conclusory and at worst

14  establishes that ATS 2 was readily ascertainable by those with the requisite skill.

15         Because Zunum failed to properly identify ATS 2 or provide non-conclusory

16  testimony that ATS 2 derived value from not being generally known to or readily

17  ascertainable by proper means by other persons who could obtain economic value from

18  its use, substantial evidence does not support the jury's verdict with respect to ATS 2.

19         4.     Alleged Trade Secret 5

20         Zunum alleged that ATS 5 "comprises the design specifications for Zunum's

21  ZA-10 aircraft."  (Ex. 2000 at 2.)

22  //

First, Zunum did not sufficiently identify ATS 5 at trial.  Mr. Knapp identified five

slides as "a good example of Trade Secret 5."  (5/17/24 Tr. (Rough) at 116:9-12; *see* Ex.

762 at 32-36.)  The slides contained information describing "the overall configuration

numbers on the TZ10," "weights by category," "[s]pecifics on the batteries," and "a

collection of data on other aircraft."  (5/17/24 Tr. (Rough) at 116:25, 117:7, 117:24,

118:3.)  There is no telling what else ATS 5 encompassed.  Mr. Tata testified that ATS 5

comprised "a number of key features" but only identified four such features and vaguely

noted that "[a] number of criteria are there."  (5/22/24 Tr. (Rough) at 37:2-5.)  It is

unclear what other "criteria" Mr. Tata was referring to; he testified on cross-examination

that "there were around 20 or so but . . . I'm not exactly precise."  (*Id.* at 70:23-71:5.)

The jury heard testimony that ATS 5 consists of an unspecified number of "key features"

and "criteria," some of which are located on five slides of an 84-page PowerPoint

presentation.  (Ex. 762 at 32-36.)  That testimony left ATS 5 ambiguous and failed to

"convey an understanding of its parameters."  *Workplace*, 664 F. Supp. 3d at 1159.

Without understanding ATS 5's scope, the jury could not have reasonably found that

ATS 5 was a trade secret or that Boeing misappropriated it.  *See InteliClear*, 978 F.3d at

658 (noting that the "trier of fact will not have the requisite expertise to define what the

plaintiff leaves abstract").

Second, Mr. Tata's conclusory testimony was insufficient to establish that ATS 5

derived value from not being generally known to or readily ascertainable by proper

means by other persons.  *See* RCW 19.108.010(4)(a).  Mr. Tata's testimony that ATS 5

was "novel, valuable, [and] kept secret" falls short of substantial evidence.  (5/22/24 Tr.

1  (Rough) at 32:19-20.)  Mr. Tata did not explain how he reached that conclusion with

2  respect to ATS 5, nor did he identify what portions of ATS 5 were even secret.[7]  (*See id.*

3  at 36:21-38:14; *see also id.* at 52:11-56:2 (identifying aspects of Zunum's aircraft design

4  in the public domain)); *IDX*, 285 F.3d at 584 (acknowledging that some "details" in the

5  plaintiff's description "may be genuine trade secrets" but affirming grant of summary

6  judgment to defendants because the plaintiff "ha[d] not tried to separate them from [the

7  non-secret] elements").

8           Because Zunum failed to properly identify ATS 5 or provide non-conclusory

9  testimony that ATS 5 derived value from not being generally known to or readily

10  ascertainable by proper means by other persons who could obtain economic value from

11  its use, substantial evidence does not support the jury's verdict with respect to ATS 5.

12           5.    Alleged Trade Secret 6

13           Zunum alleged that ATS 6 "comprises insights into the design of hybrid-electric

14  aircraft relating to the following:  (1) identification of design space; (2) aircraft and

15  powertrain configuration and sizing; (3) economics and market; and (4) ownership,

16  maintenance, and operating costs."  (Ex. 2000 at 2.)

17  //

18  //

19  _____

20           [7] In a footnote, Zunum points the court toward nearly three pages of Mr. Knapp's
testimony during which he purportedly described how Zunum developed ATS 5 and kept the
information secret.  (Resp. at 5-6 & n.17 (citing 5/17/24 Tr. (Rough) at 116:1-118:24).)  That

21  testimony, however, says nothing about whether the information comprising ATS 5 derived
value from not being readily ascertainable by others.  (*See id.* at 116:1-118:24.)  Indeed, in
discussing several specifications, such as weight and cargo load, Mr. Knapp testified that "a lot

22  of these are pretty standard."  (*Id.* at 117:1-4.)

1      First, Zunum did not sufficiently identify ATS 6 at trial.  Mr. Tata described ATS

2   6 as comprising certain "design insights" and identified "one key take away" concerning

3   an "all fuel" "reserve power scheme."  (5/22/24 Tr. (Rough) at 38:17-39:14.)  Although

4   Mr. Knapp did not mention ATS 6 during his testimony, Zunum argues that he

5   "described a number of the Zunum design insights constituting TS6."  (Resp. at 6.)

6   Zunum suggests that the jury was somehow supposed to know that Mr. Knapp was

7   referring to ATS 6 when he testified about "technical viability in early 2020s," "enter HE

8   market at regional lengths," "scale independence, ability to design smaller,

9   cost-competitive HE planes," and "design 10-seat plan[e]."  (*Id.* at 6 n.18.)  Those bursts

10  of testimony, unattached to ATS 6, fell well short of providing the "precision" the jury

11  "require[d]."  *InteliClear*, 978 F.3d at 658.  Simply put, Zunum failed to tell the jury what

12  "insights" ATS 6 comprises.  Without knowing what those insights were, the jury had no

13  means of reasonably determining whether ATS 6 was a trade secret or whether Boeing

14  misappropriated it.

15      Second, Mr. Tata's conclusory testimony was insufficient to establish that ATS 6

16  derived value from not being generally known to or readily ascertainable by proper

17  means by other persons.  *See* RCW 19.108.010(4)(a).  Mr. Tata's testimony that ATS 6

18  was "novel, valuable, [and] kept secret" falls short of substantial evidence.  (5/22/24 Tr.

19  (Rough) at 32:19-20.)  Mr. Tata did not explain how he reached that conclusion with

20  respect to ATS 6, nor did he identify what portions of ATS 6 were even secret.  (*See id.* at

21  38:17-39:14.)  With respect to the one example Mr. Tata gave, he testified that Boeing

22  "didn't really realize it should be all fuel" because "they thought probably some battery

1    or [hybrid] combination" (*id.* at 39:7-9), but that testimony says nothing about whether

2    others in the industry knew about Zunum's "all fuel" insight or whether it was readily

3    ascertainable by proper means by others who could obtain economic value from its

4    disclosure or use.

5         Because Zunum failed to properly identify ATS 6 or provide non-conclusory

6    testimony that ATS 6 derived value from not being generally known to or readily

7    ascertainable by proper means by other persons who could obtain economic value from

8    its use, substantial evidence does not support the jury's verdict with respect to ATS 6.

9              6.    Alleged Trade Secret 7

10        Zunum alleged that ATS 7 "comprises a design for a megawatt-class, 540-volt

11   hybrid powertrain targeted at a ten-seat commuter aircraft and scalable to 4 megawatts

12   for a fifty-seat regional aircraft." (Ex. 2000 at 3.)

13        First, Zunum did not sufficiently identify ATS 7 at trial.  Mr. Knapp identified a

14   single slide from Exhibit 648 that he "believe[d] . . . would be best related to Trade Secret

15   7." (5/17/24 Tr. (Rough) at 188:13-16.)  He testified that the slide contained "some very

16   detailed technical information on thermal management systems and electric power

17   distribution on a hybrid-electric aircraft." (*Id.* at 188:8-10; *see* Ex. 648 at 41.)  He further

18   testified that the slide depicted information concerning "an area that was new and

19   innovative." (5/17/24 Tr. (Rough) at 189:5-6.)  Mr. Knapp did not, however, explain

20   how any of the information depicted on that slide related to ATS 7's powertrain. (*See id.*

21   at 188:5-189:7.)  Zunum's expert Mr. Andrade did not provide the needed clarification.

22   He described ATS 7 as "a megawatt class hybrid powertrain system," stated that "a

1    megawatt is one million watts," and left his description at that.  (5/22/24 Tr. (Rough) at

2    139:9-11.)  Because Zunum failed to provide more than a cursory, surface-level

3    description of ATS 7, the jury had no means of reasonably determining whether ATS 7

4    was a trade secret or that Boeing misappropriated it.

5         Second, Mr. Andrade's testimony was insufficient to establish that ATS 7 derived

6    value from not being generally known to or readily ascertainable by proper means by

7    other persons.  *See* RCW 19.108.010(4)(a).  Mr. Andrade testified that ATS 7 was

8    "novel" because he "looked at the companies that were . . . doing[] proof of concept" and

9    "found that there was no one with this class of airplane that intended to actually make it

10   available for commercial use in the early to mid 20s."  (5/22/24 Tr. (Rough) at

11   139:13-140:3.)  All that suggests, however, is that others weren't doing it.  Mr. Andrade's

12   analysis is not probative as to whether ATS 7 was generally known or readily

13   ascertainable.  Mr. Andrade further testified that Boeing engineers recognized that

14   Zunum "ha[d] IP in motors" and "powertrain optimization" that Boeing "currently" did

15   not have, but again, that testimony says nothing about whether the information was

16   readily ascertainable.  (*Id.* at 141:1-6.)  Indeed, Mr. Andrade agreed during

17   cross-examination that "anybody knowledgeable in the art would be able to come up with

18   the idea of designing a one megawatt powertrain that contains components tailored to the

19   FAA's 540-volt certification," though not "immediately."  (*Id.* at 159:7-10, 13-14,

20   18-22.)  Moreover, Zunum fails to respond to Boeing's argument that "Zunum disclosed

21   this very information about its powertrain publicly in October 2017."  (Mot. at 17 (citing

22   Ex. A-1225 at 2 (article disclosing that Zunum's aircraft would use a "1-megawatt-class

1    series hybrid-electric propulsion system with a 500-kW-class turbogenerator")).  *See*

2    *generally* Resp.)  Zunum fell well short of providing substantial evidence that ATS 7

3    derived value from not being generally known or readily ascertainable by proper means

4    by others who could obtain economic value from its disclosure or use.

5          Because Zunum failed to properly identify ATS 7 or provide evidence that ATS 7

6    derived value from not being generally known to or readily ascertainable by proper

7    means by other persons who could obtain economic value from its use, substantial

8    evidence does not support the jury's verdict with respect to ATS 7.

9          7.    Alleged Trade Secret 9

10          Zunum alleged that ATS 9 "comprises a hybrid powertrain system controller for a

11    series hybrid powertrain that interfaces to higher-level flight and aircraft management

12    systems and that commands all subsystems of the powertrain."  (Ex. 2000 at 3.)

13          First, Zunum did not sufficiently identify ATS 9 at trial.  The sole Zunum witness

14    who discussed ATS 9, Mr. Andrade, identified it as "the hybrid powertrain system

15    controller" and provided "a high level representation" of the "very sophisticated

16    algorithms" needed for the controller to work.  (5/22/24 Tr. (Rough) at 148:13-22; *see*

17    Ex. 641 at 60.)  In general terms, Mr. Andrade described what a system controller does,

18    but he failed to identify anything unique about Zunum's hybrid powertrain system

19    controller.  (*See* 5/22/24 Tr. (Rough) at 148:13-19.)  Without that information, the jury

20    had no means of reasonably determining whether ATS 9 was a trade secret or whether

21    Boeing misappropriated it.

22    //

1    Second, Zunum's claim of misappropriation of ATS 9 likewise fails because Mr.

2    Andrade's conclusory testimony was insufficient to establish that ATS 9 derived value

3    from not being generally known to or readily ascertainable by proper means by other

4    persons.  *See* RCW 19.108.010(4)(a).  Mr. Andrade testified that he applied the "same

5    methodology" from his "analysis" of ATS 7 to "all of the trade secrets" and  concluded

6    "as to all of the powertrain trade secrets . . . [t]hat they were novel" and "that they really

7    derived value from being kept secret."  (5/22/24 Tr. (Rough) at 153:21-154:4.)  As noted

8    above, however, Mr. Andrade's "analysis" was not probative of whether Zunum's alleged

9    trade secrets were readily ascertainable.  Moreover, Mr. Andrade failed to explain how he

10   applied that methodology to ATS 9, what about ATS 9 was "novel," or why ATS 9 was

11   valuable.  (*See id.* at 148:11-149:8.)  Mr. Andrade's conclusory assertion that ATS 9

12   "really derived value from being kept secret" is insufficient to sustain the jury's verdict.

13   (*Id.* at 154:3-4); *see TQ Delta*, 942 F.3d at 1358.

14   Because Zunum failed to properly identify ATS 9 or provide evidence that ATS 9

15   derived value from not being generally known to or readily ascertainable by proper

16   means by other persons who could obtain economic value from its use, substantial

17   evidence does not support the jury's verdict with respect to ATS 9.

18       8.   Alleged Trade Secret 10

19   Zunum alleged that ATS 10 "comprises a motor controller system to power the

20   propulsion motors in a megawatt-scale aircraft.  The motor controller system includes a

21   controller and three inverters."  (Ex. 2000 at 4.)

22   *//*

1          First, Zunum did not sufficiently identify ATS 10 at trial.  The sole Zunum witness

2    who discussed ATS 10, Mr. Andrade, identified it as "the motor controller system" and

3    "the various components in there."  (5/22/24 Tr. (Rough) at 151:2-17.)  Just as he did for

4    ATS 9, Mr. Andrade described in general terms what a motor controller system does, but

5    he failed to comment on Zunum's motor controller system or identify the various

6    "components" comprising it.  Without that information, the jury had no means of

7    reasonably determining whether ATS 10 was a trade secret or that Boeing

8    misappropriated it.

9          Second, Zunum's claim of misappropriation of ATS 10 likewise fails because Mr.

10   Andrade's conclusory testimony was insufficient to establish that ATS 10 derived value

11   from not being generally known to or readily ascertainable by proper means by other

12   persons.  *See* RCW 19.108.010(4)(a).  Mr. Andrade's testimony on direct concerning

13   ATS 10's value and novelty was no different from his testimony concerning ATS 9 and is

14   insufficient for the same reasons.  Mr. Andrade's testimony during cross-examination

15   that Zunum's motor controller system was "very unique" is likewise conclusory; Mr.

16   Andrade simply failed to tell the jury what about ATS 10 was unique.  (5/22/24 Tr.

17   (Rough) at 173:5.)  His testimony is therefore insufficient to sustain the jury's verdict

18   with respect to ATS 10.

19         Because Zunum failed to properly identify ATS 10 or provide evidence that ATS

20   10 derived value from not being generally known to or readily ascertainable by proper

21   means by other persons who could obtain economic value from its use, substantial

22   evidence does not support the jury's verdict with respect to ATS 10.

1        9.    <u>Alleged Trade Secret 11</u>

2        Zunum alleged that ATS 11 "comprises certain sizing and operational

3  requirements for a range extender for a megawatt-class hybrid powertrain." (Ex. 2000 at

4  4.)

5        First, Zunum did not sufficiently identify ATS 11 at trial. Mr. Knapp described

6  ATS 11 as "a description of all the ways that you could generate power for the

7  hybrid-electric, the generation part of the hybrid powertrain." (5/17/24 Tr. (Rough) at

8  151:21-23.) The technologies "could be a diesel engine" or "it could also be a fuel set

9  which is producing power from hydrogen." (*Id.* at 151:24-152:2.) He further testified

10  that ATS 11 was "different than what others were doing" because Zunum was "looking at

11  an airplane that could fly higher [and] fly faster and we settled on realizing that a

12  helicopter turbine was really the best tool for the job." (*Id.* at 152:8-15.) Mr. Knapp also

13  identified several images on a slide as "relevant to" ATS 11. (*Id.* at 152:24-153:1; *see*

14  Ex. 426, at 26.) He pointed to "a generic picture" of a helicopter turbine, a "picture of the

15  real airplane," and schematics showing the "powertrain architecture." (5/17/24 Tr.

16  (Rough) at 153:2-12.) Throughout his testimony, Mr. Knapp did not identify any sizing

17  or operational requirements or explain how Zunum's proposed range extender differed

18  from a "generic" turbine. (*See id.* at 153:5.)

19        Mr. Andrade's testimony did not provide the needed clarification. Mr. Andrade

20  identified ATS 11 by its "title," which he noted "says hybrid powertrain range extender."

21  (5/22/24 Tr. (Rough) at 151:23-25.) He described ATS 11 as "the way that Zunum

22  developed it and the application of this within the entire system" and noted that the trade

1    secret encompasses "how it's going to operate," "how you would actually share power

2    between batteries and the range extender, and what conditions the range extender would

3    work." (*Id.* at 152:1-7.)  Mr. Andrade did not, however, provide any further explanation.

4    The jury heard no testimony explaining how the range extender operated, how power was

5    shared between the batteries and range extender, or the conditions under which the range

6    extender would function.  (*See id.*)  Because Mr. Knapp and Mr. Andrade failed to

7    identify the sizing and operational requirements comprising ATS 11, the jury had no

8    means of reasonably determining whether ATS 11 was a trade secret or that Boeing

9    misappropriated it.

10          Second, Zunum's claim of misappropriation of ATS 11 likewise fails because Mr.

11   Andrade's conclusory testimony was insufficient to establish that ATS 11 derived value

12   from not being generally known to or readily ascertainable by proper means by other

13   persons.  *See* RCW 19.108.010(4)(a).  Mr. Andrade's testimony on direct concerning

14   ATS 11's value and novelty was no different from his testimony concerning ATS 9 and is

15   insufficient for the same reasons.  Moreover, Mr. Andrade testified that a "hybrid

16   powertrain range extender" was "not a new concept," and he failed to identify what, if

17   anything, was "new" about ATS 11.  (5/22/24 Tr. (Rough) at 151:24-152:7.)  Zunum

18   points the court toward Exhibit 509, but that exhibit is nothing more than a three-page

19   draft of "a common data worksheet," which the author described as "a first shot,"

20   "high[-]level" overview, describing "the what/when, vs the how from an IP sensitivity

21   standpoint."  (Ex. 509 at 1.)  Although Zunum generally refers the court to this exhibit

22   //

1    (Resp. at 5 n.13), it does not cite any particular text therein in support of ATS 11's

2    novelty or value (*see id.*), and the court finds none.

3          Because Zunum failed to properly identify ATS 11 or provide evidence that ATS

4    11 derived value from not being generally known to or readily ascertainable by proper

5    means by other persons who could obtain economic value from its use, substantial

6    evidence does not support the jury's verdict with respect to ATS 11.

7          10.    Alleged Trade Secret 12

8          Zunum alleged that ATS 12 "comprises a multi-step method to 'flow down' the

9    overarching requirements for a hybrid-electric aircraft to identify the specific

10   requirements for each of the aircraft's lower-level systems, subsystems, and individual

11   devices."  (Ex. 2000 at 4.)

12         First, Zunum did not sufficiently identify ATS 12 at trial.  Mr. Knapp described

13   ATS 12 as "a method of flowing down requirements to the component and subcomponent

14   level using full aircraft, full mission simulation and optimization."  (5/17/24 Tr. (Rough)

15   at 110:13-15.)  He further testified that Zunum "had to develop this method" to address

16   unspecified shortcomings in the prior art because "classical flow down was insufficient to

17   size the components of a hybrid powertrain."  (*Id.* at 110:15-20.)  Looking at a slide

18   "simulating an airplane in cruise, over a mission of 500 miles[,] . . . a range of speeds,

19   and a range of amount of generation power, and a range of battery sizes," Mr. Knapp

20   testified that Zunum "would use the [flow-down] method to finalize how much battery[,]

21   how much generation within the generation[, and] how much combustion engine power

22   versus how much actual motor generator power."  (*Id.* at 111:16-117:4; *see* Ex. 762 at

15.)  Mr. Knapp did not, however, explain any step of this flow-down method or describe how it differed from "classical" methods.  (*See* 5/17/24 Tr. (Rough) at 110:7-112:4.) Zunum's counsel recognized this, later arguing that Mr. Knapp's "summary" testimony was "not what Trade Secret 12 is." (5/24/24 Tr. (Rough) at 230:19-231:6.)

Mr. Andrade similarly failed to describe ATS 12 as anything more than "the method for the flow-down requirements." (5/22/24 Tr. (Rough) at 152:20-21.)  He testified that ATS 12 was "how you flow [various] requirements," but again, failed to explain with any level of precision what Zunum's method was or how it differed from standard flow-down methods.  (*See id.* at 153:5-7.)  Without knowing what Zunum's flow-down method was, the jury had no means of reasonably determining whether ATS 12 was a trade secret or that Boeing misappropriated it.

Second, Zunum's claim of misappropriation of ATS 12 likewise fails because Mr. Andrade's conclusory testimony was insufficient to establish that ATS 12 derived value from not being generally known to or readily ascertainable by proper means by other persons.  *See* RCW 19.108.010(4)(a).  Mr. Andrade's testimony on direct concerning ATS 12's value and novelty was no different from his testimony concerning ATS 9 and is insufficient for the same reasons.

Because Zunum failed to properly identify ATS 12 or provide evidence that ATS 12 derived value from not being generally known to or readily ascertainable by proper means by other persons who could obtain economic value from its use, substantial evidence does not support the jury's verdict with respect to ATS 12.

//

1        11.    Alleged Trade Secret 13

2        Zunum alleged that ATS 13 "comprises using the 'flow-down' method of [ATS]

3    12 to obtain the specific requirements for key subsystems and components of the

4    powertrain for Zunum's ZA-10, 1 megawatt aircraft."  (Ex. 2000 at 4.)

5        First, ATS 13 requires "using" ATS 12, and, as stated above, substantial evidence

6    does not support the jury's finding that Boeing misappropriated ATS 12.

7        Second, Zunum did not sufficiently identify ATS 13 at trial.  The sole Zunum

8    witness who discussed ATS 13, Mr. Andrade, identified it as "a set of those requirements

9    that the engineers will work on to be able to design the airplane." (5/22/24 Tr. (Rough) at

10   153:8-9.)  Neither Mr. Andrade nor any other Zunum witness explained what those

11   "requirements" are.  (*See id.*)  Notably, Zunum does not dispute that this "single

12   sentence" is the "sole evidence Zunum offered" with respect to ATS 13.  (Mot. at 32.  *See*

13   *generally* Resp.)  The court was unable to locate any additional testimony from Mr.

14   Knapp or Zunum's other witnesses concerning ATS 13.  With no understanding of what

15   ATS 13's "requirements" were, the jury had no means of reasonably determining whether

16   ATS 13 was a trade secret or that Boeing misappropriated it.

17       Third, Zunum's claim of misappropriation of ATS 13 fails because Mr. Andrade's

18   conclusory testimony was insufficient to establish that ATS 13 derived value from not

19   being generally known to or readily ascertainable by proper means by other persons.  *See*

20   RCW 19.108.010(4)(a).  Mr. Andrade's testimony on direct concerning ATS 13's value

21   and novelty was no different from his testimony concerning ATS 9 and is insufficient for

22   the same reasons.

1       Because Zunum failed to provide substantial evidence supporting its claim that

2  Boeing misappropriated ATS 12, properly identify ATS 13, or provide evidence that ATS

3  13 derived value from not being generally known to or readily ascertainable by proper

4  means by other persons who could obtain economic value from its use, substantial

5  evidence does not support the jury's verdict with respect to ATS 13.

6          12.    Alleged Trade Secret 19

7       Zunum alleged that ATS 19 "comprises a hybrid-electric aircraft and hybrid

8  powertrain development and production plan for market entry in the 2020s."  (Ex. 2000 at

9  6.)

10      First, Zunum did not sufficiently identify ATS 19 at trial.  Using one slide from an

11  exhibit, Mr. Knapp described "part of the commercialization plan, meaning a sequence, a

12  timeline, and additional parts of the commercialization plan[,] . . . for example, costs, or

13  estimated costs."  (5/17/24 Tr. (Rough) at 140:3-8; *see* Ex. 262 at 8.)  He acknowledged

14  that the slide was "an overview" and that Zunum's commercialization plan "went into

15  much, much greater levels of detail from here."  (5/17/24 Tr. (Rough) at 140:6-8.)  Mr.

16  Knapp identified one additional slide from a separate exhibit, which he testified "relate[d]

17  to" Zunum's commercialization plan and "show[ed] we had a very concrete plan down to

18  the details of which prototype would be assembled when we had matching budgets to go

19  with it."  (*Id.* at 185:21-186:9; *see* Ex. 648 at 39.)  Mr. Knapp did not explain what else

20  ATS 19 encompassed (*see* 5/17/24 Tr. (Rough) at 185:21-186:9), despite testifying

21  earlier that ATS 19 comprised a "comprehensive full stack integrated schedule" (*id.* at

22  140:23-24).  Zunum's expert Mr. Garvett failed to provide the additional details.  Mr.

1    Garvett identified ATS 19 simply as the "commercialization plan" or "business plan" to

2    "help ensure dealing with new types of aircraft technology, achieving them on a timely

3    basis and also achieving them in a viable cost." (5/24/24 Tr. (Rough) at 36:3-8.)

4    Without understanding ATS 19's scope, the jury could not have reasonably found that

5    ATS 19 was a trade secret or that Boeing misappropriated it.

6         Second, Zunum's claim of misappropriation of ATS 19 likewise fails because Mr.

7    Garvett's and Mr. Knapp's testimony was insufficient to establish that ATS 19 derived

8    value from not being generally known to or readily ascertainable by proper means by

9    other persons. *See* RCW 19.108.010(4)(a). Mr. Garvett testified that ATS 19 embraced

10   an approach that was "different from the past, because in the past, airframe manufacturers

11   never had engine development occurring at the same time." (5/24/24 Tr. (Rough) at

12   49:22-24.) Mr. Garvett makes the same mistake as Mr. Andrade—a trade secret must do

13   more than simply differ from the prior art; it must derive value from not being generally

14   known to or readily ascertainable by others. *See* RCW 19.108.010(4)(a). Mr. Garvett

15   failed to explain why ATS 19 was not generally known or readily ascertainable. (*See*

16   5/24/24 Tr. (Rough) at 49:18-50:5.) Moreover, Mr. Garvett's conclusory testimony that

17   he found Zunum's commercialization plan to be "fast, rapid, [and] resulting in lower

18   costs" is insufficient to establish that ATS 19 was valuable. (*Id.* at 49:25-50:1.)

19        Mr. Knapp's testimony cannot save ATS 19. Mr. Knapp testified that certain

20   "components and subsets" of Zunum's commercialization plan were confidential while

21   acknowledging that other aspects of the timeline, such as Zunum's 2022 aircraft target

22   date, were public. (5/17/24 Tr. (Rough) at 141:5-9.) Neither Mr. Knapp nor Mr. Garvett,

however, ever explained what those confidential "components and subsets" were or why
they were not readily ascertainable.

Because Zunum failed to properly identify ATS 19 or provide evidence that ATS
19 derived value from not being generally known to or readily ascertainable by proper
means by other persons who could obtain economic value from its use, substantial
evidence does not support the jury's verdict with respect to ATS 19.

In sum, Zunum's trade secret misappropriation claim fails as a matter of law for
two independent reasons.  First, Zunum failed to tell the jury what its trade secrets were.
The jury "require[d] precision," and Zunum did not provide it.  *See InteliClear*, 978 F.3d
at 658.  Zunum argues that it "was not required to recite its pleadings and claims to the
jury in lengthy dissertations" (Resp. at 11), but that is a straw man.  Clarity does not
require a tome.  It does, however, require the plaintiff to take the time to "separate [its]
trade secrets from the other information" known to or ascertainable by the industry.  *IDX*,
285 F.3d at 584.  Having offered only vague and amorphous descriptions of its alleged
trade secrets throughout trial, Zunum fell well short providing the "specific, concrete
examples" the jury needed to determine whether the alleged trade secrets were in fact
trade secrets.  *Belo*, 343 P.3d at 375.

Second, Zunum failed to offer more than conclusory testimony that its alleged
trade secrets met the statutory definition of a trade secret.  The court rejects Zunum's
argument that Rule 705 somehow transforms conclusory expert testimony into substantial
evidence.  Having offered nothing but bare, conclusory assertions that the alleged trade
secrets derived value from not being generally known to or readily ascertainable by

1   others, Zunum failed to provide substantial evidence that any of the alleged trade secrets

2   were in fact trade secrets.

3        Accordingly, the court GRANTS Boeing's motion for judgment as a matter of law

4   on Zunum's claim for trade secret misappropriation under the WUTSA.  This claim is

5   DISMISSED with prejudice.

6   **C.    Breach of Contract**

7        The court next considers whether Boeing is entitled to judgment as a matter of law

8   on Zunum's claim for breach of the 2017 IRL.  Boeing argues that substantial evidence

9   does not support the jury's finding of breach of the 2017 IRL because Zunum failed to

10  establish that (1) it disclosed information to Boeing that was protected under the 2017

11  IRL; (2) Boeing's use of any information was unauthorized under the 2017 IRL; or (3)

12  that Boeing's alleged breach harmed Zunum.  (Mot. at 35-38.)  Zunum counters that

13  substantial evidence supports a finding that Boeing made extensive use of confidential

14  information in violation of the 2017 IRL and that Boeing's breach of contract harmed

15  Zunum.  (Resp. at 40-42.)  Although the court concludes that substantial evidence

16  supports a finding that Zunum shared confidential information governed by the 2017 IRL

17  with Boeing, the court agrees with Boeing that Zunum failed to provide substantial

18  evidence that its use of any such information was unauthorized or that Boeing's alleged

19  breach injured Zunum.

20       1.    Breach of Contract Standard

21       "[P]laintiffs must establish the following three elements to succeed on a breach of

22  contract claim:  (1) the existence of a contract, whether express or implied; (2) breach of

1    one or more of the contract's obligations; and (3) damages resulting from the breach."

2    *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022).[8]  To satisfy the third

3    element, the plaintiff "must demonstrate with reasonable certainty that defendant's

4    breach caused the loss."  *LaPoint v. AmerisourceBergen Corp.*, No. Civ.A. 327-CC, 2007

5    WL 1309398, at *7 (Del. Ch. May 1, 2007) (quoting *Tanner v. Exxon Corp.*, No.

6    79C-JA-5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981)).  In other words, the

7    plaintiff must "tak[e] the causation of damages out of the area of speculation."  *Id.*

8         2.    Disclosure of Confidential Information

9         Boeing argues that substantial evidence does not support a finding Zunum sent it

10   information protected under the 2017 IRL for two reasons:  (1) the alleged trade secrets

11   "are the only information Zunum claimed Boeing misused to breach" the 2017 IRL and,

12   "[a]t trial, Zunum identified only two slides relating to the ATSs it disclosed under the

13   [2017] IRL"; and (2) even if the court considers information unrelated to the alleged trade

14   secrets, "no evidence shows that this other 'information' was confidential."  (Reply at

15   18-19.)  Zunum responds that (1) "Boeing's challenge to the trade-secret verdict" has "no

16   bearing on the IRL verdict"; and (2) "[t]he evidence of Boeing's access to [confidential]

17   IRL information was plentiful, not limited to 'just two slides.'"  (Resp. at 15, 41.)  The

18   court considers the parties' arguments below.

19        As an initial matter, the court agrees with Zunum that Boeing could have breached

20   the 2017 IRL even if it did not misappropriate the alleged trade secrets.  (*See* 4/22/24

21   //

22        ─────────────
     [8]  Delaware law governs the 2017 IRL.  (Ex. 402 at 5.)

1    Order at 18 ("Boeing could have breached [the IRL] even if the jury finds that the

2    Alleged Trade Secrets are not in fact secrets." (citing *Rent Info. Tech., Inc. v. Home*

3    *Depot U.S.A., Inc.*, 268 F. App'x 555, 557-58 (9th Cir. 2008))).)[9]  The court must next

4    determine whether Zunum presented substantial evidence at trial that it shared

5    confidential information with Boeing.

6         Substantial evidence supports a finding that Zunum shared with Boeing

7    information that was confidential under the 2017 IRL, even if that information did not

8    comprise trade secrets.  (*See* Resp. at 15-18.)  For example, Mr. Knapp testified that

9    "[o]ne of the main ways" Zunum shared its proprietary information with Boeing was

10   through quarterly board meetings, which Boeing employee Logan Jones attended.

11   (5/17/24 Tr. (Rough) at 136:17-137:4, 22-23.)  Other examples concern technical

12   information Zunum shared with Pradeep Fernandes at Boeing.  (*See generally* Ex.

13   A-1532; A-1755.  *See* 5/20/24 Tr. (Rough) at 243:2-245:5 (discussing Mr. Fernandes's

14   role as technical advisor to Zunum and Boeing's receipt of Zunum intellectual property).)

15   //

16

17   ⁹ Boeing cites two exhibits in support of its argument that Zunum's breach of contract
     claim "was co-extensive with its misappropriation claim."  (Mot. at 33.)  The first exhibit is the
18   transcript of the March 25, 2024 *Daubert* hearing, during which Zunum's counsel stated that "the
     breach of contract is the 'mis' in misuse."  (6/13/24 Fursevich Decl. (Dkt. # 696) ¶ 9, Ex. H at
19   72:16-17.)  The second exhibit is a January 18, 2024 email from Zunum's counsel to Boeing's
     counsel, in which Zunum's counsel represented that "Zunum limits its claims concerning use of
20   information in violation of the parties' contracts to the universe of information described as
     constituting Zunum's Trade Secrets."  (2/29/24 Fursevich Decl. (Dkt. # 363) ¶ 91.)  The court
21   does not interpret these exhibits to mean that Zunum agreed to relinquish its breach of contract
     claims if it failed to prevail on its trade secret misappropriation claim.  Regardless, these exhibits
22   predate the April 22, 2024 summary judgment order cited above, meaning Boeing's assertion
     that this "new breach theory" was "unknown" to Boeing at the time of trial is incorrect.  (Reply
     at 20 n.12.)

1    Thus, Zunum established by substantial evidence that it shared confidential information

2    with Boeing under the 2017 IRL.

3         3.    Unauthorized Use of Information

4         Next, Boeing argues that "Zunum failed to establish that Boeing used the

5    information for a non-permitted purpose." (Mot. at 37 (capitalization altered).) Zunum

6    argues substantial evidence demonstrates that Boeing made unauthorized use of Zunum's

7    information through various programs or ventures associated with Boeing:  the alleged

8    CAPE assessment ("CAPE"), Thin Haul Study, Electric Lab, and Electra startup. (Resp.

9    at 18-23.) The court considers each in turn.

10             i.  CAPE

11        Zunum argues that substantial evidence supports a finding that Boeing, through

12   CAPE, "engage[d] in industrial espionage and hostile competitive intelligence." (*Id.* at

13   18.) Zunum makes three arguments in support of this theory:  (1) the CAPE team, led by

14   Kevin Gosling, "discussed Zunum 'Data Acquisition'" two weeks before Boeing

15   conducted a December 12, 2017 "competitive assessment" of Zunum; (2) Dr. Kamiar

16   Karimi "invited Gosling . . . to the [December 12] meeting"; and (3) the "CAPE deck

17   itself says" that "Boeing used IRL information learned" during the [December 12]

18   meeting for its "competitive assessment." (*Id.*)  Boeing responds that Zunum dismisses

19   key "evidentiary gaps" and that its arguments are based on speculation. (Reply at 8.)

20   The court agrees with Boeing.

21        First, the only evidence Zunum cites regarding improper "data acquisition" is a

22   single slide with the words "data acquisition" on it. (*See* Ex. 455 at 35. *See generally*

1   Resp.)  There is no basis to conclude that this slide was referring to acquisition of data

2   from Zunum, let alone the acquisition of information disclosed under the 2017 IRL.

3   Moreover, Zunum fails to provide any evidence that Mr. Gosling actually acquired any

4   information from Zunum, which makes Zunum's cited case distinguishable.  *See Brocade*

5   *Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1216 (N.D. Cal. 2012)

6   (describing findings of a "forensic expert" who determined that defendants used their

7   computers "to access and copy [the plaintiff's] source code files" and "deleted related

8   files [including over 54,000 source code files] in a manner consistent with an effort to

9   cover their tracks").

10        Second, Zunum cites a message from Hubert Wong saying that he thought it was

11   not "a good idea" to have Mr. Gosling attend the December 12, 2017 meeting (*see* Ex.

12   404; Resp. at 18), but Zunum cites no evidence showing that Mr. Gosling actually

13   attended that meeting, received any information shared under the 2017 IRL, or made

14   unauthorized use of any Zunum information (*see generally* Resp.).

15        Third, Zunum misrepresents the "CAPE deck" evidence.  The slides to which

16   Zunum directs the court do not "say[]" that Boeing used information protected under the

17   2017 IRL in a "competitive assessment" of Zunum.  (*Id.* at 18; *see* Ex. 455 at 32-39.)

18   Nor could they; the presentation is dated January 8th, 2017 (Ex. 455 at 32), two months

19   before Zunum and Boeing executed the 2017 IRL.  Regardless, the only mention of a

20   "competitive assessment" during trial occurred when Zunum solicited testimony from

21   //

22   //

1    Hubert Wong about what the first two letters in the CAPE acronym stood for.[10]  (*See*

2    5/22/24 Tr. (Rough) at 127:3-4.)  The slide deck at issue is titled "Unconventional

3    Aircraft Evaluation:  Zunum and Airbus Electric, Hybrid-Electric and Autonomous Air

4    Vehicle ***Assessments and Claims Evaluation***."  (Ex. 455 at 32 (emphasis added).)  The

5    slides do not mention a "***competitive*** assessment."  (*See id.* at 32-39.)  The slide deck

6    refers to "Data sharing/Eval," "Zunum Claims," and "Methods, Processes and Tools."

7    (*Id.* at 33, 35.)  None of the emails attached to Exhibit 455 mention a "competitive

8    assessment" of Zunum, either.  (*See generally id.*)  Rather, an email from Mr. Gosling

9    explains that "[w]e've been asked to help evaluate the Zunum hybrid-electric airplane

10   concept" and "need to understand what Boeing collectively has in the way of an airplane

11   definition to form the basis of the evaluation."  (*Id.* at 3.)  Evidence that Boeing was

12   assessing Zunum's claims is a far cry from evidence that Boeing conducted a competitive

13   assessment akin to "industrial espionage."  (Resp. at 18.)

14          Simply put, Zunum fails to cite evidence creating a non-speculative inference that

15   Boeing improperly used any information disclosed under the 2017 IRL in an alleged

16   "competitive assessment" of Zunum.  Substantial evidence does not support Zunum's

17   convoluted theory that Mr. Gosling, operating under the guise of evaluating Zunum's

18   claims, actually gathered information protected under the 2017 IRL to form a competitive

19   assessment of Zunum.

20   //

21   //

22   _____

[10]  The court is still unsure what the "PE" in CAPE stands for.

1              *ii. Thin Haul Study*

2         Zunum argues that "ample evidence" supports a finding that Boeing

3    misappropriated information governed by the 2017 IRL while conducting its Thin Haul

4    Study.  (Resp. at 20-22.)  Boeing denies that Zunum presented any evidence that Boeing

5    misused Zunum's confidential information during the Thin Haul Study.  (*See* Reply at 9.)

6    The court agrees with Boeing.

7         Zunum's first bit of "ample evidence" is the spreadsheet attached to Exhibit

8    A-1258, specifically Kevin Lutke's and Marty Bradley's comments, which Zunum argues

9    "reflect an intent to use Zunum's information for continued R&D."  (Resp. at 20.)

10   Zunum mischaracterizes the evidence, stripping necessary context and omitting

11   inconvenient portions.  Zunum argues that Mr. Bradley suggested "us[ing] Zunum's

12   'white paper / memo' to 'convince [Boeing's] propulsion & maintenance SME's that

13   there is an opportunity in engine and aircraft maintenance."  (Resp. at 21 (citing Ex.

14   A-1258).)  That is not what Mr. Bradley wrote.  Mr. Bradley wrote that Boeing "need[s] a

15   story to convince our propulsion & maintenance SME's that there is an opportunity in

16   engine and aircraft maintenance that is not just cycle based" and that "Zunum ***could give***

17   ***us that story*** in a white paper / memo."  (Ex. A-1258 (emphasis added).)  Zunum

18   provided no evidence that Boeing ever asked for or received that white paper or memo.

19   (*See generally* Resp. (citing two unrelated white papers from months prior to Mr.

20   Bradley's comment).)  Zunum likewise removes critical context from Mr. Lutke's

21   comments.  For example, Zunum says that Mr. Lutke recommended performing "a 'side

22   by side' analysis to Zunum data" to improve Boeing's plane.  (*Id.* at 20 (citing Ex.

1   A-1258).)  Zunum ignores Mr. Lutke's comment that this "side by side" was related to

2   "the need to do a secondary power and thermal analysis" not because Zunum's design

3   was better than Boeing's but rather because "[i]t was not clear that [Zunum] had properly

4   accounted for secondary power extraction . . . and thermal management in their design,"

5   and Boeing's team had a concern that Zunum's design "[s]eemed too small" in

6   comparison to Boeing's "[r]obust" design.  (Ex. A-1258.)  Zunum's final example is Mr.

7   Lutke's comment that Boeing should "look at the Embraer Phenom 100/300 for

8   maintenance costs" because that "seems to be what Zunum is basing theirs on" (Resp. at

9   21 (quoting Ex. A-1258)), but the Embraer Phenom is a ***different jet*** manufactured by a

10  ***different company*** that Boeing had previously "partnered" with.  (Ex. A-1258.)  Notably,

11  Mr. Lutke did not recommend looking at Zunum's analysis of the Embraer Phenom but

12  rather the jet itself.  Zunum also ignores portions of the spreadsheet suggesting that

13  Boeing lacked confidence in Zunum's maintenance costs, describing Zunum's "engine

14  maintenance" as "based on very aggressive technology assumptions."  (*Id.*; *see also id.*

15  (noting, with respect to airframe maintenance, that Boeing "can probably do better (but

16  not related to hybrid/electric)").)  None of these comments support an inference that

17  Boeing misappropriated information governed by the 2017 IRL to improve its

18  competitive position.

19          Zunum next argues that its co-founders "explained that when they received these

20  comments . . . they inferred that Boeing was using information shared at that meeting to

21  support Boeing's development efforts."  (Resp. at 21.)  Mr. Kumar's testimony, however,

22  is entirely conclusory, noting that the comments in the spreadsheet led him to assume that

1  "a major goal of [Boeing's] workshop . . . was to take insights from our program and put

2  that into Boeing's hybrid activities." (5/23/24 Tr. (Rough) at 40:24-41:1.)  Mr. Kumar

3  did not specifically identify any comments that supported his characterization of the

4  exhibit. (*See id.*)  The only comment Mr. Knapp pointed to is Mr. Lutke's comment

5  concerning "maintenance costs," testifying that Boeing wanted to see "what Zunum is

6  using" without informing the jury that Zunum's "benchmark" was an aircraft that Zunum

7  had nothing to do with. (5/17/24 Tr. (Rough) at 162:10-16.)

8       Simply put, Zunum fails to cite any evidence creating a non-speculative inference

9  that Boeing improperly used any information protected under the 2017 IRL during the

10  Thin Haul Study.  The court therefore concludes Zunum failed to provide substantial

11  evidence at trial to support a finding that Boeing's Thin Haul Study involved misuse of

12  confidential information disclosed under the 2017 IRL.

13           *iii.  Electric Lab*

14       Zunum argues that substantial evidence supports a finding that Boeing misused

15  IRL-governed information in the "E-Lab" for five reasons:  (1) Boeing needed to catch

16  up with its HE competitors; (2) Mr. Andrade "testified that there was evidence of use in

17  E-Lab"; (3) Zunum provided additional evidence of Boeing's "access" to Zunum

18  confidential information; (4) Dr. Karimi "admitted to proposing to partner with Safran

19  and others on programs and products that the jury could find similar to Zunum's"; and

20  (5) Boeing kept the electric lab "a secret from Zunum" because "it was meant to benefit

21  only Boeing." (Resp. at 19-20.)  The court considers Zunum's arguments in turn.

22  //

1        Zunum's first argument establishes a motive for Boeing to want to use Zunum's

2   technology in the electric lab.  Boeing does not respond to this argument (*see generally*

3   Reply), and the court agrees that Zunum introduced substantial evidence that Boeing was

4   at one point "behind" its competitors and seeking to "catch up" (Ex. 42 at 4).  Zunum's

5   issue, however, is connecting Boeing's desire to improve its position in the field with any

6   misuse of information disclosed under the 2017 IRL.

7        Mr. Andrade, the subject of Zunum's second argument, failed to provide the

8   evidence needed to make that connection.  Mr. Andrade testified that Boeing applied

9   knowledge it gained from Zunum "to enhance the capability of [the Electric] lab."

10  (5/22/24 Tr. (Rough) at 181:5-7.)  That testimony, however, was entirely conclusory.

11  Mr. Andrade testified that "there are many things that you have to do" to "upgrade" a lab

12  "to account for [the] much higher power" utilized in electric aircraft, but he never

13  identified what information, let alone information protected under the 2017 IRL, Boeing

14  used to "enhance" its Electric Lab or, if it did, what enhanced capabilities Boeing

15  implemented using proprietary Zunum information.  (*See id.* at 180:4-12.)  The only

16  "evidence of use" Zunum cites in Mr. Andrade's testimony (Resp. at 19) concerns a

17  "battery roadmap," but Mr. Andrade did not explain whether this roadmap was

18  confidential or what, if any, aspects of it Boeing purportedly used.  (*See* 5/22/24 Tr.

19  (Rough) at 144:5-16.)  Instead, Mr. Andrade merely testified that "sharing your

20  roadmap[] helps whoever is enhancing the lab." (*Id.* at 144:14-16.)  Mr. Andrade's

21  generalized testimony is distinguishable from the evidence discussed in Zunum's cited

22  case, in which the plaintiff presented specific evidence "detailing changes to . . . products

1    after" the alleged disclosure of trade secrets.  *UniRAM Tech., Inc. v. Taiwan*

2    *Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. Sept. 5, 2007).

3         Zunum's third argument rests upon "further evidence of 'access,'" primarily the

4    fact that "Karimi staffed his E-Lab team with engineers who worked on Thin Haul."

5    (Resp. at 19.)  This argument, however, says nothing about the confidential information

6    Boeing engineers allegedly took from the Thin Haul Study and incorporated into the

7    Electric Lab.  Regardless, as noted above, Zunum failed to provide substantial evidence

8    that Boeing's engineers misappropriated Zunum's confidential information during the

9    Thin Haul Study.

10        Zunum's fourth argument, that "Karimi admitted to proposing to partner with

11   Safran and others on programs and products that the jury could find similar to Zunum's,"

12   fails because Zunum provided no evidence of similarities between its confidential

13   information and any of Boeing's supposed "programs" or "products."  (Resp. at 20.)  The

14   only evidence of any such product or program concerns a 500 kilowatt motor Boeing

15   purchased from Safran (5/22/24 Tr. (Rough) at 198:21-23), but Zunum's expert testified

16   that such a motor was "sanctioned by the FAA" and "nothing unique."  (*Id.* at 139:19-23,

17   158:14.)  Indeed, Zunum ***publicly disclosed*** that its aircraft would have "a 1-megawatt-

18   class series hybrid-electric propulsion system with a 500-kW-class turbogenerator."  (Ex.

19   A-1225 at 2.)

20        Finally, Zunum points out that "Boeing kept the E-Lab a secret from Zunum," but

21   this argument says nothing about whether Boeing actually used Zunum's information in

22   the E-Lab, let alone whether such use was in violation of the 2017 IRL.  (Resp. at 20.)

1  Zunum has therefore failed to provide substantial evidence creating a non-speculative

2  inference that Boeing breached the 2017 IRL by using Zunum's confidential information

3  in the Electric Lab.

4          *iv. Electra*

5          Zunum argues that substantial evidence supports a finding that "Boeing used IRL

6  information to seed what was planned to be a new joint venture involving Boeing, which

7  later became Electra.aero." (*Id.* at 22.)  Boeing responds that Zunum fails to provide

8  evidence that Boeing misused Zunum's intellectual property in connection with Electra.

9  The court agrees with Boeing.

10         Zunum's circumstantial evidence of Boeing's use of its confidential information

11 fails to create more than a speculative inference that such use occurred.  Once again,

12 Zunum takes evidence out of context to support its argument.  For example, Zunum

13 argues that Steve Nordlund "proposed that the new venture '[i]nvestigate Zunum IP'" and

14 that "[t]he jury could infer that Boeing and Electra did what they said they were planning

15 to do." (*Id.* at 22 (citing Ex. 957 at 5).)  Zunum fails to mention that this "investigation"

16 was part of a future "Timeline" that first required Boeing and Electra to sign a

17 memorandum of understanding ("MOU") (Ex. 957 at 5), and unrefuted evidence

18 established that Boeing and Electra never signed an MOU and that Boeing did not end up

19 investing in Electra (5/23/24 Tr. (Rough) at 239:12-17).  Zunum next points out that

20 Electra's founder asked for "[f]ull indemnification . . . against any claims from Zunum"

21 in a redline (Resp. at 22 (quoting Ex. 2200 at 4)), but again, Boeing never agreed to that

22 request, and it says nothing about whether Boeing actually shared Zunum's information

ORDER - 46

1    with Electra.  Zunum points to another slide indicating that Electra was "buil[t] on

2    excellent work," but it does not identify any such "work" that was related to or derived

3    from information that was confidential under the 2017 IRL.  (*See id.* at 23 (quoting Ex.

4    957 at 3).)

5         Because Zunum failed to create more than a speculative inference that Boeing

6    improperly disclosed to Electra confidential information that was governed by the 2017

7    IRL, Zunum's claim that Boeing breached the 2017 IRL in this manner fails.

8         4.    Harm to Zunum

9         Zunum's breach of contract claim likewise fails because Zunum did not provide

10   substantial evidence of any harm resulting from Boeing's alleged breach.  Zunum argues

11   that "[t]he evidence was sufficient to support the jury's finding that Boeing's IRL

12   breaches caused the destruction of Zunum's business."  (*Id.* at 42.)  According to Zunum,

13   the evidence shows that Boeing (1) "advanced competing programs (using Zunum's

14   information) to engine majors such as Safran," which (2) caused "confusion" at Safran,

15   which (3) caused Safran to abandon its prospective $5 million investment in Zunum,

16   which (4) caused the destruction of Zunum's entire company, resulting in over $67

17   million in damages owed to Zunum by Boeing.  (*Id.*)  This theory rests on a series of

18   preposterous logical inferences rather than fact or evidence, and it is so groundless and

19   conjectural that it must be rejected.

20        To begin, Zunum's argument that "Boeing personnel . . . ***confirmed*** Boeing

21   advanced competing programs (***using Zunum's information***) to engine majors such as

22   Safran" mischaracterizes the evidence.  (*Id.* (emphasis added).)  None of the testimony

1   Zunum cites from its co-founder says anything about whether Boeing personnel

2   "confirmed" that Boeing was "using Zunum's information" to advance a competing

3   program with Safran, let alone whether that information was protected under the 2017

4   IRL.  (*See* 5/23/24 Tr. (Rough) at 23:12-24:3, 31:13-19.)

5        Zunum's next argument, that Dr. Karimi "scheduled meetings with Safran to

6   discuss 'Hybrid and All Electric airplanes' the same day as Safran met with Zunum"

7   (Resp. at 42 (citing Ex. 399)), likewise says nothing about whether Boeing was

8   advancing competing programs to Safran *using information protected under the 2017*

9   *IRL*.  (*See* 5/17/24 Tr. (Rough) at 147:1-5 (Zunum's co-founder noting that Boeing was

10  "allowed" "to compete in this space").)  Zunum argues that the timing of this meeting

11  suggests something nefarious, but Zunum ignores the portion of Exhibit 399 mentioning

12  that Boeing and Safran had several "existing projects" to discuss, all of which were

13  unrelated to Zunum.  (Ex. 399 at 1.  *See generally* Resp.)

14       Zunum's third argument, that Dr. Karimi "asked Safran to 'build a 500 kilowatt

15  motor for [the] electric lab," fails for the same reasons—Zunum does not explain how

16  Boeing misused confidential information governed by the 2017 IRL.  (Resp. at 42

17  (quoting 5/22/24 Tr. (Rough) at 198:21-23).)  Moreover, as discussed, above, there was

18  nothing confidential about the idea of a 500 kilowatt motor.

19       Zunum's fourth and fifth arguments fare no better because they, again, fail to

20  connect any of Boeing's interactions with Safran to information protected under the 2017

21  IRL.  (*See id.*)  Zunum calls attention to "Boeing internal documents indicat[ing] that the

22  Safran-Zunum investment was 'unlikely to close . . . due to concerns that its investment

1    would be seen as a negative to Boeing" (*id.* (quoting Ex. 613)), but there remains a

2    significant, unexplained gap separating Safran's decision not to pursue a deal with

3    Zunum and Boeing's alleged misuse of information protected under the 2017 IRL.

4    Zunum's final argument, that its co-founder "attributed Zunum's failure to Boeing's

5    misuse of Zunum's information to 'running off' with Zunum potential partners and

6    investors" (*id.* (quoting 5/23/24 Tr. (Rough) at 24:1-3)), is both vague and conclusory—

7    failing to identify the particular information with which Boeing allegedly "ran off."

8    What little evidence Zunum cites fails to create more than a speculative inference of

9    harm.

10          In sum, Zunum failed to provide substantial evidence at trial to support a finding

11   that Boeing breached the 2017 IRL or that Zunum suffered harm as a result of any such

12   breach.  The court therefore GRANTS Boeing's motion for judgment as a matter of law

13   on Zunum's claim for breach of the 2017 IRL.  This claim is DISMISSED with

14   prejudice.

15   **D.    Tortious Interference**

16          Finally, the court considers Boeing's argument in favor of judgment as a matter of

17   law on Zunum's claim for tortious interference with a business expectancy.  Boeing

18   argues that substantial evidence does not support the jury's verdict because Zunum failed

19   to establish that (1) a valid business expectancy existed, (2)  Boeing intentionally

20   interfered, (3) any alleged interference was by improper means or motivated by an

21   improper purpose, and (4) Boeing proximately harmed Zunum.  (Mot. at 39-45.)  Zunum

22   counters that substantial evidence supports each element of its claim for tortious

1    interference.  (*See* Resp. at 43-48.)  The court agrees with Boeing that Zunum failed to

2    provide substantial evidence that Zunum had a valid business expectancy with Safran and

3    therefore does not consider Boeing's remaining arguments.

4        1.    <u>Tortious Interference Standard</u>

5        To succeed on a claim for tortious interference with a business expectancy, a

6    plaintiff must establish:

7        (1) the existence of a valid contractual relationship or business expectancy;
         (2) that defendants had knowledge of that relationship; (3) an intentional
8        interference inducing or causing a breach or termination of the relationship
         or expectancy; (4) that defendants interfered for an improper purpose or used
9        improper means; and (5) resultant damage.

10    *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

11        2.    <u>Valid Business Expectancy</u>

12        The court agrees with Boeing that Zunum failed to provide substantial evidence of

13    a reasonable expectancy of a Safran investment.

14        To establish a valid business expectancy, the plaintiff must show that there was a

15    "prospective contractual or business relationship that would be of pecuniary value,"

16    *Newton Ins. Agency & Brokerage v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 33 (Wash.

17    Ct. App. 2002), and that the prospective relationship had "a reasonable expectancy of

18    fruition," *Scymanski v. Dufault*, 491 P.2d 1050, 1055 (Wash. 1971) (quoting *F. D. Hill &*

19    *Co. v. Wallerich*, 407 P.2d 956, 960 (Wash. 1965)).  An expectation "based on merely

20    wishful thinking" is not reasonable.  *Sea-Pac Co. v. United Food & Com. Workers Loc.*

21    *Union 44*, 699 P.2d 217, 220 (Wash. 1985); *see also Gordon v. Impulse Mktg. Grp., Inc.*,

22    No. CV-04-5125-FVS, 2006 WL 624838, at *2 (E.D. Wash. Mar. 9, 2006) (requiring the

1   plaintiff to show a "particular relationship or expectation[]"); *City of Clarkston v. Civ.*

2   *Serv. Comm'n-Fire*, No. 15119-1-III, 1997 WL 282501, at *3 (Wash. Ct. App. May 29,

3   1997) (same).

4         At trial, Zunum established that it had a prospective contractual relationship with

5   Safran, but substantial evidence does not support a finding that the contract had a

6   reasonable expectancy of fruition.  Zunum argues that it and Safran were planning to

7   close a deal in October 2018 (Resp. at 43), but the evidence established that Zunum and

8   Safran were miles apart from one another at that time due to Zunum's founders'

9   unwillingness to budge on their sky-high valuation of the company.  Dr. Kumar testified

10  that Safran was "quite concerned" with his proposed valuation of $160 to $220 million

11  contained in an August 31, 2018 email.  (5/23/24 Tr. (Rough) at 134:19-22; *see* Ex.

12  A-1616.)  Safran countered with a $40 million valuation, which Dr. Kumar described on

13  September 14, 2018 as "poor by any metric" and "[n]ot a good faith response."  (Ex.

14  A-1727 at 1.)  Indeed, Safran's offer was so "egregious" to Dr. Kumar that Zunum began

15  to shift its "focus . . . to generate alternatives to Safran financing."  (*Id.*)  The next day,

16  Mr. Knapp "candid[ly]" reported that "if we don't get terms out of Safran this week

17  we're going to have to ramp down."  (Ex. A-373 at 2.)  In late September or early

18  October 2018, Zunum "countered" with a proposed valuation of $89 million.  (Ex.

19  A-0121; 5/23/24 Tr. (Rough) at 52:15-17.)  Safran refused to go up, however, and stuck

20  with its initial $40 million valuation.  (*See* Ex. A-290 at 1.)  On October 25, 2018, Mr.

21  Knapp stated that Safran had "lowballed" Zunum and made "no attempt to provide [a]

22  fair valuation."  (Ex. A-384 at 2.)  On November 2, 2018, Dr. Kumar labeled Safran an

1  "adversar[y]" and said that its "offers of financing were no more than a front to get

2  visibility to our program, to hobble us with preferential contracts/ROFR, and to drain our

3  resources in never ending negotiation." (Ex. A-582 at 1.)  Even after furloughing their

4  employees, Zunum's founders still would not acquiesce to a lower valuation.  On January

5  5, 2019, Dr. Kumar wrote the following to Mr. Knapp:  "screw people who attack us for

6  $120M, or my $160-220M starting point.  And Safran at $40M is daylight robbery." (Ex.

7  A-290 at 1.)

8          Mr. Knapp's unfounded testimony that October 23, 2018 "was planned to be a big

9  closing day" and that Safran "sent a phalanx of vice presidents from France to go through

10  this and finalize this investment" falls well short of substantial evidence.  (5/17/24 Tr.

11  (Rough) at 177:6-11.)  Zunum introduced no additional evidence to corroborate Mr.

12  Knapp's testimony—no calendar events, emails, other documents, or testimony from

13  anyone at Safran; indeed, according to Boeing, Zunum did not even attempt to depose

14  anyone from Safran.  (Mot. at 39 n.10.)  The court concludes that the threadbare

15  testimony from Zunum's founders concerning the Safran deal amounts to no more than a

16  speculative inference that a deal with Safran was likely to close, and Zunum therefore

17  fails to surmount the substantial evidence standard.  The evidence presented at trial

18  supports only one conclusion:  Zunum did not have a reasonable expectation of a valid

19  business expectancy with Safran due to its founders' hubris.  Zunum's hope that Safran

20  would raise its valuation and pursue a deal on its founders' terms was nothing more than

21  wishful thinking.  *See Sea-Pac Co.*, 699 P.2d at 220.

22  //

1    Because Zunum failed to provide substantial evidence of a valid business

2    expectancy, the court need not consider Boeing's additional arguments.

3    Accordingly, the court GRANTS Boeing's motion for judgment as a matter of law

4    on Zunum's claim for tortious interference with a business expectancy.  This claim is

5    DISMISSED with prejudice.

6    **IV.   CONCLUSION**

7    For the foregoing reasons, the court GRANTS Boeing's motion for judgment as a

8    matter of law (Dkt. # 695).  Because Boeing has prevailed on all claims in this matter, the

9    court DENIES Zunum's motion for miscellaneous post-trial relief (Dkt. # 699) as moot.

10   The court VACATES its prior judgment (Dkt. # 686) and will enter judgment in Boeing's

11   favor.

12   Dated this 14th day of August, 2024.

13   _____

14   JAMES L. ROBART
     United States District Judge

15

16

17

18

19

20

21

22